## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| MICHAEL LEWITTER, Individually and on Behalf of All Others Similarly Situated, | **Case No.** |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| TERRAN ORBITAL CORPORATION, MARC H. BELL, MATHIEU RIFFEL, GARY A. HOBART, and STRATTON SCLAVOS, | |
| Defendants. | |

Plaintiff Michael Lewitter ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Terran Orbital Corporation ("Terran" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Terran securities between

1

August 15, 2023 and August 14, 2024, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Terran manufactures and sells satellites for aerospace and defense industries in the U.S. and internationally.  Historically, Lockheed Martin Corporation ("Lockheed") has been one of Terran's most significant stakeholders and customers.  As of October 31, 2022, Lockheed owned approximately 9.5% of Terran's stock, and by May 2, 2024, Lockheed owned an approximate 28.3% stake in the Company.  Likewise, as of December 21, 2021, contracts with Lockheed represented approximately 50% of Terran's consolidated revenues, whereas Lockheed comprised approximately 70% of Terran's consolidated revenues during the three months ended June 30, 2024.

3.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) it would take much longer than Defendants had represented to investors and analysts for Terran to convert its contracts with its customers (collectively, "Customer Contracts") into revenue and free cash flow; (ii) Terran did not have adequate liquidity to operate its business while waiting for the Customer Contracts to generate revenue and free cash flow; (iii) Terran had concealed the true scope and severity of its dire financial situation; and (iv) as a result of the foregoing, Terran's public statements were materially false and misleading at all relevant times.

4.      In February 2023, Terran issued a press release announcing that its wholly owned subsidiary Tyvak Nano-Satellite Systems, Inc. ("Tyvak") had been awarded a $2.4 billion contract

from Rivada Space Networks GmbH ("Rivada") to produce a total of 300 satellites for Rivada (the "Rivada Contract").  Throughout the Class Period, Defendants repeatedly represented to investors and analysts that Terran would rapidly convert the Rivada Contract and other Customer Contracts into revenue and free cash flow, and that Terran had ample liquidity to operate its business while waiting to generate revenue and free cash flow from the Customer Contracts.

5.      On March 1, 2024, Lockheed made a non-binding offer to acquire all of Terran's outstanding common stock for $1.00 per share in cash (the "Initial Buyout Offer").

6.      On May 2, 2024, Lockheed disclosed in an SEC filing that, "[o]n April 30, 2024, [it] notified [Terran] that it was withdrawing the [Initial Buyout Offer]."

7.      On this news, Terran's stock price fell $0.22 per share, or 17.05%, to close at $1.07 per share on May 3, 2024.

8.      On August 12, 2024, Terran filed its quarterly report for the second quarter of 2024 with the SEC, revealing, *inter alia*, that the Company had only $14.6 million in cash and debt of approximately $300 million as of June 30, 2024, as well as that it had removed the Rivada Contract from its backlog, thereby reducing the Company's total backlog by ***over 88%*** from $2.7 billion to a mere $312.7 million as of June 30, 2024.

9.      On this news, Terran's stock price fell $0.06 per share, or 8.45%, to close at $0.65 per share on August 12, 2024.

10.     Then, on August 15, 2024, Terran and Lockheed issued a joint press release announcing that they had entered into a definitive agreement whereby Lockheed would acquire Terran for $0.25 per share in cash ("Transaction").  The sale price was well below the (i) $0.40 per share price at which the Company's stock had closed the day prior, and (ii) the $1.00 per share price that Lockheed had offered in its Initial Buyout Offer.

11.     On this news, Terran's stock price fell $0.157 per share, or 39.25%, to close at $0.243 per share on August 15, 2024.

12.     On September 9, 2024, Terran filed a preliminary proxy ("Proxy") with the SEC in connection with the Transaction. The Proxy revealed that the reason Lockheed had withdrawn the Initial Buyout Offer, and was only willing to offer $0.25 per share in cash to acquire Terran, was because Terran had long suffered from severe liquidity challenges and was on the verge of bankruptcy. The Transaction announced on August 15, 2024, thus represented a materialization of the risks posed by Terran's severe liquidity challenges that Defendants had deliberately concealed from Terran stockholders throughout the Class Period.

13.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

16.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Terran is headquartered in this District, Defendants conduct business in this District, and a significant portion of Defendants' actions took place within this District.

17.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

18.     Plaintiff, as set forth in the attached Certification, acquired Terran securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

19.     Defendant Terran is a Delaware corporation with principal executive offices located at 6800 Broken Sound Parkway NW, Suite 200, Boca Raton, Florida 33487.  The Company's common stock and warrants trade in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbols "LLAP" and "LLAP WS," respectively.

20.     Defendant Marc H. Bell ("Bell") has served as Terran's Chairman and Chief Executive Officer ("CEO") at all relevant times.  Defendant Bell is also a co-founder of the Company.

21.     Defendant Mathieu Riffel ("Riffel") served as Terran's acting Chief Financial Officer ("CFO") from September 15, 2023 to June 17, 2024.

22.     Defendant Gary A. Hobart ("Hobart") served as Terran's CFO from before the start of the Class Period to September 15, 2023.

23.     Defendant Stratton Sclavos ("Sclavos") has served as a purported "independent" Director on Terran's Board of Directors (the "Board") at all relevant times.  Defendant Sclavos currently serves as the Company's Chairman of the Compensation Committee.

