**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 24-CV-81191 ROSENBERG / REINHART**

STEVEN VERZWYVELT, JESSE
RAMIREZ, MICHAEL O'NEILL, and JILL
O'NEILL, individually and on behalf of all
others similarly situated,

      Plaintiffs,

v.

TERRAN ORBITAL CORPORATION,
MARC H. BELL, MATHIEU RIFFEL, GARY
A. HOBART, and STRATTON SCLAVOS,

      Defendants.

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................................................1

STATEMENT OF FACTS .............................................................................................................3

    A.    Terran Orbital and Its Relationship with Lockheed Martin...................................3

    B.    The Rivada Contract Offers Investors Hope...........................................................3

    C.    Terran Orbital Struggles to Navigate an Ongoing Liquidity Crisis........................4

        1.    Defendants Recognize Terran Orbital Faced a Cash Shortfall and Begin Exploring Strategic Alternatives in Early 2023 ................................4

        2.    The Board Authorizes Management to Initiate a Private Sale Process .......................................................................................................5

        3.    Lockheed Martin Offers to Buy Terran Orbital At a Discount But Backs Out After Learning About Its Severe Liquidity Constraints.............6

        4.    Terran Orbital Agrees to Be Acquired by Lockheed Martin At a Fraction of Its Previous Offer to Avoid Bankruptcy ...................................6

    D.    Defendants Misled The Investing Public About Terran Orbital's Liquidity to Salvage the Below-Market Deal with Lockheed Martin and Avert Bankruptcy..............................................................................................................8

    E.    Investors Are Harmed as the Truth Emerges...........................................................9

STANDARD OF REVIEW ............................................................................................................9

ARGUMENT..................................................................................................................................9

I.    PLAINTIFFS STATE A SECTION 10(B) CLAIM..........................................................9

    A.    The AC Adequately Alleges Misstatements and Omissions of Material Fact........................................................................................................................10

        1.    The AC Pleads an Array of Present Facts Which Establish That Defendants' Misstatements Were False or Misleading When Made.........10

        2.    Defendants' Remaining Attempts to Categorically Exempt Their Misstatements from Liability as a Matter of Law Are Meritless...............15

    B.    The AC Raises a Strong Inference of Scienter ......................................................20

        1.    The AC Pleads Irrefutable Direct Evidence of Scienter ...........................20

- ii -

    2.    The AC Alleges Compelling Individualized Motives ...............................24

    3.    The Core Operations Doctrine Supports an Inference of Scienter ............26

    4.    A Wealth of Other Facts Confirms the Inference of Scienter....................27

    5.    The Inference of Scienter is Overwhelming ............................................29

II.     PLAINTIFFS STATE A CONTROL PERSON CLAIM....................................................30

CONCLUSION.........................................................................................................................30

## TABLE OF AUTHORITIES

**Cases**                                                                                                **Page(s)**

*Access Ninja, Inc. v. PassNinja, Inc.*,
2025 WL 753332 (S.D. Fla. Mar. 10, 2025)............................................................................10

*Asher v. Baxter Int'l, Inc.*,
377 F.3d 727 (7th Cir. 2004) ................................................................................................16

*Barney Holland Oil Co. v. FleetCor Techs., Inc.*,
2007 WL 9702207 (N.D. Ga. Aug. 17, 2007) .......................................................................13

*Beckel v. Fagron Holding USA, LLC*,
2019 WL 5110828 (M.D. Fla. June 24, 2019)........................................................................19

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..................................................................................................................9

*Carvelli v. Ocwen Fin. Corp.*,
934 F.3d 1307 (11th Cir. 2019) ..................................................................................... *passim*

*Chabot Walgreens Boots Alliance, Inc.*, 2023 WL 2908827 (M.D. Pa. Mar. 31,
2023) .......................................................................................................................................14

*City Pension Fund for Firefighters & Police Officers in City of Miami Beach v.
Aracruz Cellulose S.A.*,
41 F. Supp. 3d 1369 (S.D. Fla. 2011) ....................................................................................30

*Edge v. Tupperware Brands Corp.*,
2023 WL 6310236 (M.D. Fla. Sept. 28, 2023) ............................................................. *passim*

*Einhorn v. Axogen, Inc.*,
42 F.4th 1218 (11th Cir. 2022) ..............................................................................................17

*FindWhat Inv. Grp. v. FindWhat.com*,
658 F.3d 1282 (11th Cir. 2011) ..................................................................................... *passim*

*Fla. St. Bd. of Admin. v. Green Tree Fin. Corp.*,
270 F.3d 645 (8th Cir. 2001) .................................................................................................26

*Frank v. Dana Corp.*,
646 F.3d 954 (6th Cir. 2011) .................................................................................................25

*Haddad v. RAV Bahhamas, Ltd.*,
2008 WL 11399704 (S.D. Fla. Nov. 6, 2008)........................................................................24

*Helwig v. Vencor, Inc.*,
251 F.3d 540 (6th Cir. 2001) .................................................................................................15

*In re 21st Century Holding Co. Sec. Litig.*,
2008 WL 5749572 (S.D. Fla. Nov. 7, 2008).........................................................................17

*In re Adv. Auto Parts, Inc. Sec. Litig.*,
2020 WL 599543 (D. Del. Feb. 7, 2020) ..............................................................................26

*In re Altisource Portfolio Sols., S.A. Sec. Litig.*,
2015 WL 11988900 (S.D. Fla. Dec. 22, 2015) ......................................................................10

*In re BankAtlantic Bancorp, Inc. Sec. Litig.*,
2010 WL 6352664 (S.D. Fla. Sept. 9, 2010) .........................................................................16

*In re BankAtlantic Bancorp, Inc. Sec. Litig.*,
2011 WL 1585605 (S.D. Fla. Apr. 25, 2011), *aff'd* 688 F.3d 713 (11th Cir.
2012) ....................................................................................................................................16

*In re Cabletron Sys., Inc.*,
311 F.3d 11 (1st Cir. 2002)...................................................................................................25

*In re Egidi*,
571 F.3d 1156 (11th Cir. 2009) ......................................................................................10, 11

*In re Flowers Foods, Inc. Sec. Litig.*,
2018 WL 1558558 (M.D. Ga. Mar. 23, 2018).......................................................23, 24, 26, 28

*In re Home Loan Servicing Sols., Ltd. Sec. Litig.*,
2016 WL 10592320 (S.D. Fla. June 6, 2016) .......................................................................29

*In re Immucor Inc. Sec. Litig.*,
2006 WL 3000133 (N.D. Ga. Oct. 4, 2006) .........................................................................21

*In re Jan. 2021 Short Squeeze Trading Litig.*,
620 F. Supp. 3d 1231 (S.D. Fla. 2022) ...............................................................13, 20, 21, 25

*In re Thornburg Mortg., Inc. Sec. Litig.*,
695 F. Supp. 2d 1165 (D.N.M. 2010), *aff'd sub nom. Slater v. A.G. Edwards
& Sons, Inc.*, 719 F.3d 1190 (10th Cir. 2013)......................................................................26

*Keippel v. Health Ins. Innovations, Inc.*,
2019 WL 5698329 (M.D. Fla. Nov. 4, 2019) .......................................................................19

*Lamartina v. VMware, Inc.*,
2023 WL 2763541 (N.D. Cal. Mar. 31, 2023)......................................................................26

*Laperriere v. Vesta Ins. Grp., Inc.*,
526 F.3d 715 (11th Cir. 2008) ............................................................................................30

*Loc. 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*,
    2011 WL 12855820 (N.D. Ala. June 7, 2011) ...............................................................29

*Luczak v. Nat'l Beverage Corp.*,
    812 F. App'x 915 (11th Cir. 2020) .............................................................................24

*Marrari v. Med. Staffing Network Holdings, Inc.*,
    395 F. Supp. 2d 1169 (S.D. Fla. 2005) ......................................................................17

*MAZ Partners LP v. First Choice Healthcare Sols., Inc.*,
    2019 WL 5394011 (M.D. Fla. Oct. 16, 2019) ....................................................10, 11, 28

*Mizzaro v. Home Depot, Inc.*,
    544 F.3d 1230 (11th Cir. 2008) ....................................................................20, 26, 30

*Nathenson v. Zonagen Inc.*,
    267 F.3d 400 (5th Cir. 2001) .....................................................................................20

*Neb. Inv. Council v. Fidelity Nat'l Info. Servs., Inc.*,
    2024 WL 4349125 (M.D. Fla. Sept. 30, 2024) ...........................................................19

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)............................................................................10, 11, 14, 17

*Oxford Asset Mgmt., Ltd. v. Jaharis*,
    297 F.3d 1182 (11th Cir. 2002) ...................................................................................3

*Phillips v. Scientific-Atlanta, Inc.*,
    374 F.3d 1015 (11th Cir. 2004) .................................................................................23

*Plotkin v. IP Axess Inc.*,
    407 F.3d 690 (5th Cir. 2005) ....................................................................................27

*Pritchard v. Apyx Med. Corp.*,
    2020 WL 1180731 (M.D. Fla. Mar. 11, 2020) ............................................................16

*Pub. Emps. Ret. Sys. of Miss. v. Mohawk Indus., Inc.*,
    564 F. Supp. 3d 1272 (N.D. Ga. 2021) ......................................................................27

*Ret. Sys. v. MF Glob., Ltd.*,
    620 F.3d 137 (2d Cir. 2010)......................................................................................22

*Ret. Sys. v. Southern Co.*,
    2018 WL 1558577 (N.D. Ga. Mar. 29, 2018).............................................................29

*Ret. Sys. v. Teleperformance SE*,
    2024 WL 2320209 (S.D. Fla. May 22, 2024) ....................................................23, 27, 28

*Ret. Sys. v. Teleperformance SE*,
746 F. Supp. 3d 1395 (S.D. Fla. 2024) .............................................................................18, 26

*Rosky ex rel. Wellcare Health Plans, Inc. v. Farha*,
2009 WL 3853592 (M.D. Fla. Mar. 30, 2009) .........................................................................19

*SEC v. GlobeTel Commc'ns Corp.*,
2008 WL 11333153 (S.D. Fla. Nov. 12, 2008)..........................................................................23

