**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 24-CV-81191-RLR**

STEVEN VERZWYVELT, JESSE RAMIREZ,
MICHAEL O'NEILL & JILL O'NEILL,
*individually and on behalf of all others*
*similarly situated*,

      Plaintiffs,

v.

TERRAN ORBITAL CORPORATION,
MARC H. BELL, MATHIEU RIFFEL, GARY
A. HOBART & STRATTON SCLAVOS,

      Defendants.

_____/

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

**THIS CAUSE** is before the Court on the Motion to Dismiss filed by Defendants Terran Orbital Corporation, Marc H. Bell, Mathieu Riffel, Gary A. Hobart, and Stratton Sclavos (collectively, "Defendants"). DE 58. The Court has reviewed Plaintiffs' Response [DE 72] and Reply [DE 75]. For the reasons set forth below, Defendants' Motion is **GRANTED**.

## I.      INTRODUCTION

At the center of this case are two things. The first is cash. More specifically, a company's cash reserves. A company must have a certain amount of cash on hand to operate. The Plaintiff-investors in this case allege that Defendants' representations about the amount of cash the company had on hand—and the revenue the company expected to obtain in the future—were sufficiently false and misleading so as to render Defendants liable to Plaintiffs for damages.

But at the center of this case is one more thing: the applicable legal standard for Plaintiffs to prevail. The standard in this Circuit is very, very high. As detailed below, Plaintiffs have many allegations in this case, and some of them are troubling. Even so, when the Court compares Plaintiffs' allegations to the applicable legal standard, the Court concludes that Plaintiffs' allegations fall short.

Below, in the Court's **(III)** summary of the facts, the Court focuses on Plaintiffs' allegations about cash and revenue. The Court then turns to **(IV)** the applicable legal standard and **(V)** the Court's analysis of Plaintiffs' allegations. First, however, the Court briefly summarizes the **(II)** procedural history of this case.

## II.        PROCEDURAL BACKGROUND

Lead Plaintiffs[1] ("Plaintiffs") filed this class action lawsuit against Defendant Terran Orbital Corporation ("Terran Orbital"). DE 37. Plaintiffs also named four individual Defendants: Marc H. Bell, who served as CEO of Terran Orbital and as Chairman of its board of directors; Gary A. Hobart, who served as Terran Orbital's Chief Financial Officer, Executive Vice President, and Treasurer before serving as Chief Transformation Officer; Mathieu Riffel, who is Terran Orbital's current Senior Vice President and Chief Accounting Officer; and Stratton Sclavos, who is currently a director on Terran Orbital's board of directors (collectively, the "Individual Defendants," and together with Terran Orbital, "Defendants"). *Id.* ¶¶ 17–20. Plaintiffs bring this action on their own behalf and on behalf of a putative class of all persons and entities other than

---

[1] At the start of this litigation, the Lead Plaintiff was Michael Lewitter. *See* DE 1 at 1. On January 2, 2025, upon Plaintiffs' motion, the Court appointed as Lead Plaintiffs Steven Verzwyvelt, Jesse Ramirez, Michael O'Neill, and Jill O'Neill. DE 28.

Defendants that purchased or otherwise acquired Terran Orbital securities between March 21, 2023, and August 14, 2024 (the "Class Period") and were damaged thereby. *Id.* ¶ 1.

Pursuant to the Court's scheduling order [DE 36], Plaintiffs filed the First Amended Complaint on February 18, 2025, alleging that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, and that the Individual Defendants violated Section 20(a) of the Exchange Act. DE 37.  Defendants moved to dismiss [DE 58] on April 4, 2025, based on Federal Rules of Civil Procedure 12(b)(6) and 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). Plaintiffs filed their Response in Opposition [DE 72] on May 19, 2025.  Defendants filed their Reply[2] [DE 75] in Support on June 16, 2025.

### III.    FACTUAL BACKGROUND[3]

Defendant Terran Orbital is a startup company that sells small satellites to commercial and governmental customers. DE 37 at 4–5.  In 2022, Defendant Bell became Terran Orbital's Chief Executive Officer and, at that time, Bell took the company public through a special purpose acquisition company, or SPAC. *Id.* at 5.  The driving plan behind the SPAC was that Terran Orbital would broadly expand its operations to build a multibillion-dollar enterprise, based upon Terran Orbital's anticipation that the demand for small satellites would "skyrocket" in the future. *Id.*

As Terran Orbital expanded its operations, it needed cash, and it obtained the needed cash in the form of an investment from Lockheed Martin in late 2022. *Id.*  The cash infusion from Lockheed Martin began to deplete quickly, however, and investors were concerned that Terran

---

[2] Defendants Riffel and Sclavos also filed separate replies in further support of the Motion to Dismiss on June 16, 2025. DE 73; DE 74.  On July 10, 2025, Plaintiffs filed a stipulation, stating that Riffel's and Sclavos's further replies exceeded the page limits. DE 76 at 2–3.  The Court construed the stipulation as a motion for leave to file a sur-reply, which the Court denied, stating that the Court would inform the parties if additional briefing were required. DE 77. The Court did not require additional briefing.

[3] At the motion-to-dismiss stage, the Court accepts as true all well-pled factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 696 (2009).

Orbital's revenue was far below its expenditures. *Id.*  Investors' fears were at least somewhat assuaged in February 2023, however, when Terran Orbital announced a new contract with Rivada Space Networks GmbH ("Rivada"). *Id.*  That contract was for $2.4 billion. *Id.*  For context, at the time Terran Orbital entered into this contract, its revenue was a comparatively small $94 million. *Id.*  Once investors learned about the Rivada contract, Terran Orbital's stock price doubled. *Id.*

Terran Orbital used the Rivada contract to assure investors that Terran Orbital had ample liquidity to operate its business while waiting to convert contracts into free cashflow. *Id.* at 6.  But behind the scenes, management was exploring options to cover Terran Orbital's immediate cash requirements. *Id.*  Investors were again concerned that Terran Orbital's immediate cash needs were much greater than its immediate revenue. *Id.*  Stated differently, Terran Orbital needed cash in the short-term to eventually make greater revenue in the long-term.

