**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 24-CV-81191 ARTAU / REINHART**

| | |
|---|---|
| STEVEN VERZWYVELT, JESSE RAMIREZ, MICHAEL O'NEILL, and JILL O'NEILL, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>TERRAN ORBITAL CORPORATION, MARC H. BELL, MATHIEU RIFFEL, GARY A. HOBART, and STRATTON SCLAVOS,<br><br>Defendants. | CLASS ACTION<br><br>JURY TRIAL DEMANDED |

**SECOND AMENDED CLASS ACTION COMPLAINT**
**<u>FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>**

# TABLE OF CONTENTS


I. NATURE OF THE ACTION ..... 1

II. JURISDICTION AND VENUE ..... 5

III. PARTIES ..... 6

IV. NON-PARTY CONFIDENTIAL WITNESSES ..... 8

V. FACTS ..... 9

A. Relevant Background ..... 9

1. Overview of Terran Orbital and Its Corporate History ..... 9

2. Public Listing In a SPAC Transaction and Business Shift ..... 11

3. Longstanding Relationship with Lockheed Martin ..... 15

B. Terran Orbital Signs a Historic $2.4 Billion Contract with Rivada ..... 18

C. Terran Orbital Begins to Experience a Liquidity Crisis ..... 20

D. Shareholders Revolt While Terran Orbital Attempts to Sell the Company to Jettison Its Liquidity Crash ..... 25

E. Lockheed Martin Offers to Buy Terran Orbital But Backs Out After Learning About Its Severe Liquidity Constraints ..... 31

F. Terran Orbital Agrees to Be Acquired by Lockheed Martin At a Fraction of Its Original Offer to Avoid Bankruptcy ..... 35

G. Post-Class Period Events ..... 44

VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ..... 45

A. Overall Liquidity and Need to Raise Additional Capital ..... 45

B. The Lack of Reliance on the Rivada Contract ..... 53

VII. THE TRUTH EMERGES IN A SERIES OF PARTIAL DISCLOSURES ..... 56

A. April 3, 2023 ..... 56

B. May 25, 2023 ..... 56

C. September 18, 2023 ..... 56

D. November 14, 2023 ..... 57

E. December 11, 2023 ..... 58

F. April 1, 2024 ..... 59

G. May 2, 2024 ..... 61

H. May 14, 2024 ..... 61

I. July 23, 2024 ..... 63

J. August 12, 2024 ..... 63

K. August 15, 2024 ..... 64

VIII. ADDITIONAL FACTS PROBATIVE OF SCIENTER ..... 65

A. Contemporaneous Knowledge of Contradictory Information .............................. 66
B. Bell Regularly Spoke with Rivada's CEO About the Rivada Contract................ 71
C. Bell and Hobart Had Compelling Financial Motive to Hide Terran Orbital's Liquidity Constraints ........................................................................... 73
D. Terran's Liquidity was an Existential Issue and the Rivada Contract Was at the Core of Its Business ........................................................................... 75
E. The Suspicious Reassignment of Hobart and the Sudden Removal of Bell, Hobart, and Parekh Support An Inference of Scienter ........................................ 77
F. Defendants' SOX Certifications Support an Inference of Scienter ...................... 80
G. *Respondeat Superior* and Agency Principles Apply............................................ 81
IX. PRESUMPTION OF RELIANCE........................................................................... 81
X. LOSS CAUSATION.............................................................................................. 83
XI. NO SAFE HARBOR ............................................................................................ 84
XII. CLASS ACTION ALLEGATIONS ...................................................................... 86
XIII. CLAIMS FOR RELIEF ........................................................................................ 88
XIV. PRAYER FOR RELIEF ........................................................................................ 91
XV. DEMAND FOR JURY TRIAL ............................................................................. 92

Court-appointed lead plaintiffs Steven Verzwyvelt, Jesse Ramirez, Michael O'Neill, and Jill O'Neill ("Lead Plaintiffs") and additional plaintiff Michael Lewitter (collectively, with Lead Plaintiff, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, as for their Second Amended Class Action Complaint against defendants Terran Orbital Corporation ("Terran Orbital" or the "Company") and Marc H. Bell, Mathieu Riffel, Gary A. Hobart, and Stratton Sclavos (collectively, the "Individual Defendants," and, with Terran Orbital, "Defendants"), allege the following on personal knowledge as to their own acts and on information and belief as to all else based upon the investigation by counsel, which has included, among other things, a review and analysis of regulatory filings made with the U.S. Securities and Exchange Commission ("SEC"), securities analyst research reports, press releases, news reports, documents and other publicly available information issued by or about Terran Orbital or the industry in which it operates, interviews with persons knowledgeable about relevant events, including former employees of Terran Orbital, and expert consultation. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. <u>NATURE OF THE ACTION</u>

1. This is a class action against Terran Orbital and its senior-most officials for violations of the anti-fraud provisions of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder on behalf of all persons and entities other than Defendants that purchased or otherwise acquired Terran Orbital securities between March 21, 2023, and August 14, 2024, both dates inclusive (the "Class Period"), and were damaged thereby (the "Class").

2. Terran Orbital is a startup founded by Defendant Marc Bell and several business partners, which designs, manufactures, and sells "small satellites" to commercial and government

customers internationally. Bell initially agreed to let a fellow business partner run Terran Orbital for years, but after taking over as Chief Executive Officer ("CEO") in March 2021, Bell took the Company public through a special purpose acquisition company ("SPAC") at $10 per share in early 2022 as part of a broader effort to expand its operations and build a multi-billion dollar enterprise as demand for small satellites skyrocketed.

3. Lockheed Martin Corporation ("Lockheed Martin"), the largest defense contractor for the United States government, was one of Terran Orbital's first investors and its largest customer. Between June 2017 and October 2022, Lockheed Martin invested approximately $60 million for a 9.4% equity stake in Terran Orbital. As of the start of 2022, Lockheed Martin also accounted for approximately 50% of Terran Orbital's annual revenue. But following the SPAC transaction, Terran Orbital still required significant capital to fund Bell's aggressive growth plans so senior management sought and secured another $100 million investment from Lockheed Martin in October 2022 that increased its equity in the Company from 9.4% to 33.5%.

4. The new investment from Lockheed Martin provided Terran Orbital with the capital it needed to continue executing on its new business strategy, but investors remained concerned that the growing business was burning through far more cash than it was generating. Thus, investors were thrilled when Terran Orbital announced in late February 2023 that it had entered into a historic contract with Rivada Space Networks GmbH ("Rivada") to build 300 satellites by mid-2026 for a whopping ***$2.4 billion***. At the time it entered into this contract, Terran Orbital generated just $94.2 in annual revenue. The Company's stock price jumped over 100% in response to this news. As a direct result, Terran Orbital's all-important "backlog" of uncompleted contract work soared from $170.8 million to $2.5 billion.

5. Management used the contract with Rivada as an opportunity to assure investors throughout 2023 that Terran Orbital had ample liquidity to operate its business while waiting to convert customer contracts into free cash flow. Indeed, Defendants represented that they had "no concerns" about the Company's cash position, that its existing cash balance was sufficient until it broke even in 2024, and raising more capital was the "last thing" management wanted to do.

6. Behind the scenes, Defendants were sounding the alarm bells. As early as spring of 2023, Bell and Hobart began exploring options to raise the capital needed to cover the Company's immediate cash requirements and later informed Terran Orbital's Board of Directors (the "Board") that the "magnitude" of Terran Orbital's cash needs may soon cause it to enter a "negative cash position" in the immediate future. By October 2023, the Board formed a special committee in response to the "concerns" raised by Bell and Hobart, engaged legal and financial advisors to carefully consider its options, and authorized management to take the drastic step of cold calling external parties to initiate a sale process.

7. In late 2023, right before the end of the year, Terran Orbital received several overdue customer payments, including one from Rivada, that helped buoy the Company's cash balance. Management again took this as an opportunity to allay investor concern about its liquidity. Defendants repeatedly represented that "cash is stable," "we don't need cash," and "[w]e have no intentions of raising any more money." As investors and analysts continued to press management on Terran Orbital's liquidity throughout 2024, Defendants insisted that they were "very comfortable with our liquidity position" and that the hypothetical loss of the Rivada contract would not have "any impact on us going forward . . . it's just upside for us."

8. These representations, once again, misrepresented the true state of affairs. In truth, Defendants knew at the time it received the year-end customer payments that those payments

would be insufficient to cover anything beyond Terran Orbital's near-term cash needs and, as such, continued to forge ahead with the sale process, even though by then every one of the prospective bidders had dropped out except Lockheed Martin. By March 2023, Bell suggested to the Board that the Company establish an "at the market" facility to raise needed capital. In May 2023, Bell informed the Board that the Company could no longer rely on receiving payments from Rivada, which significantly deteriorated its cash forecast, and Hobart further explained that Terran might need a cash infusion of up to *$120 million* just to keep operating through 2024. Defendants soon conceded that Terran Orbital's was dire, and the Board began exploring the potential for a Chapter 11 bankruptcy.

9. Unfortunately, investors, like Plaintiffs, only learned about the liquidity crisis through a series of partial disclosures that revealed risks hidden by the fraud. For example, Terran Orbital made a series of filings with the SEC in 2023 which revealed that it planned to conduct offerings to raise needed capital after informing investors that it had no need to do so. Then, in December 2011, news broke that Terran Orbital was running a process to sell itself. Lockheed Martin later made an offer to buy the Company at a below market price but soon withdrew its offer after learning about its severe liquidity challenges. In August 2024, Terran Orbital announced that it decided to remove the Rivada contract from its backlog and, therefore, reduced it from $2.7 billion to a mere $312 million, a decrease of 88%. Just three days later, the Company announced that it entered an agreement to be acquired by Lockheed Martin for $0.25 per share at a 75% discount to the already below-market offer it initially made. Defendants later revealed in SEC filings that they had no choice but to finalize a deal with Lockheed Martin to avert bankruptcy and continue operating. Each of the foregoing events, and others described herein, were followed by

a precipitous decline in Terran Orbital's stock price, harming investors like Plaintiffs, who were lulled into a false belief that business would soon take off.

10. Unlike investors, however, Bell and other executives profited handsomely from the deal with Lockheed Martin. Each were guaranteed substantial "severance" payments following a "change of control" transaction of the type with Lockheed Martin, and Bell further negotiated, and approved, *additional* bonus payments for him and other executives. Bell ultimately received a lump sum of over $11.5 million in payments and benefits and Hobart received a lump sum of over $1.5 million in payments and benefits, as investors like Plaintiffs saw the value of their holdings disappear to practically nothing.

11. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages. This lawsuit seeks to hold Defendants accountable for those damages.

## II. <u>JURISDICTION AND VENUE</u>

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27(a) of the Exchange Act, codified at 15 U.S.C. § 78aa(a). The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, codified at 15 U.S.C. §§ 78j(b), 78t(a), and the rules and regulations duly promulgated thereunder, including SEC Rule 10b-5, codified at 17 C.F.R. § 240.10b-5.

13. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27(a) of the Exchange Act, codified at 15 U.S.C. § 78aa(a). Since at least the start of the Class Period, Terran Orbital has maintained its principal executive offices in Boca Raton, Florida, within this judicial district. Defendants therefore transact business in this judicial district and a substantial part of the events or omissions giving rise to the claims asserted herein, including the dissemination

of materially false and misleading statements to the investing public, occurred in this judicial district.

14. In connection with the acts and omissions alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, the facilities of a national securities market, and interstate telephonic and digital communications systems.

## III. PARTIES

15. Plaintiffs acquired Terran Orbital securities at artificially inflated prices during the Class Period, as set forth in the Certifications they previously filed with the Court (DE Nos. 1, 10-5), and were damaged thereby, as set forth herein.

16. Defendant Terran Orbital is a corporation organized under the laws of the state of Delaware. Its principal executive offices are located at 6800 Broken Sound Parkway NW, Suite 200, in Boca Raton, Florida. During the Class Period, Terran Orbital's securities traded on the New York Stock Exchange under various ticker symbols beginning with the prefix LLAP, an acronym that pays homage to Star Trek aphorism "live long and prosper." Terran Orbital's common stock is represented by the standalone ticker symbol LLAP.

17. Defendant Marc H. Bell ("Bell") served as CEO of Terran Orbital and Chairman of its Board from the time of its formation on March 25, 2022, through October 30, 2024. Bell has led several businesses across a range of industries as a financier and self-described "serial entrepreneur." In 1989, Bell founded Globix Corporation ("Globix"), which helped build a large part of the global internet "backbone" by connecting 1,000 internet providers around the world. Globix went public in 1996 but its market capitalization fell from nearly $2.4 billion in 1999 to $5.87 million in 2002, before it filed for bankruptcy. In 2004, Bell bought *Penthouse* magazine in a bankruptcy auction, serving as its CEO until June 2012. Under Bell's leadership, the company

acquired Various, Inc., which operated a portfolio of over 20 adult networking websites and dating platforms, including Adult FriendFinder and changed its name to FriendFinder Networks, Inc. ("Friend Finder"). Between 2008 and 2012, Friend Finder failed to turn a profit and, in 2013, its shares were delisted from the NASDAQ stock exchange, and it filed for bankruptcy. In 2008, Bell raised $250 million to purchase ARMOUR Real Estate REIT, Inc. ("Armour"), which he later led as Chief Strategy Officer ("CSO") from November 2009 through August 2013. Bell later served as CEO of the predecessor to Terran Orbital from March 2021 to March 25, 2022, and as its Chairman since its formation in 2013. Through his family home office, Marc Bell Capital Partners, LLC, Bell was also a partner in several New York City restaurants and nightclubs, including Artichoke Pizza, Lavo, and Avenue Nightclub.

18. Defendant Gary A. Hobart ("Hobart") served as Terran Orbital's Chief Transformation Officer from September 15, 2023, to October 30, 2024. Before being reassigned to the role of "Chief Transformation Officer," Hobart was Terran Orbital's Chief Financial Officer ("CFO"), Executive Vice President and Treasurer from March 2021 until September 15, 2023, when Defendant Mathieu Riffel replaced him as acting CFO. Notably, however, Hobart's LinkedIn profile indicates that he served as Terran Orbital's CFO continually from March 2021 until October 2024, thus raising a question as to who was functioning as Terran Orbital's *de facto* CFO at key points during the Class Period. From January 2009 to March 2021, Hobart was a Managing Director of Beach Point Capital Management LP ("Beach Point Capital"), an investment firm. From 2004 to 2009, he served as Managing Director of Beach Point Capital's predecessor, Post Advisory Group.

19. Defendant Mathieu Riffel ("Riffel") has served as Terran Orbital's Senior Vice President and Chief Accounting Officer since June 17, 2024. Before being appointed to his current

role, Riffel served as Terran Orbital's Senior Vice President and "Acting" CFO since September 15, 2023, after Hobart was purportedly transitioned into the role of Chief Transformation Officer. Before that, Riffel was Terran Orbital's Vice President and Corporate Controller from July 2021 to September 15, 2023. Previously, he held several financial positions at ADT Inc. from August 2018 to July 2021, and several positions in KPMG's audit practice from August 2008 to July 2018. Riffel is a Certified Public Accountant.

20. Defendant Stratton Sclavos ("Sclavos") served as a Director on Terran Orbital's Board since January 2016. Since April 2018, Sclavos has been a self-employed principal providing strategic advisory services to high technology start-ups. From October 2008 to March 2018, Sclavos was a General Partner at Radar Partners. From July 1995 to May 2008, he was Chairman and CEO of VeriSign Inc.

## IV. NON-PARTY CONFIDENTIAL WITNESSES

21. CW1 was a Senior Financial Reporting Analyst for Terran Orbital from August 2023 to October 2024. CW1 worked in Boca Raton, Florida, and reported to the Director of Financial Reporting and Corporate Accounting, Alex Lopez. In this role, CW1 assisted in preparing the Terran Orbital's financial statements.

22. CW2 was a Senior Program Planner & Cost Control Specialist for Terran Orbital from September 2023 to September 2024. CW2 worked in Irvine, CA, and reported to Senior Vice President of Programs, Mark Kula. In this role, CW2 tracked program costs to ensure high risk programs stayed on budget and worked with program managers to identify opportunities for cost cuts.

23. CW3 was a Director of Business Development for Terran Orbital from August 2023 to August 2024, which was a sales role focused on securing business from large government

accounts. CW3 worked in Irvine, CA, and reported directly to Vice President of Business Development, Civil Space Keith Thompson.

24. CW4 was a Payroll Manager for Terran Orbital from February 2023 to May 2024. CW4 worked in Terran Orbital's main corporate office on the same floor as Defendants Bell and Hobart and other C-suite executives. CW4 reported to Human Resources Director, Michael Medina, who reported to Bell. As Payroll Manager, CW4 was responsible for issuing payroll, advised executives on organizational design, and assisted with the management of staffing and benefits.

## V. FACTS

### A. Relevant Background

#### 1. Overview of Terran Orbital and Its Corporate History

25. At present, Terran Orbital is a company owned by Lockheed Martin that provides end-to-end satellite products and services to government and commercial customers in the aerospace industry, including satellite design, satellite production, launch planning, mission operations, and on-orbit support services. Terran Orbital maintains corporate and engineering offices in Boca Raton, Florida; Melbourne, Florida; Irvine, California; and Torino, Italy and owns manufacturing facilities in Irvine, California; Santa Maria, California; and Torino, Italy.

26. The predecessor to present-day Terran Orbital, now known as Terran Orbital Operating Corporation ("Legacy Terran Orbital"), was founded in 2013 by Bell and his friend Anthony "Tony" Previte ("Previte") to focus on manufacturing a new class of small satellites known as nanosatellites, which refers to satellites that weigh between 1 to 10 kilograms (2.2 to 22 pounds). In fact, Legacy Terran Orbital began by acquiring the startup Tyvak Nano-Satellite Systems LLC ("Legacy Tyvak"), based in Irvine, California, which was formed in 2011 by two academics who invented the industry standard for a type of modular nanosatellite built using

standardized cube-shaped units measuring 10 centimeters x 10 centimeters x 11.35 centimeters, known as cube satellites, or "CubeSats." As demand for small satellites grew, the business quickly shifted form simply manufacturing parts for other small satellite producers to manufacturing the satellites themselves and providing a range of related support services.

27. As Legacy Terran Orbital's small satellite business expanded, it reorganized the structure of its operating entities. In July 2014, Legacy Tyvak converted into a Delaware corporation by merging with and into another subsidiary formed by Legacy Terran Orbital just months earlier, Tyvak Nano-Satellite Systems Inc. ("Tyvak"). Then, in February 2015, Legacy Terran Orbital formed Tyvak International, S.R.L. ("Tyvak International"), a wholly owned subsidiary based in Turin, Italy, to carry out Tyvak's international operations.