24.     Defendants Bell, Riffel, Hobart, and Sclavos are collectively referred to herein as the "Individual Defendants."

25.     The Individual Defendants possessed the power and authority to control the contents of Terran's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Terran's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Terran, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

26.     Terran and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

27.     Terran manufactures and sells satellites for aerospace and defense industries in the U.S. and internationally.  The Company provides modern facilities and a global ground station network that delivers end-to-end satellite solutions, including spacecraft design, development, launch services, and on-orbit operations for critical missions across a number of applications to governmental agencies and commercial businesses.

28.     Historically, Lockheed has been one of Terran's most significant stakeholders and customers.  As of October 31, 2022, Lockheed owned approximately 9.5% of Terran's stock, and

by May 2, 2024, Lockheed owned an approximate 28.3% stake in the Company.  Likewise, as of December 21, 2021, contracts with Lockheed represented approximately 50% of Terran's consolidated revenues, whereas Lockheed comprised approximately 70% of Terran's consolidated revenues during the three months ended June 30, 2024.

29.     On February 22, 2023, Terran issued a press release announcing that its wholly owned subsidiary Tyvak had been awarded a $2.4 billion contract to produce a total of 300 satellites for Rivada.  The Rivada Contract represented more than ten times Terran's total market cap and backlog at the time.

30.     Following Terran's announcement of the Rivada Contract, the Company's stock price rose $1.22 per share, or *71.35%*, to close at $2.93 per share on February 22, 2023.

### Materially False and Misleading Statements Issued During the Class Period

31.     The Class Period begins on August 15, 2023.  On August 14, 2023, during after-market hours, Terran issued a press release announcing its second quarter 2023 results (the "2Q23 Earnings Release").  The 2Q23 Earnings Release highlighted Terran's "[b]acklog of over $2.6 billion"—$2.4 billion of which was attributable to the  Rivada Contract—"represent[ing an] over 1,400% increase since December 31, 2022[.]"  The 2Q23 Earnings Release asserted that this backlog "includes over 370 satellites of which the majority are expected to be completed in the next three years" and that Defendants "estimate approximately 80% [of this backlog] to be recognized as revenue by December 31, 2025."  Accordingly, the 2Q23 Earnings Release represented that Defendants "expect a steep ramp in revenue ahead and confirm our expectation of generating in excess of $250 million in revenue in 2023."

32.     In addition, the 2Q23 Earnings Release quoted Defendant Bell as stating, in relevant part:

> I am excited to report our positive momentum continues. First half 2023 highlights include increasing our backlog to $2.6 billion from our new constellation awards. We now have over 30 programs and over 370 satellites on contract. We estimate 80% of our backlog will convert into revenue during the next two and a half years. The development phase of the Rivada [Contract] is ramping up and is on schedule. Rivada remains current on all payments, and material milestone payments are expected in the second half of this year.

33.     Also on August 14, 2023, during after-market hours, Terran filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2023 (the "2Q23 10-Q").  With respect to the Rivada Contract, the 2Q23 10-Q stated, in relevant part:

> As of June 30, 2023, the Company had approximately $2.6 billion of remaining performance obligations, of which $2.4 billion is related to the Rivada [Contract]. The Company estimates that approximately 80% of the remaining performance obligations will be recognized as revenue by December 31, 2025 and the remainder by December 31, 2027.

34.     Appended as exhibits to the 2Q23 10-Q were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Bell and Hobart certified that the 2Q23 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report"; and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report[.]"

35.     On August 15, 2023, Terran hosted a conference call with investors and analysts to discuss the Company's second quarter 2023 results (the "2Q23 Earnings Call").  During the 2Q23 Earnings Call, Defendant Bell stated, *inter alia*, that "we are anticipating invoicing and collecting approximately $180 million from Rivada in the second half of 2023"; that "[w]e estimate that

approximately 80% of our $2.6 billion backlog will be converted to revenue by the end of 2025";

and that "[w]e believe this increase in backlog will drive revenue growth this year and beyond."

36.     Also during the 2Q23 Earnings Call, Defendant Hobart stated, *inter alia*, that "I'm

happy to report that we are on a clear path to increase revenue and improve profitability" while

repeating Defendant Bell's estimate that "approximately 80%" of Terran's $2.6 billion in backlog

would "be recognized as revenue by December 31st, 2025," and adding that "[w]e expect a steep

ramp in revenue ahead and confirm our expectation of generating in excess of $250 million in

revenue in fiscal year 2023."

37.     During the question-and-answer ("Q&A") portion of the 2Q23 Earnings Call, in

response to analyst questions, Defendant Hobart projected that the Company would be free-cash-

flow-breakeven in the second half of 2023 and free-cash-flow-positive at some point in 2024:

> **[Analyst]:** And then maybe just on free cash flow. You raised some money in the
> quarter, but I appreciated the disclosure around the money that you expect from
> Rivada . . . . I mean when you think about those moving pieces, are you expecting
> to be free cash flow positive for the second half of the year? And how are you kind
> of thinking about free cash flow generation in general, given working capital needs?
>
> **[Defendant] Hobart:** [. . . .] We have a backlog from invoicing and performance
> and our expectations from our EACs [cost estimates-at-completion], which are
> basically our budgets for our program. ***Sufficient capital to be free cash flow
> positive on a run rate basis by the beginning or during 2024. It will be plus or
> minus in the second half year of the year. So the cash flow we generate from our
> programs and invoicing and collection and invoicing should cover our needs
> going forward, and we'll start seeing that ramp up even more so going into 2024***.

38.     In response to another analyst's inquiry regarding "the capital plan at this point

going forward" and "how . . . [Defendants] think about raising cash to the extent that [they] need

to," Defendant Bell stated, in relevant part:

> It's really just about timing of payments at this point. Right now, the last thing any
> of us want to do is raise additional cash . . . . I don't want the dilution . . . . Last
> thing I wanted any dilution. So it's really just about timing of payments. If things

work out as planned, we will be in pretty good shape. So right now, everything is lining up well for us.