*SEC v. Merchant Capital, LLC*,
483 F.3d 747 (11th Cir. 2007) ...................................................................................................13

*SEC v. Mufareh*,
2024 WL 3952437 (M.D. Fla. Aug. 27, 2024) .........................................................................14

*SEC v. Revolutionary Concepts, Inc.*,
2022 WL 386085 (11th Cir. Feb. 9, 2022) ...............................................................................20

*SEC v. Torchia*,
183 F. Supp. 3d 1291 (N.D. Ga. 2016) .....................................................................................16

*Shafer v. Glob. Payments, Inc.*,
2024 WL 2789447 (N.D. Ga. Mar. 29, 2024)...........................................................................14

*Sheet Metal Workers Loc. 19 Pension Fund v. ProAssurance Corp.*,
600 F. Supp. 3d 1189 (N.D. Ala. 2021).............................................................................13, 19

*Sides v. Simmons*,
2007 WL 2819371 (S.D. Fla. Sept. 24, 2007) .........................................................................23

*Slayton v. Am. Express Co.*,
604 F.3d 758 (2d Cir. 2010)......................................................................................................17

*Sood v. Catalyst Pharm. Partners Inc.*,
2014 WL 1245271 (M.D. Fla. Mar. 26, 2014) .........................................................................25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)............................................................................................................20, 24

*Theodore v. Purecycle Techs., Inc.*,
2022 WL 20157415 (M.D. Fla. Aug. 4, 2022) .........................................................................18

*Theodore v. Purecycle Techs., Inc.*,
2023 WL 4035880 (M.D. Fla. June 15, 2023).....................................................................25, 28

*Thorpe v. Walter Inv. Mgmt., Corp.*,
111 F. Supp. 3d 1336 (S.D. Fla. 2015) ....................................................................23, 28, 29, 30

*Triton II, LLC v. Randazzo*,
　2019 WL 1777726 (S.D. Fla. Apr. 23, 2019) ...........................................................22

*TSC Indus., Inc. v. Northway, Inc.*,
　426 U.S. 438 (1976).................................................................................................18

*TSG Water Res., Inc. v. D'Alba & Donovan Certified Pub. Accts., P.C.*,
　260 F. App'x 191 (11th Dec. 2007).........................................................................20

*Tung v. Dycom Indus., Inc.*,
　454 F. Supp. 3d 1244 (S.D. Fla. 2020) ...............................................................18, 24

*Waterford Twp. Gen. Emps. Ret. Sys. v. Suntrust Banks, Inc.*,
　2010 WL 3368922 (N.D. Ga. Aug. 19, 2010) ........................................................25

*Weston v. DocuSign, Inc.*,
　669 F. Supp. 3d 849 (N.D. Cal. 2023) ....................................................................15

## Statutes

15 U.S.C. § 78u-4 ...........................................................................................................9, 20

15 U.S.C. § 78u-5 ...............................................................................................................15

## Rules

Fed. R. Civ. P. 9................................................................................................................9

Fed. R. Civ. P. 15..............................................................................................................30

## Other Authorities

17 C.F.R. § 240.10b-5(b) .............................................................................................9, 10, 13

**TABLE OF DEFINED TERMS**

| Defined Term | Definition | Cross Reference |
|---|---|---|
| AC | First Amended Class Action Complaint for Violations of the Federal Securities Laws | ECF No. 37 |
| Bell | Defendant Marc H. Bell | AC ¶ 17 |
| Board | Terran Orbital's Board of Directors | AC ¶ 6 |
| CEO | Chief Executive Officer | AC ¶ 2 |
| CFO | Chief Financial Officer | AC ¶ 18 |
| Class Period | March 21, 2023, to August 14, 2024, both dates inclusive | AC ¶ 1 |
| CMPO | Confidentially marketed private offering | AC ¶ 68 |
| Company | Terran Orbital Corporation | AC at 4 |
| CW | Confidential Witness | AC ¶ 21 |
| Defendants | Terran Orbital, Bell, Riffel, Hobart, and Sclavos | AC at 1 |
| Direct Offering | A May 24, 2023, purchase agreement with an institutional investor for the direct issuance and sale of $37.1 million in Terran Orbital securities registered in the Shelf Registration Statement | AC ¶ 62 |
| Exchange Act | Securities Exchange Act of 1934 | AC ¶ 1 |
| Hobart | Defendant Gary A. Hobart | AC ¶ 18 |
| Lead Plaintiffs | Steven Verzwyvelt, Jesse Ramirez, Michael O'Neill, and Jill O'Neill | AC at 1 |
| Lockheed Martin | Lockheed Martin Corporation | AC ¶ 3 |
| Parekh | Adarsh Parekh | AC ¶ 115 |
| Plaintiffs | Lead Plaintiffs and additional plaintiff Michael Lewitter | AC ¶ 4 |
| Proxy | The proxy statements filed with the SEC by Terran Orbital on September 9, 2024, and October 4, 2024. | AC ¶ 132 |
| Terran Orbital | Terran Orbital Corporation | AC at 4 |
| Riffel | Defendant Mathieu Riffel | AC ¶ 19 |
| Rivada | Rivada Space Networks GmbH | AC ¶ 4 |
| Rivada Contract | Contract with Rivada to develop, build, and deploy 300 satellites for a satellite constellation under development by Rivada for a total purchase price of $2.4 billion | AC ¶ 52 |
| Sclavos | Defendant Stratton Sclavos | AC ¶ 20 |
| SEC | U.S. Securities and Exchange Commission | AC at 1 |
| Shelf Registration Statement | The "short-form" registration statement on Form S-3 Terran Orbital filed with the SEC on April 3, 2023 | AC ¶ 62 |
| SOX | Sarbanes-Oxley Act of 2002 | AC ¶ 220 |
| SPAC | Special Purpose Acquisition Company | AC ¶ 2 |
| Special Committee | The special committee established by Terran Orbital's Board, comprised of Board members James LaChance, Stratton Sclavos, and Thomas Manion | AC ¶ 69 |

Lead Plaintiffs Steven Verzwyvelt, Jesse Ramirez, Michael O'Neill, and Jill O'Neill and additional plaintiff Michael Lewitter respectfully submit this memorandum in opposition to the motion to dismiss filed by Defendants on April 4, 2025 [ECF No. 58] (the "Motion").[1]

## **PRELIMINARY STATEMENT**

Defendants would have this Court believe that this case is about predicting the future. It is not. As alleged, Defendants concealed an array of ***present facts***—discussed repeatedly in Board meetings attended by Defendants—that directly contradicted their public assurances to investors and analysts who expressed concern about Terran Orbital's liquidity and capital needs, and thus materially misrepresented the risk of investing in the Company. Unbeknownst to investors, Terran Orbital was constantly scrambling throughout the Class Period to raise capital to address its ongoing liquidity crisis, and only narrowly averted bankruptcy by agreeing to a buyout by Lockheed Martin for pennies on the dollar, causing massive losses to investors misled by Defendants' misstatements.

Terran Orbital is a startup founded by Defendant Bell that manufactures satellites. By the start of the Class Period, Bell decided to significantly expand the scale of Terran Orbital's operations and, in March 2022, took it public in a SPAC transaction at $10 per share to raise the capital needed for his aggressive growth plan. In February 2023, Terran Orbital announced that it entered into a historic $2.4 billion contract with Rivada that, in time, would meaningfully improve its bottom line.

Nevertheless, investors remained concerned Terran Orbital was burning through far more cash than it was generating and regularly raised questions about its liquidity, capital needs, and the impact of the Rivada Contract. In response, Defendants repeatedly offered false assurances that concealed concerns that Bell and others regularly discussed with the Board about Terran Orbital's

---

[1] All capitalized terms have the same meaning set forth in the First Amended Class Action Complaint for Violations of the Federal Securities Laws, filed February 18, 2025 [ECF No. 37] (the "AC"), as reproduced in the Table of Abbreviations set forth above. Citations to "Ex." refer to the exhibits attached to the accompanying Declaration of Justin D. D'Aloia. Citations to "Defs.' Ex." Refer to exhibits attached to the Motion. Unless otherwise noted, all internal citations are omitted.

liquidity constraints. For example, in August 2023, Bell represented in response to a question about the need to raise more cash that "the last thing any of us want to do is raise more cash." But 12 days earlier, Bell and Hobart told the Board that the "magnitude of the Company's cash needs" required urgent financing, including a potential *capital raise*, which it ultimately conducted several weeks later. Similarly, in May 2024, Bell declared that the loss of Rivada would not have "any impact on us going forward . . . it's just upside." By then, however, Terran Orbital's business hinged on Rivada. Indeed, Bell and Hobart informed the Board a week later that Terran Orbital needed a cash infusion of up to $120 million just to survive through the end of 2024 after determining that it could no longer rely on payments from Rivada. Unable to make payroll and facing bankruptcy, Terran Orbital ultimately agreed to be acquired by Lockheed Martin in August 2024 for just $0.25 per share, a fraction of its then-prevailing share price.

In their Motion, Defendants do not (because they cannot) deny the detailed record of Board discussions they participated in documenting Terran Orbital's liquidity struggles or knowledge of the matters discussed at those meetings. Unable to muster a viable response, Defendants attempt to paper over these glaring admissions by mischaracterizing the substance of the statements at issue, overstating and misapplying established rules of law, misconstruing the AC's well-pled scienter allegations, and stressing that Terran Orbital regularly disclosed its cash balance each quarter. As explained below, these tactics do not withstand scrutiny.

Far from alleging "fraud by hindsight," the AC pleads a clear and compelling fraud in which Defendants sought to conceal Terran Orbital's liquidity crisis for as long as possible in order to raise capital or, alternatively, sell to Lockheed Martin, and thereby avoid a bankruptcy, which would wipe out their equity interests and deprive them of outsized payments due upon the consummation of a sale transaction. Defendants' proffered counternarrative is grounded in their purported belief that

- 2 -

Rivada would fulfill its contractual obligations.  But they cannot hide behind the failure of that business relationship to yield meaningful results because they repeatedly insisted during the Class Period that Terran Orbital's business model did not rely on Rivada and the loss of the payments from Rivada would have "no impact" on it going forward.  The Motion should be denied.