It is around this time that the Defendants began to make statements about Terran Orbital's cash reserves that, according to Plaintiffs, were false and misleading.  For example, on an investor call in December 2022, Bell stated, "We feel pretty good about where we are and have no concerns at this point about our cash." *Id.* at 23.

Three months after Bell stated that Terran Orbital had no concerns about cash, the company cash reserves were $57 million, and its operating losses were $33 million. *See id.*  This meant that Terran Orbital was spending $33 million more than it was making. *Id.*  To address this shortfall, Terran Orbital again obtained additional investment in March of 2023 in the amount of $37 million. *Id.* at 25.  Yet despite this new infusion of investment capital, within a few months, Terran Orbital's cash reserves declined to $48 million, and its large operating losses continued. *Id.*

At this time, without telling investors, Terran Orbital began to explore financing options, including a sale of the company and additional equity investments. *Id.*  In August of 2023, Bell explained to the Terran Orbital board of directors (the "Board") that payments from customers had been delayed. *Id.* at 26.  As a result of those delays, revenue was down. *Id.*  And because revenue was down, Terran Orbital's immediate cash requirements (such as the need to make payroll) were even more serious than in the past. *See id.*  The Board therefore authorized the hiring of a strategic advisor to try to find a solution to Terran Orbital's cash problem. *Id.*

None of this was disclosed to investors, however.  Instead, Terran Orbital hosted a call with analysts in August 2023 about its financial results in the summer. *Id.*  During the call, Bell explained that the Rivada contract would provide substantial revenue in late 2023—helping the company's cash position—and that "the last thing any of us want to do is raise additional cash." *Id.* at 26–27.

At the same time, Terran Orbital senior management was negotiating to raise additional cash. *Id.* at 27.  In September of 2023, the negotiations concluded, and Terran Orbital once again obtained cash in the form of an investment. *Id.* at 27–28.  Yet the amount obtained, $33 million, was still barely sufficient to satisfy Terran Orbital's immediate cash requirements. *Id.* at 28.  Despite obtaining the additional $33 million, by the end of September, Terran Orbital's cash reserves had dwindled yet again to $38 million. *Id.*  Unless revenue increased, Terran Orbital's immediate need for cash was great.

The Board responded to this problem by initiating a potential sale process. *Id.* at 28.  Terran Orbital reached out to over eighty different parties, including Lockheed Martin, to gauge the parties' interest in acquiring Terran Orbital. *Id.*  At the same time, Bell informed investors that

Terran Orbital revenues were sufficient to "increase[] its cash balance to a level that should provide sufficient funding until Terran Orbital reaches 'breakeven' . . . in 2024." *Id.* at 29.

Consistent with Bell's representations of recent revenue, Terran Orbital released a statement to the press informing them that as of October 2023, the company's cash reserves had increased to $70 million. *Id.* at 30. At this time, Bell also informed investors "that we will have sufficient cash to cover capital investments and operations until becoming cash flow positive, which is expected in 2024." *Id.* at 31.

Shortly after the two statements referenced above, *The Wall Street Journal* published an article indicating that Terran Orbital was seeking a buyer. *Id.* at 31. In response to employee questions, Bell told employees that the story was not true, and that the story was "very wrong." *Id.* Yet on the same day Bell made these statements, Terran Orbital filed a report with the Securities and Exchange Commission in which it confirmed the accuracy of the news report. *Id.* at 31–32. Later, when Bell was confronted about his conflicting statements—one to employees and one to the SEC—Bell indicated that his SEC filing was correct and that "all other information is not." *Id.* at 32.

In December of 2023, the Board held a meeting on the status of the potential sale of the company. *Id.* The Board learned that there were six potential bidders, one of which was Lockheed Martin. *Id.* Terran Orbital continued investigating the sale process with the six potential bidders. *Id.* By the end of the month, due in part to some payments from customers, Terran Orbital's cash reserves were $70 million. *Id.* at 33.

By January of 2024, only one potential bidder for Terran Orbital remained—Lockheed Martin. *See id.* at 34. In February 2024, Bell told an outside interviewer, "[W]e are not looking to

6

raise money," "we don't need cash," [w]e're doing just fine," and "[w]e have no intentions of raising any more money." *Id.*

Lockheed Martin made a tentative bid to buy Terran Orbital in March 2023. *Id.* at 35.  The Board began the process of considering the offer. *Id.* at 35–36.  By the end of the month, Terran Orbital reported that its cash reserves were $43 million and that its operating losses were $34 million. *Id.* at 37.  Thus, in the span of three months—December to March—Terran Orbital's cash reserves had fallen from around $70 million to $43 million.  Soon after this report, in late April 2024, Lockheed Martin withdrew its bid to buy Terran Orbital. *Id.* at 37–38.

A few days after Lockheed Martin withdrew its bid, Bell responded to analysts on a phone call. *Id.* at 39.  Bell stated, "Yes, we feel very comfortable with our liquidity position as it stands today." *Id.*  A week after the call, Defendant Hobart informed the Board that the company might need a cash infusion of $120 million to satisfy its 2024 cash requirements. *Id.* at 40.  At that time, Terran Orbital's cash reserves had shrunk to $30 million. *Id.* at 41.  Relatedly, Lockheed Martin informed the company that it was not interested in further discussing its prior bid because of concerns over Terran Orbital's liquidity—its cash. *Id.* at 42.

Soon after Lockheed Martin indicated its lack of interest, in July 2024, an outside financial services company working for Terran Orbital informed Lockheed Martin that Terran Orbital's need for cash was "dire," and that Terran Orbital might therefore be willing to sell the company at below market price. *Id.* at 26, 44.  The Board simultaneously began to consider bankruptcy. *Id.* at 44.  By the end of the month, Terran Orbital's cash reserves had fallen to $14 million. *Id.*

In the following month, August 2024, Lockheed Martin made a second bid at a 75-percent discount from the amount of its prior bid, which approximated a 50-percent discount from the

then-trading price of Terran Orbital's stock.[4] *Id.* at 45, 47.  The Board approved. *Id.* at 47.  Bell informed employees that they had to approve the offer because "they weren't able to hit the next payroll" and that Lockheed Martin had to buy the company "so they can pay the employees." *Id.* at 47–48.  A few months later, the shareholders approved as well, Lockheed Martin purchased Terran Orbital, and this lawsuit followed. *Id.* at 48.