28. Terran Orbital also took on a new line of business. By no later than June 2020, Legacy Terran Orbital acquired a controlling interest in PredaSAR Corporation ("PredaSAR"), another aerospace company co-founded by Bell in December 2018 to build a constellation of almost 100 synthetic aperture radar ("SAR") satellites with the ability to provide customers with images of sites around the world within minutes. Unlike visible spectrum imagery, which relies on sunlight to illuminate the site under observation, SAR technology penetrates cloud cover as well as other adverse weather conditions and can capture images at night. According to Defendant Bell, PredaSAR fit well within the Terran Orbital portfolio because it could rely on Tyvak to manufacture its SAR satellites.

29. By February 26, 2021, Tyvak (including its international affiliate) and PredaSAR had become wholly owned subsidiaries of Legacy Terran Orbital and represented its two reporting segments. Tyvak and Tyvak International comprised Legacy Terran Orbital's Satellite Solutions segment and PredaSAR comprised Legacy Terran Orbital's Earth Observation Solutions segment.

30. Due to the cost, complexity, and timeline associated with designing and building small satellites, most contracts that Terran Orbital entered into provided that it would be paid through a series of "milestone" payments ahead of certain stages of work. As Bell stated during an investor call on March 27, 2023, "we're cash in advance kind of people" and "we don't give a lot of credit." Bell further explained "we give credit to" the federal government as they "pay very, very quickly" but "most commercial contracts are pay in advance, then we work."

**2. Public Listing In a SPAC Transaction and Business Shift**

31. At all times prior to March 15, 2021, Previte served as Legacy Terran Orbital's CEO and President and Bell served as Chairman of its Board. According to an interview that Bell gave in July 2024 to the industry publication *Satellite Evolution Global*, the two business partners agreed on this arrangement because Previte had a degree in Aerospace engineering. But after eight years as CEO, Previte asked Bell to take over for him. Effective March 15, 2021, Tony Previte was reappointed to serve as Chief Strategy Officer and Executive Vice President of Legacy Terran Orbital and Marc Bell was named CEO and President of Legacy Terran Orbital and retained his role as Chairman of its Board.

32. By March 2021, Bell had three decades of experience building small businesses into larger enterprises. On conference calls, when investors expressed concern about Terran Orbital's financial condition, Bell often responded by boasting that it was the seventeenth company that he and his partners had taken public. But not all of his previous ventures were successful. For example, the market capitalization of Globix fell from nearly $2.4 billion in 1999 to $5.87 million in 2002, before it filed for bankruptcy. Bell also led a company that bought *Penthouse* magazine in 2004, but after it acquired a portfolio of adult dating and networking websites for $500 million, the business failed to turn a profit, Bell Retired as CEO, its shares were delisted from NASDAQ, and it filed for bankruptcy.

33. Bell told *Satellite Evolution Global* that, when he took over as CEO of Legacy Terran Orbital, "I didn't want to run a small CubeSat manufacturing operation, I wanted to build another unicorn," a finance term that refers to a privately-owned startup that reaches a value of over $1 billion. As such, Bell decided to take Legacy Terran Orbital public in order to raise the capital needed to expand the scale of its operations.

34. There are several ways that a privately held small businesses can go public, including an initial public offering ("IPO") or through a SPAC. In an IPO, a private company raises capital by selling newly issued shares to public investors. In contrast, a SPAC is a "blank check" company that raises money in an IPO to consummate a merger with a private company that meets certain criteria, the result of which is that the private company becomes public by merging with the SPAC, without a traditional IPO. Each of these vehicles provide different benefits and risks. While an IPO provides access to a broad base of capital, the price at which shares are sold are subject to market conditions. And while SPACs generally have a set amount of investment capital, the terms of a resulting business combination, or "de-SPAC," are negotiated in advance and, thus, offer more certainty than a traditional IPO.

35. Bell decided to take Legacy Terran Orbital public in a SPAC transaction. According to an interview that Bell gave in March 2022, "what a SPAC does is it gives us certainty of close versus a traditional IPO" and, at the time he wanted to take Legacy Terran Orbital public, "we wanted higher certainty of close."

36. Between March 2021 and May 2021, Bell and other senior management reviewed potential SPAC partners before narrowing down the list to a SPAC named Tailwind Two Acquisition Corp. ("Tailwind Two"), a Cayman Islands exempted company which recently raised approximately $345 million in an IPO held in March 2021. By no later than May 11, 2021,

representatives of Terran Orbital contacted senior officials at Tailwind Two to explore Tailwind Two's interest in a potential business combination with Legacy Terran Orbital. After representatives of Tailwind Two met with Bell at his home in Florida on May 12, 2021, Tailwind Two decided to engage in further diligence and discussions with Legacy Terran Orbital.

37. On October 28, 2021, Legacy Terran Orbital and Tailwind Two entered into a definitive agreement pursuant to which Legacy Terran Orbital would merge with and into Tailwind Two in exchange for gross proceeds of $345 million. The proposed transaction valued Terran Orbital at approximately $1.58 billion.

38. On March 25, 2022, Legacy Terran Orbital and Tailwind Two consummated a merger pursuant to which (i) a wholly owned subsidiary of Tailwind Two merged with and into Legacy Terran Orbital; and (ii) Tailwind Two reincorporated in the state of Delaware and changed its name to Terran Orbital (the "de-SPAC Transaction"). In connection with the de-SPAC Transaction, (i) all outstanding shares of Tailwind Two ceased trading on the NYSE; and (ii) all outstanding shares of Legacy Terran Orbital converted into shares in Terran Orbital based on an agreed-upon exchange ratio. On March 28, 2022, Terran Orbital's common stock and warrants began trading on the NYSE under the symbols LLAP and LLAP WS, respectively.

39. Even before the de-SPAC Transaction closed, Legacy Terran Orbital began to change its core focus to support Bell's new growth plan. On February 17, 2022, Legacy Terran Orbital disclosed that it planned to stop making nanosatellites and transition to larger format small satellites ranging from 150 to 500 kilograms in order to compete for military and intelligence community contracts and, as such, it planned to "phase out" the Tyvak brand. Bell told industry publication *SpaceNews* in November 2022 that this strategic shift was devised by him in 2021 together with friend and co-founder Previte and Board member Daniel Staton.

40. Teran Orbital continued to reconfigure and augment its business plans after the de-SPAC Transaction closed. On October 31, 2022, Terran Orbital reported that PredaSAR abandoned its previous plan to build and operate its own constellation of SAR satellites in favor of simply offering products using SAR technology. Bell told industry publication *SpaceNews* later that day that "[t]his makes sense for us right now because there is an immediate demand for satellites" following Russia's recent invasion of Ukraine. In addition, Bell told the publication that executives believed PredaSAR's previous plan was a "drag" on Terran Orbital's market valuation because "[a] SAR constellation is very capital intensive" and "this de-risks the company going forward from a capital perspective." In the same release, Terran Orbital reported that it added over 140,000 square feet of manufacturing space in Irvine, California and that it planned to "accelerate[]" plans to further expand the space it occupied at that location.

41. Not everyone at Terran Orbital was happy with Bell's aggressive growth plans. Sources told *SpaceNews* in November 2022 that there were months of rising tension and "significant discontent" among key employees as Terran Orbital demanded that they put in longer hours to keep up with increased production goals. In November 2022, three senior engineering and program executives resigned in protest over the company's new direction, including Austin Williams, Chief Technology Officer and Tyvak co-founder, Adam Thurn, Vice President of Engineering, and John Abel, Senior Technology Fellow.

42. In February 2023, consistent with its previously reported plans (¶ 40), Terran Orbital signed a ten-year lease for a new 94,000 square foot manufacturing and assembly facility at 4 Goodyear in Irvine, California. Local publication *Orange County Business Journal* reported that the addition to Terran Orbital's portfolio of buildings and facilities in Irvine, California makes

it "among the fastest-growing local tech firms the past two years, in terms of its real estate footprint in the area."

### 3. Longstanding Relationship with Lockheed Martin

43. Lockheed Martin is a global aerospace and defense company headquartered in Bethesda, Maryland. For years, Lockheed Martin has been the largest prime contractor for the United States government. As of 2023, it had contracts with the United States government for $47.4 billion, nearly double that of the second largest contractor for the United States government, Raytheon Technologies Corporation ("Raytheon"). For those products and services that it cannot fulfill in-house, Lockheed Martin relies on an extensive network of subcontractors.

44. Unlike other large defense companies, Lockheed Martin did not historically operate a satellite manufacturing company of its own. In recent years, many of Terran Orbital's competitors were acquired by other large government contractors and defense-focused businesses. In late 2018, small satellite manufacturer Millennium Space Systems was acquired by The Boeing Company. In late 2020, small satellite manufacturer Blue Canyon Technologies was acquired by Raytheon. Then, in 2022, AE Industrial Partners acquired a majority stake in satellite manufacturer York Space Systems.

45. As such, Lockheed Martin outsourced satellite manufacturing work to other companies, and was a longtime customer of Terran Orbital. In fact, Lockheed Martin was one of Terran Orbital's first major customers. In August 2013, Lockheed Martin chose Legacy Tyvak to provide turnkey integration services for customers with CubeSat payloads on Lockheed Martin's Athena family of rockets, which was added to the Launch Services II contract that it entered into with NASA in 2010. The two continued to work together on various programs awarded to Lockheed Martin by federal agencies, including several contracts worth almost $900 million to construct a network of military satellites in low Earth orbit known as the "Transport Layer" for the

Department of Defense's Space Development Agency. As of the start of 2022, Lockheed Martin accounted for approximately 50% of Terran Orbital's annual revenue.

46. Lockheed Martin was also an early and longtime investor in Terran Orbital. Lockheed Martin first invested in Terran Orbital in June 2017 in its very first "Series A" financing round. Between June 2017 and October 2022, Lockheed Martin invested a total of approximately $60 million for a 9.4% equity stake in Terran Orbital. During this time, Lockheed Martin also held up to approximately $87 million in debt instruments issued by Terran Orbital.

47. Between June 2017 and October 2022, the relationship between Terran Orbital and Lockheed Martin was also governed by a Strategic Cooperation Agreement, dated as of June 26, 2017 (the "First SCA"). The First SCA was amended and restated several times to extend the duration of its terms, the last of which took place on October 28, 2021. As amended, the First SCA contained a variety of provisions that required Terran Orbital to give priority to its business with Lockheed Martin. For example, Terran Orbital was required to submit binding bids for any request for proposal from Lockheed Martin and, if awarded a contract to build satellites for Lockheed Martin, then it was obligated to prioritize the Lockheed Martin order over orders from other customers. In addition, Lockheed Martin had a right of first refusal over certain orders that exceeded a specified level of Terran Orbital's production capacity.

48. Following the consummation of the de-SPAC Transaction in March 2022, Terran Orbital needed significant capital to continue scaling its manufacturing resources to adequately support its growth plans. Net of redemptions and other expenses, the de-SPAC Transaction provided Terran Orbital with cash proceeds of only approximately $58.4 million. Accordingly, Terran Orbital required additional sources of capital to carry out its business plans.

49. However, recent SEC policy changes constrained Terran Orbital's ability to access the capital markets in 2022. In general, newly issued securities must be registered with the SEC before they can be sold publicly. Among other conditions, companies that have been subject to the reporting requirements of the Exchange Act for 12 months can register new securities using an abbreviated "short-form" registration statement on SEC Form S-3 that often incorporates information from other Exchange Act filings. All else being equal, this is far more attractive than a traditional registration statement because it is quicker and less costly to prepare. Prior to September 2020, companies that went public through a SPAC often used Form S-3 to sell additional shares soon after the de-SPAC transaction by relying on the fact that the *SPAC* made Exchange Act filings long before the de-SPAC transaction. In September 2020, the SEC issued a Compliance and Disclosure Interpretation which clarified that such companies were ineligible to use Form S-3 until they had, themselves, made timely Exchange Act filings for 12 months. As Marc Bell later explained during an interview published in *Satellite Evolution Global*, the ability to raise as much money as needed using a short-form registration was a "great benefit" for early-stage companies like Terran Orbital but the new SEC guidance "undermined" its ability to access the capital markets immediately after the de-SPAC Transaction.

50. As a result, Terran Orbital sought and secured another substantial investment from Lockheed Martin. On October 31, 2022, the two entered into a Convertible Note and Warrant Purchase Agreement, pursuant to which Terran Orbital received $100 million from Lockheed Martin in exchange for (i) secured notes convertible into shares of Terran Orbital common stock in an aggregate principal amount of $100 million; and (ii) warrants to purchase 17,253,279 shares of Terran Orbital common stock at $2.898 per share. Assuming the conversion of all notes and the exercise of all warrants, the $100 million investment increased Lockheed Martin's equity

interest in Terran Orbital from 9.4% to 33.5%. By the end of 2022, orders from Lockheed Martin also accounted for 76% of Terran Orbital's annual revenues.

51. In connection with Lockheed Martin's $100 million investment, Terran Orbital and Lockheed Martin terminated the First SCA and entered into a new Strategic Cooperation Agreement, dated October 31, 2022 (the "Second SCA"), and effective through October 31, 2035. The Second SCA contained the same or substantially similar "priority" provisions as those from the First SCA described in ¶ 47. In addition, the Second SCA gave Lockheed Martin the right to designate a nominee for appointment to Terran Orbital's Board and required Terran Orbital to give Lockheed Martin notice of any potential sale of Terran Orbital and allow Lockheed Martin to be involved in any such sale process.

### B. Terran Orbital Signs a Historic $2.4 Billion Contract with Rivada

52. On February 22, 2023, Terran Orbital announced that its satellite manufacturing subsidiary Tyvak signed a contract with Rivada Space Networks GmbH ("Rivada"), a wholly owned subsidiary of Washington, D.C.-based wireless technology company Rivada Networks, Inc., to develop, build, and deploy 300 satellites for a satellite constellation under development by Rivada for a total purchase price of ***$2.4 billion*** (the "Rivada Contract"). By its terms, the Rivada Contract required Terran Orbital to deliver all 300 satellites in the first half of 2026.

53. Consistent with Terran Orbital's general practice, the Rivada Contract provided that Rivada would pay Terran Orbital in a series of "milestone" payments over the course of the contract in accordance with a design, production, and delivery schedule set forth in an Appendix therein. Importantly, the milestone payments in the Rivada Contract were structured to provide Terran Orbital with work-related payments in *advance* of each stage of work.

54. Bell consistently hyped the Rivada Contract as the largest contract of its kind. For example, Bell told industry publication *SpaceNews* on the day the deal was announced that the

Rivada Contract was "the largest smallsat contract ever awarded in history." He also provided a statement to *CNBC* later that day in which he confirmed that it was the "largest . . . deal in the history of small sats," adding "I don't know any deal that is larger." Bell reiterated during an interview with *Proactive Investors* in April 2023 that the Rivada Contract was the "largest" ever small satellite production contract to date.

55. The $2.4 billion Rivada Contract was an extraordinary commercial achievement for Terran Orbital, as it would be for any early-stage company of its size. By the start of 2023, Terran Orbital generated just $94.2 million in annual revenue. In fact, on the day the Rivada Contract was announced, Terran Orbital's overall market capitalization was approximately $390 million. Consequently, Terran Orbital reported in its annual report on Form 10-K for the year ended December 31, 2022, filed with the SEC on March 23, 2023 (the "2022 Form 10-K"), that "this contract [the Rivada Contract] will form a significant portion of our revenue in 2023 and future fiscal periods."

56. Investors were understandably thrilled by Terran Orbital's entry into the Rivada Contract. The price of Terran Orbital's common stock jumped over 100% after the news broke before closing at $2.93 per share, a 71% increase from the previous day. Numerous media outlets linked the stock climb directly to the announcement of the Rivada Contract. For example, *CNBC* reported that "Terran Orbital shares surged on Wednesday after the company announced a $2.4 billion contract to build communications satellites for Rivada Space Networks." Similarly, *Forbes* published a story titled "Terran Orbital Stock Soars 71% On Rivada Deal" in which it stated that the rally was a "result" of the announcement and observed that "investors reacted with excitement" to it.

57. Especially for a contract of its size, the Rivada Contract was subject to the risk that Rivada may not secure adequate funding to finance the payments due under the agreement. However, on February 23, 2023, the day after Terran Orbital and Rivada announced their entry into the Rivada Contract, Rivada Network's Chairman & CEO, Declan Ganley, told *SpaceNews* that "[w]e have funding commitments from both existing shareholders in Rivada and some new investors, which are sufficient to meet our obligations" for its satellite constellation, including, specifically, financing for the manufacturing contract that it just executed with Terran Orbital.

**C. Terran Orbital Begins to Experience a Liquidity Crisis**

58. Following the $100 million cash infusion from Lockheed Martin in the fourth quarter of 2022, Terran Orbital had just $93.6 million in cash and cash equivalents as of December 31, 2022. Still, Terran Orbital was brimming with optimism. On March 21, 2023, Terran Orbital announced its financial results for the quarter and year ended December 31, 2022, which it characterized as "Another Year of Record Revenues." Among other things, it touted (i) a 130% increase in its 2022 revenue to $94.2 million, and (ii) a 131% increase in its "backlog"— described in its SEC filings as a "key measure" of business growth which represents the estimated dollar value of executed contracts considered to be "firm"—to $170.8 million, driven primarily by contracts with Lockheed Martin. On the investor call that Terran Orbital held to discuss its results for the quarter and year ended December 31, 2022, Bell assured that, following the investment from Lockheed Marin, "[w]e feel pretty good about where we are and have no concerns at this point about our cash."

59. Nevertheless, by March 31, 2023, Terran Orbital's cash and cash equivalents balance had dwindled to $57.4 million. Making matters worse, Terran Orbital had not generated a profit from its operations since going public over a year earlier. For the quarter ended March 31, 2023, it posted an operating loss of $33.9 million, meaning it was spending $33.9 million *more*

than the money it made. In fact, the operating loss from that quarter was almost exactly the same as it was in the same period from 2022, even though Terran Orbital's revenues more than doubled from $13.1 million in the prior year period to $28.2 million in the quarter ended March 31, 2023. Accordingly, investors began to express concern about Terran Orbital's liquidity. For example, on the investor call Terran Orbital held to discuss those results, a shareholder expressed concern about Terran Orbital's cash flow and reported that "I think other people are concerned about this too." Bell reassured that he previously took 17 companies public and told the investor that "you'll see very quickly as these new facilities come online . . . that things turn very quickly in terms of revenues, in terms of profitability, and in terms of cash."