39.    The statements in paragraphs 31-38 above were materially false and misleading because, for among other reasons, Defendants knew that Terran (i) would not be able to convert 80% of its $2.6 billion into backlog into revenue by December 31st, 2025, (ii) would not be free-cash-flow-breakeven in the second half of 2023 and free-cash-flow-positive at some point in 2024, and (iii) was instead experiencing severe liquidity challenges.

40.    As of October 26, 2023, Rivada had paid Terran just $5 million.  That same day, Defendant Sclavos, who served on the Special Committee, appeared at a public virtual town hall meeting together with Defendant Bell, at which he stated, in relevant part:

> I am happy to be here today representing the independent Directors of Terran Orbital. Now the independent directors consist of 6 individuals with decades of combined public company board experience and professional experience themselves within military, within financial management and technology. The board routinely reviews and deliberates on management's plans and strategic proposals. Including business development, manufacturing expansion and capital requirements and funding sources. And while, as [Defendant Bell] said, the Space SPAC market has created headwinds for the company's stock performance, the independent Board members unequivocally support [Defendant Bell] and the entire Terran Management team . . . . ***Under [Defendant Bell]'s leadership . . . the company has raised over a half billion dollars of capital which has been deployed efficiently and effectively to support growth.*** Since taking over as CEO in March 2021, [Defendant Bell] has also increased LTM [last twelve months] revenue by 4x.

> \* \* \*

> In summary, I believe the Board and Management team's interests are closely aligned with those of our shareholders. ***The company's strategy is sound and delivering, management is focused on strategic execution and increasing shareholder value. The independent directors believe that under [Defendant Bell]'s continued leadership Terran Orbital will soon achieve escape velocity in this rapidly growing market for small satellites and busses.***

(Emphases added.)

41.     The statements in paragraph 40 were materially false and misleading because, for among other reasons, Defendant Sclavos did not believe his statement that "under [Defendant Bell]'s continued leadership Terran Orbital will soon achieve escape velocity in this rapidly growing market for small satellites and busses." To the contrary, Sclavos was a member of a Special Committee that, unbeknownst to investors, was formed by Terran's board of directors on September 11, 2023, to, among other things, "address issues and considerations related to, among other things, ***the Company's cash needs relative to projected liquidity position due to concerns raised with the Board by management of the Company***." In other words, when Sclavos made the statement above, he know that Terran was experiencing severe liquidity challenges and could succeed in increasing shareholder, but instead was far more likely to destroy shareholder value.

42.     On November 14, 2023, during pre-market hours, Terran issued a press release announcing its purported "[r]ecord" third quarter 2023 results (the "3Q23 Earnings Release"). The 3Q23 Earnings Release disclosed that "[d]ue to the delay and uncertainty regarding the timing of performance related to our contract with Rivada versus our original expectations, we are removing any further revenue contribution from this contract in our current year forecast" and, "[a]s a result of this removal and other factors, we now expect 2023 revenue to be in excess of $130 million, a reduction from our prior expectation of generating revenue in excess of $250 million in 2023."

43.     On this news, Terran's stock price fell $0.036 per share, or 4.81%, to close at $0.712 per share on November 14, 2023. Despite this decline in the Company's stock price, Terran securities continued trading at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions regarding, *inter alia*, the Rivada Contract, Terran's cash and/or other liquidity challenges, and the true scope and severity of the Company's dire financial situation.

44.     For example, the 3Q23 Earnings Release assured investors that Defendants "continue to expect revenue contribution in future years" from the Rivada Contract.

45.     Likewise, the 3Q23 Earnings Release continued to report that Terran's "backlog totaled $2.6 billion" with "$2.4 billion related to our contract with Rivada," assuring investors that Terran's "backlog reflects business associated with *contracts that are considered to be firm*."

46.     The 3Q23 Earnings Release also quoted Defendant Bell as stating, in relevant part:

> I am pleased to report our company's continued growth in revenue . . . . In addition, we are seeing improvements in our gross profit and adjusted gross profit margins . . . . We are still in the early stages of leveraging our enhanced capabilities from our investments in our supply chain . . . . We believe these investments will help us position ourselves to win major customer awards while improving our operating metrics.

47.     Also on November 14, 2023, Terran filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2023 (the "3Q23 10-Q"). With respect to the Rivada Contract, the 3Q23 10-Q stated, in relevant part:

> As of September 30, 2023, the Company had approximately $2.6 billion of remaining performance obligations, of which $2.4 billion is related to the Rivada [Contract]. While the Rivada [Contract] is subject to uncertainty regarding the timing of performance, *the Company estimates that all of its performance obligations will be satisfied and recognized as revenue by December 31, 2027.* Of the remaining performance obligations, *approximately $187 million is expected to be recognized as revenue by December 31, 2025*.

(Emphases added.)

48.     Appended as exhibits to the 3Q23 10-Q were substantively the same SOX certifications as referenced in ¶ 34, *supra*, signed by Defendants Bell and Riffel.

49.     On November 15, 2023, Terran hosted a conference call with investors and analysts to discuss the Company's third quarter 2023 results (the "3Q23 Earnings Release"). During the 3Q23 Earnings Call, Defendant Bell assured investors that "our current expectation [is] that we

will have sufficient cash to cover capital investments and operations until becoming cash flow positive, which is expected in 2024."