## STATEMENT OF FACTS

### A.  Terran Orbital and Its Relationship with Lockheed Martin

Bell is a former tech executive and startup investor.  AC ¶ 17.[2]  Bell founded Terran Orbital in 2013 to build a new class of small satellites known as "nanosatellites."  *Id.* ¶ 26.  Lockheed Martin is the largest defense contractor for the United States government.  *Id.* ¶ 43.  It was a long-time customer and investor with Terran Orbital, which served as a subcontractor for it.  *Id.* ¶¶ 43-46.

Prior to March 2021, Bell was a member of Terran Orbital's Board.  *Id.* ¶ 31.  At the request of his friend, Bell took over as CEO in March 2021.  *Id.*  Soon after his appointment, Bell decided to dramatically increase the scale of Terran Orbital's operations and transition it into larger classes of small satellites used by government agencies in an effort to build it into a billion-dollar "unicorn" company.  *Id.* ¶¶ 33, 39.  To support his aggressive growth plan, Bell took Terran Orbital public in a SPAC transaction at $10 per share in March 2022.  *Id.* ¶ 33, 35-38.  However, the transaction yielded far less proceeds than anticipated and Terran Orbital still needed significant capital to continue scaling its operations.  *Id.* ¶ 48.  As such, in October 2022, it secured a new $100 million investment from Lockheed Martin, which brought Lockheed Martin's equity interest to 33.5%.  *Id.* ¶ 50.

### B.  The Rivada Contract Offers Investors Hope

By the end of 2022, Terran Orbital had not reported a profit since going public and investors

---

[2] Defendants attach a variety of SEC filings to their Motion and assert that the Court may consider such filings on a motion to dismiss.  However, it has long been the law that the Court may only consider such documents on a motion to dismiss to show that their content was publicly available, and "not to prove the truth of the matters asserted therein."  *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182 (11th Cir. 2002).

grew concerned about the rate at which it was burning through cash.  AC ¶¶ 4, 59.  On February 22, 2023, Terran Orbital announced its entry into a landmark $2.4 billion contract with Rivada to build 300 satellites by early 2026, which Bell touted as the largest satellite contract ever awarded.  *Id.* ¶¶ 52, 54.  Investors were, understandably, thrilled by this news.  *Id.* ¶ 56.

As with most satellite contracts it entered, the Rivada Contract provided that Terran Orbital would be paid a series of "milestone" payments before each stage of work pursuant to a design and build schedule.  *Id.* ¶¶ 30, 53.  Accordingly, investors were eager to understand the timing and extent of the payments and how it impacted Terran Orbital's liquidity.  Accordingly, in early 2023, analysts asked if Terran Orbital planned to add the Rivada Contract to its reported "backlog," a "key measure" of growth that represents the value of executed contracts considered to be "firm," and investors expressed concern about Terran Orbital's near-term cash needs, noting "I think other people are concerned about this too." *Id.* ¶¶ 59-60, 136.

### C.  Terran Orbital Struggles to Navigate an Ongoing Liquidity Crisis

#### 1.  Defendants Recognize Terran Orbital Faced a Cash Shortfall and Begin Exploring Strategic Alternatives in Early 2023

As noted above, by March 21, 2023, investors were concerned about Terran Orbital's capital requirements until it could begin meaningful work on the Rivada Contract.  Defendants were too. By March 31, 2023, Terran's cash balance declined to $57.4 million.  AC ¶ 59.  Thus, even before March 31, 2023, management had started exploring financing options to cover its anticipated cash requirements and began preparing a "shelf" registration statement to hold one or more equity offerings.  *Id.* ¶ 62.  Terran Orbital filed the Shelf Registration Statement on April 3, 2023.  *Id.*  In May 2023, it held a Direct Offering of $37.1 million in shares registered therein.  *Id.*

Despite this, Terran Orbital's cash balance dropped to $48.6 million by June 30, 2023.  *Id.* ¶ 63.  As such, management held discussions with outside parties about financing options, including a

capital raise or company sale.  *Id.*  At a Board meeting on July 19, 2023, Bell told the Board that anticipated business *would not solve Terran Orbital's near-term liquidity issues*.  *Id.* ¶ 64.  At another Board meeting on August 3, 2023, Bell explained the Company was exploring financing because of the "*magnitude of the Company's cash needs*," and Hobart reported that another "capital raise" may be needed to avoid entering a "*negative cash position*" in the coming months.  *Id.* ¶ 65.  Terran Orbital later conducted a $32.5 million CMPO capital raise in September 2023.  *Id.* ¶ 68.

### 2. The Board Authorizes Management to Initiate a Private Sale Process

On September 11, 2023, in direct response to the *concerns* raised by management about Terran Orbital's cash needs, the Board established a Special Committee to consider financing options, which, by then, included a *financial restructuring*.  AC ¶ 69.  Even with the proceeds of the CMPO, by September 30, 2023, Terran Orbital's cash balance fell to $38.7 million.  *Id.* ¶ 70.  On October 6, 2023, the Board authorized management, including Bell and Hobart, to formally conduct an unsolicited sale process in light of Terran Orbital's "*continued cash constraints*."  *Id.* ¶ 72.

Meanwhile, Rivada stalled on its payments.  While Terran Orbital received an initial $5 million payment from Rivada in August 2023, subsequent payments were "delayed."  *Id.* ¶ 76.  On November 14, 2023, Terran Orbital announced that it decided to remove all revenue associated with the Rivada Contract from its 2023 forecast, which reduced its previously issued 2023 revenue guidance from $250 million to $130 million, a total of *$120 million*.  *Id.* ¶ 79.

In the fourth quarter of 2023, Terran Orbital received several overdue customer payments.  *Id.* ¶¶ 76, 86.  However, these payments were insufficient to cover anything other than its *immediate* capital requirements and, as such, management continued to move ahead with the sale process, ultimately meeting with two prospective bidders in January 2024, including Lockheed Martin.  *Id.* ¶¶ 84, 87-88.  The other bidder formally withdrew from the process on January 30, 2023.  *Id.* ¶ 90.  Of course, Lockheed Martin had much to lose if it did not remain involved in the sale process.

The Board held a meeting on February 9, 2024, at which Terran Orbital's financial advisor reported that there was a lack of interest from the 32 other companies who received confidential materials because they believed Terran Orbital's financial projections were ***too optimistic***. *Id.* ¶ 91.

### 3. Lockheed Martin Offers to Buy Terran Orbital at a Discount but Backs Out After Learning About Its Severe Liquidity Constraints

On March 1, 2024, Lockheed Martin submitted a non-binding bid to acquire Terran Orbital for $1.00 per share. AC ¶ 93. At the time, Terran Orbital remained in need of cash. At a Board meeting on March 21, 2024, Bell raised the possibility of conducting yet another offering to ***raise needed capital***. *Id.* ¶ 97. In response to Lockheed Martin's bid, the Special Committee worked with management to collect information about Terran Orbital's liquidity, such as anticipated awards and probabilities and assumptions, and, ultimately, met with Lockheed Martin on April 16, 2024, to discuss its bid. *Id.* ¶¶ 95, 100. Two weeks later, Lockheed Martin withdrew its offer. *Id.* ¶ 101.

### 4. Terran Orbital Agrees to Be Acquired by Lockheed Martin at a Fraction of Its Previous Offer to Avoid Bankruptcy

After Lockheed Martin withdrew its initial offer, Terran Orbital's liquidity continued to deteriorate. On May 6, 2024, Hobart spoke with a subprime lender who sent him an unsolicited email because Terran Orbital was ***in need of liquidity solutions***. AC ¶ 102. In addition, the Special Committee continued to assess Lockheed Martin's offer ***even though it had been withdrawn***. *Id.* ¶ 103. Worse still, Terran Orbital struggled to collect payments from customers. *Id.* ¶ 104.

Just a week later, on May 23, 2024, Bell told the Board that the Company could no longer rely on receiving payments from Rivada. *Id.* ¶ 106. Because Terran Orbital's cash requirements had become "heavily dependent" on the Rivada Contract, this move "***significantly deteriorated the Company's cash forecast for . . . 2024***." *Id.* Indeed, Hobart cautioned that this "***constrained the Company's liquidity profile***" for the next quarter, and that it needed an infusion of ***$120 million*** to satisfy its cash requirements through the end of 2024. *Id.* Another advisor hired by the Company

warned on June 4, 2024, it may be ***unable to continue operating*** in the near future.  *Id.* ¶ 107.

On June 18, 2024, the Special Committee delivered a counteroffer to Lockheed Martin to be acquired for $1.50 per share and a $1 CVR tied to future contracts.  *Id.* ¶ 109.  On July 17, 2024, Lockheed Martin informed the Special Committee that it was not interested in pursuing ***any*** deal with Terran Orbital due to ***concerns*** about its ***liquidity***.  *Id.* ¶ 114.  The Special Committee met later that day to discuss Lockheed Martin's response and was forced to consider the fallout from Terran Orbital's ***short-term liquidity issues***.  *Id.*  The Board, including Bell, was given a report on the matter by the Special Committee at a meeting held two days later, at which the Board directed management to explore immediate finance options and reengage with Lockheed Martin.  *Id.* ¶ 115.

On July 23, 2024, Terran Orbital entered into an ATM Agreement for a new issuance of up to $98 million in stock.  *Id.*  ¶ 116.  However, the issuance was conditioned on the receipt of a CEO or CFO certification that there was no material change in Terran Orbital's financial condition since its last Form 10-Q, which neither were prepared to give until Terran Orbital filed its *next* Form 10-Q in three weeks.  *Id.*  By then, however, Terran Orbital only had three weeks of cash left.  *Id.* ¶ 118. Because of this, Terran Orbital's new CFO, Parekh, contacted Lockheed Martin on July 24, 2024, to ask for its consent to engage in a warrant issuance, and stated the matter was ***urgent***.  *Id.* ¶ 117.

Over the next week, Terran Orbital began to prepare for ***bankruptcy*** while it continued to engage with Lockheed Martin.  *Id.* ¶¶ 118-21, 124.  Bell also reported that that Terran Orbital was unable to raise money through the ATM Agreement in time to bridge its cash gap.  *Id.* ¶ 126.