## IV.    LEGAL STANDARD

Although the Court accepts Plaintiff's factual allegations as true and draws reasonable inferences from the Second Amended Complaint in the light most favorable to Plaintiff, "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002) (citing *S. Fla. Water Mgmt. Dist. v. Montalvo*, 84 F.3d 402, 406 (11th Cir. 1996)).

For claims sounding in fraud, the plaintiff must satisfy the heightened pleading standards under Federal Rule of Civil Procedure 9(b). *See Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1318 (11th Cir. 2019).  A plaintiff alleging fraud must state "with particularity the circumstances constituting the fraud." Fed. R. Civ. P. 9(b).  When a complaint alleges misrepresentations or omissions in violation of securities laws, the Eleventh Circuit has held that the complaint must say "(1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendant obtained as a consequence

---

[4] By this point, Terran Orbital's finances were so dire that outside lenders were only willing to loan money to the company at an annual interest rate of 145 percent. DE 37 at 45.

of the fraud." *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011)

(citing *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006)).

The Private Securities Litigation Reform Act ("PSLRA") imposes even higher pleading requirements for securities class action claims brought under the Exchange Act. *See* 15 U.S.C. § 78u-4(a)(1); *Carvelli*, 934 F.3d at 1317–18. *First*, where the plaintiff alleges either an untrue statement of material fact or the omission of a material fact, the complaint must set forth with particularity "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). *Second*, the plaintiff must allege "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind [i.e., scienter]." *Id.* § 78u–4(b)(2)(A). The complaint must allege facts supporting a strong inference of scienter "for each defendant with respect to each violation." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008) (quoting *Phillips v. Scientific–Atlanta, Inc.*, 374 F.3d 1015, 1016 (11th Cir. 2004)). *Third*, the plaintiff must plead that the defendant's misrepresentation or omission "caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). Because Rule 9(b) and the PSLRA's heightened pleading standards are claim-specific, the Court will address the applicable standards on a claim-by-claim basis below.

Finally, in analyzing a motion to dismiss in a securities fraud case, the Court may consider the full text of documents incorporated by reference into the complaint and other documents as to which the Court may take judicial notice. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). In particular, the Court may consider the full text of securities filings that

allegedly contain misstatements. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1276–81 (11th Cir. 1999) (noticing SEC filings).  Documents incorporated by reference may be considered if they are central to a plaintiff's claim and undisputed. *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005); s*ee also Harris v. Ivax Corp.*, 182 F.3d 799, 802 n.2 (11th Cir. 1999).

## V.      ANALYSIS

Plaintiffs bring two counts in their First Amended Complaint.  Count I alleges that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5. DE 37 ¶¶ 242–48.  Count II alleges that the Individual Defendants violated Section 20(a) of the Exchange Act. *Id.* ¶¶ 249– 54.

## A.      Count I – Section 10(b) of the Exchange Act

Plaintiffs bring one count against all Defendants for violations of Section 10(b) of the Exchange Act and Rule 10b-5.  A securities fraud claim under Section 10(b) must satisfy six elements: (1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the material misrepresentation or omission and the loss, an element commonly called "loss causation." *Mizzaro*, 544 F.3d at 1236–37; *see also* 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5.

Defendants' Motion to Dismiss argues that Plaintiffs fail to allege the first two elements for their Section 10(b) claim: a false or misleading statement, and scienter. *Id.*

Based on its analysis below, the Court concludes that many of the alleged misrepresentations are non-actionable forward-looking statements, opinions, and puffery.  The Court also concludes that certain statements *might* be actionable because they could be materially

10

misleading: Plaintiffs allege that Defendants knew of the liquidity risk at Terran Orbital and knew that a sale of the company was likely necessary, yet Defendants repeatedly downplayed the seriousness of the liquidity risk and disavowed the measure ultimately needed to correct the problem—the sale of the company.

Despite these potentially actionable statements, the Court must consider the record as a whole.  When the record is viewed in its entirety, Terran Orbital's liquidity risk was well documented and was public knowledge; Terran Orbital did not disguise its cash reserves in its public filings.[5]  The Court must weigh not only Terran Orbital's cash reserves and operating losses, but also Terran Orbital's expected future revenues.  Here, the law permits Defendants to have some optimism.

For the reasons discussed below, the Court is uncertain as to whether Plaintiffs have sufficiently alleged material misrepresentations.  The Court does not reach a conclusion on the issue.  The Court's ruling, instead, is based upon the Court's determination that Plaintiffs have not met their burden to plead the second requirement for the statements to be legally actionable: scienter.  Below, however, the Court analyzes the statements in detail for the benefit of the parties and to inform any future briefing on the issue that may arise at a later stage of the proceeding.

    1.   <u>Whether the False or Misleading Statements and Omissions are Actionable</u>

Defendants argue that Plaintiffs have failed to plead actionable false or misleading statements or omissions.  Plaintiffs' specific Count I allegations pertain to how, throughout the Class Period, Defendants made or caused Terran Orbital to make false and misleading statements and omissions regarding (i) Terran Orbital's 2023 revenue outlook, (ii) Terran Orbital's overall

---

[5] Similarly, Terran Orbital disclosed to the public that it was investigating the potential sale of the company.

liquidity, and (iii) the Rivada contract. DE 37 ¶¶ 134–62, 244–47.  Most of the allegedly misleading statements concern Terran Orbital's overall liquidity.

A particular statement is a "misrepresentation" under Section 10(b) and Rule 10b-5 if "in the light of the facts existing at the time of the [statement] . . . [a] reasonable investor, in the exercise of due care, would have been misled by it." *IBEW Local 595 Pension and Money Purchase Pension Plans v. ADT Corp.*, 660 F. App'x 850, 857 (11th Cir. 2016) (quoting *FindWhat*, 658 F.3d at 1305).  To be actionable under the securities laws, misrepresentations and omissions must also be "material." 17 C.F.R. § 240.10(b).