60. Despite this, senior management signaled that the Rivada Contract would, in time, change the tide. For example, during a call on March 21, 2023, an analyst asked if Terran Orbital planned to include the Rivada Contract in its all-important backlog. At the time, Defendant Hobart responded that "we are still evaluating how we want to present the Rivada Contract" and "we will make determinations as finish the March quarter on how properly to approach that in terms of backlog." Management ultimately decided to add the revenue streams associated with the Rivada Contract to its backlog, and formally increased it from $170.8 million as of December 31, 2022, to $2.5 billion, as of March 31, 2023.

61. Nevertheless, Terran Orbital expressly noted that the financial benefit of the Rivada Contract may not be realized until *after* 2023. In the press release announcing its financial results for the quarter ended March 31, 2023, Terran Orbital reported that "[t]he timing and execution of our new contract work with Rivada . . . are variables for our full year 2023 results but are the building blocks for a higher revenue base in 2024" and, as such, "we anticipate in excess of $250m [million] in revenue in 2023" with potential for greater "[u]pside."

62. Thus, notwithstanding Bell's assurances to the contrary, Terran Orbital was in immediate need of additional capital to fund operations through at least 2023 and, as such, began exploring financing options by no later than spring of 2023. As a result, on April 3, 2023, Terran Orbital filed with the SEC a "short-form" registration statement on Form S-3 (the "Shelf Registration Statement") to register an indefinite number of securities for future sale in one or more offerings in an amount not to exceed $500 million. The Shelf Registration Statement was signed by all members of Terran Orbital's Board, including Bell and Hobart. The SEC declared the Shelf Registration Statement effective on April 18, 2023. On May 24, 2023, after being approved in resolutions by the Board, Terran Orbital entered into a purchase agreement with an institutional investor for the direct issuance and sale of $37.1 million in securities registered in the Shelf Registration Statement (the "Direct Offering"), which closed on or around May 30, 2023. Terran Orbital stated that it planned to use the proceeds from the Direct Offering for "general corporate purposes, including capital expenditures, working capital, research and development and general and administrative expenses."

63. Despite the Direct Offering, Terran Orbital was still in dire need of additional cash. Even with the proceeds of the Direct Offering, Terran Orbital's cash and cash equivalents shrank from $57.4 million as of March 31, 2023, to $48.6 million as of June 30, 2023. As such, unbeknownst to investors, senior management began holding discussions with external parties regarding financing options, including alternative capital raise transactions as well as strategic sale transactions.

64. On July 19, 2023, Terran Orbital's Board held a special meeting to learn about the conversations that occurred with interested parties regarding financing options and other strategic options that were being considered. During the meeting, Bell explained that certain expected

upcoming program awards ***would not solve Terran Orbital's near-term liquidity issues*** due to their timing. These near-term liquidity issues were not publicly disclosed to investors.

65. The Board met again on August 3, 2023. At this meeting, Bell explained that the magnitude of Terran Orbital's near-term cash needs was due in part to a major program being put on hold by a customer, delaying a large initial payment that was expected when the program began. Bell also discussed potential financing transaction that were being explored with third parties. Hobart, who was also present, provided an overview of Terran Orbital's cash requirements and noted that delays in receiving collections on existing and new contract awards may result in a ***negative cash position*** for Terran Orbital in the coming months and, thus, require it to pursue an additional capital raise.

66. On August 10, 2023, the Board held a regular meeting, during which Bell provided an update on senior management's pursuit of alternative financing opportunities. At Bell's recommendation, the Board unanimously approved engaging Jefferies LLC ("Jefferies") to advise on strategic alternatives to a capital raise, including an investment, sale of Terran Orbital, a take-private transaction, or an alternative strategic relationship. Terran Orbital formally engaged Jefferies the following day, August 11, 2023.

67. None of the above was disclosed to investors. On the contrary, Bell continued to exude optimism. On August 15, 2023, Terran Orbital hosted a call with analysts to discuss its financial results for the quarter ended June 30, 2023. During this call, Bell advised that Terran Orbital would earn $180 million during the second half of 2023 from the Rivada Contract. Later on the call, H.C. Wainwright & Co. analyst Scott Buck explained that there was "investor hesitation around the contract" with Rivada because of how vague Rivada had been about its sources of financing. In response, Bell assured that "we've done extreme due diligence on their

financials" and "we are very much aware of who their funding is and how much it's for, and where it's coming from." Bell also reported that, with the incoming cash from Rivada, Terran Orbital would not need to raise any more funds to scale its business. In fact, Bell told an analyst who asked about Terran Orbital's capital plans that "the last thing any of us want to do is raise additional cash" adding "I don't want the dilution."

68. Meanwhile, despite Marc Bell's assurance that he did not want to raise additional cash, senior management was negotiating a private capital raise. On September 12, 2023, and September 14, 2023, the Board and the Special Committee approved Terran Orbital's entry into a previously negotiated securities purchase agreement with certain investors in which it agreed to issue and sell to those investors Terran Orbital equity securities in a confidentially marketed public offering (the "CMPO"). On September 18, 2023, after the Special Committee approved pricing terms for the CMPO, Terran Orbital entered into a securities purchase agreement to sell the investors $32.5 million in equity securities registered in the Shelf Registration Statement in a CMPO, which closed on or around September 25, 2023. Terran Orbital stated that it planned to use the proceeds from the CMPO "general corporate purposes, including capital expenditures, working capital, research and development, maintenance of the liquidity covenant in debt documents and general and administrative expenses."

69. In addition, on September 11, 2023, the Board established a special committee (the "Special Committee") comprised of the purportedly independent Board members James LaChance, Stratton Sclavos, and Thomas Manion to address issues and considerations regarding the Company's cash needs and projected liquidity position due to the concerns raised by senior management at previous Board meetings, and the ongoing assessment of financing options and alternatives, including ***a potential financial restructuring***.

70. Again, however, Terran Orbital's capital raise was barely sufficient to satisfy its immediate cash requirements. By September 30, 2023, Terran Orbital's cash and cash equivalents were just $38.7 million, including the proceeds from the CMPO. Indeed, the vast majority of that cash balance came from the CMPO, which closed five days earlier.

71. Worse still, it was clear to employees by this time that Terran Orbital was beginning to experience severe financial difficulties. For example, CW1 recounted that Terran Orbital was *always* in need of fresh infusions of cash to keep its operations running as early as August 2023. Similarly, CW2 recalled that Terran Orbital began experiencing difficulty collecting payments from customers immediately upon joining the Company in September 2023, which, in turn, negatively impacted its cash flow.

### D. Shareholders Revolt While Terran Orbital Attempts to Sell the Company to Jettison Its Liquidity Crash

72. On October 6, 2023, Terran Orbital's Board met again. As a direct result of Terran Orbital's continued ***cash constraints***, the Board authorized senior management, including Bell and Hobart, to initiate a potential sale process with the assistance of Jefferies. Following this meeting, senior management, including Defendants Marc Bell and Gary Hobart, worked with Jefferies to prepare materials for such a process. Beginning on October 24, 2023, Jefferies contacted over 80 different parties, including Lockheed Martin, to gauge their interest in a transaction with Terran Orbital. Thirty-three of these parties entered into non-disclosure agreements and received limited financial and operational information regarding Terran Orbital.

73. As senior management worked with Jefferies to prepare materials for a potential sale process, significant stockholders publicly protested the strategic choices of Terran Orbital's leadership. On October 12, 2023, a group of "concerned investors" holding approximately 8.4% of Terran Orbital's shares outstanding, including Sophis Investments LLC ("Sophis") and several

co-founders of Tyvak, including Austin Williams (the "Investor Group"), announced that they sent a letter to the Board on October 11, 2023, expressing discontent with the current state of affairs. The letter highlighted that Terran Orbital's stock had lost approximately 94% of its value since the Company went public in March 2022 and a series of missteps by senior management had left it in "constant need of cash" and an unable to "raise money on favorable terms." The letter outlined several recommendations to prevent further harm and restore stockholder value, including the installment of a new CEO to replace Bell.

74. On October 19, 2023, the independent directors of Terran Orbital's Board responded to the Investor Group in a letter, in which they expressed their "continued and unqualified support for Marc [Bell] and the Company's entire management team" and stated that "the Company's current strategy remains the best course for maximizing long-term shareholder value."

75. Just one day later, on October 20, 2023, Terran Orbital was forced to reveal that it received a notice from the NYSE that it was in danger of being delisted because the trading price of its common stock was less than $1 per share for 30 consecutive trading days.

76. On October 26, 2023, Terran Orbital hosted a "town hall" meeting open to the public to address all stockholder concerns. During his opening remarks, Bell disclosed that Terran Orbital recently received several contract payments which increased its cash balance to a level that should provide sufficient funding until Terran Orbital reaches "breakeven" EBITDA in 2024. Bell also revealed that, after receiving approximately $5 million from Rivada as of August 2023, additional milestone payments since then had been "delayed." He emphasized, however, that "[w]e remain engaged with Rivada on a near-daily basis" through its CEO, Declan Ganley, and

"we have been told by Rivada that we should still expect to receive approximately $180 million" by the end of 2023.

77. On November 9, 2023, the Concerned Investor Group sent another letter to Terran Orbital's Board, in which they reiterated their concerns and criticized the Board for failing to agree to meet with them to address their concerns and, instead, dismissing them out of hand.

78. On November 14, 2023, Terran Orbital filed a lawsuit against Austin Williams in California Superior Cout for failing to give proper notice before he resigned over a year earlier in November 2022 (¶ 41) in accordance with the terms of his employment agreement. Given the amount of time that had passed, and Williams' recent participation in the Concerned Investor Group, many viewed the lawsuit at retaliatory. For example, *TechCrunch* published an article on the lawsuit on November 27, 2023, in which it stated "it's uncommon for a company to sue a departing executive a full year later over failing to give adequate notice" and "[o]bservers, such as other shareholders, may reasonably interpret the company's actions in this context as retaliatory or punitive, regardless of the outcome."

79. On November 14, 2023, Terran Orbital also issued a press release announcing what it characterized as "Record Third Quarter 2023 Financial Results," for the period ending September 30, 2023, including (i) revenue of $43.9 million, up 58% from the same period in the previous year; (ii) gross profit of $9.7 million compared to $37 thousand in the same period in the previous year; (iii) gross margin of 22.1% compared to 0.1% in the same period in the previous year; and (v) a cash balance of more than $70 million as of October 31, 2023. At the same time, the press release stated, "[d]ue to the delay and uncertainty regarding the timing of performance related to our contract with Rivada versus our original expectations, we are removing any further revenue contribution from this contract in our current year forecast but continue to expect revenue

contribution in future years" and "[a]s a result of this removal and other factors, we now expect 2023 revenue to be in excess of $130 million, a reduction from our prior expectation of generating revenue in excess of $250 million in 2023." Nevertheless, Terran Orbital continued to report backlog of $2.6 billion due to the Rivada Contract, even though backlog is supposed to represent "business associated with contracts that are considered to be firm."

80. Later on November 14, 2023, Terran Orbital hosted a call with investors to discuss its results for the quarter ended September 30, 2023. On the call, despite his prior private discussions with the Special Committee regarding the need to raise capital, Bell stated that "***our current expectation [is] that we will have sufficient cash to cover capital investments and operations until becoming cash flow positive, which is expected in 2024.***" Bell was later asked by a private investor whether Terran Orbital had "enough cash to make it through to cash flow positive" even if Rivada never sent any additional payments. Bell responded, "Yes, we do." In response to another question concerning Terran Orbital's cash flow, Bell reiterated that "the plan is to be cash flow positive during 2024."

81. On December 11, 2023, *The Wall Street Journal* published a story titled "Satellite Manufacturer Terran Orbital Seeks a Buyer" in which it reported that Terran Orbital was attempting to find a buyer by the end of the month, according to people involved in the process. In response, Bell called an all-hands meeting during which he told employees "we are not looking for a buyer" but, rather, another strategic investor similar to Lockheed Martin. He also sent an email to all employees with the subject line "WSJ," in which he said the *Journal* got the story "very wrong" and "we are working with them to correct." Nevertheless, that same day, Terran Orbital filed a current report on Form 8-K (the "December 11, 2023 Form 8-K") with the SEC in which it ***confirmed*** the report by the *Journal* and explained that it was "conducting a formal review

of strategic alternatives to maximize shareholder value . . . which may include an investment, ***sale of the company***, 'take private' transaction or an alternative strategic relationship." Bell's company-wide email also had harsh words for the Investor Group: "[T]he whole thing is a joke . . . . The company recently sued one of the Sophis idiots and we will be suing them all in due course. They will eventually go away."

82. *SpaceNews* later contacted Bell to comment on several recent events, including the discrepancies between his internal communications to employees and Terran Orbital's SEC filings about a potential sale in December of 2023. Bell confirmed by email "My 8-K filing is correct," adding "All other information is not."

83. On December 12, 2023, the Investor Group announced that they sent another letter to the Board in which they called on the Board to immediately replace Bell as CEO. The letter submitted that Bell's actions over the past 24 hours confirm that he is "not fit to be CEO of Terran," including, by way of example, making conflicting statements to employees about the sale of the company and referring to the Investor Group as "idiots,"

84. The Board held a special meeting on December 19, 2023, to receive an update on the status of the strategic review process. Jefferies informed the Board that the process so far resulted in six potential bidders who Jefferies expected to move to a second round, including Lockheed Martin. However, because none submitted an indication of interest by the stated deadline of December 14, 2023, Jefferies extended the deadline to do so.

85. On December 19, 2023, Bell also held an internal company-wide meeting to provide a business update to staff. During the meeting, Bell reported that "I had dinner with [Rivada CEO] Declan Ganley last week in [Washington] DC," where Rivada's parent company is headquartered, and "he told me they expect to close tomorrow on their funding," adding "he texted

me this morning and maybe Thursday, Friday." Bell elaborated that "we'll at least get paid on the invoice that's owed, the $9 million invoice" but noted "I want to get the big check as everyone else does, because that will dramatically help our share price and everything else in our world." At this meeting, Bell also confirmed for staff that Terran was still considering a go-private transaction, but that his goal was to "go private, and then take it public again the traditional way and not have this dumbass market cap like we have today."

86. In late December 2023, Terran Orbital received a payment from Rivada that brought it current on all outstanding invoices along with a payment from one other customer. Terran Orbital reported its receipt of the payment from Rivada on January 2, 2024, but did not disclose the *amount* it received from Rivada. Later that same day, Terran Orbital announced that it expected to report approximately $70 million in cash and cash equivalents as of December 31, 2023, primarily due to the receipt of several key customer payments at year-end, which, in the aggregate, was far less than the $180 million that it previously said it expected to receive from Rivada by the end of 2023. Later SEC filings by Terran Orbital confirmed that it only recognized a total of $6.9 million under the Rivada Contract during all of 2023.

87. At the time Terran Orbital received the 2023 year-end contract payments, Defendants Bell and Hobart knew that, while the cash from these payments was sufficient to cover Terran Orbital's immediate capital requirements, they were ***insufficient*** to address anything beyond that. This accords with the account of CW3, who explained that Terran Orbital did not appear to have access to adequate cash reserves for its future operations based on the amount of business in its pipeline and opportunities in the marketplace in late 2023 and early 2024. CW4 also reported that there was a high amount of turnover around this time due to a "toxic" and "unhealthy" work environment with long hours. As CW4 put it, "people were dropping like flies."

In fact, CW4 went on leave in February 2024 after suffering a mini stroke during a high pressure 13 hour shift.

88. Between January 18, 2024, and January 19, 2024, representatives of Lockheed Martin and one of the other potential bidders attended a presentation by Jefferies and Terran Orbital's senior leadership in Irvine, California and toured its manufacturing facilities there. Terran Orbital's management informed the Board about these meetings on January 19, 2024. The four other potential bidders never fully engaged in the process or made an offer to acquire Terran Orbital. The company other than Lockheed Martin that visited Terran Orbital's offices in Irvine, California formally withdrew from the sale process on January 30, 2024.

89. On February 4, 2024, Terran Orbital entered into a settlement agreement with the Investor Group, pursuant to which Terran Orbital agreed to dismiss the lawsuit against Austin Williams and identify and appoint an independent director reasonably acceptable to the Investor Group to fill the seat left open by the passing of Anthony Previte. Bell signed the agreement.

90. After putting the dispute with the Investor Group to rest, Bell continued to insist that Terran Orbital's liquidity was stable as it forged ahead with the strategic review even though all bidders other than Lockheed Martin had dropped out. For example, on February 7, 2024, Bell gave an interview to the investor site *Seeking Alpha* in which he repeatedly asserted that Terran was not in need of cash, stating "***we are not looking to raise money,***" "***we don't need cash,***" "***[w]e're doing just fine,***" and "***[w]e have no intentions of raising any more money***."

### E. Lockheed Martin Offers to Buy Terran Orbital But Backs Out After Learning About Its Severe Liquidity Constraints

91. On February 9, 2024, the Board held a meeting at which representatives of Jefferies confirmed that Lockheed Martin was the only remaining potential bidder from the sale process and explained the reasons for the lack of strong interest from others, including, among other

factors, Terran Orbital's financial projections, which ascribed a higher probability of success and progress to certain programs and proposals than did prospective bidders. Following this discussion, the Board authorized Jefferies to provide bidding instructions to Lockheed Martin.

92. On February 14, 2024, Jefferies provided a second-round bid letter to Lockheed Martin's financial advisor, which specified that February 28, 2024, was the deadline to submit a final offer. Despite holding a series of due diligence calls with Terran Orbital over the next week, Lockheed Martin did not submit an offer by February 28, 2024, and, instead, requested and received an extension to submit a final offer.

93. On March 1, 2024, Lockheed Martin submitted a non-binding offer letter to acquire all equity in Terran Orbital that it did not already own for $1.00 per share, valuing the Company at approximately $200 million, buy all outstanding warrants for $70 million, and assume Terran Orbital's existing debt of $313 million (the "First Lockheed Martin Offer"). Later that same day, Lockheed Martin also filed an amended statement of beneficial ownership on Schedule 13D with the SEC disclosing the First Lockheed Martin Offer.

94. Terran Orbital's Board convened a meeting on March 3, 2024, to discuss the First Lockheed Martin Offer. At the recommendation of Jefferies, the Board adopted a shareholder rights plan which implemented a "poison pill" to block a hostile takeover. After this, the Board delegated the authority to assess the First Lockheed Martin Offer, and develop an appropriate strategy for responding to it, to the Special Committee and its advisors.

95. During the first half of March of 2024, the Special Committee held various internal discussions, working group sessions and informal meetings with Terran Orbital's senior management to establish a process to gather the necessary information to properly evaluate the First Lockheed Martin Offer, including the Company's financial budget and forecast, probabilities

and assumptions relating to the conversion of pipeline to backlog, potential future contract awards and the Company's current and future operation capacity, each to the extent necessary to sufficiently understand the Company's liquidity position.