50.     During the Q&A portion of the 3Q23 Earnings Call, in response to an investor's inquiry regarding whether Terran had "enough cash to make it through to cash flow positive" even without any additional payments from Rivada, Defendant Bell answered unequivocally, "[y]es, we do."  Likewise, when asked "with or without Rivada, what is the earliest possible quarter you see becoming cash flow positive, and worst-case scenario, what's the latest down the road you see it happening?", Defendant Bell responded: "We're still currently going through our 2024 budget and forecast cycle. So earliest will be Q1, late will be Q4, but the plan is to be cash flow positive during 2024."

51.     The statements referenced in ¶¶ 44-50 were materially false and misleading because Defendants made false and/or misleading statements and/or failed to disclose that: (i) Terran was unlikely to receive the vast majority of revenues that it had initially announced under the Rivada Contract; (ii) Terran was experiencing significant cash and/or other liquidity challenges; (iii) Terran was concealing the true scope and severity of its dire financial situation; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

52.     On December 11, 2023, during pre-market hours, the *WSJ* reported that Terran was conducting a formal review of strategic alternatives to maximize shareholder value and had engaged Jefferies  to provide transaction advisory services in connection with this process, which could include an investment, sale of the Company, "take private" transaction, or an alternative strategic relationship.

53.     Thereafter the same day, also during pre-market hours, Terran filed a current report on Form 8-K with the SEC confirming the revelations in the *WSJ* Report, stating, in relevant part:

> As reported by the [*WSJ*] . . . Terran . . . is conducting a formal review of strategic alternatives to maximize shareholder value. The Company has engaged Jefferies LLC to provide transaction advisory services in connection with this process, which may include an investment, sale of the Company, "take private" transaction or an alternative strategic relationship.
>
> The Company has not set a definitive timetable for completion of the strategic review or any resulting transaction, and there can be no assurance regarding the results or outcome of this process. It is possible that the Company does not pursue a strategic alternative or that a transaction is not consummated.

54.     On this news, Terran's stock price fell $0.305 per share, or 29.61%, to close at $0.725 per share on December 11, 2023.  Despite this decline in the Company's stock price, Terran securities continued trading at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions regarding, *inter alia*, the Rivada Contract, Terran's cash and/or other liquidity challenges, and the true scope and severity of the Company's dire financial situation.

55.     For example, on January 2, 2024, Terran issued a press release "announc[ing] that it had received a payment from [Rivada] pursuant to the [Rivada Contract,]" while assuring investors that the Company would receive additional payments under the Rivada Contract and dissuading further inquiries into the subject, stating, in relevant part:

> The amount was for the completion of a program milestone. As a result, Rivada is current on all outstanding invoices. The Company expects to receive additional milestone payments in 2024 and continues to expect to meet its delivery obligations under the Rivada Contract on schedule in 2025 and 2026.
>
> As a privately held company, Rivada is not required to report any information regarding its financial or operational performance. Consequently, at Rivada's request, the Company does not plan to provide any further updates or otherwise publicly comment on the Rivada Contract, including but not limited to the status, timing and amount of any future payments to be made under such contract, except as required by the [SEC] or in updates in connection with the Company's quarterly and annual financial reporting. Any inquiries regarding Rivada or the Rivada Contract should be directed to Brian Carney, Corporate Communications, Rivada Networks, bcarney@rivada.com.

56.     In a separate press release issued by Terran the same day to "pre-announce[] its 2023 year-end cash balance," Defendant Bell was quoted as stating that "[w]e are entering 2024 with a strong financial foundation that we believe will enable us to continue to execute on our strategic and operational objectives[.]"

57.     On February 7, 2024, in an interview with investor media outlet *Seeking Alpha*, Defendant Bell repeatedly asserted that Terran was not in need of cash, stating, *inter alia*, that "[w]e've made it very public that we are not looking to raise money"; that "[i]t's just getting people comfortable that we don't need cash"; that "[w]e're doing just fine" and there is "disconnect in the market" and "[w]e have no intentions of raising any more money" which "is the last thing we want to do"; and that "[w]e just want to get the world to see that [Terran is] a very different company than it was 36 months ago."

58.     The statements in paragraphs 55-57 above were materially false and misleading because, for among other reasons, Defendants knew that Terran (i) did not expect to receive additional payments from Rivada in 2024, and (ii) desperately needed cash and would need to raise more money to alleviate its severe liquidity challenges.

59.     On March 1, 2024, during after-market hours, Lockheed filed an amended general statement of acquisition of beneficial ownership on Form SC 13D/A with the SEC, disclosing that it had made a non-binding Initial Buyout Offer to acquire all of Terran's outstanding common stock for $1.00 per share in cash.

60.     On March 3, 2024, Terran issued a press release announcing that it had adopted a limited duration stockholder rights plan and formed an independent committee of the Board to determine the best course of action for the Company following Lockheed's Initial Buyout Offer, stating, in relevant part:

[T]he [Board] adopted a limited duration stockholder rights plan (the "Rights Plan"), which is intended to enable all stockholders to realize the full value of their investment in Terran Orbital. The Board adopted the Rights Plan following [the] non-binding [Initial Buyout Offer] from Lockheed . . . on March 1, 2024 to acquire all outstanding shares of the Company's common stock for cash. Consistent with its fiduciary duties and in consultation with its financial and legal advisors, an independent committee of the Board will review and evaluate the [Initial Buyout Offer] as part of the Company's ongoing review of strategic alternatives to determine the course of action that it believes will maximize value for the Company's stockholders. However, there is no guarantee that a strategic transaction involving Lockheed Martin or any other party will be approved or consummated. The independent committee does not intend to provide any updates with respect to the [Initial Buyout Offer] or any other transaction, unless and until it deems further disclosure is appropriate.