Lockheed Martin ultimately offered to buy Terran Orbital for $0.25 per share, which the Board approved the next day.  *Id.*  Bell later told employees that the Board had to agree to the buyout because Terran Orbital was unable to make the next payroll.  *Id.* ¶ 131.  Indeed, the Board previously determined that a buyout was preferable to bankruptcy. *Id.* ¶ 122.

**D.**     **Defendants Misled the Investing Public About Terran Orbital's Liquidity to Salvage the Below-Market Deal with Lockheed Martin and Avert Bankruptcy**

As investors and analysts raised questions about Terran Orbital's cash needs, Defendants repeatedly assured there was no issue. For example, on March 21, 2023, an analyst asked about financing options to limit dilution if capital was needed. AC ¶¶ 138-39. Even though management was in the process of preparing a "shelf" registration statement for that very purpose, Bell represented that management had "no concerns" about Terran Orbital's cash at that time. *Id.*

Defendants also falsely portrayed the Rivada Contract as a source of additional "upside" in 2023. On May 15, 2023, Terran Orbital announced that the "timing and execution of our new contract work with Rivada" was a "variable[]" for 2023 and, as such, it expected to earn $250 million in 2023 with the potential for further "[u]pside" depending on customer commitments. *Id.* ¶ 135. In response to an analyst question about whether the Rivada Contract was part of the $250 million or upside, Bell assured "Tranche 1 is by far the largest part" of the forecast. *Id.* ¶¶ 136-37.

The misrepresentations continued through 2023. In response to questions, Bell, Hobart, and/or Sclavos insisted that "the last thing any of us want to do is raise additional cash," and confirmed that Terran Orbital's existing cash flow was sufficient to cover its cash needs until they became self-sustaining in the second half of 2024, even without the cash flows from Rivada. *Id.* ¶¶ 140-46, 159-60. As Terran Orbital responded to public criticisms from investors in late 2023 and early 2024, Bell held a series of interviews in which he declared "[w]e are not running out of cash," "cash is stable" and "we have no intentions of raising any more money." *Id.* ¶¶ 73-90, 147-51.

Defendants doubled down on these claims in 2024 despite the rapid deterioration of Terran Orbital's liquidity profile. On May 14, 2024, Bell confirmed in response to questions from analysts and investors that "we feel very comfortable with our liquidity as it stands today," and that the hypothetical loss of the Rivada Contract "doesn't have any impact on us going forward," adding "it's

just upside for us." *Id.* ¶¶ 152-54, 161-62.  On June 25, 2024, Bell reported "[w]e feel very comfortable about our covenants going into the end of the quarter," adding "no issues on our side." *Id.*  Then, on July 23, 2024, as Terran Orbital was on the verge of bankruptcy, it issued a press release on the ATM Program, which was expressly made to give "additional confidence that we have adequate capital to successfully manage current and future programs."  *Id.* ¶¶ 157-58.

### E.       Investors Are Harmed as the Truth Emerges

The misstatements described above and elsewhere in the AC caused Terran Orbital's stock to trade at artificially inflated prices.  AC ¶ 229.  As the truth leaked out, Terran Orbital's stock price fell as the inflation introduced by the earlier misstatements came out of the stock price, causing harm to investors like Plaintiffs who purchased before then.  *Id.* ¶¶ 163-87, 229-31.

### STANDARD OF REVIEW

To survive dismissal, a complaint need only plead facts sufficient to state a claim that is "plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In making this assessment, the Court must accept all factual allegations as true and draw all reasonable inferences in Plaintiffs' favor.  *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011).

### ARGUMENT

### I.       PLAINTIFFS STATE A SECTION 10(B) CLAIM

To state a claim under Section 10(b) and Rule 10b-5 promulgated thereunder, a plaintiff must allege: (1) a misstatement or omission of material fact; (2) scienter; (3) a connection to a security transaction; (4) reliance; (5) economic loss; and (6) loss causation.  *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1317 (11th Cir. 2019).  Claims of this type must satisfy the heightened pleading requirements of Rule 9(b).  *FindWhat*, 658 F.3d at 1296.  In addition, under the PSLRA, a plaintiff must specify the "reasons why the statement is misleading" and "state with particularity facts giving rise to a strong inference that the defendant acted with [scienter]."  15 U.S.C. § 78u-4(b)(1), (b)(2).

- 9 -

Defendants dispute only elements (1) and (2) and, thus, concede that Plaintiffs have adequately pled all others. *See In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) (argument not raised in initial brief is waived); *see also Access Ninja, Inc. v. PassNinja, Inc.*, 2025 WL 753332, at *4 (S.D. Fla. Mar. 10, 2025) (party that does not challenge element of claim initial brief has "forfeited" the argument). As explained below, Defendants' arguments lack merit.

### A.      The AC Adequately Alleges Misstatements and Omissions of Material Fact

Rule 10b-5 prohibits not only statements of material fact that are "untrue" on their face, but the omission of any material facts needed to make statements that are made "not misleading." 17 C.F.R. § 240.10b-5(b). Thus, once a company *chooses* to speak on a topic, Rule 10b-5 imposes a duty to speak "fully and truthfully." *FindWhat*, 658 F.3d at 1305. In other words, statements that are literally true can mislead by virtue of what they omit. *Id.*; *see also Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 192 (2015) ("[L]iteral accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another."). Such statements will mislead if they create an "impression of a state of affairs that differs in a material way from the one that actually exists." *MAZ Partners LP v. First Choice Healthcare Sols., Inc.*, 2019 WL 5394011, at *9 (M.D. Fla. Oct. 16, 2019), *R&R adopted*, 2020 WL 1072582 (M.D. Fla. Feb. 14, 2020); *see also In re Altisource Portfolio Sols., S.A. Sec. Litig.*, 2015 WL 11988900, at *4 (S.D. Fla. Dec. 22, 2015) (similar). This assessment is made from the perspective of a reasonable investor. *FindWhat*, 658 F.3d at 1306.

### 1.      The AC Pleads an Array of Present Facts Which Establish That Defendants' Misstatements Were False or Misleading When Made

Defendants made 19 statements during the Class Period—a time when investors were keenly focused on Terran Orbital's cash flow—that materially misrepresented the Company's (i) 2023 revenue outlook; (ii) overall liquidity and need to raise capital; and (iii) dependence on the Rivada

Contract. AC ¶¶ 135-62. Defendants do not dispute that the AC identifies the statements, speakers, and settings with adequate specificity but, instead, maintain that (1) Plaintiffs fail to plead that any of the statements in AC ¶¶135-36, 138, 140-41, 143-45, 148-50, 152-53, 157, and 160 are false; and (2) the statements in AC ¶¶ 138, 144, 145, 148, 152, 153, 155, and 159 are opinions that are inactionable under *Omnicare* and its progeny. Mot. 16-19. These arguments hold no water.

**First**, as an initial matter, Defendants do not argue that the statements in AC ¶¶ 147 or 161 are inadequately alleged to be false or misleading and, thus, concede that they are. *Egidi*, 571 F.3d at 1163. In fact, Defendants do not offer *any* argument—including those addressed in Point I.A.2—suggesting that the statement in AC ¶ 147 is otherwise inactionable. *Id.*

**Second**, Defendants reason that the AC fails to plead that any of the remaining statements are false by attempting to draw a distinction between Terran Orbital's *current* need for additional funding and expressing confidence in its *future* cash flows. Mot. 18. But this sweeping generalization grossly mischaracterizes the allegations set forth in the AC.

Several misstatements had nothing to do with Terran Orbital's cash needs—immediate, future, or otherwise. For example, Defendants denied that the Rivada Contract was a significant part of Terran Orbital's 2023 revenue outlook, if any, when, in fact, it accounted for nearly *half* of the outlook. AC ¶¶ 135-37. Similarly, Defendants assured in 2024 that the Rivada Contract was not a fixture of its business model and simply represented a source for further "upside." *Id.* ¶¶ 160-61. In truth, by then, Terran Orbital's operating plan hinged on receiving payments from Rivada. *Id.* ¶ 162.

For those addressing cashflow, many admittedly communicated Defendants' *current* comfort with Terran Orbital's liquidity or confirmed that they had no *current* plans to raise more cash. *Id.* ¶¶ 138, 141, 147, 149-50, 152.[3] In each case, however, Defendants were already taking steps to secure

---

[3] Tellingly, Defendants shift gears and acknowledge in their scienter argument that several of the alleged misstatements spoke to the Company's "current" cash position and plans. Mot. 24-25.

additional capital, or warning such steps were necessary, because Terran Orbital faced an urgent cash shortfall. *Id.* ¶¶ 139, 142, 151, 154. To take one example, just 12 days before Bell told investors on August 15, 2023, that "the last thing any of us want to do is raise additional cash," Bell and Hobart privately told the Board that a "capital raise" was under consideration due to the Company's cash needs. *Id.* ¶¶ 63, 65, 67. Sure enough, management negotiated the CMPO capital raise in the weeks that followed. *Id.* ¶ 68. Similarly, by the time Bell told investors on May 14, 2024, that "we feel very comfortable with our liquidity position as it stands today," he was informed by Terran Orbital's financial advisor that almost three dozen companies dropped out of the sale process because its business forecast was unrealistic, he had recently suggested conducting another offering to raise needed capital, Hobart spoke with a subprime lender a week earlier because Terran Orbital was in such bad need of cash, and the Special Committee continued to engage with Lockheed Martin even though it withdrew its offer. *Id.* ¶¶ 97, 102-03, 105. Indeed, one week later, on May 23, 2024, Hobart told the Board that the Company faced a $120 million shortfall. *Id.* ¶ 106.

Further, nearly all statements expressing confidence in *future* cash flows did not speak to Terran Orbital's financial stability at an abstract future point but, rather, expressly advised that it could survive on cash flows from its operations until they turned "positive" in the second half of 2024 and, thus, became self-sustaining. *Id.* ¶¶ 140, 143-45, 159.[4] But Terran Orbital's immediate cash needs were so dire at the time these statements were made—despite the recent the CMPO—that management was moving ahead with an unsolicited sale process, which the Board authorized in light of Terran Orbital's "continued cash constraints." *Id.* ¶¶ 72, 146. Indeed, there would be no need to continue with the sale process if Terran Orbital's ability to reach "breakeven" was assured.