Several doctrines limit the scope of actionable misrepresentations and omissions under Rule 10b-5.  As relevant here and as discussed below, Rule 10b-5 generally does not impose liability for forward-looking statements, statements of opinion, and statements of generic corporate optimism. *See Carvelli*, 934 F.3d at 1322–26.  Furthermore, to be actionable under Rule 10b-5, Plaintiffs must sufficiently allege that the representations or omissions were misleading. *Id.* at 1329 (dismissing Section 10(b) claims based on statements that "weren't alleged to be false"); 15 U.S.C. § 78u-4(b)(1)(B) (requiring a complaint to "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading").

With these principles in mind, the Court analyzes whether Plaintiffs' alleged misrepresentations and omissions are actionable.  The Court concludes that many of the statements are non-actionable forward-looking statements, opinions, and puffery.  The Court also concludes certain statements *might* be actionable because they could be materially misleading.

### a. Non-actionable Forward-Looking Statements

The PSLRA includes a safe harbor provision "that immunizes certain 'forward-looking' statements from liability" when the statement is accompanied by "meaningful cautionary statements." *Carvelli*, 934 F.3d at 1324; 15 U.S.C. § 78u-5(c)(1).  This protection can extend to statements that "contain[] 'some sentences that were forward-looking and some that were not,'" "[b]ecause 'forward-looking conclusions often rest both on historical observations and assumptions about future events.'" *Id.* at 1328 (quoting *Harris*, 182 F.3d at 806–07) (citation modified).

Defendants argue that Plaintiffs' claims based on certain statements in the Amended Complaint should be dismissed because they are non-actionable forward-looking statements accompanied by specific cautionary statements. DE 58 at 18.

Upon review of the paragraphs, the Court is persuaded that the statements fall within the PLSRA safe harbor.  *First*, many of the statements clearly contain forward-looking statements (in **bold**):

- "Given our current view of the steep ramp **ahead**, we **anticipate** in excess of $250m in revenue in 2023.  Upside beyond this level **is possible depending on** our successful execution of our customer commitments." DE 37 ¶ 135.

- "So the cash flow we generate from our programs and invoicing and collection and invoicing **should** cover our needs **going forward**, and we'll start seeing that ramp up even more so **going into 2024**." *Id.* ¶ 140.

- ". . . this level of cash is **expected** to be sufficient to cover our capital investments and operating use until we achieve the expected break even, barring any **unforeseen events**." *Id.* ¶ 143.

The remaining statements in the relevant paragraphs also comprise forward-looking language.  Bell's statement "I mean, Tranche 1 is a big part of it.  Then you have Rivada right after

that, and you have this new customer, and there is some other things coming down the pipe.  But Tranche 1 is by far the largest part of that component" came in response to an analyst's forward-looking question: "[A]s you build out this $250 million plus in revenue this year, what program should we think are driving that?" *Id.* ¶ 136.  And in response to a forward-looking question about whether Terran Orbital would meet the required minimum cash balance under its debt agreements, Riffel responded, "We do not have any concerns about that covenant at this time." *Id.* ¶ 153.  These statements concern future payments and prospects—and "[s]tatements about projections of revenue, income, and other financial items and metrics fall squarely within the definition of forward-looking statements." *Gonzalez v. Cano Health, Inc.*, No. 22-20827-CV, 2024 WL 4415216, at *8 (S.D. Fla. Oct. 4, 2024).

*Second*, the statements above are accompanied by meaningful, specific cautionary language.  "In analyzing statements which Defendants argue are protected, the Court is to consider 'any statement cited in the complaint' as well as 'any cautionary statement accompanying the forward-looking statement, which are not subject to material dispute, cited by the defendant.'" *In re Royal Caribbean Cruises Ltd. Sec. Litig.*, No. 11-22855-CIV, 2013 WL 3295951, at *13 (S.D. Fla. Apr. 19, 2013) (quoting 15 U.S.C. § 78u-5(e)).  "If the Court determines that the statement is accompanied by meaningful cautionary language, the defendants' state of mind is irrelevant." *Id.* (quoting *Harris*, 182 F.3d at 803) (internal quotation marks omitted).  The meaningful-cautionary-language obligation requires that an issuer list "important factors that could cause actual results to differ materially from those in the forward-looking statement." *Harris*, 182 F.3d at 803. "[M]eaningful cautionary language should be 'explicit, repetitive and linked to the projections about which the plaintiff complains." *In re Royal Caribbean*, 2013 WL 3295951, at *15 (quoting

*Bellocco v. Curd*, No. 02-CV-1141-T-27TBM, 2005 WL 2675022, at *3 (M.D. Fla. Oct. 20, 2005)).  "[W]hen an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward." *Harris*, 182 F.3d at 807.

Here, Defendants note that for each relevant statement, investors were expressly directed to the risk disclosures in Terran Orbital's SEC filings, of which the Court may take judicial notice. *See Bryant*, 187 F.3d at 1276–81 (noticing SEC filings).  Those disclosures were explicit, specific, and linked to the concerns underpinning Plaintiffs' claims—Plaintiffs acknowledge that Defendants' cautionary disclosures "referred to uncertainties regarding Rivada, financing, and cash flows." DE 72 at 25.  Examples of Defendants' cautionary disclosures include:

- "The timing and execution of our new contract work with Rivada and our other new customer constellation are variables for our full year 2023 results . . . ." DE 58-4 at 4.

- "Since our last earnings call, we have not received expected further milestone payments and do not yet have a definitive schedule and when further receipts maybe [*sic*] received." DE 58-13 at 6.

- "We are currently not profitable, nor do we have positive cash flow. We have increased the scale of our operations over recent years which has increased our expenses at a higher rate than the increase in our revenue. Additionally, we expect to increase research and development efforts relating to new offerings and technologies, and hire more employees. These efforts may be more costly than we expect and may not result in increased revenue. Any failure to increase our revenue sufficiently to cover our operating expenses and other investments could prevent us from achieving or maintaining profitability or positive cash flow." DE 58-1 at 9.

- "We are an early stage company with a history of losses and may not achieve or maintain profitability." *Id.*

- "Our contract with [Rivada] is subject to uncertainty." *Id.* at 7.