96. On March 20, 2024, Bell spoke on a panel at the Satellite 2024 Conference & Exhibition in Washington, D.C. titled "The Future of LEO/MEO Constellations: Connectivity Beyond Borders." The panel also included Declan Ganley, CEO of Rivada and its parent company, Rivada Networks. As noted above (¶¶ 76, 85), Bell regularly spoke with Ganley about Rivada's commitments under the Rivada Contract.

97. On March 21, 2024, the Board held a regularly scheduled meeting. At this meeting, Bell provided an update on Rivada's efforts to obtain financing for another milestone payment to Terran Orbital under the Rivada Contract, which he believed, if made, could impact the Company's valuation and, thus, the Board's consideration of the First Lockheed Martin Offer. Bell also discussed the possibility of conducting an "at the market" offering to raise needed capital through open market equity sales.

98. Following the Board meeting on March 21, 2024, the Special Committee continued its evaluation of the First Lockheed Martin Offer by engaging in discussions with senior management to understand real-time information relating to the Rivada Contract and the likelihood and timing of further payments from Rivada, the Company's projected cash flows, the ability to maintain compliance with financial covenants under existing debt agreements, and the ability to pursue additional financing transactions.

99. On April 1, 2024, Terran Orbital announced what it characterized as "Record 2023 Financial Results" for the year ended December 31, 2022, including (i) record revenue of $135.9 million, up 44% year-over-year, (ii) record gross profit of $8.6 million, which was improved $25.8

million over prior year, (iii) manufacturing 78 satellites for Lockheed Martin for the Space Development Agency programs, and (iv) signing over $2.7 billion in new awards in 2023 representing more than 360 satellites. Thus, Terran Orbital continued to include the Rivada Contract in its backlog, even after it had removed revenue from that contract from its 2023 guidance. During the quarter ended March 31, 2024, however, Terran Orbital generated $27.2 million in revenue, but reported an operating ***loss*** of $34.4 million, meaning its operating expenses exceeded its revenues by $34.4 million. As such, by March 31, 2024, its cash and cash equivalents fell to $43.7 million, compared to $71.1 million as of December 31, 2023.

100. The Special Committee invited Lockheed Martin to present its perspectives on the First Lockheed Martin offer in person. On April 16, 2024, representatives of Lockheed Martin attended a meeting with Terran Orbital's senior officers and members of the Special Committee at the Company's offices in Irvine, California, at which they discussed their assessment of Terran Orbital's business and plans in the context of the First Lockheed Martin Offer. Terran Orbital management, in turn, presented updated information regarding the Company's financial forecast, program gross margin, and potential pipeline opportunities. In addition, a member of the Special Committee raised the concept of using an earn-out style contingent value right ("CVR") to potentially bridge the valuation gap between the two sides but did not formally present a response to the First Lockheed Martin Offer.

101. On April 30, 2024, notwithstanding Terran Orbital's so-called "record" results, Lockheed Martin informed Terran Orbital that it was withdrawing the First Lockheed Martin Offer. On May 2, 2024, after Lockheed Martin made this news public in a filing with the SEC, Terran Orbital issued a press release confirming that its strategic review remains "ongoing" and noting that "[w]e value Lockheed Martin's partnership."

**F. Terran Orbital Agrees to Be Acquired by Lockheed Martin At a Fraction of Its Original Offer to Avoid Bankruptcy**

102. On May 6, 2024, Hobart received an unsolicited email from a micro-cap business lender, referred to as "Lender R," offering potential liquidity solutions. Because Terran Orbital was in need of liquidity solutions, its management spoke with Lender R that same day. On May 14, 2024, Lender R verbally provided terms to Riffel for a $5 million unsecured term loan with a 30-week tenor and a 117% annualized coupon. Terran Orbital declined to pursue this financing offer due to the high interest rate and the small amount of proceeds compared to its total cash requirements.

103. The Special Committee also continued to assess the valuation of the Company and engage with representatives of Lockheed Martin. On May 7, 2024, the Special Committee received a presentation on a valuation model prepared by Province LLC ("Province"), a financial advisory firm. Between approximately May 13, 2024, and May 20, 2024, Mr. LaChance of the Special Committee held several discussions with contacts of Lockheed Martin. During these meetings, Lockheed Martin was informed that the Special Committee was continuing to evaluate the First Lockheed Martin offer, notwithstanding that Lockheed Martin withdrew it, and was told that the valuation of Terran Orbital was difficult given its complex capital structure and uncertainty regarding its contractual work.

104. At this time, however, Terran Orbital continued to struggle to collect payments from customers. CW2 confirmed that the customer payment issues first observed in September 2023 (¶ 71) were endemic throughout the duration of CW2's tenure at the Company. CW2 learned this information from senior executives and program managers who reported to Defendants, adding it was "known" throughout the Company that money was not coming in on schedule.

105. Meanwhile, Defendants continued to assure that Terran Orbital's liquidity was stable. For example, on May 14, 2024, management held a conference call with investors to discuss its financial results for the quarter ended March 31, 2023. On the call, Terran Orbital's new CFO, Mathieu Riffel, advised that "[a]s of today, backlog is estimated to be over $2.8 billion, inclusive of approximately $400 million of non-Rivada programs." Later on the call, an analyst asked if there were "concerns" if the Rivada Contract fell apart. Bell responded that "***it doesn't have any impact on us going forward***," adding "***[w]e have lots of other customers***." An investor associated with the Investor Group asked Bell if he was comfortable with Terran Orbital's liquidity position based on new contract awards, to which Bell responded, "***Yes, we feel very comfortable with our liquidity position as it stands today***." A different investor asked if Terran Orbital would meet its obligation under the Company's debt agreements requiring minimum cash balances. Riffel responded that "We do not have any concerns about that covenant at this time." Bell added, "***The answer is yes. We'll meet the requirements; we're well positioned to do this***."

106. On May 23, 2024, the Board held a regularly scheduled meeting. Bell provided an update on Terran Orbital's discussions with Rivada. Bell reported that the Company had reason to no longer rely on continued representations from Rivada that it was expecting an investment in the near future and, as such, it would start reducing staff on the program in the coming weeks absent a development to the contrary. At the time, the Company's interim cash requirements were heavily dependent on Rivada's payments and this move significantly deteriorated the Company's cash forecast for future periods, including 2024. The Board discussed the Company's liquidity outlook for the next quarter. Defendant Hobart explained that a milestone payment from Lockheed Martin under the Tranche 1 "Monsoon" contract was delayed because the program was pushed out by the need to pivot to new propulsion supplier after the original supplier was fired, which, in turn,

***constrained the Company's liquidity profile*** for the quarter. Hobart advised that the Company might need a cash infusion of up to ***$120 million*** to cover its cash requirements through the end of 2024.

107. On June 4, 2024, the Special Committee met with Province to discuss its continued due diligence of the Company. Province explained that Terran Orbital suffered from ***ongoing liquidity constraints*** and cautioned that it may be ***unable to continue operating*** given the Company's cash burn unless it found a solution to those liquidity constraints. The Special Committee and Province also discussed the framework for presenting a potential counterproposal to Lockheed Martin, including the terms of a potential CVR tied to future contract opportunities.

108. On June 12, 2024, the Special Committee met with Province to discuss the terms of a potential counterproposal for Lockheed Martin, including a potential CVR. At this meeting, the Special Committee raised concerns about Terran Orbital's ***ongoing liquidity and cash flow forecasts*** as well as the challenging operating environment. At the time of this meeting, the Company had not yet earned the milestone payment from Lockheed Martin discussed at the Board meeting on May 23, 2024, due to the program delays created by the propulsion supplier.

109. On June 18, 2024, at the direction of the Board, including Bell, Mr. LaChance of the Special Committee spoke with the primary contact for Lockheed Martin and verbally presented a counterproposal consisting of $1.50 per share and a $1 CVR (the "Terran Orbital Counterproposal") and requested that Lockheed Martin advance the upcoming milestone payments under the Tranche 1 "Monsoon" contract.

110. By June 30, 2024, Terran Orbital's cash and cash equivalents sank to $30.6 million, compared to $43.7 million, as of March 31, 2024. This was particularly concerning to Defendants because certain corporate debt documents contained restrictive covenants that if not satisfied could

make all unpaid amounts due under the debt instruments immediately due and payable, including a liquidity maintenance covenant that required Terran Orbital to maintain cash and cash equivalents of more than $20 million or 15% of certain aggregated funded indebtedness at the end of each fiscal quarter, which, if required, could make Terran Orbital insolvent or require bankruptcy.

111. On July 1, 2024, Terran Orbital engaged investment bank H.C. Wainwright to structure a transaction to raise capital that was either allowable under the covenant restrictions in the Company's debt documents or reasonable to the Company's existing lenders such that they would consent to the transaction. In consultation with H.C. Wainwright, senior management ultimately decided to pursue three potential transactions concurrently: (1) a warrant inducement transaction, whereby the Company would reduce the strike-price on existing warrants and issue new warrants; (2) a working capital facility providing access to $25 million from a new lender, subject to a negotiated interest rate on borrowed amounts; and (3) an "at the market" offering providing for the sale of common stock into the market at the prevailing market price.

112. On July 8, 2024, Casey French, Director of Mergers & Acquisitions at Lockheed Martin, told Mr. LaChance of the Special Committee that the Terran Orbital Counterproposal would soon be presented to Lockheed Martin's investment committee but that it was unlikely the proposal was workable. Mr. LaChance updated the Special Committee on this conversation the following day.

113. In the meantime, from July 5, 2024, to July 13, 2024, Terran Orbital negotiated a term sheet with a prospective lender to secure a $25 million working capital facility allowable under its debt agreements. After multiple rounds of negotiation, the transaction contemplated by

the term sheet was not a true working capital facility allowable under the exceptions in the Company's debt agreements, but rather a term loan prohibited under those instruments.

114. On July 17, 2024, Mr. French of Lockheed Martin told Mr. LaChance of the Special Committee that Lockheed Martin was not willing to negotiate on the Terran Orbital Counterproposal and not interested in pursuing any new commercial or strategic transactions with the Company at the time due to concerns about Terran Orbital's ***liquidity situation***, and further advised that Lockheed Martin would be seeking a ***liquidity review*** of Terran Orbital. Later that day, Mr. LaChance updated the Special Committee on his conversation with Mr. French. Among other things, the Special Committee focused its discussion on anticipated impacts resulting from the Company's ***short-term liquidity issues***.

115. On July 19, 2024, the Board held a special meeting, during which Mr. LaChance reported on Lockheed Martin's rejection of the Terran Orbital Counterproposal. At this meeting, Terran Orbital's new CFO, Adarsh Parekh, provided an update on the three financing options proposed by H.C. Wainwright. Specifically, Parekh explained that a working capital facility or warrant inducement transaction likely required consent from existing lenders, including Lockheed Martin, but that an "at the market" offering would not and an agreement to conduct such an offering was under negotiation and close to being finalized. The Board directed management to continue exploring financing options that do not require lender consent and reengage with Lockheed Martin on a potential sale of the Company.

116. On July 23, 2024, Terran Orbital entered into an At The Market Offering agreement with H.C. Wainwright (the "ATM Agreement"), providing terms on which the Company could sell through H.C. Wainwright up to a maximum of $98 million in common stock at prevailing market prices. However, the ATM Agreement conditioned any such sales upon receipt of a

certification from the CEO and CFO of the Company that there had been no material adverse effect on the financial conditions of the Company since the most recent Form 10-Q or Form 10-K filing by Terran Orbital. As such, it was understood, when Terran Orbital entered into the ATM Agreement, that it was ***unable***, as a practical matter, to commence any sales under the ATM Agreement until the Company released its next quarterly report on Form 10-Q, which would not occur, based on its historic cadence, for another three weeks in mid-August. Yet, Bell failed to disclose this constraint, instead publicly telling investors that the purpose of the ATM Agreement was "***to give our customers and vendors additional confidence that we have adequate capital to successfully manage current and future programs***." Bell added, "We are confident that the ATM announced today will allow us to deliver maximum value to our customers and other stakeholders." Of course, this was not possible if Terran Orbital could not survive until it was able to release its next quarterly report on Form 10-Q.

117. On July 24, 2024, Terran Orbital's CFO, Adarsh Parekh, contacted Mr. French of Lockheed Martin to ask for Lockheed Martin's consent, in its capacity as a holder of Terran Orbital debt, for the Company to enter into a proposed warrant inducement transaction in order to provide Terran Orbital with near-term liquidity. During this conversation, Parekh explained that feedback from Lockheed Martin was ***urgent***.

118. On July 25, 2024, Jefferies held a call with representatives of Lockheed Martin to explore if it was still interested in engaging in a strategic transaction with Terran Orbital. During this call, Jefferies communicated that Terran Orbital was in a ***dire cash position*** and indicated that it would be willing to transact at a below market price. That same day, the Board held a special meeting to discuss the status of ongoing efforts to obtain financing. At the meeting, management indicated that the Company had approximately ***three weeks before exhausting its cash reserves***.

Bell explained that Terran Orbital's options were to (1) obtain Lockheed Martin's consent to facilitate financing to bridge the Company's liquidity constraints until a new customer payment occurred, or (2) continue to explore a sale to Lockheed Martin. The Board discussed exploring ***Chapter 11 bankruptcy*** as a third option. The purportedly independent members of the Board received legal advice regarding their fiduciary duties in the context of an insolvent company.

119. By of July 31, 2024, Terran Orbital's cash and cash equivalents balance had been reduced to $14.6 million, which was ***insufficient*** to fund its operations and financial obligations through the end of 2024 without additional sources of funding.

120. The Board met again on August 1, 2024. Bell provided his view that Lockheed Martin may have continuing interest to acquire Terran Orbital. Province offered the opinion that Terran Orbital should begin planning for a potential ***reorganization*** or ***liquidation*** given its ***very limited cash balance***.

121. On August 1, 2024, Defendants Marc Bell and Gary Hobart contacted Mr. French of Lockheed Martin to reiterate the request that Lockheed Martin consent to a warrant inducement transaction. The next day, Mr. French spoke with Mr. LaChance of the Special Committee and advised that Lockheed Martin was not supportive of a warrant inducement transaction because it would not provide enough capital to solve Terran Orbital's liquidity problems. However, Mr. French indicated that, for Lockheed Martin to consider reengaging on a potential acquisition, the price would need to be "around" $0.25 per share, a 75% discount to the First Lockheed Martin Offer, and include a bridge for the Company's liquidity through closing.

122. On August 5, 2024, the Board held a special meeting. Bell reported that Lockheed Martin was considering a new offer, and described its potential terms. He advised that the Company should commence negotiations with Lockheed Martin and explore direct financing

options but cautioned that the need to secure consent from existing lenders for most financing options made the ability to secure such financing uncertain. The Board expressed a preference for a financial solution to address the Company's liquidity challenges but, barring the availability of any such financing, the Board preferred a transaction with Lockheed Martin over bankruptcy. Defendant Hobart described Terran Orbital's continuing cash needs and highlighted that, even if it were successful in raising capital until a new contract payment, the Company would likely need to raise capital again before the end of 2024.

123. In light of the Company's rapidly deteriorating liquidity situation, Terran Orbital reengaged with Lender R for a potential loan. On August 6, 2024, Terran Orbital provided Lender R's underwriting team with additional information. On August 7, 2024, Lender R verbally provided terms for a $4 million unsecured term loan with a 26-week tenor and a 145% annualized coupon, along with a $200,000 origination fee. Lender R explained that the terms had changed because Terran Orbital's cash runway significantly decreased since its last proposal. No further action was taken by Terran Orbital given the unfavorable terms and limited loan size.

124. On August 6, 2024, the Board held a special meeting, during which it received an update on financing and discussed the process of bankruptcy planning. During the rest of that week, Terran Orbital's senior management explored engaging bankruptcy counsel as part of the Board's directive to explore various alternative paths to address the Company's liquidity crisis.

125. On August 7, 2024, legal representatives for Lockheed Martin and Terran Orbital met to discuss whether amendments to the merger agreement first circulated in connection with the First Lockheed Martin Offer were necessary in the event the parties decided to consider such a transaction. From August 7, 2024, to August 14, 2024, the parties and their legal counsel

negotiated the terms of a possible merger agreement. During this time, Terran Orbital also negotiated the terms of bridge financing from its existing lenders.

126. The Board convened a special meeting on August 8, 2024. At the meeting, Bell reported that Terran Orbital would be unable to raise money through its "at the market" facility in time to be able to bridge its existing liquidity deficit. Given the inability of Terran Orbital to secure lender consent for other financing options, Bell indicated that Terran Orbital had ***no viable financing options***. He further advised that Mr. French indicated that he would seek internal authorization for an acquisition of Terran Orbital at $0.25 per share. Accordingly, Bell recommended focusing on reaching an agreement with Lockheed Martin. The Board agreed. The Board also discussed suspending the Special Committee. Given the Board's desire to be fully informed of all matters going forward, the independent members of the Board agreed to suspend the Special Committee for the time being.

127. Between August 9, 2024, and August 12, 2024, Terran Orbital and Lockheed Martin held multiple due diligence sessions along with their financial advisors.

128. On August 12, 2024, the Board convened a special meeting. Representatives of Jefferies provided an overview of the Terran Orbital's current liquidity and the potential options available to the Company. The Board was generally in favor of pursuing a proposal from Lockheed Martin given the absence of viable alternatives.

129. On August 14, 2024, Lockheed Martin management approved a plan to acquire Terran Orbital at a price of $0.25 per outstanding share of common stock it did not already own, a discount of almost 50% to the $0.46 closing price of Terran Orbital's stock on August 13, 2024, and retire its existing debt (the "Second Lockheed Martin Offer"). Mr. French of Lockheed Martin

communicated this approval to Terran Orbital. Terran Orbital's Board held a special meeting that same day to discuss the terms of the Second Lockheed Martin Offer and the proposed transaction.

130. On August 15, 2024, the Board reconvened to discuss the Second Lockheed Martin Offer and the proposed transaction. Following a lengthy discussion, the Board unanimously approved accepting the Second Lockheed Martin Offer on the terms set forth in the proposed merger agreement, adopted a recommendation that shareholders vote in favor of such a transaction, and approved the terms of a proposed bridge financing agreement with Terran Orbital's existing lenders to provide funding through closing. Following such approvals, Terran Orbital and Lockheed Martin executed the merger agreement and issued a joint press release announcing that they entered into a definitive agreement for Lockheed Martin to acquire Terran Orbital on the terms set forth in the agreement (the "Transaction").