The Rights Plan will reduce the likelihood that any person or group gains control of the Company through open market accumulation, or other coercive tactics potentially disadvantaging the interests of all stockholders, without paying all stockholders an appropriate control premium or providing the Board sufficient time to make informed decisions in the best interest of all stockholders. The Rights Plan is not intended to interfere with any transaction that the Board determines to be in the best interests of stockholders, nor does the Rights Plan prevent the Board from considering any proposal, but is intended to encourage anyone seeking to acquire the Company, including Lockheed Martin, to negotiate with the Board prior to attempting to impose a transaction that is not in the best interests of the Company's stockholders.

61.     On April 1, 2024, Terran issued a press release announcing its purported "[r]ecord" full year 2023 results (the "FY23 Earnings Release").  The FY23 Earnings Release reported that Terran's "backlog totaled $2.7 billion as of December 31, 2023, of which $2.4 billion is related to Rivada" and included "300 satellites for Rivada" among its agreements comprising "$2.7 billion in new contracts" for 2023.

62.     In addition, the FY23 Earnings Release quoted Defendant Bell as stating, in relevant part:

I am pleased to report our company's strong results for 2023. Our revenue growth and gross margin improvement affirm the strength of our strategy and execution. The future of space is responsive, and Terran Orbital is well-positioned to capitalize on this growing market segment.

16

63.     Unusually, the 4Q/FY23 Earnings Release advised that, "[i]n light of the Company's ongoing strategic review, management has decided to cancel its previously scheduled fourth quarter and full-year 2023 earnings call."

64.     Also on April 1, 2024, Terran filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2023 (the "2023 10-K").  With respect to the Rivada Contract, the 2023 10-K stated, *inter alia*:

> As of December 31, 2023, the Company had approximately $2.7 billion of remaining performance obligations, of which $2.4 billion is related to the Rivada [Contract] . . . . The Company estimates that approximately 80% of the remaining performance obligations will be recognized as revenue by December 31, 2025 and the remainder by December 31, 2026.

65.     Appended as exhibits to the 2023 10-K were substantively the same SOX certifications as referenced in ¶ 34 *supra*, signed by Defendants Bell and Riffel.

66.     The statements referenced in ¶¶ 61-65 were materially false and misleading because Defendants made false and/or misleading statements and/or failed to disclose that: (i) Terran was unlikely to receive the vast majority of revenues that it had initially announced under the Rivada Contract; (ii) Terran was experiencing significant cash and/or other liquidity challenges; (iii) Terran was concealing the true scope and severity of its dire financial situation; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

67.     On May 2, 2024, during after-market hours, Lockheed filed an amended general statement of acquisition of beneficial ownership on Form SC 13D/A with the SEC, disclosing that "[o]n April 30, 2024, [it] notified [Terran] that it was withdrawing the [Initial Buyout Offer]."

68.     The market quickly reacted negatively to the foregoing news.  For example, also on May 2, 2024, during after-market hours, *Seeking Alpha* published an article entitled "Terran Orbital plunges as Lockheed Martin withdraws takeover offer," stating, in relevant part:

Terran Orbital (NYSE:LLAP) plummeted 13% in after hours trading after Lockheed Martin (NYSE:LMT) withdrew its takeover offer.

Lockheed Martin (LMT) notified Terran Orbital (LLAP) that it was withdrawing its offer on Thursday, according to a 13D filing. Lockheed plans to review its investment in the company on a continuing basis and may from time to time and at any time in the future review or reconsider their position.

69.     On this news, Terran's stock price fell $0.22 per share, or 17.05%, to close at $1.07 per share on May 3, 2024.  Despite this decline in the Company's stock price, Terran securities continued trading at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions regarding the Rivada Contract, Terran's cash and/or other liquidity challenges, the availability and viability of adequate strategic alternatives to the Initial Buyout Offer, and the true scope and severity of the Company's dire financial situation.

70.     For example, also on May 2, 2024, Terran issued a press release "confirm[ing] its ongoing strategic review to maximize shareholder value" which purportedly "allows [Defendants] to explore all options."

71.     On May 14, 2024, Terran issued a press release announcing its first quarter 2024 results (the "1Q24 Earnings Release").  The 1Q24 Earnings Release reported that, "[a]s of March 31, 2024, [Terran's] backlog was $2.7 billion, of which $2.4 billion was related to our contract with Rivada," assuring investors that the Company's "backlog reflects business associated with *contracts considered to be firm*."

72.     With respect to Terran's ongoing review of strategic alternatives, the 1Q24 Earnings Release stated, in relevant part:

As previously announced, a special committee of Terran Orbital's board of directors composed solely of independent and disinterested directors, consistent with its fiduciary duties and in consultation with its financial and legal advisors, has engaged in an ongoing proactive process to evaluate strategic opportunities that

are or may be available to the Company, ***including maintaining the status quo and continuing to operate as a standalone, independent publicly traded company***, to determine the course of action that it believes will maximize value for the company's stockholders.

(Emphasis added.)

73.     In addition, the 1Q24 Earnings Release quoted Defendant Bell, who likewise

asserted, in relevant part:

> We remain committed to exceeding customer expectations and delivering cutting-edge satellite solutions while our strategic review is still ongoing. ***This process includes a range of options, including staying independent.***

(Emphasis added.)