---

[4] Even the statement from AC ¶ 140 that Defendants cite (Mot. 18) was framed in terms of becoming "cash flow positive" in "the second half" of 2024. That Hobart was speaking about the ability to sustain operations until then is evident from his accompanying statement that "we'll start seeing that ramp up even more so *going into 2024*," before cash flows would turn positive. *Id.*

More fundamentally, Defendants' singular focus on whether their statements were literally false disregards that Rule 10b-5 prohibits "half-truths" that are misleading by omission. *FindWhat*, 658 F.3d at 1305; *see also Barney Holland Oil Co. v. FleetCor Techs., Inc.*, 2007 WL 9702207, at *5 (N.D. Ga. Aug. 17, 2007) (it is irrelevant a statement may be "technically true").  Here, a jury could easily find that Defendants' repeated assurances—including that "[w]e are not running out of cash," "we are not looking to raise money," and "we feel very comfortable with our liquidity position as it stands today"—gave the false impression that Terran Orbital did not require external funding to continue operating or need a sale to avoid potential insolvency.  Thus, once they chose to tout Terran Orbital's cash stability, Defendants were required to provide a complete picture—both good and bad—to avoid misleading investors.  *See SEC v. Merchant Capital, LLC*, 483 F.3d 747, 770-71 (11th Cir. 2007) ("touting" business experience put the topic at issue and trigger duty to disclose negative facts); *see also In re Jan. 2021 Short Squeeze Trading Litig.*, 620 F. Supp. 3d 1231, 1265 (S.D. Fla. 2022) ("denying any concerns about liquidity despite internal . . . statements to the contrary" is misleading); *Sheet Metal Workers Loc. 19 Pension Fund v. ProAssurance Corp.*, 600 F. Supp. 3d 1189, 1208 (N.D. Ala. 2021) (same for problems "acknowledged in a meeting internally" at time of statements).  For similar reasons, even if the ATM Agreement announced in July 2024 provided an additional source of capital, it was misleading to present it as such when Terran Orbital was potentially unable to use it before running out of cash.  AC ¶¶ 157-58.  Indeed, the "natural and normal implication" of that disclosure—expressly made to give added confidence in Terran Orbital's cash stability—was that it could do so freely without restriction or, at the very least, before filing for bankruptcy.  *FindWhat*, 658 F.3d at 1305.

**Third**, Defendants' efforts to characterize various statements as opinions fare no better.  Mot. 16-18.  As the Supreme Court explained, "a statement of fact ('the coffee is hot') expresses

certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not." *Omnicare*, 575 U.S. at 183.  But several of the statements captured by this argument express certainty, including, for example, "[w]e . . . have *no* concerns at this point about our cash," "[w]e do not have *any* concerns about that [debt] covenant," and confirming "[y]es, we do" when asked "do you have enough cash to make it through to cash flow positive?"  AC ¶¶ 138, 153, 159.

In any case, all such statements are actionable.  In the challenged statements, Defendants expressed their comfort with Terran Orbital's liquidity or stated that it had sufficient cashflows to reach "breakeven" in 2024.  AC ¶¶ 138, 144, 145, 148, 152, 153, 155, 159.  As *Omnicare* held, and as Defendants accept (Mot. 17), an opinion is "untrue" if it is not honestly held by the speaker but can also be "misleading" if it lacks a reasonable basis.  575 U.S. at 185-89.  This is so because investors expect opinions to "fairly align[] with the information in the issuer's possession," especially the views of senior officials.  *Id.* at 189-90; *see also SEC v. Mufareh*, 2024 WL 3952437, at *10 (M.D. Fla. Aug. 27, 2024) ("a defendant can be held liable" for opinions that "do not fairly align with [internal] information").  Bell and Hobart cannot deny that they harbored beliefs contrary to their upbeat assessments because they were the ones who repeatedly raised ***concerns*** with the Board about Terran Orbital's cash constraints.  For the same reason, Defendants' statements did not fairly align with the information they possessed even if others raised the liquidity concerns at those meetings.  *See Shafer v. Glob. Payments, Inc.*, 2024 WL 2789447, at *5 (N.D. Ga. Mar. 29, 2024) (opinions made when speaker is "on notice" of facts undermining them are actionable); *see also Chabot Walgreens Boots Alliance, Inc.*, 2023 WL 2908827, at *15 (M.D. Pa. Mar. 31, 2023) (directing others to "confidentially develop a plan B" supported finding that public opinions by same executive expressing confidence in current proposal "were insincere or lacked a reasonable basis").

Unable to respond on the merits, Defendants stress that Terran Orbital consistently disclosed

its revenue and cash balance.  Mot. 18.  But Plaintiffs do not fault them for omitting those facts.  AC ¶¶ 139, 146, 151, 154, 156.  Indeed, cash balances as of a certain date (reported several months after the fact) say nothing about the sufficiency of cashflows or a company's overall liquidity in future periods (*e.g.*, when the figures are disclosed).  Thus, investors were led to believe that Terran Orbital's had sufficient cash flows to sustain until "breakeven," *notwithstanding* its recent results.

**2.    Defendants' Remaining Attempts to Categorically Exempt Their Misstatements from Liability as a Matter of Law Are Meritless**

Given the above, Defendants attempt to argue that the vast majority of their misstatements are exempt from liability as a matter of law by raising several baseless categorical challenges.

**PSLRA Safe Harbor**.  Defendants first claim that the statements in AC ¶¶ 135-36, 140, 143-44, 153, and 161—made in Terran Orbital press releases or conference calls hosted by it—are protected by the PSLRA safe harbor. Mot. at 11-15.[5]  This argument is flawed on many levels.

The safe harbor is limited by its terms to "forward-looking statement[s]."  15 U.S.C. § 78u-5(c).  As such, it does not protect statements that "represent present facts," *FindWhat*, 658 F.3d at 1299, and, as Defendants' case makes clear, any "distinct present-tense . . . component[]" in mixed present/future statement.  *Carvelli*, 934 F.3d at 1328.  In AC ¶ 136, an analyst asked Bell to clarify whether the 2023 revenue outlook announced earlier that day relied on any payments from Rivada or they simply represented a source for additional "upside."  By responding "Tranche 1 is by far the largest part," Bell signaled that those payments were not part of—or, at the very least, not a large part of—the *present* model.  *Id.*  Similarly, in AC ¶153, Riffel stated "[w]e do not have any concerns

---

[5] Notably, Defendants do *not* argue that a nearly identical statement in AC ¶ 155 is protected by the safe harbor.  There is good reason why:  Bell failed to give *any* warning during the third-party interview that identified any type of statement as "forward-looking," much less specify any documents containing a description of the factors that could cause actual results to differ.  *See Helwig v. Vencor, Inc.*, 251 F.3d 540, 558-59 (6th Cir. 2001) (press release and SEC filings lacking statement "designat[ing]" predictions as "forward-looking" not protected by safe harbor); *Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 877 (N.D. Cal. 2023) (same for analyst call).

- 15 -

about that covenant *at this time*." That these assertions are not forward-looking is evident from the fact that their veracity is "discernable" at the time they were made. *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 2011 WL 1585605, at *36 (S.D. Fla. Apr. 25, 2011), *aff'd* 688 F.3d 713 (11th Cir. 2012).

Regardless, the grab bag of cautionary statements collected by Defendants about what "may" or "could" occur in the future are plainly insufficient to merit safe harbor protection. Mot. 13-14. To be "meaningful" for the safe harbor, cautionary language must warn of "important factors that could cause actual results to differ . . . similar to that actually realized." *Carvelli*, 934 F.3d at 1326-27. It is of no moment that the disclosures here generally referred to uncertainties regarding Rivada, financing, and cash flows. By posing them as abstract future possibilities, the disclosures "impl[ied] that no such problems were on the horizon." *Asher v. Baxter Int'l, Inc.*, 377 F.3d 727, 733 (7th Cir. 2004); *see also SEC v. Torchia*, 183 F. Supp. 3d 1291, 1313 n.21 (N.D. Ga. 2016) (disclosing "possibility" of adverse events "implied that the risks . . . had not occurred"). But at the time of each misstatement, Defendants *knew* that Terran Orbital was *already* facing cashflow constraints to such a degree that external capital was necessary to continue operating, and/or *knew* that removing the cashflows from Rivada would be financially devastating in 2024. Indeed, Terran Orbital's liquidity problems materialized at the outset of the Class Period, and only continued to grow worse over time.

Significantly, "cautionary language can't be 'meaningful' if it is nothing more than a front for present problems." *Carvelli*, 934 F.3d at 1327. Such is the case when it describes "possible future risks while failing to disclose known facts suggesting risks that had already happened." *Pritchard v. Apyx Med. Corp.*, 2020 WL 1180731, at *7 (M.D. Fla. Mar. 11, 2020); *see also In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 2010 WL 6352664, at *3 (S.D. Fla. Sept. 9, 2010) (general warning about "potential impact of an economic slowdown" does not "cure" failure to disclose "actual deterioration of the . . . loans"); *Edge v. Tupperware Brands Corp.*, 2023 WL 6310236, at *4

(M.D. Fla. Sept. 28, 2023) (warning on "efforts to improve its profitability" and "success and timing of" turnaround plan not meaningful when issuer "was cutting prices to move inventory, reducing margins to almost zero, and abandoning the Turnaround Plan"). Were it otherwise, any issuer could escape liability by simply claiming that known events are merely *possible*. That is not the law. *FindWhat*, 658 F.3d at 1299 ("To warn that the untoward may occur when the event is contingent is prudent, to caution that it is only possible . . . when they have already occurred is deceit."); *In re 21st Century Holding Co. Sec. Litig.*, 2008 WL 5749572, at *13 (S.D. Fla. Nov. 7, 2008) ("Cautionary language can never be 'meaningful' if it warns of risks that have already materialized.").