Plaintiffs argue that this cautionary language is not meaningful because it describes "possible future risks while failing to disclose known facts suggesting risks that had already happened." DE 72 at 25 (quoting *Pritchard v. Apyx Med. Corp.*, No. 19-CV-00919, 2020 WL 1180731, at *7 (M.D. Fla. Mar. 11, 2020)); *see also Carvelli*, 934 F.3d at 1327 ("[C]autionary language can't be 'meaningful' if it is nothing more than a front for present problems."). But Plaintiffs have not alleged facts to show that the risks had already happened. For example, Plaintiffs do not allege that Defendants *knew* that Rivada would not continue the contract; Plaintiffs allege that Defendants failed to disclose that its revenue forecasts were heavily dependent on the Rivada contract. DE 37 ¶¶ 137, 162. Defendants adequately conveyed caution as to the revenue impact and the dependability of the Rivada contract: "Whether the Company ultimately recognizes revenue and profit on this contract is subject to a number of uncertainties including . . . Rivada's continuing ability to fund contract performance," DE 58-3 at 5; "Our conversations with Rivada have been positive, but there can be no assurance . . . ," DE 58-11 at 8. And Plaintiffs do not allege that Terran Orbital was out of cash, but that Defendants failed to disclose that Terran Orbital required more cash to operate its growing business than generated. *Id.* ¶ 142. Defendants' cautionary language was also on point in this respect. Defendants disclosed that: "We are currently not profitable, nor do we have positive cash flow," DE 58-1 at 9; "We may incur significant expenses and capital expenditures . . . and we may by [*sic*] unable to adequately control our expenses," *id.* at 11; "As of December 31, 2023, the Rivada Agreement represented 88% of our backlog," *id.* at 7; "We may not be able to convert our backlog, or the sales opportunities represented in our pipeline, into revenue," *id* at 13.

Based on the foregoing, Defendants have adequately listed important factors—the Rivada contract, a history of losses, a limited operating history, significant expenses, lack of positive cash flow—that could cause actual results to differ materially from those in the forward-looking statements. *Harris*, 182 F.3d at 803. The language warned investors of risks of a significance similar to that actually realized—such as the loss of the Rivada contract—and therefore put the investors sufficiently on notice. *Id.* at 807.

       *b.  Non-actionable Opinions*

Opinion statements—statements concerning what a defendant believed or expected—"are generally nonactionable because liability attaches only in the case of an 'untrue statement of a material fact.'" *Carvelli*, 934 F.3d at 1322 (citation and emphasis omitted). An opinion is actionable in only three situations: (1) when a plaintiff can show that the speaker did not honestly hold the opinion when stated, (2) when the opinion contains an embedded statement of untrue fact, and (3) when a statement "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183–86, 189 (2015).

Defendants argue that certain statements are inactionable opinion statements. The Court agrees that many of these statements are opinions because the statements express only belief, feeling, and expectation:

- "We **feel pretty good** about where we are and **have no concerns** at this point about our cash." DE 37 ¶ 138.

- "The independent directors **believe** that under Marc's continued leadership Terran Orbital will soon achieve escape velocity in this rapidly growing market for small satellites and busses." *Id.* ¶ 144.

- "... our current **expectation** that we will have sufficient cash to cover capital investments and operations until becoming cash flow positive, which is **expected** in 2024." *Id.* ¶ 145.

- "We are entering 2024 with a strong financial foundation that we **believe** will enable us to continue to execute on our strategic and operational objectives." *Id.* ¶ 148.

- "Yeah, we **feel** very comfortable with our liquidity position as it stands today." *Id.* ¶ 152.

- "We do not have any **concerns** about that covenant at this time." *Id.* ¶ 153.

- "We **feel** very comfortable about our covenants going into the end of the quarter. No issue on our side." *Id.* ¶ 155.

Plaintiffs argue that the above statements are actionable because they are either untrue because they are not honestly held opinions by the speaker, or misleading because they lack a reasonable basis. DE 72 at 23. Following the Eleventh Circuit's analysis in *Carvelli*, however, Plaintiffs have "failed to allege facts with particularity that give rise to a strong inference that the defendants didn't truly believe what they asserted in the statements in question, or that the statements embedded false facts." 942 F.3d at 1323. Plaintiffs do not specifically allege that Defendants did not hold their stated beliefs at the time that they made those statements. *See Carvelli v. Ocwen Fin. Corp.*, No. 9:17-CV-80500-RLR, 2018 WL 4941110, at *6 (S.D. Fla. Apr. 30, 2018), *aff'd*, 934 F.3d 1307 (11th Cir. 2019) ("'[S]tatements about defendants' belief in the adequacy of loan loss reserves could be actionable,' but only 'if it is alleged that defendants did not actually believe the loan loss reserves were adequate, or if defendants had no reasonable factual basis for their belief.'" (quoting *In re CIT Grp. Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 690 (S.D.N.Y. 2004))). Plaintiffs may have alleged that Bell, for instance, knew about Terran Orbital's serious cash constraints, but Bell's knowledge is not inconsistent with his stated "expectation" that Terran

18

Orbital would "have sufficient cash to cover capital investments and operations until becoming cash flow positive." DE 37 ¶ 80.

Because "none of [these] statements of opinion are mutually exclusive of—or even inconsistent with—[Defendants'] alleged knowledge," Plaintiffs have not provided sufficient allegations to render actionable these opinion statements. *Carvelli*, 924 F.3d at 1323.

### c.   *Non-actionable Puffery*

"[S]tatements that are vague, generalized, or 'corporate puffery' are not actionable under the securities laws because a 'reasonable investor would not base a decision on such statements.'" *In re KLX, Inc. Sec. Litig.*, 232 F. Supp. 3d 1269, 1276–77 (S.D. Fla. 2017) (quoting *In re Royal Caribbean*, 2013 WL 3295951, at *12).   "Plaintiffs must look beyond these optimistic characterizations to the specific, verifiable statements made by Defendants if they are to successfully allege a violation of the federal securities laws." *Waterford Twp. Gen. Emps. Ret. Sys. v. BankUnited Fin. Corp.*, No. 08-CIV-22572, 2010 WL 1332574, at *8 (S.D. Fla. Mar. 30, 2010).