131. CW2 confirmed that Terran Orbital had no choice but to finalize a deal with Lockheed Martin because it did not have enough cash to survive another payroll cycle. CW2 specifically recalled attending an "all-hands" meeting after the Transaction was announced, in late August 2024, during which Bell confided that "they weren't able to hit the next payroll" and "that's the reason why they have to allow Lockheed to buy them out—so they can pay the employees."

**G. Post-Class Period Events**

132. On September 9, 2024, Terran Orbital filed a preliminary proxy statement on Schedule 14A with the SEC (the "Preliminary Proxy") for the purpose of soliciting shareholders votes in respect of the proposed Transaction. In an apparent effort to justify the Board's decision to enter into a transaction for below-market consideration and support its recommendation to vote in favor of the Transaction, the Preliminary Proxy included a detailed overview of the financial difficulties and liquidity constraints faced by Terran Orbital leading up to the announcement of the proposed Transaction, as well as the internal discussions on those topics by Terran Orbital's Board

and senior management. Terran Orbital filed a final, "definitive," version of the proxy statement on Schedule 14A with the SEC on October 4, 2024 (the "Final Proxy," and together with the Preliminary Proxy, the "Proxy"). The Proxy was signed by Bell.

133. On October 30, 2024, Lockheed Martin completed the Transaction with Terran Orbital. In connection with the Transaction, a newly formed wholly owned subsidiary of Lockheed Martin merged with and into Terran Orbital, which resulted in Terran Orbital becoming a wholly owned subsidiary of Lockheed Martin. Following the Transaction, Terran Orbital has been known as "Terran Orbital, a Lockheed Martin Company."

## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

134. As provided more fully below, Defendants made materially false and misleading statements during the Class Period regarding (1) Terran Orbital's overall liquidity; and (2) the Rivada Contract. Plaintiffs assert that all statements set forth below in bold and italicized text are materially false and misleading for the reasons stated therein. Statements that are not bolded and italicized are included for context.

### A. Overall Liquidity and Need to Raise Additional Capital

135. On March 21, 2023, Terran Orbital hosted an investor call to discuss its financial results for the quarter and year ended December 31, 2022, attended by Defendants Marc Bell and Gary Hobart. On the call, an analyst observed that there was a recent "crunch in the banking space" and asked "what type of alternatives you may have in mind to be able to limit dilution if you do need [to] develop and get that capital." Bell responded as follows:

> We just raised $100 million last year from Lockheed. ***We feel pretty good about where we are and have no concerns at this point about our cash***.

136. The statement identified in bold and italicized text in the paragraph above was false and misleading when made, or omitted to state material facts necessary to make it not misleading,

because, as detailed more fully above, Terran Orbital failed to disclose that (i) by the end of March 2023, Terran Orbital had only $57.4 million remaining in cash and cash equivalents; (ii) Terran Orbital would not report its cash balance for the quarter ended March 30, 2023 until May 15, 2023; (iii) the $57.4 million in cash and cash equivalents on hand at the time of the statement was insufficient to cover Terran Orbital's cash requirements until it expected to receive a meaningful milestone payment under the Rivada Contract; and, as a result of the foregoing, (iv) Terran Orbital was actively exploring additional financing options to cover its forecasted cash requirements. Indeed, Terran Orbital filed the Shelf Registration Statement with the SEC by no later than April 3, 2023, for the very purpose of raising needed capital in one or more future offerings. Thus, management was taking active steps out of concern for Terran Orbital's precarious cash position. To the extent this statement was not technically untrue, it gave the false impression that Terran Orbital did not need and was not exploring additional financing options to fund its cash needs, much less a potential offering.

137. On August 15, 2023, Terran Orbital hosted a call with investors and analysts to discuss its financial results for the quarter ended June 30, 2023, attended by Defendants Marc Bell and Gary Hobart. During the call, Jefferies analyst Greg Konrad asked, "how are you thinking about free cash flow generation in general, given working capital needs?" In response, Hobart stated as follows:

> We have a backlog from invoicing and performance and our expectations from our EACs [cost estimates-at-completion], which are basically our budgets for our program. Sufficient capital to be free cash flow positive on a run rate basis by the beginning or during 2024. It will be plus or minus in the second half year of the year. ***So the cash flow we generate from our programs and invoicing and collection and invoicing should cover our needs going forward, and we'll start seeing that ramp up even more so going into 2024.***

138. In response to another analyst's inquiry on the same call about "the capital plan at this point going forward" and "raising cash to the extent that you need to," Defendant Bell stated:

> It's really just about timing of payments at this point. ***Right now, the last thing any of us want to do is raise additional cash. I don't want the dilution . . . . Last thing I want is any dilution.*** So it's really just about timing of payments. If things work out as planned, we will be in pretty good shape. ***So right now, everything is lining up well for us.***

139. The statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because, as detailed more fully above, Terran Orbital failed to disclose that (i) Terran Orbital required more cash to operate its growing business than it generated; (ii) Terran Orbital would soon deplete its cash reserves if existing customers failed to make timely payments; (iii) anticipated program awards were too distant to meaningfully address the immediate cash shortfall; and, accordingly, (iv) senior management and the Board were actively discussing and pursuing financing options that could provide Terran Orbital with the near-term funding needed to operate the business, including capital raise transactions. Indeed, by August 15, 2021, Defendants Marc Bell and Gary Hobart informed the Board that Terran Orbital may need to pursue an additional capital raise because it may enter a negative cash position in the coming months and were actively holding discussions with external parties to do so. To the extent any of these statements were not technically untrue, they gave the false impression that immediate financing was not needed for Terran Orbital to continue operating, much less that it was actively contemplating another potential capital raise.

140. On October 26, 2023, Terran Orbital held a virtual town hall open to the public attended by Defendants Marc Bell and Stratton Sclavos. During his opening remarks, Bell stated in relevant part as follows:

> Next, let's talk about some good news and talk about cash. I'd like to start with our cash balances. At of the close of business today, we expect to have over $70 million of cash on hand. This far exceeds our June 30th closing cash number of $48.5 million. Our cash position is strong following our successful equity offering last month and initial contract payments from customers. Given our expectation to

> reach EBITDA and cashflow breakeven in 2024, ***this level of cash is expected to be sufficient to cover our capital investments and operating use until we achieve the expected break even, barring any unforeseen events***. So, this is great news. We're very excited to tell you this. I know it's been on everybody's mind and happy to get that out.

141. On November 14, 2023, Terran hosted a call with investors and analysts to discuss its financial results for the quarter ended September 30, 2023, attended by Defendants Bell and Riffel. Bell opened the prepared remarks by stating, in relevant part:

> Thank you, everyone, for joining our third quarter 2023 earnings conference call. I also want to thank those of you who attended our virtual town hall event on October 26, which is part of our effort to increase investor engagement. During our town hall, we were pleased to highlight the team's recently announced contract wins across three several programs and two continents, our active engagement on 80 opportunities relating to more than 2,800 satellites for 40 different customers collectively valued at over $2.7 billion, and ***our current expectation that we will have sufficient cash to cover capital investments and operations until becoming cash flow positive, which is expected in 2024***.

142. The statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because, as detailed more fully above, Terran Orbital failed to disclose that (i) Terran Orbital continued to suffer from near-term cash constraints of the type described in ¶ 139; and (ii) the proceeds raised from the recent CMPO were barely sufficient to satisfy Terran Orbital's immediate cash needs, much less until it broke even in 2024. Indeed, the Board authorized management to take the drastic step of initiating a sale process on October 6, 2023, due to Terran Orbital's continued cash constraints, and the Company's advisors moved ahead with contacting potential counterparties for such a transaction on October 24, 2023, because the need for additional capital was not negated by the CMPO or recent customer payments. To the extent any of these statements were not technically untrue, they gave the false impression that, notwithstanding the Company's most recently reported cash and cash equivalents balance, Terran Orbital did not need external funding to continue operating or to sell the Company to stay solvent in the near term.

143. On December 20, 2023, Defendant Bell gave an interview to the investment site *Seeking Alpha* in which he explained why he believed Terran Orbital would be paid by Rivada before the end of 2023 and discussed its overall liquidity. The article quoted Bell as saying:

> ***We are not running out of cash*** . . . . We are not going to be tapping the capital markets. We are not going to be doing any more dilutive transactions. We have raised the cash we need to get to EBITDA positive ***and we are not going out looking for cash***.
>
> * * *
>
> We were going to do the Nov. 30 numbers, but we decided the year ends are coming up and the year-end numbers are looking great so in January we will put out the year-end cash . . . ***Cash is looking very solid***.

144. On January 2, 2024, Terran Orbital issued press releases announcing that it received a payment from Rivada and that it expected to report approximately $70 million in cash and cash equivalents as of December 31, 2023, due to the receipt of several customer payments at year-end. In the release, Defendant Bell was quoted as stating that "***[w]e are entering 2024 with a strong financial foundation that we believe will enable us to continue to execute on our strategic and operational objectives***."

145. Later on January 2, 2024, *SpaceNews* released a story on the increase in Terran Orbital's cash balance. That story reported that *SpaceNews* received an email from Marc Bell in which he stated, regarding the press releases issued by Terran Orbital earlier that day, "***[t]he goal is demonstrate to the market that cash is stable and no need to raise additional capital***."

146. On February 7, 2024, *Seeking Alpha* published excerpts from another interview with Bell about the recent settlement with the Investor Group titled "Terran Orbital CEO reiterates company doesn't need cash, makes détente with activists." According to the story, Bell had the following to say about Terran Orbital's liquidity:

> 'We've made it very public that ***we are not looking to raise money***,' Bell said in a Zoom interview with Seeking Alpha on Wednesday [February 7, 2024]. 'It's just getting people comfortable that ***we don't need cash***.'
>
> * * *
>
> '***We're doing just fine***. This is the disconnect in the market. ***We have no intentions of raising any more money. That is the last thing we want to do.*** All I want to do is start accumulating cash.'

147. The statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because, as detailed more fully above, Terran Orbital failed to disclose that (i) Terran Orbital continued to suffer from cash constraints of the type described in ¶ 139; (ii) the customer payments received at the end of 2023, and the Company's resulting cash balance, was insufficient to satisfy anything beyond Terran Orbital's near-term cash requirements; and, accordingly (iii) Terran Orbital was unable to continue its operations without a significant source of additional capital if the sale process it initiated was unsuccessful or prolonged. Indeed, the Proxy admitted that the year-end customer payments were not expected to address Terran Orbital's long-term capital needs and, as such, management continued to proceed with the sale process that the Board initiated in October 2023 to remedy the Company's liquidity constraints, meeting with potential bidders at its offices as recent as January 19, 2024. To the extent any of these statements were not technically untrue, they gave the false impression that, despite the Company's most recently reported cash and cash equivalents balance, Terran Orbital did not need to consummate a sale or secure a significant source of additional capital to continue operating before its cashflow turned positive when, in fact, it did.

148. On May 14, 2024, Terran held a call with investors and analysts to discuss its financial results for the quarter ended March 31, 2024, attended by Defendants Bell and Riffel. During the call, an investor from Sophis asked about down payments for new contracts awards,

known as "authorization to proceed," or ATP, payments, and asked "looking at your cash balances at the end of the quarter and then maybe doing some math on what they might be around now, it would be safe to assume that you're comfortable with your liquidity position in part due to the ATP?" Bell responded "***Yeah, we feel very comfortable with our liquidity position as it stands today.***"

149. Later on the same call, a private investor asked if Terran Orbital would meet the required minimum cash balance under its debt agreements. Riffel responded, "***[w]e do not have any concerns about that covenant at this time***," and Bell immediately followed up by confirming, "***The answer is yes. We'll meet the requirements; we're well positioned to do this.***"

150. The statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because, as detailed more fully above, Terran Orbital failed to disclose that (i) Terran Orbital continued to suffer from cash constraints of the type described in ¶ 139; (ii) the customer payments received at the end of 2023, and the Company's resulting cash balance, were insufficient to satisfy anything beyond Terran Orbital's near-term cash requirements; because of this, (iii) Terran Orbital continued to pursue a strategic transaction with Lockheed Martin even after all other bidders dropped out of the process and Lockheed Martin withdrew its own below-market offer; and, accordingly (iv) Terran Orbital would be unable to continue funding its operations without a significant source of additional capital if the sale process was unsuccessful or prolonged. Indeed, the Board was informed on March 21, 2024 that an "at the market" offering may be necessary to raise needed capital and told on May 23, 2024, that the Company's liquidity profile had recently become "constrained" to such a degree that it may need a cash infusion of up to *$120 million* to cover its cash requirements through the end of 2024, much less any of its debt liabilities.

To the extent any of these statements were not technically untrue, they gave the false impression that, despite the Company's most recently reported cash and cash equivalents balance, Terran Orbital did not need to consummate a sale or secure a significant source of additional capital to continue operating before its cashflow turned positive when, in fact, it did.

151. On June 25, 2024, Bell participated in the Jefferies Virtual Space Summit hosted by Jefferies analyst Greg Konrad. During the interview, Greg Konrad asked "How comfortable do you feel with cash position and in terms of the debt covenants kind of going into the end of the quarter?" Bell confirmed, "We feel very comfortable about our covenants going into the end of the quarter. ***No issue on our side.***"

152. The statements identified in bold and italicized text in the paragraph above were false and misleading when made, or omitted to state material facts necessary to make them not misleading for all the reasons set forth in ¶ 150. In addition, Province informed the Special Committee by no later than June 4, 2024, that its due diligence revealed that Terran Orbital suffered from ongoing liquidity constraints that may render it unable to continue operating in the near future, and by no later than June 12, 2024, the Special Committee expressed concern regarding Terran Orbital's recent cash flow forecasts. To the extent any of these statements were not technically untrue, they gave the false impression that, despite the Company's most recently reported cash and cash equivalents balance, Terran Orbital did not need to consummate a sale or secure a significant source of additional capital to continue operating before its cashflow turned positive when, in fact, it did.

153. On July 23, 2024, Terran published a press release announcing an "at the market" offering program to raise up to $98 million in cash, titled "Terran Orbital Announces up to $98

Million of New Capital Through ATM Program." The press release included a quote from Defendant Bell, which stated as follows:

> As opportunities from our business pipeline convert to awards, we want to give our customers and vendors additional confidence that ***we have adequate capital to successfully manage current*** and future ***programs***. . . . We are confident that the ATM announced today will allow us to deliver maximum value to our customers and other stakeholders.

154. The statements identified in bold and italicized text in the paragraph above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because, as detailed more fully above, Terran Orbital failed to disclose that (i) it was unable to commence any sales under the ATM Agreement until the Company released its next quarterly report on Form 10-Q, in approximately three weeks; (ii) at the time, Terran Orbital only enough cash to last approximately three weeks; and, accordingly, (iii) it was reasonably likely that Terran Orbital would be unable to utilize the ATM Agreement as a means to raise additional capital. Indeed, Terran Orbital was ultimately unable to raise money through the ATM Agreement in time to bridge its cash deficit due to the delay associated with the filing of its forthcoming Form 10-Q. To the extent any of these statements were not technically untrue, they gave the false impression that the ATM Agreement provided Terran Orbital with immediate and unencumbered access to liquidity when, in fact, it did not.

### B. The Lack of Reliance on the Rivada Contract

155. On May 15, 2023, Terran Orbital hosted a call with investors and analysts to discuss its financial results for the quarter ended March 31, 2023, attended by Defendants Marc Bell and Gary Hobart. On the call, analyst Rob Spingarn from Melius Research asked, "as you build out this $250 million plus in revenue this year, what program should we think are driving that?" and added "I assume Tranche 1 is a big piece of that" but admitted "[i]t's not clear if Rivada is or not."

In response, Defendant Bell continued to obfuscate whether Rivada was included in the total or just additional "upside":

> ***I mean, Tranche 1 is a big part of it. Then you have Rivada right after that, and you have this new customer, and there is some other things coming down the pipe. But Tranche 1 is by far the largest part of that component.*** We're going to deliver, call it, 2/3 of Tranche 1 in calendar year 2023.

156. The statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because, as detailed more fully above, Terran Orbital failed to disclose that the revenue forecast for 2023 was heavily dependent on the receipt of payments from Rivada in 2023. Indeed, approximately $120 million of the forecast was tied to Terran Orbital's receipt of one or more milestone payments under the Rivada Contract in 2023. Thus, far from merely representing additional "upside" for 2023, nearly *half* of the forecast for 2023 was contingent upon the receipt of a milestone payment under the Rivada Contract. To the extent any of these statements were not technically untrue, they gave the false impression that the 2023 forecast was not contingent on the receipt of milestone payments under the Rivada Contract when, in fact, it was.

157. During the call that Terran Orbital hosted on November 14, 2023, an investor asked, "presuming [you] never get a single additional cent from Rivada, do you have enough cash to make it through to cash flow positive?" Bell responded unequivocally, "***Yes, we do***."

158. In the interview that he gave to *Seeking Alpha*, published on December 20, 2023, Defendant Bell had the following to say about the Rivada Contract:

> Rivada is great, but ***we don't rely on Rivada . . . [o]ur business model is we are no [sic] relying on them.*** They are there; when they get funded it's great.
>
> * * *
>
> We have lots of other Rivada's out there . . . . We have multiple constellations, the same size as, or potentially larger than, Rivada that we are working with today that

> we are bidding on. ***Hopefully it's Rivada but it could be someone else that takes that spot.***

159. During the call that Terran Orbital hosted on May 14, 2024, an analyst noted that "[e]vidently, they [Rivada] do not have all their financing in place" and asked "are there concerns that this whole thing could fall apart, and have a major impact on your business operations in the future because the capital is not available to pay for the build-out of the satellites for which you've contracted?" Defendant Bell continued to deny that the loss of the Rivada contract had "any" impact on Terran Orbital:

> As far as Rivada goes, I can't comment on what they have or don't have. That's a question for Rivada. On—but I can comment on, does it affect us. And, no, ***it doesn't have any impact on us going forward.*** We have lots of other customers as you could see with this way, Rivada's for the 300 space vehicles with us, Lockheed alone has already placed orders for over 100 space vehicles with us. ***So it is—it's just upside for us at the end of the day.***

160. The statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because, as detailed more fully above, Terran Orbital failed to disclose that (i) Terran Orbital's cashflow in 2024 was heavily dependent on receiving milestone payments from Rivada under the Rivada Contract; and, accordingly, (ii) the loss of the Rivada Contract would significantly impact Terran Orbital's plan to become cashflow positive in 2024. Indeed, the decision to no longer rely on the revenue streams associated with the Rivada Contract in May 2023 significantly deteriorated the Company's cash forecast for future periods, including the remainder of 2024, and contributed to the collapse of its liquidity profile. To the extent any of these statements were not technically untrue, they gave the false impression that the impact of failing to receive milestone payments from Rivada would have at most an immaterial impact on Terran Orbital's short-term liquidity.