74.     The same day, Terran hosted a conference call with investors and analysts to

discuss the Company's first quarter 2024 results (the "1Q24 Earnings Call").  During his prepared

remarks on the 1Q24 Earnings Call, Defendant Bell went "off script" to stress to investors that the

Rivada Contract remained an "amazing program" for Terran, as well as asserted that the Company

had visibility to achieving significant revenues within the next two years and billions of dollars in

its pipeline, stating, in relevant part:

> I'm going to go a little off script here for a minute, if you don't mind. I don't think people are realizing, ***we have Rivada, which is this amazing program*** that we won last year. But people are realizing ***we have $400 million of signed backlog, which becomes revenue, and it becomes revenue over the course of the next 18 to 24 months. So that's money that will build***, the bulk of it is from Lockheed Martin, and we're very appreciative of our relationship with Lockheed Martin and it continues to grow stronger every day.
>
> \* \* \*
>
> [W]e're going to be moving more and more and to do more classified work, more and more work for the government and the DoD [U.S. Department of Defense]. And I think ***these are important metrics to see how that $400 million becomes revenue. And I don't think people are quite grasping that*** because we realized it looks like revenues were down this quarter, but we've just under 50 space vehicles that will be delivered in 2024 alone.

* * *

> As of March 31, ***we have over $25 billion of identified pipeline***, over 140 programs across a globally diverse customer set . . . . Our current capacity, we are positioned to execute on multiple mega-constellations of space vehicles such as [*inter alia*] . . . Rivada and many others[.]

* * *

> ***[T]he future of the next $400 million of orders that we're delivering and beyond, the impact of that will be significant on our financial statements as we drive to become EBITDA positive***.

(Emphases added.)

75. In addition, presumably with respect to delays from Rivada and Terran's attendant need to cut costs, Defendant Bell stated, in relevant part:

> [O]ther challenges have been the timing of orders in difficult capital markets, which have constrained available capital for our customers' constellation plans. Our customers have to raise money on the commercial space, not the DoD space, and we are very cognizant of that. We share our shareholders' frustration with some delays our company and industry have experienced. With that, ***we are steadfast in our confidence in long-term prospects of the industry and our company's positioning***.
>
> ***As a result of these delays, our team responsibly throttled back capital expenditures, tightened discretionary expenditures***, the intent was to flex appropriately to the delays, while preserving the option to ramp capacity as demand for these pending mega constellations may acquire.

(Emphases added.)

76. With specific respect to Rivada, Defendant Bell continued, in relevant part:

> Regarding the company's program with Rivada, we continue to execute on the program, although it was a modest contributor to our first quarter revenue, ***we have agreed in principle on a payment schedule that we will believe will keep the program on track and make the launch timetable***.

(Emphasis added.)

77. With respect to Lockheed's withdrawn Initial Buyout Offer and Terran's strategic alternatives, Defendant Bell stated, in relevant part:

Now I'd like to provide an update on our strategic review process. On March 1, we received an all-cash proposal from Lockheed Martin, one of our largest stakeholders and partners, Lockheed who already owns or has the right to acquire approximately 27.7% of Terran shares proposed by all Terran shares of price at $1 a share, which represented a 6.5% discount to the then current market price of $1.07.

In response, Terran Orbital adopted a shareholder rights plan. The shareholders' right plan was intended to encourage anyone seeking to acquire the company, including Lockheed Martin, to negotiat[e with] the Board but prior to attempting to oppose a transaction that is not in the best interest of such stakeholders.

A special committee of the Board was diligently evaluating the Lockheed Martin proposal as part of the company's ongoing strategic review alternatives, including direct engagement with Lockheed Martin. On April 30, Lockheed Martin withdrew the [Initial Buyout Offer]. However, the strategic review is still ongoing and allows us to explore all options. There is no guarantee, however, this will result in any transaction or a strategic alternative.

78.    Also during the 1Q24 Earnings Call, Defendant Riffel stated, in relevant part:

Our backlog at the end of the quarter was $2.7 billion, of which $2.4 billion was related to our contract with Rivada and approximately $300 million was related to non-Rivada programs. As of today, backlog is estimated to be over $2.8 billion, inclusive of approximately $400 million of non-Rivada programs due to our second quarter awards, which have exceeded $100 million so far.

Our programs generally take 18 months to 24 months to complete, and *our backlog is expected to be fully recognized as revenue by the end of 2026*.

(Emphasis added.)

79.    During the Q&A portion of the 1Q24 Earnings Call, in response to an investor's inquiry regarding Terran's cash balance and whether "it would be safe to assume that you're comfortable with your liquidity position," Defendant Bell answered unequivocally: "*Yes. We feel very comfortable with our liquidity position as it stands today*."

80.    When asked by the same investor regarding the status of the Rivada Contract, Defendant Bell responded:

As of right now, *everything is on track*. We're on the precursor satellites with Rivada, they have asked that all detailed questions [regarding] Rivada go to them.

They want to be able to control their own narrative on this. ***But right now, we're tracking based on the schedule we have.***

(Emphases added.)

81.    In response to another investor's question regarding whether Terran would meet certain covenants in one of its debt agreements requiring a minimum cash balance of $20 million by the end of the Company's second quarter of 2024, Defendant Riffel responded that "[w]e do not have any concerns about that covenant at this time" and Defendant Bell chimed in: "The answer is yes. We'll meet the requirements; we're well positioned to do this."

82.    In response to yet another inquiry regarding the Rivada Contract, particularly, whether it might "fall apart" and the potential impact that would have on Terran's business, Defendant Bell asserted it would have no impact on the Company going forward:

> **Unidentified Analyst:** [. . . .] This is a Rivada question. Evidently, they do not have all their financing in place to build the 600-satellite array that you will be constructing. That's my understanding. So therefore, are there concerns that this whole thing could fall apart, and have a major impact on your business operations in the future because the capital is not available to pay for the build-out of the satellites for which you've contracted?
>
> **[Defendant] Bell:** And so there are really two different questions there. As far as Rivada goes, I can't comment on what they have or don't have. That's a question for Rivada. On – but I can comment on, does it affect us? And ***no, it doesn't have any impact on us going forward***. We have lots of other customers as you could see with this way, Rivada's for the 300 space vehicles with us, Lockheed alone has already placed orders for over 100 space vehicles with us. So it is – ***it's just upside for us at the end of the day***.