Separately, the safe harbor offers no protection because Bell, Hobart, and Sclavos **knew** the disputed statements were false or misleading. Consistent with *Omnicare*, the SEC has long viewed forecasts of the type here to communicate that (1) the statement is genuinely believed; and (2) there is a reasonable basis for the belief. *Slayton v. Am. Express Co.*, 604 F.3d 758, 774 (2d Cir. 2010) (citing SEC *amicus* brief). As discussed above and in Point I.B.1, the AC pleads that Bell and Hobart's public assurances were insincere and conflicted with the liquidity concerns they repeatedly raised with Terran Orbital's Board. Sclavos is equally culpable because he was present at the same Board meetings where Bell and Hobart raised these concerns. *See Marrari v. Med. Staffing Network Holdings, Inc.*, 395 F. Supp. 2d 1169, 1189 (S.D. Fla. 2005) (actual knowledge inferred from fact defendants were "informed" by employees of negative trends). As such, this case does not bear a metaphorical thread to *Einhorn v. Axogen, Inc.*, 42 F.4th 1218 (11th Cir. 2022), the case Defendants cite, in which the complaint expressly *disclaimed* any allegations of intentional wrongdoing to more easily state a claim under the Securities Act of 1933 (which does not require scienter). *Id.* at 1225.

**Puffery**. Defendants also seek to downplay the statements in AC ¶¶ 135, 140-41, 144, 149-50, 153, 157, 159, and 160 as inactionable "puffery" (Mot. 15-16), *i.e.*, statements so "[e]xcessively"

vague or optimistic they are deemed immaterial as a matter of law. *Carvelli*, 934 F.3d at 1320. Materiality turns on whether there is a "substantial likelihood" a reasonable investor would find the information "important." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449-50 (1976). Because this requires a "delicate assessment of the inferences a reasonable investor would draw from a given set of facts and the significance of those inferences to him," this is a matter best left to "the trier of fact." *Carvelli*, 934 F.3d at 1320 (quoting *TSC*, 426 U.S. at 450). As such, a claim should not be dismissed for failure to plead materiality unless the alleged misstatement is "so obviously unimportant . . . that reasonable minds could not differ." *Id.* Defendants' challenge flouts this rule.

Information that is "objectively verifiable" is not puffery. *Theodore v. Purecycle Techs., Inc.*, 2022 WL 20157415, at *9 (M.D. Fla. Aug. 4, 2022) (*Purecycle I*); *City of Warren Gen. Emps.' Ret. Sys. v. Teleperformance SE*, 746 F. Supp. 3d 1395, 1407 (S.D. Fla. 2024) (*Teleperformance II*) (same when statements use "concrete language"). But the affirmations that Defendants sweep into their argument fail this simple litmus test, including, for example, "cash flow we generate from our programs . . . should cover our needs going forward," "cash is stable," "we don't need cash," confirming "[t]he answer is yes" when asked if Terran Capital will meet its debt covenant, and verifying "[y]es we do" in response to the question "do you have enough cash to make it through to cash flow positive." AC ¶¶ 140, 149-50, 153, 159. This remains so even if the statements otherwise employ "flowery language." *Purecycle I*, 2022 WL 20157415, at *9. Similarly, statements are not beyond reproach simply because they may address Terran Orbital's future prospects. None represent the type of "exaggeration and ballyhoo" that investors *disregard* out of hand. *Tung v. Dycom Indus., Inc.*, 454 F. Supp. 3d 1244, 1257 (S.D. Fla. 2020); *see also Edge*, 2023 WL 6310236, at *5 (prospective statements on "profitability, price increases, and the status of the Turnaround Plan" not puffery because they "represent important information to a reasonable investor").

More fundamentally, as a concept rooted in materiality, whether a statement is puffery depends on "context." *Carvelli*, 934 F.3d at 1320; *see also Keippel v. Health Ins. Innovations, Inc.*, 2019 WL 5698329, at *7 (M.D. Fla. Nov. 4, 2019) (statements that "might be considered puffery in one context . . . may be found actionable in another."). Here, the statements about Terran Orbital's liquidity and the Rivada Contract were paramount to investors. By the first day of the Class Period, investors were "concerned" about Terran Orbital's eroding cash balance and, thus, focused on the timing and extent of the impact of the Rivada Contract on Terran Orbital's bottom line. AC ¶¶ 4, 54-56, 59. Later, in October 2023, a block of investors lodged a public protest over concerns about Defendants' cash management. *Id.* ¶ 73. This context dispels any doubt that Defendants' *repeated* reassurances about Terran Orbital's cash position and the Rivada Contract were meant to quell investor concern. *See ProAssurance*, 600 F. Supp. 3d at 1215 (statements not puffery when context suggest they were made to "allay investor concerns"); *Keippel*, 2019 WL 5698329, at *7 (same when defendants "emphasized" topic "every quarter" on calls). That several of these statements (and like comments) were made in direct response to investor and analyst inquiry (AC ¶¶ 60, 67, 140-41, 153, 159) confirms they were material to investors. *See Neb. Inv. Council v. Fidelity Nat'l Info. Servs., Inc.*, 2024 WL 4349125, at *4 (M.D. Fla. Sept. 30, 2024) (materiality evident when statements "made in response to specific questions from investors"). Still other statements were expressly made with the "goal to demonstrate to the market" and "getting people comfortable" that cash was stable. *Id.* ¶¶ 149-50. Defendants' puffery challenge cannot be sustained on this record.[6]

---

[6] Defendants stress that Hobart, Riffel, and Sclavos are alleged to only make a single misstatement. Mot. 16, 18. This ignores that, as alleged (AC ¶¶ 136, 138, 140-41, 143, 145 152-53, 159, 161), they are also liable for being present on calls where others "uttered a false statement" and they "failed to correct it." *Rosky ex rel. Wellcare Health Plans, Inc. v. Farha*, 2009 WL 3853592, at *6 (M.D. Fla. Mar. 30, 2009) (quoting *Barrie v. Intervoice-Brit, Inc.*, 409 F.3d 653, 656 (5th Cir. 2005)); *see also Beckel v. Fagron Holding USA, LLC*, 2019 WL 5110828, at *5 (M.D. Fla. June 24, 2019) (defendants liable when they were "present at the meeting and did not dispute or otherwise correct" misstatements made by another party).

## B.      The AC Raises a Strong Inference of Scienter

Scienter is a state of mind embracing "intent to defraud" as well as "severe recklessness." *FindWhat*, 658 F.3d at 1299; *see also TSG Water Res., Inc. v. D'Alba & Donovan Certified Pub. Accts., P.C.*, 260 F. App'x 191, 202 & n.2 (11th Dec. 2007) (failing to distinguish between "intent" and "recklessness" is improper).  Severe recklessness arises when there is "a danger of misleading buyers" that "is so obvious that the defendant must have been aware of it."  *FindWhat*, 658 F.3d at 1300.  Importantly, scienter can be inferred from "direct" or "circumstantial" evidence.  *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1249 (11th Cir. 2008); *see also Nathenson v. Zonagen Inc.*, 267 F.3d 400, 410 (5th Cir. 2001) ("Congress plainly contemplated that scienter could be proven by inference, thus acknowledging the role of indirect and circumstantial evidence").  Indeed, such an inference may be pled through "circumstantial evidence alone."  *Mizzaro*, 554 F.3d at 1249.

To qualify as "strong" under 15 U.S.C. § 78u-4(b)(2), the inference of scienter must be "cogent and at least as compelling as any opposing inference" drawn from the facts alleged.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).  The test is whether "*all* of the facts alleged, taken collectively, give rise to a strong inference . . . not whether any individual allegation, scrutinized in isolation" does so.  *Id.* at 323.  Notably, the inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible.'"  *Id.* at 324.  Rather, a tie among competing inferences favors the plaintiff.  *Id.*  Here, the AC pleads a host of facts that, individually and in concert, raise an overwhelming inference of scienter for each Defendant.

### 1.      The AC Pleads Irrefutable Direct Evidence of Scienter

Publishing statements when the speaker "knew facts suggesting the statements were inaccurate or misleadingly incomplete" is "classic evidence of scienter."  *Short Squeeze*, 620 F. Supp. 3d at 1253; *see also SEC v. Revolutionary Concepts, Inc.*, 2022 WL 386085, at *10 (11th Cir. Feb. 9, 2022) (failure to disclose contrary facts is "classic . . . evidence of scienter"); *Edge*, 2023 WL

6310236, at *6 ("Incongruity between word and deed establishes a strong inference of scienter.").

The Proxy filed in support of the sale to Lockheed Martin—a trustworthy SEC-filed disclosure *signed by Bell* (AC ¶ 132)—unequivocally documents Defendants' knowledge of the undisclosed liquidity struggles that made their public assurances on the topic false or misleading.[7] By spring 2023, management recognized action was needed to address an urgent cash shortfall. *Id.* ¶ 192. Over several months, the Board met frequently to discuss "concerns" raised by Bell and Hobart about Terran Orbital's "liquidity issues" and "cash constraints." *Id.* ¶¶ 193-94. At these meetings, Bell and Hobart warned that, absent drastic steps to raise more capital or find a new owner, the "magnitude" of the issues would render Terran Orbital insolvent, which ultimately led the Board to form the Special Committee and initiate a sale process. *Id.* The Proxy also confirms that the customer payments in late 2023 were insufficient to satisfy anything beyond Terran Orbital's immediate cash needs and, as such, it moved ahead with the sale process, and Bell suggested conducting another issuance in March 2024 to raise needed capital. *Id.* ¶ 195. In May 2024, Bell reported that the decision to abandon the Rivada Contract "significantly deteriorated the Company's cash forecast," and Hobart warned that it needed *$120 million* to operate through year-end. AC ¶ 196. These admissions evince Defendants' scienter. *See In re Immucor Inc. Sec. Litig.*, 2006 WL 3000133, at *18 (N.D. Ga. Oct. 4, 2006) (allegation of a "special meeting" at which defendants "served as presenters" on concealed subject shows scienter); *see also Short Squeeze*, 620 F. Supp. 3d at 1255 (scienter supported by later admission of liquidity problems at the time of misstatements).

For similar reasons, the Proxy also provides direct evidence of scienter for the statements that the Company was not dependent on the Rivada Contract. AC ¶¶ 160-61. As pled, when Bell decided to remove Rivada's payments from the business plan, it "significantly deteriorated the

---

[7] Attached as Exhibit 1 is a complete copy of the section from the Proxy describing the discussions leading to the buyout by Lockheed Martin, which Defendants only attached in excerpted form, and confirms the accuracy of Plaintiffs' allegations.