Defendants argue that certain statements are inactionable because they are general statements of corporate optimism.  The Court agrees as to the below statements:

- "The independent directors believe that under Marc's continued leadership Terran Orbital will soon achieve escape velocity in this rapidly growing market for small satellites and busses." DE 37 ¶ 144.

- ". . . we want to give our customers and vendors additional confidence that we have adequate capital to successfully manage current and future programs . . . ." *Id.* ¶ 157.

These "generalized, positive statements about the company's competitive strengths, experienced management, and future prospects are not actionable because they are immaterial." *Douglas v. Norwegian Cruise Lines*, No. 20-21107-CIV, 2021 WL 1378296, at *6 (S.D. Fla. Apr.

19

12, 2021) (quoting *Southland Securities Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 372 (5th Cir. 2004)).

### d. Whether the Remaining Statements Are Misleading and Actionable

Defendants argue that most of Plaintiffs' alleged statements also are inactionable because Plaintiffs have not alleged particularized facts to show that the statements actually were false. DE 58 at 25. A statement does not necessarily have to be actually false, however, in order to be actionable. A statement can be a misrepresentation if "in the light of the facts existing at the time of the [statement] . . . [a] reasonable investor, in the exercise of due care, would have been misled by it." *IBEW Local 595*, 660 F. App'x at 857 (quoting *FindWhat*, 658 F.3d at 1305). To be actionable, a misleading statement also must be material, meaning there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *SEC v. Morgan Keegan & Co., Inc.*, 678 F.3d 1233, 1245 (11th Cir. 2012) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). "When it comes to omissions specifically, the Supreme Court has clarified that '[s]ilence, absent a duty to disclose, is not misleading under Rule 10b–5.'" *Carvelli*, 934 .3d at 1317 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988)). "[A]bsent a duty, material information needn't be disclosed unless its omission would render misleading other information that an issuer *has* disclosed." *Id.* (citing *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)) (emphasis in original).

Upon review of the remaining alleged statements—those that were not inactionable forward-looking statements, opinions, or puffery—the Court finds that Plaintiffs may have sufficiently alleged certain material, misleading, and thus actionable misrepresentations (in **bold**

below).  Plaintiffs have alleged how Defendants' repeated assurances belied Terran Orbital's seeming need for cash.  Plaintiffs allege that in the summer of 2023, because "Terran Orbital was still in dire need of additional cash," senior management began holding discussions with external parties regarding financing options. DE 37 ¶ 63.  In August 2023, the Board unanimously approved engaging Jefferies LLC ("Jefferies") to advise on strategic alternatives to a capital raise, including an investment, a sale of Terran Orbital, a take-private transaction, or an alternative strategic relationship. *Id.* ¶ 66.  In September 2023, the Board established the Special Committee to address issues regarding Terran Orbital's cash needs. *Id.* ¶ 69.  In October 2023, "[a]s a direct result of Terran Orbital's continued cash constraints, the Board had authorized senior management, including Bell and Hobart, to initiate a potential sale process." *Id.* ¶ 72.  In January 2024, Terran Orbital met with Lockheed Martin and another potential bidder. *Id.* ¶ 88.  Going into June 2024, a financial advisory firm explained that Terran Orbital suffered from ongoing liquidity constraints and cautioned that it may be unable to continue operating given the Company's cash burn unless it found a solution to those liquidity constraints. *Id.* ¶ 107.

Yet during this time period, Defendants made repeated statements indicating that they did not need, and were not seeking, cash.  In December 2023, Defendant Bell stated, "**We are not running out of cash** . . . . and **we are not going out looking for cash. * * * Cash is looking very solid.**" DE 37 ¶ 147.  In January 2024, Bell stated, "**The goal is demonstrate to the market that cash is stable and no need to raise additional capital.**" *Id.* ¶ 149.  In February 2024, Bell stated in an interview, "We've made it very public that **we are not looking to raise money** . . . It's just getting people comfortable that **we don't need cash. * * * We're doing just fine. . . . We have no intentions of raising any more money. That is the last thing we want to do.**" *Id.* ¶ 150.

Given Plaintiffs' allegations, these definitive statements by Defendants arguably provided an incomplete picture of Terran Orbital's cash stability for investors. Plaintiffs' allegations could also have cast Defendants' truthful statements in a misleading light. For instance, in response to an analyst's question about "the capital plan at this point going forward" and "raising cash to the extent that you need to," Defendant Bell stated, "**Right now, the last thing any of us want to do is raise additional cash. I don't want the dilution . . . . Last thing I want is any dilution.**" *Id.* ¶ 141. It may very well have been true that the last thing Defendants wanted was to raise additional cash—but omitting the fact that Defendants needed cash and were seriously pursuing pathways to acquire that cash could render Bell's statement misleading.

Relatedly, Plaintiffs also sufficiently allege that Terran Orbital's cashflow was heavily dependent on receiving payments from Rivada and that the loss of the Rivada contract would significantly impact Terran Orbital's plan to become cashflow positive in 2024. *See id.* ¶ 162. Yet Defendants continued to represent otherwise. During a call in November 2023, when an investor asked, "[P]resuming [you] never get a single additional cent from Rivada, do you have enough cash to make it through to cash flow positive?" Bell responded, "**Yes, we do.**" *Id.* ¶ 159. In December 2023, Bell stated that "Rivada is great, but **we don't rely on Rivada . . . [o]ur business model is we are no [*sic*] relying on them.**" *Id.* ¶ 160. And in May 2024, when asked, "Evidently, [Rivada] do not have all their financing in place . . . are there concerns that this whole thing could fall apart, and have a major impact on your business operations in the future because the capital is not available to pay for the build-out of the satellites for which you've contracted?" Bell stated, "As far as Rivada goes, I can't comment on what they have or don't have. That's a question for

Rivada.  On—but I can comment on, does it affect us.  And, no, **it doesn't have any impact on us going forward.**" *Id.* ¶ 161.