## VII. THE TRUTH EMERGES IN A SERIES OF PARTIAL DISCLOSURES

161. As detailed more fully below, the risks hidden by Defendants' fraud materialized in a series of partial disclosures, each of which revealed, for the first time, new facts about Terran Orbital's severe liquidity challenges and operational viability. Investors had been in the dark about these facts and, thus, as the news was released and investors were able to consider the ramifications for Terran Orbital, the price of Terran Orbital's stock dropped.

### A. April 3, 2023

162. On April 3, 2023, after the close of trading, Terran Orbital filed the Shelf Registration Statement, which revealed that the Company planned to raise capital by issuing shares in one or more future offerings.

163. On this news, the trading price of Terran Orbital common stock sank from $1.79 at the close of trading on April 3, 2024, to $1.65 as of April 4, 2024, a decline of 7.8%.

### B. May 25, 2023

164. On the morning of May 25, 2023, before market open, Terran Orbital issued a press release announcing the Direct Offering, including its pricing and size, titled "Terran Orbital Announces $37.1 Million Registered Direct Offering." The following day, *BofA Global Research* downgraded Terran Orbital stock from BUY to UNDERPERFORM, explaining, among other reasons, that the "May 25 registered direct offering of ~$37 mn essentially buy[s] the company just one more quarter of liquidity."

165. On this news, Terran Orbital's share price fell from $1.24 at the close of trading on May 24, 2023, to $1.19 at the close of trading on May 25, 2023.

### C. September 18, 2023

166. Shortly after market close on September 18, 2023, Terran Orbital filed a preliminary prospectus supplement on Form 424B5 (the "CMPO Preliminary Prospectus") for a

public offering of an indefinite number of equity instruments pursuant to the Shelf Registration Statement declared effective in April 2023. The CMPO Preliminary Prospectus revealed that "[w]e intend to use the net proceeds from this offering for general corporate purposes, including capital expenditures, working capital, R&D, maintenance of the liquidity covenant in our debt documents and general and administrative expenses." Later on September 18, 2023, Terran Orbital issued a press releases announcing that the offering would consist of 23,214,290 shares of its common stock and warrants to purchase up to 23,214,290 shares of its common stock at a combined offering price of $1.40 per share and accompanying warrant, for total gross proceeds of $32.5 million.

167. On this news, Terran Orbital's stock price fell $0.28 per share, or 19.72%, to close at $1.14 per share on September 19, 2023. The market quickly connected the stock decline to the proposed CMPO. For example, on the morning of September 19, 2024, *Bloomberg* published a note explaining that "Terran Orbital Corp. shares drop as much as 20% in premarket trading Tuesday after it priced its offering of about 23.2 million shares at $1.40 per share via HC Wainwright." Similarly, *Aviation Week* published an article that same day titled "Terran Orbital Surprises With Stock Sale; Shares Plummet."

**D. November 14, 2023**

168. On November 14, 2023, before market open, Terran Orbital issued a press release announcing its financial results for the quarter ended September 30, 2023, which revealed that the Company was reducing its annual revenue guidance from $250 million to $130 million, a ***48% decrease***, due to uncertainty surrounding milestone payments under the Rivada Contract. On the corresponding earnings call later that morning, Bell explained that "we have not received expected further milestone payments and do not yet have a definitive schedule" for when they will be received and, as such, management "removed the expected revenue contribution related to Rivada

for our full year 2023 outlook, hence the change in guidance." Industry insiders quickly took note of this news. For example, *Aviation Weekly* observed in an article published that same day that "Terran Orbital—the small satellite startup whose profile skyrocketed early this year when it was tapped to supply Rivada Space Network's planned megaconstellation—is walking back its own midterm expectations from that deal and lowering Terran's 2023 financial guidance." *Space Intel Report* also reported that "Terran Orbital dropped its expected 2023 revenue forecast by 48% as it zeroed-out any future payments from its major customer, Rivada Space Networks." Similarly, *Via Satellite* ran a story titled "Terran Orbital Slashes 2023 Revenue Outlook as Rivada Misses Payment."

169. On this news, Terran Orbital's stock price dropped 4.87% to close at $0.71 per share on November 14, 2023. As the *Orange County Business Journal* explained in a story published after the closer of trading that day, "Terran Orbital Corp. . . . confirmed it's cutting its 2023 revenue guidance almost in half due to 'delay and uncertainty' of a payment from its partner Rivada Space Networks" and "Terran's shares closed down 4.9% following the announcement to 71 cents apiece."

**E. December 11, 2023**

170. On December 11, 2023, before the commencement of trading, *The Wall Street Journal* published an article titled "Satellite Manufacturer Terran Orbital Seeks a Buyer," which reported for the first time publicly that "Terran Orbital is looking to sell itself" and "seeking bids by the end of the month . . . according to those involved" in the process. Later that morning, Terran Orbital filed the December 11, 2023 Form 8-K, in which it confirmed as follows: "As reported by the Wall Street Journal on December 11, 2023, Terran Orbital Corporation (the 'Company') is conducting a formal review of strategic alternatives to maximize shareholder value . . . which may

include an investment, sale of the Company, 'take private' transaction or an alternative strategic relationship."

171. On this news, Terran's stock price fell $0.31 per share, or 29.64%, to close at $0.72 per share on December 11, 2023. There was substantial consensus on the reason for the stock movement. For example, on December 11, 2023, *Investor Place* published an article titled "LLAP Stock Sinks 30% as Terran Orbital Seeks a Buyer: This speculative space stock is plummeting back to earth today." Similarly, *Seeking Alpha* published an article titled "Terran Orbital plunges amid report it's seeking a buyer," in which it reported that the Company's share price "plummeted 32% amid a report it's looking to sell itself."

**F. April 1, 2024**

172. Terran Orbital was scheduled to release its financial results for the quarter and year ended December 31, 2023, and hold a corresponding investor call, on March 26, 2023. However, on March 25, 2024, the day before the scheduled release, Terran Orbital announced that it would, instead, release those results on April 1, 2024, and hold its call the following day.

173. On April 1, 2024, during after-market hours, Terran Orbital issued a press release announcing its financial results for the quarter and year ended December 31, 2023 (the "April 1, 2024 Press Release"), and filed an annual report on Form 10-K for the year ended December 31, 2023 (the "2023 Form 10-K"). In the release that it issued on April 1, 2024, Terran Orbital reported that "management has decided to cancel its previously scheduled fourth quarter and full-year 2023 earnings call" due to "the Company's ongoing strategic review." In addition, the 10-K contained the following "going concern" warning:

> The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 1 to the consolidated financial statements, the Company has a history of recurring losses from operations and has debt agreements that contain a covenant requiring the Company to have Consolidated Adjusted EBITDA (as defined in the agreements)

> of not less than $0 by December 31, 2024. This raises substantial doubt about its ability to continue as a going concern.

Note 1 to the consolidated financial statements in the 2023 Form 10-K elaborated as follows:

> As disclosed in Note 5 'Debt,' the Company's primary corporate debt agreements contain a covenant requiring the Company's Consolidated Adjusted EBITDA (as defined in the underlying note agreements), on a trailing twelve month basis, to not be less than $0 by December 31, 2024 . . . . The commencement of the EBITDA Financial Covenant may be further delayed by one quarter for every additional $25 million of net cash proceeds received from qualified equity sources. If the Company is unable to comply with these financial covenants, the Company's creditors may accelerate the principal and interest on the Company's primary corporate indebtedness to be immediately due and payable. ***As of December 31, 2023, cash and cash equivalents totaled $71.7 million and debt subject to the EBITDA Financial Covenant totaled $289.7 million with related accrued but unpaid interest of $2.1 million.***
>
> ***There is uncertainty regarding the Company's ability to comply with the EBITDA Financial Covenant for at least twelve months from the issuance of these consolidated financial statements.*** To address the potential future breach of the EBITDA Financial Covenant, the Company is executing on its business plan to improve operating results. Additionally, ***the Company is in active discussions with funding sources to have access to additional sources of qualified equity issuances in the event needed*** to extend the EBITDA Financial Covenant beyond December 31, 2024. Furthermore, the Company could request waivers from existing creditors to waive the EBITDA Financial Covenant to the extent necessary. The Company cannot provide assurances that it will be successful in improving operating results, obtaining new financing, and/or receiving waivers to the EBITDA Financial Covenant.

(Emphasis added.) The market immediately reacted to this news. For example, on April 2, 2024, *Space News* published an article discussing Terran Orbital's continuing losses, the "going concern" warning, and the disclosure that it was in active discussions to conduct yet another equity sale to avoid falling out of compliance with its debt covenants.

174. On this news, Terran Orbital's stock price fell $0.17 per share, or 12.50%, to close at $1.19 per share on April 2, 2024. Following the disclosures described above, *Bloomberg* reported "Terran Orbital Corp Down 10%, Most in 12 Weeks."

**G. May 2, 2024**

175. On May 2, 2024, Lockheed Martin filed an amended statement of beneficial ownership on Schedule 13D with the SEC (the "Schedule 13D/A"), which revealed that it withdrew the First Lockheed Martin Offer on April 30, 2024.

176. On this news, Terran Orbital's stock price sank by $0.22 per share, or 17.05%, to close at $1.07 per share on May 3, 2024. The financial community immediately linked the sharp stock decline to Lockheed Martin's disclosure. For example, after market close on May 2, 2024, *Seeking Alpha* published an article entitled "Terran Orbital plunges as Lockheed Martin withdraws takeover offer," stating, in relevant part that "Terran Orbital (NYSE:LLAP) plummeted 13% in after hours trading after Lockheed Martin (NYSE:LMT) withdrew its takeover offer. Lockheed Martin (LMT) notified Terran Orbital (LLAP) that it was withdrawing its offer on Thursday, according to a 13D filing. Similarly, *Morningstar* ran a story on May 2, 2024, titled "Terran Orbital Shares Tumble 13% After Lockheed Martin Withdraws Bid." *Barron's* also issued a "Stock Alert" titled "Lockheed Decision Sends This Satellite Stock Tumbling 20%" which reported that "shares of Terran Orbital are plunging in early trading Friday" and "a decision by Lockheed Martin is to blame." The article went on to note that the "dip wipes out about $60 million" in Terran Orbital's market value.

**H. May 14, 2024**

177. Before the market opened on May 14, 2024, Terran Orbital issued a press release announcing its financial results for the quarter and year ended December 31, 2023 (the "April 1, 2024 Press Release"), and filed an annual report on Form 10-K for the year ended December 31, 2023 (the "2023 Form 10-K"). In the release that it issued on April 1, 2024, Terran Orbital reported that "management has decided to cancel its previously scheduled fourth quarter and full-year 2023

earnings call" due to "the Company's ongoing strategic review." In addition, the 10-K contained the following "going concern" warning:

> The condensed consolidated financial statements have been prepared in accordance with GAAP assuming the Company will continue as a going concern. . . . However, substantial doubt about the Company's ability to continue as a going concern exists.
>
> The Company's primary corporate debt agreements contain a covenant requiring the Company's Consolidated Adjusted EBITDA (as defined in the underlying note agreements), on a trailing twelve month basis, to not be less than $0 by December 31, 2024 . . . . The commencement of the EBITDA Financial Covenant may be further delayed by one quarter for every additional $25 million of net cash proceeds received from qualified equity issuances. If the Company is unable to comply with these financial covenants, the Company's creditors may accelerate the principal and interest on the Company's primary corporate indebtedness to be immediately due and payable. ***As of March 31, 2024, cash and cash equivalents totaled $43.7 million and debt subject to the EBITDA Financial Covenant totaled $292.6 million with related accrued but unpaid interest of $2.1 million.***
>
> ***There is uncertainty regarding the Company's ability to comply with the EBITDA Financial Covenant for at least twelve months from the issuance of these consolidated financial statements.*** To address the potential future breach of the EBITDA Financial Covenant, the Company is executing on its business plan to improve operating results. Additionally, ***the Company is in active discussions with funding sources to have access to additional sources of qualified equity issuances in the event needed*** to extend the EBITDA Financial Covenant beyond December 31, 2024. Furthermore, the Company could request waivers from existing creditors to waive the EBITDA Financial Covenant to the extent necessary. The Company cannot provide assurances that it will be successful in improving operating results, obtaining new financing, and/or receiving waivers to the EBITDA Financial Covenant.

(Emphasis added.)

178. On this news, Terran's stock price fell $0.15 per share, or 14.41%, to close at $0.90 per share on May 14, 2024. Nevertheless, Terran Orbital continued to mislead the market by issued false and misleading statements about its financial condition and liquidity position. Indeed, *Space Intel Report* published a story titled "Terran Orbital: We've got plenty of opportunities even if $2.4B Rivada constellation contract is terminated."

**I. July 23, 2024**

179. After market close on July 23, 2024, Terran filed a preliminary prospectus supplement on Form 424B5 (the "ATM Preliminary Prospectus") announcing an "at the market" offering of up to $98 million in common stock pursuant to the Shelf Registration Statement declared effective in April 2023. As an investor with the username MaterialDream7326 explained on *Reddit*, by filing for an "at the market" offering to raise cash, Terran Orbital was "signaling potential liquidity concerns."

180. On this news, Terran's stock price fell $0.14 per share, or 15.83%, to close at $0.72 per share on July 24, 2024.

**J. August 12, 2024**

181. On August 12, 2024, during pre-market hours, Terran filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its second quarter ended June 30, 2024 (the "2Q 2024 Form 10-Q"), but did not—as it had historically—issue a press release announcing the results or hold a corresponding investor call. The 2Q 2024 Form 10-Q revealed that the Company had only $14.6 million in cash as of July 31, 2024, which cast substantial doubt on its ability to continue operating. As stated in the 2Q 2024 Form 10-Q:

> ***[S]ubstantial doubt about the Company's ability to continue as a going concern exists.***
>
> ***As of July 31, 2024, the Company's cash and cash equivalents balance was approximately $14.6 million which, without additional funding, will not be sufficient to meet its obligations within the next twelve months from the issuance of this quarterly report.*** In order to proceed with its business plan, the Company will need to pursue additional sources of capital, and there is no assurance that additional capital will be able to be obtained on favorable terms, if at all. Additionally, the Company may also incur substantial costs in pursuing future capital financing, including financial advisory and/or placement agent fees, legal fees, accounting fees, securities law compliance fees, distribution expenses and other costs in connection with any potential financing transaction, which could adversely affect the Company's financial position. If the amount of capital the Company is able to raise from financing activities, together with cash generated

> from operations, is not sufficient to satisfy its capital needs (even to the extent that the Company reduces its operations), third parties may be reluctant to provide the services the Company needs in order to operate and ***the Company may be required to cease its operations, initiate insolvency proceedings or otherwise conduct a capital restructuring, divest its assets at unattractive prices or accept an offer to purchase the Company at a discount to its current market price of its outstanding shares, to the extent it receives such offer.***

(Emphasis added.) The 2Q24 10-Q further disclosed that that Terran Orbital reduced its all-important "backlog" from $2.7 billion to a mere $312 million, a decrease of ***88%***, because it decided to remove the unpaid portion of the Rivada Contract from the backlog.

182. News of these disclosures took the industry and financial community by storm. *Space News* reported on August 13, 2023, that "Terran Orbital has removed the broadband constellation it is developing for Rivada Space Networks from the backlog of revenues in its accounts" and "[the] backlog now stands at $312.7 million, according to earnings results disclosed in a regulatory filing without a press release or call with investors." Similarly, *Via Satellite* observed that "the company's supply of cash dwindles" and noted that "Terran Orbital removed unpaid Rivada commitments from its backlog . . . and backlog [sic] is now at $312.7 million." *Advanced Television* also ran a story on August 13, 2024, which highlighted the cash balance disclosure in Terran Orbital's 2Q 2024 Form 10-Q. Indeed, B. Riley analyst Mike Crawford commented that the $13 million cash balance is only "$11 million above the $20 million minimum required to comply with the company's debt obligations."

183. On this news, Terran Orbital's stock began a multi-day slide, tumbling from $0.71 at the close of trading on August 9, 2024, to a record low of $0.40 at the close of trading on August 14, 2024, a decrease of over 43%.

**K. August 15, 2024**

184. Before market open on August 15, 2024, Terran Orbital issued a press release announcing that it entered into a definitive agreement for Lockheed Martin to acquire its remaining

equity interests for $0.25 per share, a 37.5% discount to Terran Orbital's already-discounted share price, in a transaction expected to close in the fourth quarter of 2024. The market responded negatively to this news. For example, *MSN* published an article titled "Terran Orbital Shareholders Take Massive Hit in Lockheed Buyout." *Payload* stated that Lockheed Martin's new offer was "a far cry from the $1 per share offer it made just four months ago." An article from *Via Satellite* observed that the deal was "a bargain versus the $606 million unsolicited proposal the aerospace and defense giant made in March." Commenting on the acquisition, B. Riley analyst Mike Crawford explained that "Terran Orbital tripped itself up by not being a good allocator of capital." In an article titled "How Lockheed Martin Bought a Space Company for 75% Off," *The Motley Fool* put it as follows: "By waiting until its target had no other option but to say 'yes,' Lockheed Martin got a great price on Terran Orbital."

185. On this news, Terran Orbital's share price plunged $0.16, or nearly 40%, to close at $0.24 per share on August 15, 2024. As many observed, the stock decline was directly linked to the announcement of the deal with Lockheed Martin. For example, *Seeking Alpha* reported on August 15, 2024, that "Terran Orbital (LLAP) [fell] -35/7% pre-market Thursday after Lockheed Martin (NYSE: LMT) said it agreed to acquire the struggling satellite manufacturer for an enterprise valuation of ~$450 million, well below Lockheed's previous bid." Similarly, *Reuters* reported that "Terran's shares plunged nearly 41% to 24 cents on the New York Stock Exchange" following the announcement.

## VIII. ADDITIONAL FACTS PROBATIVE OF SCIENTER

186. As detailed more fully above, the Individual Defendants received information reflecting the true facts regarding Terran Orbital and its operations and business practices and had control over and/or received the Company's materially misleading statements before they were issued to the investing public. Accordingly, the Individual Defendants acted with scienter because

at the time they issued public documents and other statements in Terran Orbital's name, they knew, or were severely reckless in not knowing, that such statements were materially false and misleading.