(Emphases in bold and italics added.)

83.    Also on May 14, 2024, Terran filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2024 (the "1Q24 10-Q").  With respect to the Rivada Contract, the 1Q24 10-Q stated, in relevant part:

> As of March 31, 2024, the Company had approximately $2.7 billion of remaining performance obligations, of which $2.4 billion is related to the Rivada [Contract] .

. . . The Company estimates that approximately 80% of the remaining performance obligations will be recognized as revenue by December 31, 2025 and the remainder by December 31, 2026.

84.     Appended as exhibits to the 1Q24 10-Q were substantively the same SOX certifications as referenced in ¶ 34 *supra*, signed by Defendants Bell and Riffel.

85.     The statements referenced in ¶¶ 70-84 were materially false and misleading because Defendants made false and/or misleading statements and/or failed to disclose that: (i) Terran was unlikely to receive the vast majority of revenues that it had initially announced under the Rivada Contract; (ii) Terran was experiencing severe cash and/or other liquidity challenges; (iii) Terran overstated the availability and viability of adequate strategic alternatives to the Initial Buyout Offer; (iv) as a result of all the foregoing, Terran had concealed the true scope and severity of its dire financial situation; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Fully Emerges

86.     On August 12, 2024, during pre-market hours, Terran filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its second quarter ended June 30, 2024 (the "2Q24 10-Q").  The 2Q24 10-Q revealed, *inter alia*, that the Company had only $14.6 million in cash, in addition to debt of approximately $300 million as of June 30, 2024.  The 2Q24 10-Q further revealed that Terran had removed the Rivada Contract from its backlog, thereby reducing its total backlog by ***over 88%*** from $2.7 billion to a mere $312.7 million as of June 30, 2024.

87.     On this news, Terran's stock price fell $0.06 per share, or 8.45%, to close at $0.65 per share on August 12, 2024.

88.    Then, on August 15, 2024, during pre-market hours, Terran and Lockheed issued a joint press release announcing that they had entered into a definitive Merger Agreement whereby Lockheed would acquire Terran for $0.25 per share in cash, stating, in relevant part:

> The enterprise value of the transaction is approximately $450 million. Lockheed Martin will acquire Terran Orbital for $0.25 in cash for each outstanding share of common stock and retire its existing debt. This transaction also provides for Lockheed Martin and other current Terran Orbital creditors establishing a new, $30 million working capital facility that has been put in place as of signing.

> The transaction is expected to close in fourth quarter of 2024 and is subject to the satisfaction of customary closing conditions, including regulatory and Terran Orbital stockholder approvals. Upon closing, Terran Orbital will remain a commercial merchant supplier to industry.

89.    The market quickly reacted negatively to the Merger Announcement.  For example, also on August 15, 2024, during pre-market hours, *Seeking Alpha* published an article entitled "Lockheed Martin to buy Terran Orbital in $450M deal, well below prior offer," reporting, in relevant part:

> Terran Orbital (LLAP) [stock fell] -35.7% pre-market Thursday after Lockheed Martin (NYSE:LMT) said it agreed to acquire the struggling satellite manufacturer at an enterprise valuation of ~$450M, well below Lockheed's previous bid of nearly $600M in March.

> Lockheed Martin (LMT) said it will buy Terran Orbital (LLAP) for $0.25/share in cash, while Terran closed at $0.40 on Wednesday; Lockheed previously had offered to acquire Terran's outstanding shares for $1.00 each and pay $70M for its outstanding warrants.

> Lockheed (LMT) withdrew its offer in early May after Terran (LLAP) adopted a shareholder rights plan aimed at averting a takeover.

> The transaction provides for Lockheed (LMT) and other Terran (LLAP) creditors to establish a new $30M working capital facility.

> Lockheed (LMT) already is a significant stakeholder in Terran Orbital (LLAP) and is an important customer for Terran, comprising 70% of Terran's $30.4M in Q2 revenues.

Terran's (LLAP) cash reserves totaled less than $15M at the end of July, and it has ~$300M in debt, the company reported in a 10-Q filing this week.

Terran (LLAP) also said it is removing the Rivada [Contract] from its total contract backlog, reducing its backlog of orders by 88% to $312.7M from $2.7B previously.

90.     On this news, Terran's stock price fell $0.157 per share, or 39.25%, to close at $0.243 per share on August 15, 2024.

91.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

### Regulation S-K Items 105 & 303

92.     Throughout the Class Period, Terran's periodic financial filings were required to disclose the adverse facts and circumstances detailed above under applicable SEC rules and regulations.   Specifically, Item 105 of SEC Regulation S-K, 17 CFR § 229.105 ("Item 105"), required Terran to "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the [Company] or offering speculative or risky" and "[c]oncisely explain how each risk affects the [Company] or the securities being offered."  Defendants' failures to disclose, *inter alia*, that Terran was unlikely to receive the vast majority of revenues that it had initially announced under the Rivada Contract, that Terran was experiencing significant cash and/or other liquidity challenges, and, accordingly, the true scope and severity of Terran's dire financial situation violated Item 105 because these issues represented material factors that made an investment in the Company speculative or risky.