Company's cash forecast" to such a degree that Terran Orbital needed $120 million to continue operating through the end of the year. *Id.* ¶ 196. These statements, made to the Board on May 23, 2024, show that Bell and Hobart were plainly aware that the Rivada Contract was materially important to Terran Orbital. While this admission was made one week after Bell's misstatement on May 14, 2024, that alone is not dispositive. If Defendants decided to formally report the decision to remove Rivada from its business model on May 23, 2024, it is fair to infer that they were at least aware of the *significance* of those cash flows before then, especially a mere week before then. *See Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 143 n.13 (2d Cir. 2010) (allegation of misconduct in later period "may support an inference that it was present six months earlier"); *Triton II, LLC v. Randazzo*, 2019 WL 1777726, at *5 (S.D. Fla. Apr. 23, 2019) (scienter pled when "several subsequent events . . . provide circumstantial proof" of knowledge at time of misstatements).

Unable to deny their *knowledge* of these incriminating facts, Defendants reprise their misguided falsity argument that attempts to draw a false distinction between Terran Orbital's current and long-term cash needs, which are thoroughly discussed in Point I.A.1. Mot. 24-25. For example, while Defendants mischaracterize the admissions made on September 11, 2023 and October 6, 2023, as referring to *future* liquidity, the AC pleads that (i) the Special Committee was formed on September 11, 2023 because of prior concerns raised by Bell and Hobart, which expressly addressed Terran Orbital's "**near-term** liquidity" and its "cash position . . . *in the coming months*" (AC ¶¶ 64-65, 69), and (ii) the decision to initiate a sale process was admittedly based on Terran Orbital's "**continued** cash constraints" as of that date (AC ¶ 72).[8] That Defendants are forced to parse these statements (and jettison any effort to dispute knowledge) exposes the folly of their argument.

---

[8] Defendants also posit that there is no inconsistency between Hobart's admission on May 23, 2024, and the statement on June 25, 2024 because the former spoke to Terran Orbital's cash needs for the year and the latter about "the end of the quarter." Mot. 25. This ignores that the admission addressed Terran Orbital's cash needs *through* the end of the year. AC ¶ 106. In fact, Hobart said at the same meeting that the Company's liquidity profile was "constrained" in *the next quarter*. *Id.*

Given these infirmities, Defendants resort to arguing that the AC engages in improper "group pleading" because it does not specifically identify them by name. Mot. 20, 26. This elevates form over substance. The law is clear that a plaintiff may "aggregate facts to imply scienter." *City of Warren Gen. Emps.' Ret. Sys. v. Teleperformance SE*, 2024 WL 2320209, at \*18 (S.D. Fla. May 22, 2024) (*Teleperformance I*). The AC pleads that Bell and Sclavos were members of the Board, and Sclavos was a member of the Special Committee. AC ¶¶ 17, 20, 69. It also pleads precisely when Bell, Hobart, and Riffel presented to the Board and Special Committee. *Id.* ¶¶ 58-131. These detailed, party-specific allegations dispel any suggestion that the AC claims "group responsibility" without specifying individual involvement. *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 118 (11th Cir. 2004); *see also SEC v. GlobeTel Commc'ns Corp.*, 2008 WL 11333153, at \*5 (S.D. Fla. Nov. 12, 2008) (complaint does not use group pleading when it "separately identifies each Defendant, describes each Defendant's relationship to each other, and identifies each Defendant's respective position"); *Sides v. Simmons*, 2007 WL 2819371, at \*5 (S.D. Fla. Sept. 24, 2007) (same for allegations that broadly refer to "defendants" when "earlier paragraphs" incorporated therein "clearly outline each individual Defendant's alleged activity" and "when it occurred").

To detract from the glaring admissions in the Proxy, Defendants labor to discredit the CWs by insisting that none "interacted" with them. Mot. 2, 22. But Plaintiffs do not rely on the CWs to plead scienter except a single statement by CW2 that it was "known" throughout the Company that money was not coming in on time in late 2023 and early 2024. AC ¶ 104. That CW2 never "discussed the alleged fraud" with Defendants is inapposite because "circumstantial proof will suffice." *Thorpe v. Walter Inv. Mgmt., Corp.*, 111 F. Supp. 3d 1336, 1373 (S.D. Fla. 2015); *see also In re Flowers Foods, Inc. Sec. Litig.*, 2018 WL 1558558, at \*15 (M.D. Ga. Mar. 23, 2018) (same). Indeed, the Eleventh Circuit has made clear that such statements may be considered so long as they

- 23 -

bear the hallmarks of reliability. *Luczak v. Nat'l Beverage Corp.*, 812 F. App'x 915, 925 (11th Cir. 2020). Despite Defendants' effort to overcomplicate it, Plaintiffs need only describe "the position(s) held, the proximity to the offending conduct, and the relevant time frame." *Id.* at 924.[9] The AC does just that, specifying that CW2 learned this "from senior executives and program managers who reported to Defendants." AC ¶¶ 104. Moreover, this is fully consistent with the fact that Bell gave an update on collection delays in an all-employee call in December 2023. AC ¶¶ 85. In any case, the Proxy details Defendants' knowledge of the collection delays throughout the Class Period. *Id.* ¶¶ 65, 106; Ex. 1. That CW2's statement is corroborated by other allegations provides further indicia of its reliability. *See Tung*, 454 F. Supp. 3d at 1257 (crediting CW statements when they are "corroborated" by content of "SEC filings"); *Flowers Foods*, 2018 WL 1558558, at *17 (same when statements "corroborated by numerous other allegations" in complaint).

### 2.     The AC Alleges Compelling Individualized Motives

While the lack of a motive to defraud is not "fatal," an allegation of "personal financial gain may weigh heavily in favor of a scienter inference." *Tellabs*, 551 U.S. at 325; *accord Haddad v. RAV Bahhamas, Ltd.*, 2008 WL 11399704, at *5 (S.D. Fla. Nov. 6, 2008). Here, Defendants had ample motive to hide Terran Orbital's liquidity woes because (1) its very survival hinged on constantly raising significant sums of new capital or finding a buyer; and (2) Bell and Hobart stood to gain (and did gain) large sums from consummating a sale transaction. AC ¶¶ 202-08.

As alleged, Terran Orbital's liquidity crisis posed an "existential" threat to Terran Orbital's survival that required it to raise new capital or attract a strategic buyer, both of which would be negatively impacted if its liquidity struggles were known publicly. *Id.* ¶¶ 206, 209-10. Defendants

---

[9] In this regard, Defendants' attempts to impugn other statements of CW2 and those by CW4 are especially misplaced. CW2 learned that Bell felt that Terran Orbital had "no choice but to finalize a deal with Lockheed Martin" from an *all-employee meeting hosted by Bell*. AC ¶ 131. Similarly, CW4 reported the departure of *colleagues* and CW4's *own departure*. *Id. Id.* ¶ 87.

attempt to liken this to a "generic" motive held by all companies to increase profits and raise capital. Mot. 21-22.  But these allegations—unique and specific to Terran Orbital's survival—set this motive apart from those held by *all* companies.  *See Sood v. Catalyst Pharm. Partners Inc.*, 2014 WL 1245271, at *7 (M.D. Fla. Mar. 26, 2014) (motive pled for issuer when "remaining listed on the public exchange was essential to its survival").  In fact, this very argument was recently rejected in *Short Squeeze*, which credited the allegation that the corporate defendant's "financial desperation" supplied a proper motive.  620 F. Supp. 3d at 1252-55.  Although the Eleventh Circuit has not weighed in, this is consistent with holdings from several other Circuits.  *See Frank v. Dana Corp.*, 646 F.3d 954, 960 (6th Cir. 2011) (need for company to secure "loans imperative for its survival" provided proper motive); *In re Cabletron Sys., Inc.*, 311 F.3d 11, 39 (1st Cir. 2002) (motive pled when complaint alleged that "very survival" of company was on the line).

If that were not enough, Bell and Hobart stood to profit handsomely (including up to *three times* base salary) under the change-of-control provision in their employment agreements if they consummated a buyout.  AC ¶¶ 203-04.  A bespoke payout specific to their employment contract is a far cry from a general desire to receive higher executive compensation.  *See Theodore v. Purecycle Techs., Inc.*, 2023 WL 4035880, at *6 (M.D. Fla. June 15, 2023) (*Purecycle II*) ("personal financial incentive to consummate a merger" from merger bonus is a proper motive).  Indeed, unlike executives of other companies, these provisions gave Bell and Hobart interests in the merger that admittedly *differed* from stockholders.  AC ¶ 206.  Defendants attack this motive by misreading a case which declined to credit a change-in-control clause motive when it was based on "speculation and conjecture."  *Waterford Twp. Gen. Emps. Ret. Sys. v. Suntrust Banks, Inc.*, 2010 WL 3368922, at *4 (N.D. Ga. Aug. 19, 2010).  Such was the case there because the complaint did not allege that a merger was, in fact, being pursued.  *See* Ex. 2 (complaint).  That is simply not the case here.

- 25 -

Defendants also incorrectly argue that the lack of insider stock sales suggests there was "**no** scienter." Mot. at 20-21. But in the very case they cite, the Eleventh Circuit "emphasize[d] that suspicious stock sales are not *necessary* to create a strong inference of scienter." *Mizzaro*, 544 F.3d at 1253 n.3. It held that the lack of such sales weighed against scienter because, unlike here, no other motive was pled. *Id.* at 1253. But that is not so when *other* motive allegations "fill[] a gap left by the lack of [such] activity." *In re Thornburg Mortg., Inc. Sec. Litig.*, 695 F. Supp. 2d 1165, 1194 (D.N.M. 2010), *aff'd sub nom. Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190 (10th Cir. 2013); *see also Fla. St. Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 663 (8th Cir. 2001) (lack of stock sales not dispositive when there are "other motives, such as the hope of huge bonuses").

Citing Form 4 filings, Defendants also assert that scienter is further undercut by the increase in their stock holdings. Mot. at 21 (citing Defs. Exs. 14-21). But Defendants' exhibits show that the acquisitions reported therein (designated by an A) were shares awarded *automatically* through options granted to them at *no cost* and, thus, do not "negate" scienter. *In re Adv. Auto Parts, Inc. Sec. Litig.*, 2020 WL 599543, at *8-9 (D. Del. Feb. 7, 2020); *see also Lamartina v. VMware, Inc.*, 2023 WL 2763541, at *15 (N.D. Cal. Mar. 31, 2023) (similar). On the contrary, the increase in their holdings provided even *more* motive because the "change in control" provision vested *all* equity awards upon a change-in-control transaction. AC ¶ 202.