These omissions—about ongoing cash constraints, the serious exploration of alternative financing options, and the importance of the Rivada contract—could make Defendant's statements misleading, in that the statements would have significantly altered the total mix of information available to a reasonable investor. *See In re Jan. 2021 Short Squeeze Trading Litig.*, 620 F. Supp. 3d 1231, 1265 (S.D. Fla. 2022) (finding misleading the defendant's denial of "any concerns about liquidity despite internal and subsequent statements to the contrary").

Based on this analysis, the Court concludes that the statements *might* be actionable as materially misleading.  The Court has doubt, however.  On the one hand, *if future revenue were realized as Defendants had hoped*, then there would have been no immediate liquidity issues and no need for future capital raises or the sale of the company.  On the other hand, there is the clear and troubling juxtaposition, in hindsight, of Defendants' repeated assurances about Terran Orbital's cashflow and what actually occurred: repeated capital raises and the sale of the company.

Because the Court has doubt, the Court does not reach a conclusion as to whether the statements are sufficiently pled as materially misleading.  The Court's analysis above is for the benefit of the parties and to inform any future briefing on this issue that may arise at a later stage of the proceeding.  The Court's ruling on Defendant's Motion, instead, is based upon the second requirement for the statements to be legally actionable: scienter.  The Court turns its analysis to scienter now.

2.  <u>Whether Plaintiffs Have Alleged Scienter</u>

Defendants argue that Plaintiffs have failed to allege scienter. DE 58 at 26.  The Court agrees for three reasons.  First, the Amended Complaint has not adequately alleged particularized facts to support a strong inference of scienter for each defendant.  Second, Plaintiffs' pleading and briefing do not sufficiently explain how the alleged circumstantial evidence connects to, and reveals, each Defendant's requisite state of mind.   Third, when Plaintiffs have provided particularized allegations of scienter, those allegations do not meet the Eleventh Circuit's standard.

The Eleventh Circuit sets a high standard for establishing scienter, the "mental state embracing intent to deceive, manipulate, or defraud." *Bryant*, 187 F.3d at 1282 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)).  To adequately plead scienter in the Eleventh Circuit, Plaintiffs must "state with particularity facts giving rise to a strong inference" that each Defendant acted "purposefully or with 'severe recklessness.'" 15 U.S.C. § 78u-4(b)(2); *Richard Thorpe & Darrel Weisheit v. Walter Inv. Mgmt., Corp.*, 111 F. Supp. 3d 1336, 1359 (S.D. Fla. 2015) (quoting *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 634 (11th Cir. 2010)). "Severe recklessness" requires a showing of "highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care," such that they "present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Richard Thorpe*, 111 F. Supp. 3d at 1359 (citation omitted). The inference of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent," and courts must "take into account plausible opposing inferences" suggesting the absence of any wrongful intent. *Tellabs*, 551 U.S. at 309, 323.

Plaintiffs ask the Court to infer scienter based on the following allegations:  As discussed above, *see supra* Part V.A.1.d., certain individual Defendants issued potentially material, misleading statements.  Terran Orbital prepared a Proxy, signed by Bell, that revealed Defendants' knowledge of the severity and duration of Terran Orbital's ongoing cashflow struggles. DE 37 ¶¶ 191–97.  Bell had frequent and regular contact with Rivada about the Rivada contract. *Id.* ¶¶ 198–201.  Bell and Hobart had financial motives to hide Terran Orbital's liquidity constraints. *Id.* ¶¶ 202–08.  Terran Orbital's available cash balance was an existential issue for the company, and the Rivada contract was at the core of the company's business. *Id.* ¶¶ 209–13.  Hobart was abruptly removed and reassigned from his role as CFO shortly after the Board took action to address Terran Orbital's financial state, and Bell and Hobart were separated from the company shortly after the Lockheed Martin acquisition. *Id.* ¶¶ 214–19.  And Bell, Hobart, and Riffel filed Sarbanes-Oxley Act ("SOX") certifications. *Id.* ¶ 220–223.

The Court must examine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 310 (emphasis in original).  Crucially, Plaintiffs must also "allege[] facts supporting a strong inference of scienter '**for each defendant** with respect to each violation.'" *Mizzaro*, 544 F.3d at 1238 (quoting *Phillips*, 374 F.3d at 1016) (emphasis added); *see also Murdeshwar v. Search Media Holdings Ltd.*, No. 11-CIV-20549, 2011 WL 7704347, at *15 (S.D. Fla. Aug. 8, 2011) ("Plaintiffs' reliance on group pleading to set forth nearly all of the scienter allegations makes it impossible for the Court to determine if any of the Ideation Defendants acted with scienter based upon these allegations."); *Durgin v. Mon*, 659 F. Supp. 2d 1240, 1254 (S.D. Fla. 2009), *aff'd*, 415 F. App'x 161 (11th Cir. 2011) ("Significantly, the group pleading doctrine does not apply to the scienter requirement.").

Plaintiffs have not sufficiently alleged facts to support strong inferences of scienter for each defendant.  To start, Plaintiffs' more general allegations—those that pertain to Defendants in the aggregate—do not give rise to a strong inference of scienter as to each Defendant.  Plaintiffs allege that Terran Orbital's Proxy, prepared to secure votes to approve the Lockheed Martin transaction, demonstrates that Defendants undeniably knew about Terran Orbital's liquidity problems throughout the class period and materially misled investors. DE 37 ¶ 191.  But Plaintiffs do not particularly allege how each Defendant is responsible for the statements in the Proxy, nor how the statements in the Proxy correspond to and reveal fraudulent intent or severe recklessness in the actions or statements by each Defendant.  Plaintiffs also allege that the Proxy confirms that Defendants acted with scienter by failing to disclose Terran Orbital's liquidity problems.  Yet Plaintiffs do not dispute that during the relevant period, Terran Orbital's SEC filings accurately reflected the company's cash position, revenue, and projections. DE 58 at 32; DE 75 at 9–10.  That is, Terran Orbital's financial statements would have kept investors informed of the company's financial outlook and risk.