187. Indeed, the ongoing fraud described herein could not have been perpetrated without the knowledge and/or severe recklessness and complicity of personnel at the highest level of Terran Orbital, including the Individual Defendants. The Individual Defendants knew such statements would be disseminated to the investing public, knew that persons were likely to rely upon those misrepresentations and omissions, and knowingly or recklessly participated in the dissemination of such statements and documents to the investing public. Thus, the Individual Defendants were active and culpable participants in the fraudulent schemes alleged herein.

188. These facts, in conjunction with the additional indicia of scienter alleged below, collectively support a strong inference that, throughout the Class Period, Defendants knew or, at a minimum, recklessly disregarded, that their statements were materially false and misleading.

**A. Contemporaneous Knowledge of Contradictory Information**

189. As explained above (¶ 132), Terran Orbital prepared and filed a Proxy, signed by Bell, to secure votes needed to approve the proposed Transaction with Lockheed Martin, in which it was forced to reveal that Terran Orbital's ongoing cashflow struggles were routinely discussed at the highest levels of the Company. As set forth below, the Proxy demonstrates that Defendants had knowledge of Terran Orbital's ongoing liquidity problems throughout the Class Period and that its cash needs were so pressing that it needed to pursue additional sources of funding, despite making repeated statements denying any such issues.

190. As early as spring of 2023, Terran Orbital "began exploring additional financing options to cover its forecasted cash requirements" as early as spring of 2023, which ultimately resulted in the consummation of the Direct Offering in May of 2023, which raised $37.1 million.

191. Yet, despite exploring additional financing in the spring of 2023, on March 21, 2023, Bell confidently answered an analyst question about raising capital while avoiding dilution, "***We . . . have no concerns at this point about our cash***," as discussed above (¶ 135). Bell could not have honestly had "no concerns" while simultaneously seeking out new sources of cash.

192. During the summer of 2023, mere weeks after the Direct Offering, Company management began exploring a variety of options for the Company to obtain a cash infusion sufficient to fund its growth plans." On March 31, 2023, Terran Orbital had $57.4 million cash on hand, yet despite raising $37.1 million in May, by June 30, 2023, the Company only had $48.6 million remaining.

193. On July 19, 2023, the Board held a special meeting with the purpose of "updat[ing] the Board" on "financing and strategic options" that were being considered. Bell discussed upcoming program awards with the Board "but noted that these awards ***would not solve the Company's near-term liquidity issues*** due to their anticipated timing."

194. On August 3, 2023, the Board met again, and Bell updated on communications with certain private equity firms and potential financing transactions that were being explored. Indeed, at these meetings, Bell highlighted the reasons for "the magnitude of the Company's cash needs," and recommended engaging Jefferies to explore a sale of the Company. Hobart also highlighted that the Company could soon enter a "negative cash position in the coming months, which may necessitate pursuing a capital raise." In short, Bell and Hobart raised "concern" about the Company's "near-term liquidity issues" and explained that, absent drastic steps to raise more capital or find new ownership, the "magnitude" of these issues could make the Company insolvent.

195. Yet despite Bell and Hobart's dire warnings behind closed doors, mere *days later*, on August 15, Hobart publicly assured the market that "***the cash flow we generate . . . should***

***cover our needs going forward,*** " and Bell responded to a question about raising capital by saying "***the last thing any of us want to do is raise additional cash***" and that "***right now, everything is lining up well for us***," as described above (¶¶ 137-138).

196. After these comments, the Board, including Bell, spent September 2023 planning a significant response to the liquidity issues raised by management. On September 11, 2023, the Board established the Special Committee to address "issues and considerations related to, among other things, the Company's cash needs relative to projected liquidity position due to concerns raised with the Board by management of the Company," including the need for "a potential *financial restructuring* of the Company." On September 12, 2023, the Special Committee engaged King & Spalding to provide legal advice. Then, on September 14, 2023, the Special Committee approved the CMPO previously negotiated by management to provide an immediate infusion of cash needed to continue operating the business – despite Bell's public statement only one month denying the need for an additional cash raise. Finally, on October 6, 2023, the Board authorized Jefferies to initiate a sale process in light of "the Company's continuing cash constraints." Thus, the Board, on receiving Bell and Hobart's warnings of serious liquidity issues, understood the issue to be serious and created a Special Committee, including Sclavos, to fully understand the situation and weigh the Company's options, and took the drastic step of initiating a sale process in order to avoid a potential bankruptcy.

197. Yet, despite the Board's decision to proceed with a sale to avoid bankruptcy, a mere *ten days later*, Bell told the market he had "some good news" because "***this level of cash is expected to be sufficient to cover our capital investments and operating use until we achieve the expected break even***" in 2024, as described above (¶ 140). He repeated similar assurances in November and December, as described above (¶¶ 141, 143). He could not have honestly held this

"expect[ation]" while also knowing that, based on *his own warnings,* the Board had *initiated* the process of a sale to avoid bankruptcy.

198. Despite Bell's repeated statements that cash would be sufficient through 2024, the Company concluded that the year-end customer payments that Terran Orbital received at the end of 2023 were "sufficient for the Company's near-term capital requirements" but "such payments were not expected to address the Company's long-term liquidity needs," and, as such, management continued to move forward with the strategic review.

199. Although the Company proceeded with the strategic review to address liquidity in early 2024, at the same time, Bell continued publicly assure investors that "we don't need cash" and "[w]e have no need to raise additional capital," as described above (¶¶ 143-146).

200. Yet, behind closed doors the Company continued to pursue more cash and additional capital. At a Board meeting on March 21, 2024, Bell discussed the potential of conducting an "at the market" facility to raise needed capital.

201. On May 13, 2024, Riffel met with a lender's CEO, who provided verbal terms on a loan whose interest rate was too high and proceeds too small for Terran Orbital to meet its total capital requirements.

202. Yet, the *very next day*, on May 14, 2024, Bell again publicly responded to an investor question by saying, "***we feel very comfortable with our liquidity position as it stands today***," as described above (¶ 148), and Riffel—who had just failed to secure financing for the Company—responded ***"[w]e do not have any concerns***" and Bell confirmed "***we're well positioned to do this,***" as described above (¶ 149). Bell and Riffel could not have honestly expressed "*no* concern" and "comfort[]" *the day after* realizing that financing had become unattainable and the Company was running out of strategies to bring money in the door.

203. Yet despite describing the Company's "comfortable" liquidity position, just over *one week later* at the May 23, 2024 Board Meeting, Bell and Hobart told the Board that Terran Orbital's liquidity challenges were urgent. Bell reported that the Company was no longer relying on milestone payments from Rivada, which "significantly deteriorated the Company's cash forecast." Notably, this significant deterioration was *less than ten days* after Bell answered an analyst question about Rivada by saying their contract "***doesn't have any impact on us going forward***" and "***it's just upside for us at the end of the day***," as described above (¶ 159).

204. At the same May 23, 2024 Board Meeting, Hobart also confirmed that a delay in one other program "constrain[ed] the Company's liquidity profile" and explained that Terran Orbital may "need a permanent cash infusion of up to $120 million to cover the Company's expected cash burn *for the year*."

205. These liquidity constraints did not abate and, in fact, intensified. By June 4, 2024, Province was of the view that Terran Orbital may be *unable to continue operating* based on the cash forecasts it received from management. As such, the Board, including Bell, authorized the Special Committee to ask that Lockheed Martin advance upcoming milestone payments for an ongoing program before they were due, which request was made no later than June 18, 2024.

206. Yet, mere *weeks* after the Company received notice that Terran Orbital may be *unable to continue operating*, Bell assured an investor concerned about the Company's cash position and ability to meet covenants that "***[w]e feel very comfortable about our covenants going into the end of the quarter. No issue on our side***," as described above (¶ 151). Again, Bell could not have felt "comfort[]" or believed that there was "no issue" when Bell was aware that outside advisors were informing the Company that it may be unable to continue operating.

207. Even after these comments, Terran Orbital continued to work urgently to secure more sources of cash. Due to the Company's near-term capital requirements, management attempted to negotiate a $25 million working capital facility with a lender between July 5, 2024, and July 13, 2024. On July 19, 2024, Mr. LaChance of the Special Committee informed the Board, including Bell, that Lockheed Martin was not interested in negotiating a transaction with Terran Orbital due to concerns about its *liquidity situation*. By July 24, 2024, Terran Orbital's new CFO, Adarsh Parekh, told Lockheed Martin that it "urgent[ly]" needed consent to secure new financing. The following day, Jefferies told Lockheed Martin's representatives that Terran Orbital's cash position was "dire," and management informed the Board that its cash reserves would last only approximately *three weeks*. In response, the Board, including Bell, began to discuss the potential for a *Chapter 11 bankruptcy*.

208. Thus, as admitted by the Company, throughout the Class Period, Bell and Hobart knew, discussed, and acted upon information about their insufficient liquidity that contradicted their repeated and specific public assurances to the market.

**B. Bell Regularly Spoke with Rivada's CEO About the Rivada Contract**

209. At the time the Company entered into it, the Rivada Contract provided Terran Orbital with a revenue stream that was more than *twenty times* the amount of its annual revenue, which, in 2022, totaled $94.2 million. Because the Rivada Contract was such a large source of business for a company the size of Terran Orbital, Bell received frequent questions on the Rivada Contract at nearly every investor call or analyst presentation they attended. To quell investor concern, Bell assured that he had frequent and regular contact with Rivada about the Rivada Contract, including direct communication with its CEO, and was well-informed about Rivada's sources of funding for the Rivada Contract.

210. For example, on May 15, 2023, in response to a question about Rivada, Marc Bell commented that, "when I talked to Rivada, they feel they are a private company, they don't have to disclose to the public where their money is coming from." Then, during a call on August 15, 2023, H.C. Wainwright & Co. analyst Scott Buck explained that there was "investor hesitation around the contract" with Rivada because of how vague Rivada has been about its sources of financing. In response, Bell assured that "we've done extreme due diligence on their financials, both . . . ourselves and our attorneys." Bell added "we can't disclose what we have—information we know," but assured that "we are very much aware of who their funding is and how much it's for, and where it's coming from."

211. Similarly, on October 26, 2023, Marc Bell confirmed during a public town hall that "Declan Ganley, Rivada CEO, has been fully transparent with us from Day 1 regarding their funding sources . . . and has kept us engaged almost daily," adding that "[o]ver the last couple of months, he has provided a great deal of information regarding his ongoing and anticipated funding sources so that we could make strategic decisions for both companies." At this same meeting, Bell also added that "[t]heir money so far has largely been affiliated with a large sovereign" and "our conversations with Rivada have been positive" to date.

212. Lest there be any doubt, Bell told employees during an internal meeting on December 11, 2023, that "I had dinner with Declan Ganley last week" during which the two discussed the Rivada Contract, adding "he texted me this morning and maybe Thursday, Friday" about an outstanding payment. Bell later told *Seeking Alpha* that he continued to have text exchanges with Declan Ganley about the forthcoming payment as recently as December 19, 2023, and even recited the text of one of the messages from Ganley verbatim.

### C. Bell and Hobart Had Compelling Financial Motive to Hide Terran Orbital's Liquidity Constraints

213. During the Class Period, Defendants Marc Bell and Gary Hobart stood to gain enormously from hiding Terran Orbital's liquidity constraints. As explained below, each had employment agreements with Terran Orbital with terms that rewarded them handsomely for a "change in control" transaction—rewards that would be unavailable if the Company was unable to find a strategic partner and forced to file for bankruptcy.

214. On March 15, 2021, Bell entered into a written Employment Agreement with Terran Orbital, which was amended and restated on October 23, 2021 (as amended, the "Bell Employment Agreement"). Under the Bell Employment Agreement, Bell received an annual base salary of $995,000 and an annual bonus opportunity equal to 200% of his annual base salary (*i.e.*, $1,990,000). In addition, the Bell Employment Agreement provided that Bell was to receive various severance payments and benefits if he elected to terminate his employment for "good reason," including, among other things, (i) *three years* of his then current annual base salary, paid in one lump sum; (ii) *100%* of his target annual bonus, paid in one lump sum; and (iii) full acceleration of all outstanding equity awards granted to him as of the termination date. The Bell Employment Agreement specifically provided that a decision to terminate within 90 days of a Change in Control (as defined in Terran Orbital's equity incentive plan) shall be deemed to be a termination for "good reason."

215. On March 31, 2021, Hobart entered into a written Employment Agreement with Terran Orbital (the "Hobart Employment Agreement"). Under the Hobart Employment Agreement, Hobart received an annual base salary of $425,000 and an annual bonus opportunity equal to 75% of his annual base salary (*i.e.*, $318,750). In addition, the Hobart Employment Agreement provided that Hobart was to receive various severance payments and benefits if he

elected to terminate his employment for "good reason," including, among other things, (i) *three years* of his then current annual base salary, paid in one lump sum; (ii) *100%* of his target annual bonus, paid in one lump sum; and (iii) full acceleration of all outstanding equity awards granted to him as of the termination date. The Hobart Employment Agreement specifically provided that a decision to terminate within 90 days of a Change in Control (as defined in Terran Orbital's equity incentive plan) shall be deemed to be a termination for "good reason."

216. While most any competent executive would be fully aware of the terms of his or her compensation package, Bell was fully aware of the terms in his. As recent as July 8, 2022, Bell signed SEC filings for Terran Orbital that contained a detailed summary of the terms of the Bell Employment Agreement, including the severance payments due to him the event of a termination for "good reason."

217. The foregoing contract terms provided Defendants Bell and Hobart with ample motive to misrepresent the true state of Terran Orbital's liquidity during the Class Period. All severance payments provided financial incentive to *favor* a "change in control" transaction. Indeed, the contract terms described in two preceding paragraphs were summarized in the Proxy in a section titled "Interests of Company Directors and Executive Officers in the Merger" and Terran Orbital warned that these contract terms gave Bell and Hobart "interests in the merger that may be different from, or in addition to, the interests of our stockholders generally." Of course, a company that is suffering from liquidity constraints, or insolvent, is a less attractive target for an acquisition than one with a healthy balance sheet and cash flow. This became even more acute after Lockheed Martin, the only bidder, withdrew its initial offer.

218. In addition to the above, a "change in control" transaction provided Bell and Hobart with an opportunity to receive retention bonuses to continue providing services through and/or

after closing of any such transaction. This is particularly true for Bell, who was a member of the Board that would approve any such bonus. Sure enough, on September 6, 2024, after Terran Orbital announced the Transaction with Lockheed Martin, its Board approved a "transaction bonus pool" of $9 million to retain and incentivize key employees through the closing of the Transaction, approximately *$6 million* of which was allocated to Defendant Bell.

219. Terran Orbital's acquisition by Lockheed Martin qualified as a "Change of Control" within the meaning of the Bell Employment Agreement and the Hobart Employment Agreement. Because each "separated" from the Company upon its acquisition by Lockheed Martin, each received substantial compensation in connection with the Transaction. Bell received a total of *$11,608,875* in payments and benefits, including $6 million "retention" bonus, and Hobart received a total of *$1,546,633* in payments and benefits.

### D. Terran's Liquidity was an Existential Issue and the Rivada Contract Was at the Core of Its Business

220. The Individual Defendants' knowledge of the practices described herein can be inferred from the fact that Terran Orbital's available cash balance, cash burn, and resulting liquidity were admittedly existential issues for the company throughout the Class Period and were the subjects of great focus by them during that time. The Rivada Contract was equally important as the Company faced a liquidity crisis driven by insufficient revenues and management received regular questions about that specific program from investors and analysts.

221. Terran Orbital's cash-on-hand was actively managed by Bell and Hobart, and overseen by the Board of Directors, throughout the Class Period because it threatened the very survival of the Company. For example, Hobart explained on March 27, 2023, that there were "fairly significant swings in working capital" given the nature of Terran Orbital's business and, as such, "it's one of the reasons why we're looking at our liquidity ***constantly*** and thinking about

how to manage that, both our growth and also our liquidity profile." According to the Proxy, by July 19, 2023, Defendants acknowledged that Terran Orbital would run out of cash to fund its operations without additional or alternative sources of financing beyond its operating revenues and, thereafter, regularly discussed its efforts to address the Company's cash needs with the Board. Indeed, Terran Orbital was forced to admit in its 2023 Form 10-K that its liquidity position raised substantial doubt about its ability to continue as a going concern. In the end, the liquidity crisis led the Company to be sold at a sharp discount and narrowly avert bankruptcy.

222. The revenue stream due to Terran Orbital under the Rivada Contract was also central to Terran Orbital's business, the subject of great attention by investors, and a focus of Bell, Hobart, and the Board throughout the Class Period. As of June 30, 2023, $2.4 billion of Terran Orbital's $2.6 billion "backlog" was attributable to the Rivada Contract. Thus, the Rivada Contract accounted for ***92%*** of Terran Orbital's future business. When Rivada missed a payment in October 2023, the Company revised its revenue outlook for the year from 250 million to 130 million, *a drop of 48%*. In other words, the Rivada Contract was so important that a *single missed payment* reduced Terran Orbital's outlook by almost half. Then, in August 2024, Terran Orbital reduced its backlog by ***88%*** when it decided to remove the unpaid portion of the Rivada Contract from its backlog. Thus, the Rivada contract was the vast majority of Terran's revenues at a time when the Company was desperately in need of cash to continue operating.

223. In addition to how important the Rivada Contract was in financial terms, Terran Orbital's SEC disclosures demonstrate that the Company understood how critical the Rivada Contract was to its operations. The 2023 Form 10-K and the 2024 Form 10-K warned that "[i]f Rivada is unable to fund and maintain its operations . . . our financial condition and results of operations in future periods would be materially adversely affected." In addition, the Proxy

revealed that the Rivada Contract was the subject of focus at the highest levels of the Company. For example, the Board discussing a single missed milestone payment on November 9, 2023, as grounds to slash the revenue forecast by nearly half. It also documents how, on March 21, 2024, Bell updated the Board on Rivada's financing, and that if they were able to secure money to pay Terran, it would "impact the Company's valuation and the Lockheed Martin March Offer." The Proxy also outlines how the work of Company's advisors to determine if the First Lockheed Martin Offer was in the best interest of shareholders included "real-time information relating to the Company's contract with Rivada and the likelihood and timing of payments from Rivada." Then, on May 23, 2024 "Mr. Bell provided an update on the Company's customer Rivada" and that the low likelihood of a payment from Rivada meant the Company "would start reducing staff." As the Merger Proxy admitted, "[t]he uncertainty in Rivada's ability to pay significantly deteriorated the Company's cash forecast." The Proxy further disclosed that, Terran's "last option" to avoid pursuing a sale to Lockheed Martin or a bankruptcy filing was to "contact senior management at Rivada to see if an immediate cash payment could be made."

224. The inference that Individual Defendants were kept apprised of information about a single contract providing most of the Company's projected revenue is even stronger given that Terran Orbital was facing an liquidity crisis that threatened its very survival.