93.     For similar reasons, Defendants violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), which required the Company to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or

unfavorable impact on net sales or revenues or income from continuing operations." Defendants' failures to disclose, *inter alia*, that Terran was unlikely to receive the vast majority of revenues that it had initially announced under the Rivada Contract, that Terran was experiencing significant cash and/or other liquidity challenges, that Terran had overstated the availability and viability of adequate strategic alternatives to the Initial Buyout Offer, and, as a result of all the foregoing, the true scope and severity of Terran's dire financial situation violated Item 303 because these issues represented known trends and uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.

## SCIENTER ALLEGATIONS

94.    During the Class Period, Defendants had both the motive and opportunity to commit fraud. By overstating the likelihood of full payment under the Rivada Contract and, after the Initial Buyout Offer was withdrawn, the availability and viability of adequate strategic alternatives, while simultaneously concealing the true scope and severity of the Company's severe liquidity challenges, dire financial situation, Defendants maintained an artificially high price for the Company's securities during the Class Period, thereby falsely signaling to investors and the market that the Company had adequate liquidity to operate its business. Moreover, Defendants had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time. Accordingly, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

95.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise

acquired Terran securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

96.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Terran securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Terran or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

97.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

98.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

99.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Terran;

- whether the Individual Defendants caused Terran to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Terran securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

100.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

101.   Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Terran securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Terran securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

102.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

103.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

104.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

105.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

106.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Terran securities; and

(iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Terran securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

107.   Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to inTerran the market for Terran securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Terran's finances and business prospects.

108.   By virtue of their positions at Terran, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

109.   Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Terran, the Individual Defendants had knowledge of the details of Terran's internal affairs.

110.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Terran.   As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Terran's businesses, operations, future financial condition and future prospects.   As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Terran securities was artificially inflated throughout the Class Period.   In ignorance of the adverse facts concerning Terran's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Terran securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

111.     During the Class Period, Terran securities were traded on an active and efficient market.   Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Terran securities at prices artificially inflated by Defendants' wrongful conduct.   Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.   At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Terran securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.   The market price of Terran securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

112.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

113.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

114.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

115.     During the Class Period, the Individual Defendants participated in the operation and management of Terran, and conducted and participated, directly and indirectly, in the conduct of Terran's business affairs.  Because of their senior positions, they knew the adverse non-public information about Terran's misstatement of income and expenses and false financial statements.

116.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Terran's financial condition and results of operations, and to correct promptly any public statements issued by Terran which had become materially false or misleading.

117.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Terran disseminated in the marketplace during the Class Period concerning

Terran's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Terran to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Terran within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Terran securities.

118.    Each of the Individual Defendants, therefore, acted as a controlling person of Terran.  By reason of their senior management positions and/or being directors of Terran, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Terran to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Terran and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

119.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Terran.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

<u>**DEMAND FOR TRIAL BY JURY**</u>

Plaintiff hereby demands a trial by jury.

Dated: September 27, 2024                    Respectfully submitted,

**MILLER SHAH LLP**

By: *<u>/s/ Jayne A. Goldstein</u>*
    Jayne A. Goldstein
    Nathan C. Zipperian
    2103 N. Commerce Parkway
    Ft. Lauderdale, FL  33326
    Telephone: (954) 515-0123
    Facsimile: (866) 300-7367
    jagoldstein@millershah.com
    nczipperian@millershah.com

**POMERANTZ LLP**
Thomas H. Przybylowski
(*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
tprzybylowski@pomlaw.com

**WOHL & FRUCHTER LLP**
Joshua E. Fruchter
(*pro hac vice* application forthcoming)
25 Robert Pitt Drive, Suite 209G
Monsey, New York 10952
Telephone: (845) 290-6818
Facsimile: (718) 504-3773
jfruchter@wohlfruchter.com

*Attorneys for Plaintiff and the Putative Class*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.    I, ___Michael Lewitter_____, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.    I have reviewed a Complaint against Terran Orbital Corporation ("Terran") and authorize the filing of a comparable complaint on my behalf.

3.    I did not purchase or acquire Terran securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.    I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired Terran securities during the Class Period as specified in the Complaint, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.    The attached sheet lists all of my transactions in Terran securities during the Class Period as specified in the Complaint.

6.    During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.    I agree not to accept any payment for serving as a representative party on behalf of the Class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.      I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

**Executed** <u>___8/21/2024_____</u>
                         **(Date)**

DocuSigned by:

*Michael Lewitter*

7C87DBFB0C5F492...

<u>_____</u>
         **(Signature)**

Michael Lewitter

<u>_____</u>
         **(Type or Print Name)**

**Terran Orbital Corporation (LLAP)**                                                    **Michael Lewitter**

### List of Purchases/Acquisitions and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Account 1 | | | |
| Purchase/Acquisition | 2/8/2024 | 232 | $0.8400 |
| Purchase/Acquisition | 2/8/2024 | 1,190 | $0.8400 |
| Purchase/Acquisition | 2/9/2024 | 233 | $0.8900 |
| Purchase/Acquisition | 2/9/2024 | 3,370 | $0.8900 |
| Purchase/Acquisition | 8/1/2024 | 41,666 | $0.7500 |
| Sale | 2/21/2024 | (1,994) | $0.9900 |
| Sale | 7/12/2024 | (3,031) | $0.8600 |
| Sale | 8/14/2024 | (4,444) | $0.4500 |
| Sale | 8/14/2024 | (21,276) | $0.4600 |
| Account 2 | | | |
| Purchase/Acquisition | 7/30/2024 | 2,038 | $0.7300 |
| Purchase/Acquisition | 7/30/2024 | 1,801 | $0.7400 |
| Sale | 8/1/2024 | (3,839) | $0.7200 |