### 3. The Core Operations Doctrine Supports an Inference of Scienter

The core operations doctrine embodies a commonsense inference that "officers of a company have knowledge of critical facts related to its core operations." *Teleperformance II*, 746 F. Supp. 3d at 1407. Defendants stress that this principle can "rarely" give rise to a strong inference of scienter on its own. Mot. 27. Even so, courts—including the case they rely on—agree that such allegations can "bolster" the inference of scienter, especially when coupled with other pertinent allegations. *Teleperformance II*, 746 F. Supp. 3d at 1412; *see also Flowers Foods*, 2018 WL 1558558, at *14.

Here, Terran Orbital's very "survival" hinged on finding a solution to its worsening liquidity profile, which was the subject of intense focus, discussed repeatedly at Board meetings with the input of numerous third-party advisors who worked with senior management. AC ¶ 210. Similarly, the Rivada Contract represented a whopping 92% of Terran Orbital's future "backlog" and was a critical, if not the single largest, component of its business forecast in 2023 and 2024. *Id.* ¶¶ 106, 211. Courts have found the inference applicable on far weaker facts. *See Teleperformance I*, 2024 WL 2320209, at *19 (business that was a "significant driver of [future] growth" permitted core operation inference); *Pub. Emps. Ret. Sys. of Miss. v. Mohawk Indus., Inc.*, 564 F. Supp. 3d 1272, 1302 (N.D. Ga. 2021) (same for business that accounted for 40% of sales); *see also Plotkin v. IP Axess Inc.*, 407 F.3d 690, 699-700 (5th Cir. 2005) (core operation inference proper when "IPaxess was a struggling company" and new "agreements" would bring in much needed revenue).

Defendants' singular focus on Rivada's financing is a sideshow. Mot. at 27-28. Under the circumstances described above, it is virtually inconceivable that Defendants were unaware that (1) the Rivada Contract accounted for nearly half of Terran Orbital's 2023 revenue guidance (*i.e.*, the first guidance it issued after signing the contract); (2) Terran Orbital's business forecast for 2024 was heavily dependent on revenue from Rivada; and (3) the severe liquidity constraints repeatedly discussed in Board meetings throughout the Class Period. *See Edge*, 2023 WL 6310236, at *6 (reasonable to infer defendants were aware of "status" of a critical "turnaround plan"). Indeed, Hobart's admitted on the first day of the Class Period that "we're looking at our liquidity ***constantly***" and Bell, who boasted about speaking with the CEO of Rivada "***almost daily***," ultimately informed the Board that the decision to no longer rely on Rivada in 2024 and the impact of that decision on its business. AC ¶¶ 106, 198, 200, 210. This is a classic case for the core operations inference.

### 4. A Wealth of Other Facts Confirms the Inference of Scienter

A variety of other facts further substantiate the inference of scienter.

**First**, while scienter cannot be pled solely on corporate position, it "can be inferred when a Defendant's position and responsibilities establish other particular facts probative of scienter." *Flowers Foods*, 2018 WL 1558558, at *14.  Here, a court "can reasonably conclude" that Hobart and Riffel, as the senior-most financial officers (AC ¶¶ 18-19), were "provided significant information, formally and informally, about the financial performance . . . over which he has overall operational responsibility."  *Flowers Foods*, 2018 WL 1558558, at *14.

**Second**, Bell spoke frequently on the subject of Terran Orbital's liquidity and cash needs as well as the Rivada Contract, and was constantly faced with questions regarding these topics from investors and analysts.  AC ¶¶138-58.  Making misstatements on a subject "repeatedly" can "more strongly evince an inference that the defendant spoke with scienter."  *Purecycle II*, 2023 WL 4035880, at *6 (collecting cases); *see also Edge*, 2023 WL 6310236, at *6 (similar when defendants "made several public statements on these topics" on calls).  Indeed, it "diminishes the likelihood that a misstatement was made out of carelessness."  *Teleperformance I*, 2024 WL 2320209, at *19.

**Third**, Bell held himself out as an expert on the Rivada Contract.  In response to repeated questions about it, Bell cited conversations with Rivada's CEO regarding their "funding sources," including "who their funding is and how much it's for," and frequent texts with the CEO about Rivada's outstanding payment.  AC ¶¶ 198-201.  Because he "held himself out to be knowledgeable" about the cash situation and the Rivada Contract, the Court may draw the inference that he reviewed the available information contradicting his public statements. *Thorpe*, 111 F. Supp. 3d at 1373-74.

**Fourth**, Hobart's sudden reassignment and the abrupt removal of Bell, Hobart, and Parekh support an inference of scienter.  AC ¶¶ 214-16, 219.  Hobart was removed four days after the Special Committee was formed to investigate the liquidity issues he brought to their attention, three days after it hired outside counsel to investigate restructuring options, and one day after moving

ahead with a CMPO to raise capital, which damaged stock sales. AC ¶ 217. He was also removed from the role of CFO in the midst of a liquidity crisis without a successor in place. *Id.* Similarly, Bell, Hobart, and Parekh were "at the epicenter" of Terran's business and "forced to resign." *In re Home Loan Servicing Sols., Ltd. Sec. Litig.*, 2016 WL 10592320, at *7 (S.D. Fla. June 6, 2016). Indeed, Bell stated, "I have no intentions of going anywhere" when the deal signed, and, at the time that Parekh was removed, he had been CFO for only *four months*; yet, he had replaced an "interim" CFO, so he was clearly not intended to be a short-term solution. AC ¶¶ 218-19. Equally, Lockheed Martin was not motivated by replacing the executive team with their own executives. AC ¶ 219.

**Fifth**, Defendants signed SOX certifications attesting that they designed controls to *ensure* that material information was provided to them for each filing. AC ¶¶ 220-23. While not indicative of scienter on their own, such certifications support scienter if "the person signing the certification had a reason to know, or should have suspected" that the filing contained misleading information due to "red flags." *Monroe Cnty. Emps.' Ret. Sys. v. Southern Co.*, 2018 WL 1558577, at *31 (N.D. Ga. Mar. 29, 2018). As stated above, the Individual Defendants were aware of glaring red flags that Terran's filings were misleadingly incomplete. *Id.* (SOX certifications add to scienter where signing executive had a "constant presence" monitoring the project's progress); *see also Loc. 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 2011 WL 12855820, at *8-9 (N.D. Ala. June 7, 2011) (same where signers "had access to and were aware of a financial situation that was not as strong as they were suggesting to the public").

### 5. The Inference of Scienter is Overwhelming

The AC pleads a narrative that raises the clear and compelling inference that Defendants sought to conceal Terran Orbital's liquidity crisis for as long as possible in order to raise capital or, alternatively, sell to Lockheed Martin, and thereby avoid a bankruptcy, which would have wiped Defendants' equity interests and eliminated their outsized buyout payments. Defendants' preferred

explanation—that "Terran and its management honestly believed that the Company would be successful" and "Rivada would perform its contractual obligations" (Mot. 29-30)—cannot be squared with the admissions in the Proxy that Bell and Hobart repeatedly warned that Terran Orbital was running out of cash and required major infusions of capital.  Indeed, it is difficult to conceive *any* nonculpable inference for why Defendants would conceal these adverse facts and repeatedly make public representations to the contrary.  Even if they "trusted that Rivada would perform its contractual obligations," Defendants insisted that the loss of payments from Rivada would have *no impact* on the business even though they knew that was false.  AC ¶¶ 159-61.  There can be no good faith for believing in a contingency that is publicly disclaimed.  At a bare minimum, there is "at least a fifty-fifty chance that the individual defendants knew about the alleged fraud (or were severely reckless in not knowing)."  *Mizzaro*, 544 F. 3d at 1249; *accord Thorpe*, 111 F. Supp. 3d at 1373.

## II.   PLAINTIFFS STATE A CONTROL PERSON CLAIM

A claim under Section 20(a) of the Exchange Act requires a primary violation and requisite control over it by a defendant.  *Carvelli*, 934 F.3d at 1330.  Conceding control, Defendants move to dismiss for failure to plead a primary violation or "culpable participation."  Mot. 30.  The Eleventh Circuit has specifically rejected the need to plead culpable participation.  *See Laperriere v. Vesta Ins. Grp., Inc.*, 526 F.3d 715, 723-25 (11th Cir. 2008); *see also City Pension Fund for Firefighters & Police Officers in City of Miami Beach v. Aracruz Cellulose S.A.*, 41 F. Supp. 3d 1369, 1408 (S.D. Fla. 2011) (noting same).  In addition, the AC pleads a primary violation for all the reasons above.

## CONCLUSION

For all the foregoing reasons, the Court should deny Defendants' Motion in its entirety.  Alternatively, Plaintiffs request leave to replead, which should be granted freely.  Fed. R. Civ. P. 15.

- 30 -

Dated:  May 19, 2025

MILLER SHAH LLP

*/s/ Jayne A. Goldstein*
Jayne A. Goldstein (Fl. Bar #144088)
Nathan C. Zipperian (Fl. Bar #61525)
2103 N. Commerce Pkwy.
Fort Lauderdale, Florida 33326
Telephone: (954) 515-0123
Facsimile: (866) 300-7367
jagoldstein@millershah.com
nczipperian@millershah.com

*Counsel for Plaintiffs and Liaison Counsel for the Class*

Respectfully submitted,

POMERANTZ LLP

*/s/ Justin D. D'Aloia*
Justin D. D'Aloia (admitted *pro hac vice*)
Guy Yedwab (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jdaloia@pomlaw.com
guyyedwab@pomlaw.com

*Counsel for Plaintiffs and Lead Counsel for the Class*

WOHL & FRUCHTER LLP
Joshua E. Fruchter
(*pro hac vice* application forthcoming)
25 Robert Pitt Drive, Suite 209G
Monsey, New York 10952
Telephone: (845) 290-6818
Facsimile: (718) 504-3773
jfruchter@wohlfruchter.com

*Additional Counsel for Lead Plaintiffs*

- 31 -