Plaintiffs' other allegations about Defendants in the aggregate are also not probative of scienter.  Plaintiffs allege knowledge and motive, based on the "core operations doctrine," from the fact that the Rivada contract was at the core of the company's business.  But "merely alleging that [Rivada] is a core operation does not lead to a conclusion that Defendants . . . acted with scienter because the PSLRA requires more." *Richard Thorpe*, 111 F. Supp. 3d at 1376.  That Bell, Hobart, and Riffel filed SOX certifications is also not probative.  "[A] Sarbanes-Oxley certification is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements." *Mizzaro*, 544 F.3d at 1252 (quoting *Garfield*

26

*v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006)).  A signor is severely reckless only if the signor "should have suspected . . . that the financial statements contained material misstatements or omissions," which Plaintiffs do not allege. *Id.* (citation omitted).

Plaintiffs' individualized allegations, considered together, also do not give rise to a strong inference of scienter.  To start, Plaintiffs have provided few specific allegations overall as to Sclavos and Riffel.  The allegations discuss Sclavos's and Riffel's non-actionable statements, their positions within Terran Orbital, and the fact that Riffel filed SOX certifications. *See supra* Part V.A.1.b–c.  These allegations do not give rise to a strong inference of scienter as to Sclavos and Riffel. *See In re Flowers Foods, Inc. Sec. Litig.*, No. 7:16-CV-222 (WLS), 2018 WL 1558558, at *14 (M.D. Ga. Mar. 23, 2018) ("While 'scienter cannot be inferred merely from a defendant's position,' scienter can be inferred when a defendant's position and responsibilities establish *other particular facts* probative of scienter." (emphasis added)); *see also Tellabs*, 551 U.S. at 326 (holding that "omissions and ambiguities count against inferring scienter").

Plaintiffs provide more individualized allegations about Bell and Hobart, but Plaintiffs' pleading—and briefing—do not clearly delineate, with particularity, how the facts give rise to a strong inference of fraudulent intent or severe recklessness.  Plaintiffs allege that Bell was in frequent contact with Rivada about the contract and was well informed about Rivada's funding. But Plaintiffs' allegations about the nature of the contact—that Bell was texting with Rivada's CEO about a forthcoming payment, that conversations were "positive," and that Rivada provided information about funding sources—are not sufficient for the Court to infer that Bell or Defendants acted with severe recklessness and knowledge that Rivada would be unable to satisfy its contractual obligations. DE 37 ¶¶ 199–201.  And Bell's statement that Terran Orbital had

conducted "extreme due diligence on [Rivada's] financials" would result in a finding, "[a]t most," of "inexcusable negligence," not severe recklessness. *In re Unicapital Corp. Sec. Litig.*, 149 F. Supp. 2d 1353, 1371 (S.D. Fla. 2001); DE 37 ¶ 199.

Similarly, Plaintiffs have not delineated why Hobart's reassignment and Hobart's and Bell's departures occurred under suspicious circumstances. *See Brophy v. Jiangbo Pharms., Inc.*, 781 F.3d 1296, 1305 (11th Cir. 2015) ("Various courts have recognized that an executive officer's resignation can strengthen an inference of scienter when it occurs around the same time as an investigation.").   Without allegations that connect Hobart's and Bell's departures to their fraudulent or severely reckless behavior, Plaintiffs' allegations are only speculative.   To compare, the court in *In re Home Loan Servicing Solutions, Ltd. Securities Litigation* found scienter as to a defendant who was "at the epicenter" of the business, was "forced to resign," and who, based on regulatory documents, was "engaged in improper transactions." No. 16-CV-60165, 2016 WL 10592320, at *7 (S.D. Fla. June 6, 2016).

Plaintiffs' remaining allegation of scienter is that Bell and Hobart had motive to hide Terran Orbital's financial constraints because each had employment agreements "that rewarded them handsomely for a 'change in control' transaction—rewards that would be unavailable if the Company was unable to find a strategic partner and forced to file for bankruptcy." DE 37 ¶ 202. Motive and opportunity alone, however, are insufficient to plead scienter. *See Bryant*, 187 F.3d at 1287.   Because Plaintiffs' other allegations are insufficient to give rise to an inference of scienter as to Bell and Hobart, the fact that Bell and Hobart stood to profit from the Lockheed Martin acquisition, alone, is also insufficient.

In sum, Plaintiffs' scienter allegations are insufficient to give rise to a strong inference that Defendants acted with severe recklessness.  *First*, the Amended Complaint has not adequately alleged particularized facts to support a strong inference of scienter *for each defendant*. *See Kosowsky v. Icahn Enters. L.P.*, 748 F. Supp. 3d 1303, 1322 (S.D. Fla. 2024) ("Because Plaintiffs fail to clearly distinguish how each Individual Defendant acted purposefully or with severe recklessness, the Court cannot meaningfully assess whether any of the Individual Defendants acted with scienter[.]").  *Second*, Plaintiffs' pleading and briefing do not sufficiently explain to the Court how the alleged circumstantial evidence connects to, and reveals, the requisite state of mind behind each of Defendant's actions or statements.  *Third*, where Plaintiffs have provided particularized allegations of scienter, those allegations do not meet the Eleventh Circuit's high standard of scienter—that is, after "tak[ing] into account plausible opposing inferences," the inference of scienter is not "*at least as* compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 309, 323 (emphasis added).  For example, Plaintiffs discuss in detail how Terran Orbital's Proxy demonstrates scienter, yet Plaintiffs do not persuasively respond to the fact that Terran Orbital's SEC filings and releases are consistent with the Proxy.

For these reasons, the Court dismisses Count I.

**B.      Count II – Section 20(a) of the Exchange Act**

Because Plaintiffs failed to adequately plead a violation of Section 10(b) and Rule 10b-5, Plaintiffs' second claim, that the Individual Defendants are liable as "control persons" under Section 20(a) of the Securities Exchange Act, necessarily fails as well. *See KLX, Inc.*, 232 F. Supp. 3d at 1283.

## VI.    RULING

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that Defendant's Motion [DE 58] is **GRANTED**.  Counts I and II are **DISMISSED**.  Because this is the first dismissal based on a Court order, the Court's dismissals are **WITH LEAVE TO AMEND**.  Plaintiffs shall file any Second Amended Complaint within three weeks of the date of rendition of this Order.

**DONE and ORDERED** in Chambers, West Palm Beach, Florida, this 21st day of August, 2025.

ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

Copies furnished to Counsel of Record