**E. The Suspicious Reassignment of Hobart and the Sudden Removal of Bell, Hobart, and Parekh Support An Inference of Scienter**

225. During the Class Period, Defendant Hobart was suddenly removed from the position of CFO, and, eventually, Defendants Bell, Hobart, and Parekh—all of whom were tasked with managing Terran Orbital's liquidity and oversaw the Company's descent into near bankruptcy—were relieved from their executive positions. Each of these executive changes were sudden, suspicious, and support an inference of scienter.

226. The Board took swift action after the dire financial state of the Company was brought to its attention by Hobart in August and September of 2023. On August 3, 2023, Hobart told the Board that Terran Orbital's cashflow difficulties "may result in the Company going into a negative cash position, which may necessitate pursuing a capital raise." One week later, the Board approved engaging Jefferies for advisory services associated with strategic alternatives to a capital raise. On September 11, 2023, the Board established the Special Committee to address "issues and considerations related to, among other things, the Company's cash needs relative to projected position due to concerns raised with the Board by management of the company." The next day, the Special Committee engaged King & Spalding LLP ("King & Spalding") to provide legal advice. Then, on September 14, 2023, the Special Committee approved Terran Orbital's entry into a securities purchase agreement with certain investors to facilitate the CMPO.

227. Immediately after these events, Hobart was removed from his role as CFO. On September 15, 2023, Terran Orbital announced that Hobart "transitioned" from CFO to a new role as Chief Transformation Officer, effective immediately. In his place, Terran Orbital appointed Mathieu Riffel, previously the Company's Senior Vice President and Controller, as "Acting Chief Financial Officer," effective as of Hobart's departure.

228. The circumstances surrounding Hobart's reassignment were highly suspicious. The transition came just ***four days*** after the Special Committee was formed, ***three days*** after it decided to retain King & Spalding, and ***one day*** after it approved moving forward with a CMPO to raise needed capital. To be sure, the need to conduct the CMPO reflected negatively on the Company. Indeed, after it was announced on September 18, 2023, the investment community responded with surprise, as captured in the title of an article published by *Aviation Week*: "Terran Orbital Surprises With Stock Sale; Shares Plummet." The abrupt nature of the move is also evident from the fact

that there was no long-term successor in place. Instead, Terran Orbital appointed Riffel as *interim* CFO, a role he held for *eight months* until a permanent replacement was found in May 2023. Furthermore, the Chief Transformation Officer position did not exist before Hobart's appointment to that newly created role. Finally, Hobart's LinkedIn indicates that he served as Terran Orbital's CFO until *October 2024*, raising a question as to whether he was acting as the *de facto* CFO from September 18, 2023 to October 30, 2024, when the Transaction with Lockheed Martin closed.

229. On August 16, 2024, Terran Orbital announced that it entered into a definitive agreement to be acquired by Lockheed Martin at $0.25 per share of common stock. The announcement included a quote from Bell touting the transaction as "combin[ing] our strengths and expertise." Although Bell would not comment otherwise on the acquisition, when asked by a reporter whether he would remain as CEO, he said, "*I have no intentions of going anywhere*."

230. However, Lockheed Martin did not follow the common practice of retaining Bell and other key executives for a period after the consummation of the acquisition to ease the transition. Instead, as detailed more fully above (¶ 218) in the Preliminary Proxy, filed with the SEC on September 9, 2024, Terran Orbital disclosed that the Board approved bonuses for Bell and other executives to stay with the Company only through *closing*. On October 30, 2024, Lockheed completed the acquisition of Terran Orbital. That same day, Terran Orbital filed a current report on Form 8-K with the SEC disclosing that "[i]n connection with the consummation of the Merger," on October 30, 2024, Bell, Hobart, and Parekh had all been "separated from the company." At the time, Parekh had served in his position as CFO for just *four months*. In addition, Lockheed was not motivated by a desire to install its own CEO in place of Bell. Instead, Bell was replaced by Peter Krauss, who previously served as Terran Orbital's Chief Operating Officer, and had no prior affiliation with Lockheed Martin.

## F. Defendants' SOX Certifications Support an Inference of Scienter

231. Following a series of high-profile financial scandals that occurred in the early 2000s at large public companies, Congress enacted the Sarbanes-Oxley Act of 2002 ("SOX") to protect investors by improving the accuracy and reliability of corporate disclosures.

232. Among other things, Section 404 of SOX directed the SEC to prescribe rules which effectively required all public companies to establish and maintain a system of internal controls over financial reporting ("ICFR"), and to assess the effectiveness of those controls on a periodic basis. As provided in Rules 13a-15 and 15d-15 of the Exchange Act, management must not only maintain ICFR but evaluate the effectiveness of ICFR annually and evaluate any change that is reasonably likely to materially affect ICFR each quarter. Other provisions of SOX require the CEO and CFO of any such company to certify compliance with SOX in each annual and quarterly report filed with the SEC on Form 10-K or Form 10-Q, including that it complies with generally accepted accounting principles ("GAAP").

233. During the Class Period, Bell, Hobart, and/or Riffel included such SOX certifications in each Form 10-K and Form 10-Q that Terran filed with the SEC, including the 2022 Form 10-K, the quarterly report on Form 10-Q for the quarter ended March 31, 2023, filed with the SEC on May 15, 2023 (the "1Q 2023 Form 10-Q"), the quarterly report on Form 10-Q for the quarter ended June 30, 2023, filed with the SEC on August 14, 2023 (the "2Q 2023 Form 10-Q"), the quarterly report on Form 10-Q for the quarter ended September 30, 2023, filed with the SEC on November 14, 2023 (the "3Q 2023 Form 10-Q"), the 2023 Form 10-K, the quarterly report on Form 10-Q for the quarter ended March 31, 2024, filed with the SEC on May 14, 2024 (the "1Q 2024 Form 10-Q"), and the 2Q 2024 Form 10-Q. Specifically, each signed SOX certifications accompanying the filings in the table below:

| Defendant | Filings Including a SOX Certification |
|---|---|
| Bell | 2022 Form 10-K, 1Q 2023 Form 10-Q, 2Q 2023 Form 10-Q, 3Q 2023 Form 10-Q, 2023 Form 10-K, 1Q 2024 Form 10-Q, 2Q 2024 Form 10-Q |
| Hobart | 2022 Form 10-K, 1Q 2023 Form 10-Q, 2Q 2023 Form 10-Q |
| Riffel | 3Q 2023 Form 10-Q, 2023 Form 10-K, 1Q 2024 Form 10-Q |

234. Among other things, the SOX certifications accompanying each of these filings certified that the signatory was "responsible for establishing and maintaining disclosure controls and procedures" and that such controls and procedures were designed "to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared."

### G. *Respondeat Superior* and Agency Principles Apply

235. Terran Orbital is liable for the acts of Defendants and other Company officers, directors, employees, and agents under the doctrine of *respondeat superior* and common law principles of agency as all wrongful acts alleged herein were carried out within the scope of their employment or agency with the authority or apparent authority to do so. The scienter of Defendants and other Company officers, employees, and agents is imputed to Terran Orbital under such principles.

## IX. PRESUMPTION OF RELIANCE

236. Plaintiffs and the Class are entitled to a presumption of reliance under the fraud-on-the-market doctrine because, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts necessary to make the statements that were made not misleading during the Class Period;

(b) the misrepresentations and/or omissions were material;

(c) the Company's securities traded in an efficient market;

(d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e) Plaintiffs and other members of the Class purchased Terran Orbital securities between the time that Defendants misrepresented or failed to disclose material facts necessary to make the statements that they made not misleading and the time the true facts were disclosed, without knowledge of the misrepresented and/or omitted facts.

237. At all relevant times, the market for Terran Orbital securities was efficient for the following reasons, among others:

(a) Terran Orbital's securities met the requirements for listing on the NYSE, a highly efficient and automated market;

(b) as a regulated issuer, Terran Orbital filed periodic public reports with the SEC;

(c) throughout the Class Period, Terran Orbital's common stock was highly liquid, with an average daily trading volume over 3.5 million shares;

(d) Terran Orbital regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(e) Terran Orbital was followed by numerous securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and, thus, entered the public marketplace; and

(f) new, company-specific information was reflected and incorporated into the stock price for Terran Orbital's securities.

238. As a result of the foregoing, the market for Terran Orbital securities promptly digested current information regarding the Company from publicly available sources and reflected such information in the price of Terran Orbital's securities. Under these circumstances, all purchasers of Terran Orbital securities during the Class Period suffered similar injury through their purchase of Terran Orbital securities at artificially inflated prices and the presumption of reliance applies.

239. In addition, a presumption of reliance is also appropriate under *Affiliate Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are predicated on the omission of material facts for which there was a duty to disclose. As this action involves Defendants' failure to disclose material adverse information regarding Terran Orbital's operations, forecasts, and business prospects—information that Defendants were obligated to disclose in light of the statements they made on these very topics and/or applicable SEC rules and regulations—positive proof of reliance is not a prerequisite to recovery.

## X. <u>LOSS CAUSATION</u>

240. At all relevant times, Terran Orbital securities traded in an open, well-developed, and efficient market which promptly digested new information about the Company from all reasonably accessible public sources and reflected such information in the price of its securities. As described above, Defendants made false and misleading statements throughout the Class Period which misrepresented and/or failed to disclose the adverse facts detailed herein. Defendants' false and misleading statements caused Terran Orbital securities to trade at artificially inflated prices throughout the Class Period and, thus, operated as a fraud or deceit on Plaintiffs and other members of the Class who purchased or otherwise acquired such securities before such the inflation was

removed. As detailed herein, the price of Terran Orbital securities fell precipitously in response to disclosures made on April 3, 2023, May 25, 2023, September 18, 2023, November 14, 2023, December 11, 2023, April 1, 2024, May 2, 2024, May 14, 2024, July 23, 2024, August 12, 2024, and August 15, 2024. Each such disclosure revealed new information that removed part of the inflation introduced by Defendants' previous misstatements and omissions, causing real economic loss to Plaintiffs and other members of the Class who purchased such securities during the Class Period at inflated prices.

241. Each decline in the price of Terran Orbital securities referenced above was a direct and proximate result of Defendants' misstatements or omissions being revealed to the market and/or the materialization of risks concealed by the fraud. The timing and magnitude of each such price decline negates any inference that the losses suffered by Plaintiffs and other members of the Class were caused by changed market conditions, macroeconomic factors, or Company-specific facts unrelated to the fraud alleged herein.

242. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages. Accordingly, Defendants' wrongful conduct directly and proximately caused Plaintiffs and other members of the Class to suffer economic losses, *i.e.*, damages under the federal securities laws.

## XI. <u>NO SAFE HARBOR</u>

243. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged herein to be false or misleading.

244. None of the statements alleged herein to be false or misleading are forward-looking statements. Rather, the statements alleged herein to be false or misleading all relate to facts and conditions existing at the time the statements were made or prior to the time the statements were

made. Furthermore, none of the historic or present-tense statements alleged herein to be false or misleading were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

245. To the extent certain of the statements alleged to be false may be characterized as forward-looking, they were neither identified as such when made nor accompanied by any meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. For example, no statements were identified as forward-looking during the interview that Bell gave at the Jefferies Virtual Space Summit on June 25, 2024, much less subject to a cautionary disclosure that actual results could differ. Similarly, the statement made to *Seeking Alpha* on December 20, 2023, was not accompanied by any identification of forward-looking statements or meaningful cautionary language. To the extent Defendants issued any statements designed to "warn" or "caution" investors of certain risks, those statements were not meaningful because they warned only of theoretical future risks at times when such risks were not merely hypothetical and/or identified risks that already began to materialize. Furthermore, those statements were not meaningful because they were explicitly and repeatedly contradicted by Defendants in their statements. Thus, the boilerplate and abstract cautionary statements made by Defendants were themselves false and misleading and insufficient to insulate Defendants from liability.

246. In addition, Defendants are liable for any forward-looking statements because, at the time each such statement was made, the speaker knew that the forward-looking statement was

false or misleading or had actual knowledge of material facts undermining the statement, and/or the forward-looking statement was authorized or approved by an executive officer of Terran Orbital who knew that the statement was materially false or misleading when made or had actual knowledge of material facts undermining the statement.

## XII. CLASS ACTION ALLEGATIONS

247. Plaintiffs bring this action on their own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class. Excluded from the Class are Defendants, members of the immediate families of the Individual Defendants, the Company's subsidiaries and affiliates, any person who is or was an officer or director of the Company or any of the Company's subsidiaries or affiliates during the Class Period, any entity in which such excluded party has or had a controlling interest, and the legal representatives, heirs, successors, or assigns of any such excluded party.

248. The members of the Class are so numerous and geographically dispersed that joinder is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. During the Class Period, Terran Orbital's securities were actively traded on the NYSE. As of August 8, 2024, there were approximately 204,355,515 shares of Terran Orbital's common stock outstanding. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are many thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in class actions arising under the federal securities laws.

249. Plaintiffs' claims are typical of the claims of members of the Class. All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act, as complained of herein.

250. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to, or in conflict with, those of the Class.

251. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class, including:

(a) whether the acts described herein violated the Exchange Act and/or SEC rules promulgated thereunder;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts or omitted material facts necessary to make the statements made, in the circumstances under which they were made, not misleading;

(c) whether Defendants acted with the requisite level of scienter;

(d) whether the material misstatements and omissions alleged herein artificially inflated the market price of Terran Orbital securities during the Class Period;

(e) whether the Individual Defendants were controlling persons; and

(f) whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

252. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other reasons, joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for members

of the Class to redress the wrongs done to them individually. There will be no difficulty in the management of this action as a class action.

## XIII. CLAIMS FOR RELIEF

**COUNT I**
**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

253. Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs as if fully set forth herein. This Count is brought pursuant to Section 10(b) of the Exchange Act, codified at 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, codified at 17 C.F.R. § 240.10b-5, on behalf of the Class against all Defendants.

254. Throughout the Class Period, Defendants, individually and in concert, directly or indirectly, by means or instrumentalities of interstate commerce, including but not limited to the mails and the internet, and/or the facilities of a national securities exchange, carried out a plan, scheme, or course of conduct in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC, in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Terran Orbital securities during the Class Period.

255. Specifically, throughout the Class Period, Defendants made or caused Terran Orbital to issue untrue statements of material fact and/or omit material facts from its public disclosures that were necessary to make the statements that were made, in light of the circumstances under which they were made, not misleading, including those specified above, which were intended to, and did, as alleged herein: (i) deceive the investing public, including

Plaintiffs and the other members of the Class; (ii) artificially inflate and maintain the price of Terran Orbital securities; and (iii) cause Plaintiffs and members of the Class to purchase Terran Orbital securities at artificially inflated prices. Defendants are individually and collectively responsible for making such statements by virtue of having made the public statements or otherwise prepared, approved, signed, and/or disseminated documents that contained those statements to the investing public.

256. The Individual Defendants made the false and misleading statements and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who purchased Terran Orbital securities during the Class Period.

257. As a result of disseminating the materially false and misleading statements specified above, the market price for Terran Orbital securities was artificially inflated during the Class Period. Relying directly or indirectly on those statements or upon the integrity of the market price for Terran Orbital securities, Plaintiffs and other members of the Class purchased Terran Orbital securities at prices that were artificially inflated by the fraud described herein. As set forth herein, Plaintiffs and other members of the Class suffered damages as a direct and proximate result of Defendants' wrongful conduct when the true facts were subsequently disclosed or the risks concealed by the misstatements materialized and the inflation was removed from the price of such securities.

258. At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of the fact that they were materially false or omitted material facts necessary to make them not misleading, and believed them to be true. Plaintiffs and the other members of the Class would not have purchased Terran Orbital securities at the prices they paid,

or at all, if they had been aware that the market prices had been artificially inflated by the false and misleading statements and/or the material adverse facts which the Defendants did not disclose.

259. By reason of the foregoing, Defendants are liable to Plaintiffs and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**COUNT II**
**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

260. Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs as if fully set forth herein. This Count is brought pursuant to Section 20(a) of the Exchange Act, codified at 15 U.S.C. § 78t(a), on behalf of the Class against the Individual Defendants.

261. As alleged herein, the Individual Defendants, and each of them, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making materially false and misleading statements and omitting material facts necessary to make the statements that were made not misleading in connection with the purchase or sale of the Company's securities and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period.

262. Throughout the Class Period, the Individual Defendants, as Terran Orbital's most senior executives, had direct involvement in the day-to-day operations of the Company, and conducted and participated, directly and indirectly, in the conduct of Terran Orbital's business affairs.

263. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Terran Orbital's business operations, financial condition, and prospects. In this capacity, the Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged herein to be false or misleading prior to and/or

shortly after those statements were made, and had the ability to prevent the issuance of the statements or cause the statements to be corrected. The Individual Defendants, therefore, were "controlling persons" of Terran Orbital within the meaning of Section 20(a) of the Exchange Act. In this capacity, they actively participated in the unlawful conduct alleged.

264. Because of their senior positions, the Individual Defendants knew of or recklessly disregarded the adverse, non-public information about Terran Orbital's business practices, financial condition, and prospects. The Individual Defendants acted knowingly and intentionally, or in such a deliberately reckless manner as to constitute culpable participation in the primary violation.

265. By reason of the foregoing, the Individual Defendants are liable to Plaintiffs and members of the Class for violations of Section 20(a) of the Exchange Act.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A. Declaring that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as class representatives and Plaintiffs' counsel as lead counsel under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with pre-judgment interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

D. Granting such other and further relief as the Court may deem just and proper.

## XV. DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: October 6, 2025

MILLER SHAH LLP

/s/ Jayne A. Goldstein
Jayne A. Goldstein (Fl. Bar #144088)
Nathan C. Zipperian (Fl. Bar #61525)
2103 N. Commerce Pkwy.
Fort Lauderdale, Florida 33326
Telephone: (954) 515-0123
Facsimile: (866) 300-7367
jagoldstein@millershah.com
nczipperian@millershah.com

*Counsel for Plaintiffs and Liaison Counsel for the Class*

POMERANTZ LLP

/s/ Justin D. D'Aloia
Justin D. D'Aloia (admitted *pro hac vice*)
Guy Yedwab
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jdaloia@pomlaw.com
guyyedwab@pomlaw.com

*Counsel for Plaintiffs and Lead Counsel for the Class*

WOHL & FRUCHTER LLP
Joshua E. Fruchter
(*pro hac vice* application forthcoming)
25 Robert Pitt Drive, Suite 209G
Monsey, New York 10952
Telephone: (845) 290-6818
Facsimile: (718) 504-3773
jfruchter@wohlfruchter.com

*Additional Counsel for Lead Plaintiffs*