**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 24-CV-81191 ARTAU / REINHART**

STEVEN VERZWYVELT, JESSE
RAMIREZ, MICHAEL O'NEILL, and JILL
O'NEILL, individually and on behalf of all
others similarly situated,

        Plaintiffs,

v.

TERRAN ORBITAL CORPORATION,
MARC H. BELL, MATHIEU RIFFEL, GARY
A. HOBART, and STRATTON SCLAVOS,

        Defendants.

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...............................................................................................1

STATEMENT OF FACTS ......................................................................................................3

    A.    Terran Orbital's Relationship with Lockheed Martin.............................................3

    B.    Terran Orbital's Massive Contract with Rivada .....................................................3

    C.    Terran Orbital Struggles to Navigate an Ongoing Liquidity Crisis........................4

        1.    Defendants Recognize Terran Orbital Faced a Cash Shortfall and Begin Exploring Strategic Alternatives in Early 2023 ................................4

        2.    The Board Authorizes Management to Initiate a Private Sale Process ........................................................................................................4

        3.    Lockheed Martin Offers to Buy Terran Orbital at a Discount but Backs Out After Learning About Its Severe Liquidity Constraints.............5

        4.    Terran Orbital Agrees to Be Acquired by Lockheed Martin at a Fraction of Its Previous Offer to Avoid Bankruptcy ...................................5

    D.    Defendants Misled the Investing Public About Terran Orbital's Liquidity to Salvage the Below-Market Deal with Lockheed Martin and Avert Bankruptcy...........................................................................................................7

    E.    Investors Are Harmed as the Truth Emerges...........................................................8

STANDARD OF REVIEW .....................................................................................................8

ARGUMENT...........................................................................................................................8

I.    PLAINTIFFS STATE A SECTION 10(B) CLAIM.........................................................8

    A.    The SAC Adequately Alleges Misstatements and Omissions of Material Fact........................................................................................................................9

        1.    The SAC Pleads an Array of Present Facts Which Establish That Defendants' Misstatements Were False or Misleading When Made........10

        2.    Defendants' Remaining Attempts to Categorically Exempt Their Misstatements from Liability as a Matter of Law Are Meritless...............14

    B.    The SAC Raises a Strong Inference of Scienter ...................................................20

1.     The SAC Pleads Direct Evidence of Scienter for Each Defendant Through Contemporaneous Knowledge ...................................................21

2.     The SAC Alleges Compelling Individualized Motives .............................25

3.     The Core Operations Doctrine Supports an Inference of Scienter ............27

4.     A Wealth of Other Facts Confirms the Inference of Scienter....................28

5.     The Inference of Scienter is Overwhelming ..............................................29

II.     PLAINTIFFS STATE A CONTROL PERSON CLAIM...................................................30

CONCLUSION.................................................................................................................................30

## TABLE OF AUTHORITIES

**Cases**                                                                                               **Page(s)**

*100079 Canada, Inc. v. Stiefel Labs., Inc.*,
  2011 WL 13116079 (S.D. Fla. Nov. 30, 2011)...................................................................9

*Access Ninja, Inc. v. PassNinja, Inc.*,
  2025 WL 753332 (S.D. Fla. Mar. 10, 2025)...................................................................9, 25

*Alpern v. UtiliCorp United, Inc.*,
  84 F.3d 1525 (8th Cir. 1996) .........................................................................................21

*Anastasio v. Internap Network Servs. Corp.*,
  2011 WL 13124500 (N.D. Ga. Sept. 30, 2011) ..............................................................23

*Asher v. Baxter Int'l, Inc.*,
  377 F.3d 727 (7th Cir. 2004) .........................................................................................16

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)........................................................................................................8

*Buqueras v. Sharecare, Inc.*,
  2025 WL 3183000 (N.D. Ga. Sept. 25, 2025) ...........................................................28, 29

*Carvelli v. Ocwen Fin. Corp.*,
  934 F.3d 1307 (11th Cir. 2019) ............................................................................. *passim*

*Chabot Walgreens Boots All., Inc.*, 2023 WL 2908827 (M.D.Pa. Mar. 31, 2023)........................19

*City of St. Clair Shores Gen. Employees' Ret. Sys. v. Lender Processing Servs.,
  Inc.*,
  2012 WL 1080953 (M.D. Fla. Mar. 30, 2012) ...............................................................22

*Doller v. Hertz Glob. Holdings, Inc.*,
  2025 WL 2896919 (M.D. Fla. Oct. 10, 2025) ................................................................25

*Edge v. Tupperware Brands Corp.*,
  2023 WL 6310236 (M.D. Fla. Sept. 28, 2023) ...............................................................23

*Einhorn v. Axogen, Inc.*,
  42 F.4th 1218 (11th Cir. 2022) ......................................................................................16

*FindWhat Inv. Grp. v. FindWhat.com*,
  658 F.3d 1282 (11th Cir. 2011) ............................................................................. *passim*

*Fla. St. Bd. of Admin. v. Green Tree Fin. Corp.*,
  270 F.3d 645 (8th Cir. 2001) .........................................................................................26

*Frank v. Dana Corp.*,
   646 F.3d 954 (6th Cir. 2011) ...........................................................................................27

*Haddad v. RAV Bah., Ltd.*,
   2008 WL 11399704 (S.D. Fla. Nov. 6, 2008).................................................................25

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014).........................................................................................................9

*Helwig v. Vencor, Inc.*,
   251 F.3d 540 (6th Cir. 2001) ...........................................................................................15

*In re 21st Century Holding Co. Sec. Litig.*,
   2008 WL 5749572 (S.D. Fla. Nov. 7, 2008)....................................................................16

*In re Altisource Portfolio Sols., S.A. Sec. Litig.*,
   2015 WL 11988900 (S.D. Fla. Dec. 22, 2015).................................................................10

*In re Banco Bradesco S.A. Sec. Litig.*,
   277 F. Supp. 3d 600 (S.D.N.Y. 2017)..............................................................................24

*In re BankAtlantic Bancorp, Inc. Sec. Litig.*,
   2010 WL 6352664 (S.D. Fla. Sept. 9, 2010) ...................................................................16

*In re Bos. Sci. Corp. Sec. Litig.*,
   646 F. Supp. 3d 249 (D. Mass. 2022) ..............................................................................20

*In re Cabletron Sys., Inc.*,
   311 F.3d 11 (1st Cir. 2002)...........................................................................................9, 27

*In re Catalina Mktg. Corp. Sec. Litig.*,
   390 F. Supp. 2d 1110 (M.D. Fla. 2005)............................................................................16

*In re Eagle Building Techs., Inc. Sec. Litig.*,
   319 F. Supp. 2d 1318 (S.D. Fla. 2004) ............................................................................19

*In re Egidi*,
   571 F.3d 1156 (11th Cir. 2009) ....................................................................................9, 10

*In re Emergent BioSolutions Inc. Sec. Litig.*,
   2023 WL 5671608 (D. Md. Sept. 1, 2023).......................................................................29

*In re Eros Int'l PLC Sec. Litig.*,
   2021 WL 1560728 (D.N.J. Apr. 20, 2021) .......................................................................13

*In re Flowers Foods, Inc. Sec. Litig.*,
   2018 WL 1558558 (M.D. Ga. Mar. 23, 2018)..................................................................27

*In re Jan. 2021 Short Squeeze Trading Litig.*,
620 F. Supp. 3d 1231 (S.D. Fla. 2022) ........................................................................12, 20, 27

*In re Kirkland Lake Gold Ltd. Sec. Litig.*,
2021 WL 4482151 (S.D.N.Y. Sept. 30, 2021)..........................................................................12

*In re Republic Servs., Inc. Sec. Litig.*,
134 F. Supp. 2d 1361 (S.D. Fla. 2001) ....................................................................................22

*In re Scientific-Atlanta, Inc. Sec. Litig.*,
239 F. Supp. 2d 1351 (N.D. Ga. 2002)*, aff'd*, 374 F.3d 1015 (11th Cir. 2004).................22, 25

*In re Teco Energy, Inc. Sec. Litig.*,
2006 WL 2884960 (M.D. Fla. Oct. 10, 2006) .........................................................................22

*In re Theragenics Corp. Sec. Litig.*,
137 F. Supp. 2d 1339 (N.D. Ga. 2001) ...................................................................................19

*In re Thornburg Mortg., Inc. Sec. Litig.*,
695 F. Supp. 2d 1165 (D.N.M. 2010), *aff'd sub nom. Slater v. A.G. Edwards*
*& Sons, Inc.*, 719 F.3d 1190 (10th Cir. 2013)..........................................................................26

*In re Towne Servs., Inc. Sec. Litig.*,
184 F. Supp. 2d 1308 (N.D. Ga. 2001) ...................................................................................15

*In re Villa*,
261 F.3d 1148 (11th Cir. 2001) ...............................................................................................30

*Kadel v. Flood*,
427 F. App'x 778 (11th Cir. 2011) ..........................................................................................29

*Kohut v. KBR, Inc.*,
2015 WL 11995250 (S.D. Tex. Sept. 3, 2015) ........................................................................24

*Laperriere v. Vesta Ins. Grp., Inc.*,
526 F.3d 715 (11th Cir. 2008) .................................................................................................30

*Lormand v. U.S. Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) ...................................................................................................22

*Marrari v. Med. Staffing Network Holdings, Inc.*,
395 F. Supp. 2d 1169 (S.D. Fla. 2005) ...................................................................................16

*MAZ Partners LP v. First Choice Healthcare Sols., Inc.*,
2019 WL 5394011 (M.D. Fla. Oct. 16, 2019) ...................................................................10, 28

*Miller v. Dyadic Int'l, Inc.*,
2009 WL 10697095 (S.D. Fla. Sept. 29, 2009) .......................................................................30

*Mizzaro v. Home Depot, Inc.*,
544 F.3d 1230 (11th Cir. 2008) ..................................................................20, 30

*Moradpour v. Velodyne Lidar, Inc.*,
2022 WL 2391004 (N.D. Cal. July 1, 2022)...........................................................13

*Nathenson v. Zonagen Inc.*,
267 F.3d 400 (5th Cir. 2001) .................................................................................20

*Neb. Inv. Council v. Fidelity Nat'l Info. Servs., Inc.*,
2024 WL 4349125 (M.D. Fla. Sept. 30, 2024) .........................................................18

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)....................................................................................14

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015)..............................................................................9, 18, 19

*Oxford Asset Mgmt., Ltd. v. Jaharis*,
297 F.3d 1182 (11th Cir. 2002) ................................................................................3

*Plotkin v. IP Axess Inc.*,
407 F.3d 690 (5th Cir. 2005) ............................................................................11, 28

*Plumbers, Pipefitters & Apprentices Loc. No. 112 Pension Fund v. Vestis Corp.*,
2025 WL 2797712 (N.D. Ga. Sept. 30, 2025) ................................................. *passim*

*Pritchard v. Apyx Med. Corp.*,
2020 WL 1180731 (M.D. Fla. Mar. 11, 2020) ......................................................16

*Pub. Emps. Ret. Sys. of Miss. v. Mohawk Indus., Inc.*,
564 F. Supp. 3d 1272 (N.D. Ga. 2021) ..................................................................28

*Ret. Sys. v. MF Global, Ltd.*,
620 F.3d 137 (2d Cir. 2010)...................................................................................11

*Ret. Sys. v. Teleperformance SE*,
2024 WL 2320209 (S.D. Fla. May 22, 2024) .........................................................28

*Ret. Sys. v. Teleperformance SE*,
746 F. Supp. 3d 1395 (S.D. Fla. 2024) ...........................................................17, 27

*SEC v. GenAudio Inc.*,
32 F.4th 902 (10th Cir. 2022) ................................................................................21

*SEC v. Mufareh*,
2024 WL 3952437 (M.D. Fla. Aug. 27, 2024) .......................................................19

*SEC v. Revolutionary Concepts, Inc.*,
  2022 WL 386085 (11th Cir. Feb. 9, 2022) .................................................................20

*Shafer v. Global Payments, Inc.*,
  2024 WL 2789447 (N.D. Ga. Mar. 29, 2024)..............................................................19

*Sheet Metal Workers Loc. 19 Pension Fund v. ProAssurance Corp.*,
  600 F. Supp. 3d 1189 (N.D. Ala. 2021)................................................................12, 18

*Slayton v. Am. Express Co.*,
  604 F.3d 758 (2d Cir. 2010)........................................................................................16

*Sood v. Catalyst Pharm. Partners Inc.*,
  2014 WL 1245271 (M.D. Fla. Mar. 26, 2014) ...........................................................26

*Spitzberg v. Hou. Am. Energy Corp.*,
  758 F.3d 676 (5th Cir. 2014) ......................................................................................20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)...............................................................................................21, 25

*Theodore v. Purecycle Techs., Inc.*,
  2022 WL 20157415 (M.D. Fla. Aug. 4, 2022) ...........................................................17

*Theodore v. Purecycle Techs., Inc.*,
  2023 WL 4035880 (M.D. Fla. June 15, 2023)........................................................25, 28

*Thorpe v. Walter Inv. Mgmt., Corp.*,
  111 F. Supp. 3d 1336 (S.D. Fla. 2015) .......................................................................29

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976)....................................................................................................17

*TSG Water Res., Inc. v. D'Alba & Donovan Certified Pub. Accts., P.C.*,
  260 F. App'x 191 (11th Dec. 2007).............................................................................20

*Waterford Twp. Gen. Emps. Ret. Sys. v. Suntrust Banks, Inc.*,
  2010 WL 3368922 (N.D. Ga. Aug. 19, 2010) ............................................................26

*Wellcare Health Plans, Inc. v. Farha*,
  2009 WL 3853592 (M.D. Fla. Mar. 30, 2009) ...........................................................20

*Weston v. DocuSign, Inc.*,
  669 F. Supp. 3d 849 (N.D. Cal. 2023) ........................................................................15

**Statutes**

15 U.S.C. § 78j(b)................................................................................................................8

15 U.S.C. § 78u-4 ................................................................................................9, 21

15 U.S.C. § 78u-5 ...........................................................................................14, 15, 16

Private Securities Litigation Reform Act of 1995 ....................................................9, 14

**Rules**

Fed. R. Civ. P. 9 ...........................................................................................................9

Fed. R. Civ. P. 15 .......................................................................................................30

**Other Authorities**

17 C.F.R. § 240.10b-5(b) ........................................................................................8, 9

**TABLE OF DEFINED TERMS**

| Defined Term | Definition | Cross Reference |
|---|---|---|
| AC | First Amended Class Action Complaint for Violations of the Federal Securities Laws | ECF No. 37 |
| ATM Agreement | A July 23, 2024, At The Market Offering agreement between Terran Orbital and H.C. Wainwright, providing terms on which the Company could sell up to a maximum of $98 million in common stock | SAC ¶ 116 |
| ATM Program | An "at the market" offering program to raise up to $98 million in cash | SAC ¶ 153 |
| Bell | Defendant Marc H. Bell | SAC ¶ 17 |
| Board | Terran Orbital's Board of Directors | SAC ¶ 6 |
| CEO | Chief Executive Officer | SAC ¶ 2 |
| CFO | Chief Financial Officer | SAC ¶ 18 |
| Class Period | March 21, 2023, to August 14, 2024, both dates inclusive | SAC ¶ 1 |
| CMPO | Confidentially marketed private offering | SAC ¶ 68 |
| Company | Terran Orbital Corporation | SAC at 1 |
| CVR | Contingent value right | SAC ¶ 100 |
| Defendants | Terran Orbital, Bell, Riffel, Hobart, and Sclavos | SAC at 1 |
| Direct Offering | A May 24, 2023, purchase agreement with an institutional investor for the direct issuance and sale of $37.1 million in Terran Orbital securities registered in the Shelf Registration Statement | SAC ¶ 62 |
| Exchange Act | Securities Exchange Act of 1934 | SAC ¶ 1 |
| Hobart | Defendant Gary A. Hobart | SAC ¶ 18 |
| Lead Plaintiffs | Steven Verzwyvelt, Jesse Ramirez, Michael O'Neill, and Jill O'Neill | SAC at 1 |
| Lockheed Martin | Lockheed Martin Corporation | SAC ¶ 3 |
| Order | Order entered by the Court on August 21, 2025, granting Defendants' prior motion to dismiss | ECF. No. 78 |
| Plaintiffs | Lead Plaintiffs and additional plaintiff Michael Lewitter | SAC ¶ 1 |
| Proxy | The proxy statements filed with the SEC by Terran Orbital on September 9, 2024, and October 4, 2024. | SAC ¶ 132 |
| Terran Orbital | Terran Orbital Corporation | SAC at 1 |
| Riffel | Defendant Mathieu Riffel | SAC ¶ 19 |
| Rivada | Rivada Space Networks GmbH | SAC ¶ 4 |
| Rivada Contract | Contract with Rivada to develop, build, and deploy 300 satellites for a satellite constellation under development by Rivada for a total purchase price of $2.4 billion | SAC ¶ 52 |
| Sclavos | Defendant Stratton Sclavos | SAC ¶ 20 |
| SEC | U.S. Securities and Exchange Commission | SAC at 1 |
| Shelf Registration Statement | The "short-form" registration statement on Form S-3 Terran Orbital filed with the SEC on April 3, 2023 | SAC ¶ 62 |
| SOX | Sarbanes-Oxley Act of 2002 | SAC ¶ 231 |

| SPAC | Special Purpose Acquisition Company | SAC ¶ 2 |
|---|---|---|
| Special Committee | The special committee established by Terran Orbital's Board, comprised of Board members James LaChance, Stratton Sclavos, and Thomas Manion | SAC ¶ 69 |

Lead Plaintiffs Steven Verzwyvelt, Jesse Ramirez, Michael O'Neill, and Jill O'Neill, and additional plaintiff Michael Lewitter respectfully submit this memorandum in opposition to the motion to dismiss filed by Defendants on November 20, 2025 [ECF No. 87] (the "Motion").[1]

## PRELIMINARY STATEMENT

The Court previously found that there was a "clear and troubling juxtaposition" between Defendants' repeated assurances about Terran Orbital's liquidity and "what actually occurred." ECF No. 78 at 23 (the "Order").  Indeed, Defendants frequently attempted to quell investor concern by assuring that there was no need to raise more capital, even though they were scrambling behind closed doors to find new sources of capital to keep Terran Orbital operating.  While the Court declined to definitively conclude that the statements were materially misleading, it indicated that its analysis should "inform any future briefing on this issue."  *Id*. at 23.  That issue—whether Defendants made materially false and misleading statements about Terran Orbital's liquidity—is once again before the Court on Defendants' Motion, where all of Plaintiffs' factual allegations must be accepted as true, and all reasonable inferences must be drawn in Plaintiffs' favor.

As alleged in the SAC, investors regularly questioned the Company's liquidity and capital needs and, in response, Defendants repeatedly offered false assurances that concealed the frantic efforts of Bell and others to address Terran Orbital's increasingly dire liquidity problems.  In other words, this case is not about what the financial statements in Terran Orbital's SEC filings reported in terms of cash balances, but about what was happening behind the scenes outside the public eye.

For example, in August 2023, Bell and Hobart told the Board in an undisclosed private

---

[1] All Unless otherwise noted, all capitalized terms have the same meaning set forth in the Second Amended Class Action Complaint filed October 6, 2025 [ECF No. 83] ("SAC"), as reproduced in the Table of Abbreviations.  Citations to "Ex." refer to the exhibits attached to the accompanying Declaration of Justin D. D'Aloia.  Citations to "Defs.' Ex." Refer to exhibits attached to the Motion.  Unless otherwise noted, all emphasis is added and internal citations are omitted..

meeting that the "magnitude of the Company's cash needs" required urgent financing, including a potential capital raise. Yet 12 days later, in response to questioning, Bell unequivocally told investors, "[r]ight now, the last thing any of us want to do is raise additional cash." Similarly, in May 2024, Bell declared that the loss of the historic contract with Rivada would not have "any impact on us going forward . . . it's just upside." By then, however, Terran Orbital's business hinged on Rivada. Indeed, Bell and Hobart informed the Board a week later, in a private meeting, that Terran Orbital needed a cash infusion of up to $120 million just to survive through the end of the year, after determining that it could no longer rely on payments from Rivada. Plaintiffs' scienter allegations are also well-pled. Bell signed a Proxy documenting all of the private internal meetings at which Defendants raised alarm bells about Terran Orbital's deteriorating liquidity and the drastic steps they took to secure infusions of cash. Thus, Defendants knew that the very information that made their statements false or misleading at the time they chose to make them.

As before, Defendants do not dispute that they held numerous internal meetings during which they sounded the alarm bells and proposed drastic actions to keep Terran Orbital afloat. Instead, they attempt to recast the public statements they made and ignore or misconstrue Plaintiffs' well-pled allegations of scienter. But those efforts fail to overcome the facts alleged. Defendants said that they would not seek out additional funding when they were actively doing so. Defendants said that Terran Orbital had enough cash when they warned internally it did not. Defendants said that the Rivada Contract was immaterial when it was mission-critical. And Defendants knew their statements did not accurately reflect the true state of affairs because they attended—or in some instances led—the very meetings where the contrary facts were discussed. And when the truth was exposed, investors who were misled by Defendants' assurances suffered significant losses. This is a textbook case of securities fraud. The Motion should be denied.

**STATEMENT OF FACTS**

A.   **Terran Orbital's Relationship with Lockheed Martin**

Bell founded Terran Orbital in 2013 to build small satellites known as "nanosatellites." SAC ¶ 26.[2]  Prior to March 2021, Bell was a member of Terran Orbital's Board.  SAC *Id.* ¶ 31. In March 2021, he became CEO.  *Id.*  Soon thereafter, Bell decided to dramatically increase Terran Orbital's operations and transition to building larger classes of small satellites used by government agencies to transform the Company into a billion-dollar "unicorn."  *Id.* ¶¶ 33, 39.  To support his aggressive growth plan, Bell took Terran Orbital public in a SPAC transaction at $10 per share in March 2022.  *Id.* ¶ 33, 35-38.  However, the transaction yielded far less proceeds than anticipated, and Terran Orbital still needed significant capital to continue scaling its operations.  *Id.* ¶ 48.  As such, in October 2022, it secured a new $100 million investment from existing investor and customer, Lockheed Martin, bringing its equity interest in Terran Orbital to 33.5%.  *Id.* ¶ 50.

B.   **Terran Orbital's Massive Contract with Rivada**

By the end of 2022, Terran Orbital had not reported a profit since going public, and investors grew concerned about the rate at which it was burning through cash.  SAC ¶¶ 4, 59.  On February 22, 2023, Terran Orbital announced its entry into a landmark $2.4 billion contract with Rivada to build 300 satellites by early 2026, which Bell touted as the largest satellite contract *ever* awarded.  *Id.* ¶¶ 52, 54.  At the time, Terran Orbital generated just $94.2 million in annual revenue. *Id.* ¶¶ 55.  Investors were, understandably, thrilled by this news.  *Id.* ¶ 56.

---

[2] Defendants attach numerous SEC filings to their Motion and assert that the Court may consider such filings on a motion to dismiss.  However, it is well settled that such documents may only be used on a 12(b) motion to show that their content was public, "not to prove the truth of [the] matters asserted therein." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).

C.      **Terran Orbital Struggles to Navigate an Ongoing Liquidity Crisis**

1.      **Defendants Recognize Terran Orbital Faced a Cash Shortfall and Begin Exploring Strategic Alternatives in Early 2023**

By March 21, 2023, investors were concerned about Terran Orbital's capital requirements until it could begin receiving "milestone" payments from Rivada.  SAC ¶¶ 4, 53, 59.  Defendants were, too.  To cover Terran Orbital's anticipated cash requirements, they began preparing a "shelf" registration statement to hold one or more equity offerings.  *Id.* ¶ 62.  Terran Orbital filed the Shelf Registration Statement on April 3, 2023.  *Id.*  In May 2023, it held a Direct Offering of $37 million in shares registered therein.  *Id.*

Despite the offering, management continued to hold discussions with outside parties about financing options, including a capital raise and a company sale.  SAC ¶ 63.  At a private Board meeting on July 19, 2023, Bell advised that present programs would *not* solve Terran Orbital's liquidity issues.  *Id.* ¶ 64.  At another private Board meeting on August 3, 2023, Bell explained the Company was exploring financing because of the "magnitude" of the Company's cash needs, and Hobart reported that another capital raise may be needed to avoid entering a "***negative cash position***" in the coming months.  *Id.* ¶ 65.  Terran Orbital later conducted a $32.5 million CMPO capital raise in September 2023.  *Id.* ¶ 68.

2.      **The Board Authorizes Management to Initiate a Private Sale Process**

On September 11, 2023, in direct response to the "concerns" raised by Bell and Hobart about Terran Orbital's cash needs, the Board established a Special Committee to consider financing options, which, by then, included a ***financial restructuring***.  *Id.* ¶ 69.  On October 6, 2023, the Board authorized management to formally conduct an unsolicited sale process in view of Terran Orbital's "continued cash constraints."  *Id.* ¶ 72.

Meanwhile, Rivada stalled on its payments.  While Terran Orbital received an initial $5

million payment from Rivada in August 2023, subsequent payments were "delayed." *Id.* ¶ 76. On November 14, 2023, Terran Orbital announced that it decided to remove all revenue associated with the Rivada Contract from its 2023 forecast, which reduced its previously issued 2023 revenue guidance from $250 million to $130 million, a total of $120 million, *i.e.* nearly **50%**. *Id.* ¶ 79.

In the fourth quarter of 2023, Terran Orbital received several overdue customer payments. *Id.* ¶¶ 76, 86. However, these payments were insufficient to cover anything more than its ***immediate*** capital requirements and, as such, management continued to proceed with the sale process, ultimately meeting with two prospective bidders in January 2024, including Lockheed Martin. *Id.* ¶¶ 84, 87-88. The other bidder formally withdrew from the process at the end of January. *Id.* ¶ 90. Of course, as an existing investor in Terran Orbital, Lockheed Martin had much to lose if it did not remain involved in the sale process.

### 3. Lockheed Martin Offers to Buy Terran Orbital at a Discount but Backs Out After Learning About Its Severe Liquidity Constraints

On March 1, 2024, Lockheed Martin submitted a non-binding bid to acquire Terran Orbital for $1.00 per share. SAC ¶ 93. At the time, Terran Orbital remained in need of cash and floundered in response to the Lockheed Martin offer. At a private Board meeting on March 21, 2024, Bell raised the possibility of yet another offering to raise ***more capital***. *Id.* ¶ 97. In response to Lockheed Martin's bid, the Special Committee worked with management to collect information about Terran Orbital's liquidity and, ultimately, met with Lockheed Martin on April 16, 2024, to discuss its bid. *Id.* ¶¶ 95, 100. Two weeks later, Lockheed Martin withdrew its offer. *Id.* ¶ 101.

### 4. Terran Orbital Agrees to Be Acquired by Lockheed Martin at a Fraction of Its Previous Offer to Avoid Bankruptcy

After Lockheed Martin withdrew its initial offer, Terran Orbital's liquidity continued to deteriorate. On May 6, 2024, Hobart spoke with a subprime lender who sent him an unsolicited email because Terran Orbital was in such dire need of liquidity. SAC ¶ 102. In addition, the

Special Committee continued to assess Lockheed Martin's offer even though it had been *withdrawn*. *Id.* ¶ 103. Compounding matters, Terran Orbital struggled to collect customer payments. *Id.* ¶ 104.

Just a week later, on May 23, 2024, Bell told the Board that the Company could no longer rely on Rivada to make payments. *Id.* ¶ 106. Because Terran Orbital's cash requirements had become "heavily dependent" on Rivada, this move ***significantly deteriorated*** the Company's cash forecast for the remainder of 2024. *Id.* Indeed, Hobart cautioned that this "constrained the Company's liquidity profile" for the next quarter and that it needed an infusion of ***$120 million*** just to satisfy its cash requirements through year-end. *Id.* Another advisor hired by the Company warned on June 4, 2024, its cash needs may soon render it unable to continue ***operating***. *Id.* ¶ 107.

On June 18, 2024, the Special Committee delivered a counteroffer to Lockheed Martin to be acquired for $1.50 per share and a $1 CVR tied to future contracts. *Id.* ¶ 109. On July 17, 2024, Lockheed Martin informed the Special Committee that it was not interested in any deal with Terran Orbital due to ***concerns*** about its liquidity. *Id.* ¶ 114. The Special Committee met later that day to discuss the response and was forced to consider the fallout from Terran Orbital's ***short-term liquidity issues***. *Id.* The Board, including Bell, was given a report on the matter by the Special Committee at a meeting held two days later, at which the Board directed management to explore immediate finance options and reengage with Lockheed Martin. *Id.* ¶ 115.

On July 23, 2024, Terran Orbital entered into an ATM Agreement for a new issuance of up to $98 million in stock. *Id.* ¶ 116. However, the issuance was conditioned on the receipt of a CEO or CFO certification that there was no material change in Terran Orbital's financial condition since its last Form 10-Q filing with the SEC, which could not be provided until Terran Orbital filed its *next* Form 10-Q in three weeks. *Id.* By then, however, Terran Orbital only had three weeks of

cash left.  *Id.* ¶ 118.  Thus, Terran Orbital's new CFO, Adarsh Parekh, sought Lockheed Martin's consent to engage in a warrant issuance and stated the matter was **urgent**.  *Id.* ¶ 117.

Over the next week, Terran Orbital began preparing for bankruptcy while continuing to engage with Lockheed Martin.  *Id.* ¶¶ 118-21, 124.  Bell also told the Board that Terran Orbital was unable to raise money through the ATM Agreement in time to bridge its cash gap.  *Id.* ¶ 126. Lockheed Martin ultimately offered to buy Terran Orbital for $0.25 per share—a 75% discount to its previous offer—which the Board approved the next day.  *Id.*  Bell later told employees the Board agreed to the buyout because Terran Orbital was unable to make payroll.  *Id.* ¶ 131.  Indeed, the Board already decided that a buyout was preferable to bankruptcy.  *Id.* ¶ 122.

### D. Defendants Misled the Investing Public About Terran Orbital's Liquidity to Salvage the Below-Market Deal with Lockheed Martin and Avert Bankruptcy

Throughout the Class Period, investors and analysts raised questions about Terran Orbital's cash needs, but Defendants repeatedly assured that there was no issue.  For example, on March 21, 2023, an analyst asked about financing options to limit dilution if capital was needed.  SAC ¶¶ 135-36.  Even though management was in the process of preparing a "shelf" registration statement for that very purpose, Bell represented that management had "no concerns" about Terran Orbital's cash at the time.  *Id.*

The misrepresentations continued through 2023.  In response to questions, Bell and Hobart insisted that "the last thing any of us want to do is raise additional cash," and confirmed that Terran Orbital's existing cash flow was sufficient to cover its cash needs until cash flow became self-sustaining in the second half of 2024, even without payments from Rivada.  *Id.* ¶¶ 137-42, 157-58.  As Terran Orbital responded to public criticisms from investors in late 2023 and early 2024, Bell held a series of interviews in which he declared "[w]e are not running out of cash," "cash is stable," and "we have no intentions of raising any more money."  *Id.* ¶¶ 73-90, 143-57.

Case 9:24-cv-81191-EA   Document 88   Entered on FLSD Docket 01/09/2026   Page 19 of 42

Defendants doubled down on these claims in 2024 despite the rapid deterioration of Terran Orbital's liquidity. On May 14, 2024, Bell confirmed in response to questions from analysts and investors that "we feel very comfortable with our liquidity . . . as it stands today," and that the hypothetical loss of the Rivada Contract "doesn't have any impact on us going forward," adding "it's just upside for us." *Id.* ¶¶ 148-50, 159-60. On June 25, 2024, Bell reported "[w]e feel very comfortable about our covenants going into the end of the quarter," adding "no issue on our side." *Id.* ¶151. Then, on July 23, 2024, as Terran Orbital was on the verge of bankruptcy, it issued a press release on the ATM Program, which was expressly made to give "additional confidence that we have adequate capital to successfully manage current and future programs." *Id.* ¶¶ 153-54.

### E.  Investors Are Harmed as the Truth Emerges

The misstatements described above and in the SAC caused Terran Orbital's stock to trade at artificially inflated prices. SAC ¶ 240. As the truth leaked out, Terran Orbital's stock price fell as the inflation introduced by the earlier misstatements came out of the stock price, harming investors as Terran Orbital's stock price plummeted from $10 to $0.25. *Id.* ¶¶ 161-85, 240-42.

## STANDARD OF REVIEW

To survive dismissal, a complaint need only plead facts sufficient to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In making this assessment, the Court must accept all factual allegations as true and draw all reasonable inferences in Plaintiffs' favor. *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011).

## ARGUMENT

### I.  PLAINTIFFS STATE A SECTION 10(B) CLAIM

Section 10(b) of the Exchange Act and the SEC's general anti-fraud rule promulgated thereunder, Rule 10b-5, prohibit false or misleading statements in connection with securities transactions. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(b). Investors enjoy a private right of

- 8 -

action to enforce this rule. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014). To state a claim, a plaintiff must allege: (1) a misstatement or omission of material fact; (2) scienter; (3) a connection to a security transaction; (4) reliance; (5) economic loss; and (6) loss causation. *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1317 (11th Cir. 2019). Such claims are subject to Rule 9(b). *FindWhat*, 658 F.3d at 1296. In addition, under the PSLRA, a plaintiff must specify the "reasons why the statement is misleading" and "state with particularity facts giving rise to a strong inference that the defendant acted with [scienter]." 15 U.S.C. § 78u-4(b)(1), (b)(2). Although such claims have a "stringent pleading standard," they "do not demand sheer perfection or set the bar so high as to make it near impossible to get beyond the dismissal stage." *100079 Canada, Inc. v. Stiefel Labs., Inc.*, 2011 WL 13116079, at *14 (S.D. Fla. Nov. 30, 2011); *see also In re Cabletron Sys., Inc.*, 311 F.3d 11, 30 (1st Cir. 2002) (the PSLRA was designed to "erect barriers to frivolous strike suits," not "make meritorious claims impossible to bring.").

Defendants dispute only elements (1) and (2) and, thus, concede that Plaintiffs have adequately pled all other elements. *See In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) (argument not raised in initial brief is waived); *see also Access Ninja, Inc. v. PassNinja, Inc.*, 2025 WL 753332, at *4 (S.D. Fla. Mar. 10, 2025) (party that does not challenge elements of a claim in initial brief has "forfeited" the argument). As explained below, Defendants' arguments lack merit.

**A.      The SAC Adequately Alleges Misstatements and Omissions of Material Fact**

Rule 10b-5 prohibits not only statements that are "untrue" on their face but also the omission of any facts needed to make statements that are "not misleading." 17 C.F.R. § 240.10b-5(b). That is, Rule 10b-5 forbids misleading "half-truths." *FindWhat*, 658 F.3d at 1305. Thus, statements that are literally true can still mislead by virtue of what they omit. *Id.*; *see also Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 192 (2015) ("[L]iteral accuracy is not enough: An issuer must as well desist from misleading investors by

- 9 -

saying one thing and holding back another."). Incomplete half-truths mislead if they create an "impression of a state of affairs that differs in a material way from the one that actually exists." *MAZ Partners LP v. First Choice Healthcare Sols., Inc.*, 2019 WL 5394011, at *9 (M.D. Fla. Oct. 16, 2019), *R&R adopted*, 2020 WL 1072582 (M.D. Fla. Feb. 14, 2020); *accord In re Altisource Portfolio Sols., S.A. Sec. Litig.*, 2015 WL 11988900, at *4 (S.D. Fla. Dec. 22, 2015). This assessment is made from the perspective of a reasonable investor. *FindWhat*, 658 F.3d at 1306.

### 1.   The SAC Pleads an Array of Present Facts Which Establish That Defendants' Misstatements Were False or Misleading When Made

At a time when investors were keenly focused on Terran Orbital's cash flow and liquidity, Defendants made 18 statements that inaccurately depicted the Company's (i) liquidity and need to raise capital, and (ii) dependence on the Rivada Contract. SAC ¶¶ 135-60. As with the AC, Defendants do not dispute that the SAC identifies the statements, speakers, and settings where they were made with requisite specificity but, instead, maintain that Plaintiffs fail to adequately plead that the statements regarding cash-on-hand and liquidity in ¶¶135, 137-38, 140-41, 143-46, 148-49, 153, 155, and 157-59 were false or misleading when made because they either were prospective or not false at specific moments in time. Mot. 22-24.[3] As explained below, these arguments fail.

**First**, Defendants' statements regarding the Company's liquidity and cash flow are alleged to be false *when made*. Many expressly addressed Defendants' comfort with Terran Orbital's *current* cash position or relayed that they had no *current* plans to raise more capital. SAC ¶¶ 135, 138, 143, 145-46, 148, 153. These statements were false when made because Defendants were *already* taking drastic action to combat ongoing liquidity issues or raise more capital. *Id.* ¶¶ 62-71, 80-82, 87-88, 90, 97-98, 102-04, 106-31. For example, when Bell assured in March 2023 that

---

[3] Notably, Defendants do *not* contest that the statements in SAC ¶¶ 151, 157, 159, or 161 are adequately alleged to be false or misleading and, thus, concede as much. *Egidi*, 571 F.3d at 1163.

- 10 -

management had "no concerns at this point about our cash," they were already exploring financing options, including a stock offering. *Id.* ¶¶ 135-36. Similarly, in August 2023, Bell privately told the Board that a "capital" raise was under active consideration, just twelve days before publicly declaring, "[r]ight now, the last thing any of us want to do is raise additional cash." *Id.* ¶¶ 138-39. Likewise, it was misleading to state without qualification in February 2024 that "we are not looking to raise money" and "we don't need cash" because, by then, Terran Orbital's current cash balance was so insufficient that it continued an unsolicited search for a willing buyer. *Id.* ¶¶ 146-47. And by the time Bell told investors in May 2024 that "we feel very comfortable with our liquidity position as it stands today," he had already suggested conducting another offering to raise needed capital, and Hobart was negotiating with a subprime lender to gain access to cash. *Id.* ¶¶ 148, 150. Indeed, one week later, Hobart told the Board that the Company faced a $120 million shortfall. *Id.* ¶ 106; *see Plotkin v. IP Axess Inc.*, 407 F.3d 690, 698 (5th Cir. 2005) ("[L]ater-emerging facts can, in some circumstances, provide warrant for inferences about an earlier situation."); *accord Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 143 n.13 (2d Cir. 2010).

Further, nearly all statements that touched on Terran Orbital's future cash needs expressed confidence in the sufficiency of its *current* liquidity or cash position. SAC ¶¶ 137, 140-41, 144, 149, 151. But its current cash needs were so dire at the time of these statements that management continued to take urgent action to address them. *Id.* ¶¶ 72, 146. For example, Defendants claim no facts show Hobart's statement that "the cash flow we generate from our programs . . . should cover our needs going forward" was false. Mot. 23. Yet, this statement was made mere *days* after Hobart told the Board that near-term liquidity issues meant the Company would soon enter a "negative cash position" and may be forced to pursue a capital raise—in other words, that cash flow from programs alone would *not* cover needs going forward. SAC ¶¶194-95. The statements

- 11 -

and the facts cannot be reconciled.  *See Plumbers, Pipefitters & Apprentices Loc. No. 112 Pension Fund v. Vestis Corp.*, 2025 WL 2797712, at *6, *9 (N.D. Ga. Sept. 30, 2025) ("optimistic statements" about business false "when in truth and fact [Defendant] was doing the opposite"). Furthermore, a jury could easily find that Defendants' repeated assurances gave the false impression that Terran Orbital did not require external funding or a company sale to continue operating or avoid bankruptcy.  *See In re Jan. 2021 Short Squeeze Trading Litig.*, 620 F. Supp. 3d 1231, 1265 (S.D. Fla. 2022) (statements "denying any concerns about liquidity despite internal and subsequent statements to the contrary" are actionable); *Sheet Metal Workers Loc. 19 Pension Fund v. ProAssurance Corp.*, 600 F. Supp. 3d 1189, 1208 (N.D. Ala. 2021) (similar for problems "acknowledged in a meeting internally" at time of statement).

In addition, Defendants fail to address the fact that the statements were also misleading because they flatly denied strategic moves the Company was, in fact, pursuing.  Throughout the Class Period, Defendants insisted "we are not looking to raise money" because "we don't need cash."  SAC ¶ 146; *see also id.* ¶¶ 138, 143, 145.  But at the time, they were scrambling to raise cash to save their liquidity.  SAC ¶¶ 62, 64-65, 68, 102, 106, 111-16.  Defendant's statements "explicitly downplayed" their approach to generate cash while "actively considering" those same strategies.  *In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2021 WL 4482151, at *3 (S.D.N.Y. Sept. 30, 2021).  Defendants' other liquidity misstatements contributed to this false impression created by asserting that "the cash flow we generate from our programs" would be sufficient and, therefore, not require additional fundraising.  SAC ¶ 137; *see also id.* ¶¶ 135, 140-41, 144, 148-49, 151, 153.

To be sure, Terran Orbital publicly reported its "cash reserves" in SEC filings (Order 11), and Defendants seize on this as though it somehow insulates their statements from scrutiny (Mot. 24).  But statements that a company was "well capitalized" are actionable even if made "in

conjunction with quarterly financial reports" disclosing specific figures. *In re Eros Int'l PLC Sec. Litig.*, 2021 WL 1560728, at *6-7 (D.N.J. Apr. 20, 2021). Here, Defendants' statements were designed to falsely convey that Terran Orbital was "well-capitalized," despite what investors might otherwise conclude from its public SEC filings. For example, as the Court observed, Bell stated that the "last thing any of us want to do is raise additional cash," when in fact, Terran Orbital urgently needed cash, and Defendants "were seriously pursuing pathways to acquire that cash." Order 22. In other words, Terran Orbital's public financial statements did not reveal what was happening privately behind the scenes, and thus, Defendants were able to lull investors into a false sense of security with repeated assurances that Terran Orbital's cash balances were adequate, and therefore Terran Orbital did not need or want to raise cash. In fact, as shown, the reality behind the scenes was exactly the opposite: Defendants were constantly raising alarm bells at undisclosed private meetings about Terran Orbital's deteriorating liquidity and urgent need to raise cash.

Of course, there would be no liquidity issue if "future revenue were realized as Defendants had hoped." Order 23. But as the SAC alleges (SAC ¶¶193-94, 198), at the time of the statements, Defendants knew they could not possibly generate such revenue organically, and thus desperately sought a variety of financing options to keep Terran Orbital afloat. *See Moradpour v. Velodyne Lidar, Inc.*, 2022 WL 2391004, at *13 (N.D. Cal. July 1, 2022) (falsity where defendants touted leadership involvement while "taking actions that directly contradicted" the statements).

Defendants assert that Riffel's statement claiming "no concerns" about meeting the covenant cannot be false because the Company did not breach its covenants in June 2024. Mot. 23. This statement was false *at the time it was made*, regardless of what happened later. The day before making the statement, Riffel had been unable to secure strategic financing, amidst ongoing liquidity issues. SAC ¶¶ 201-202. Shortly thereafter—and before Bell repeated a very similar

statement—one of Terran Orbital's strategic advisors concluded that the Company may be *unable to continue operating*.  SAC ¶¶ 205-206.  While the Company did meet the covenant that quarter—barely—by the end of the next quarter, it was no longer able to make payroll and moved ahead with the fire sale that extinguished the Company.  SAC ¶¶ 130-31.  Defendants also purport to provide 'additional context' that does not change the meaning of the exchange at all.  Mot. 24.  In response to questions about the covenant, the statements asserted that there were no concerns, misleading investors by obscuring liquidity issues that consumed the Company soon thereafter.

**Second**, Defendants' statements about Rivada misled investors about Terran Orbital's *current* reliance on the Rivada Contract.  SAC ¶¶ 155-60.  For example, Defendants denied that the Rivada Contract was a significant part of Terran Orbital's 2023 revenue outlook, if any, when, in fact, it accounted for nearly *half* of the outlook at the time.  *Id.* ¶¶ 155-56; *see also id.* ¶¶ 106, 222.  Similarly, Bell assured in May 2024 that Rivada was not a cornerstone of Terran Orbital's business model and simply represented a source of additional "upside."  SAC ¶¶ 157-59.  By then, however, Terran Orbital's business plan relied heavily on receiving payments from Rivada.  *Id.* ¶ 160.  Indeed, the decision to no longer rely on Rivada a week later ***significantly deteriorated*** its cash forecast for 2024 and intensified the liquidity crisis.  *Id.* ¶ 106; *see Novak v. Kasaks*, 216 F.3d 300, 312 (2d Cir. 2000) (later write-off supports falsity when statements were made).

### 2. Defendants' Remaining Attempts to Categorically Exempt Their Misstatements from Liability as a Matter of Law Are Meritless

Given the above, Defendants attempt to argue that the vast majority of their misstatements are exempt from liability as a matter of law by raising several baseless categorical challenges.

**PSLRA Safe Harbor**.  Defendants first claim the statements in SAC ¶¶ 137, 140, 149, 155, and 159 are protected by the PSLRA safe harbor, codified at 15 U.S.C. § 78u-5.  Mot. 24-

- 14 -

27.[4]

The safe harbor is limited by its terms to "forward-looking statement[s]." 15 U.S.C. § 78u-5(c)(1).  As such, it neither protects statements that "represent present facts," *FindWhat*, 658 F.3d at 1299, nor any "distinct present-tense . . . component[]" in mixed present/future statement. *Carvelli*, 934 F.3d at 1328.  Some disclosures were found to include "forward-looking statements" to the extent that they contain statements concerning "future payments and prospects."  Order 13-14.  As discussed in Point I.A.1, these statements also contained discrete representations about "ongoing cash constraints, the serious exploration of alternative financing options, and the importance of the Rivada contract," which were ***not*** forward-looking.  *Id.* 23.  "An otherwise actionable omission concerning past or present problems . . . cannot be sanitized by forward-looking statements about similar problems."  *In re Towne Servs., Inc. Sec. Litig.*, 184 F. Supp. 2d 1308, 1320 (N.D. Ga. 2001).  Similarly, by indicating that "Tranche 1 is by far the largest part" in response to a question about whether the revenue outlook relied on Rivada, Bell signaled that those payments were not part of—or, at the very least, not a large part of—the *present* model.  *Id.*

Regardless, none of the vague cautionary statements collected by Defendants were "meaningful," as they must be for the safe harbor to apply.  15 U.S.C. § 78u-5(c)(1)(A)(i).  To be "meaningful" for the safe harbor, cautionary language must warn of "important factors that could cause actual results to differ . . . similar to that actually realized."  *Carvelli*, 934 F.3d at 1326-27.  General warnings that customer payments may not arrive, revenues may be insufficient to turn a

---

[4] Notably, Defendants do *not* argue that a nearly identical statement in SAC ¶ 151 is protected by the safe harbor.  There is good reason why:  Bell failed to give *any* warning during the third-party interview that identified any type of statement as "forward-looking," much less specify any documents containing a description of the factors that could cause actual results to differ.  *See Helwig v. Vencor, Inc.*, 251 F.3d 540, 558-59 (6th Cir. 2001) (press release and SEC filings lacking statement "designat[ing]" predictions as "forward-looking" not protected by safe harbor); *Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 877 (N.D. Cal. 2023) (same for analyst call).

profit, or that it may be unable to secure financing—*i.e.*, the type collected by Defendants (Mot. 26-27)—do not warn of a liquidity crisis raising the risk of bankruptcy or a forced sale.

More fundamentally, "cautionary language can't be 'meaningful' if it is nothing more than a front for present problems." *Carvelli*, 934 F.3d at 1327; *In re 21st Century Holding Co. Sec. Litig.*, 2008 WL 5749572, at *13 (S.D. Fla. Nov. 7, 2008) ("Cautionary language can never be 'meaningful' if it warns of risks that have already materialized"). By posing the dangers as abstract possibilities about what "may" or "could" occur (Mot. 26-27), the disclosures "impl[ied] that no such problems were on the horizon." *Asher v. Baxter Int'l, Inc.*, 377 F.3d 727, 733 (7th Cir. 2004). This is a classic case of describing "possible future risks while failing to disclose known facts suggesting risks that had already happened." *Pritchard v. Apyx Med. Corp.*, 2020 WL 1180731, at *7 (M.D. Fla. Mar. 11, 2020); *see also In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 2010 WL 6352664, at *3 (S.D. Fla. Sept. 9, 2010) (general warning about "potential impact of an economic slowdown" does not "cure" failure to disclose "actual deterioration of the . . . loans").

Separately, the safe harbor offers no protection because Defendants *knew* the disputed statements were false or misleading. 15 U.S.C. § 78u-5(c)(1)(B)(ii)(II). The SEC has long viewed forward-looking statements to communicate that (1) the statement is genuinely believed; and (2) there is a reasonable basis for the belief. *Slayton v. Am. Express Co.*, 604 F.3d 758, 774 (2d Cir. 2010) (citing SEC *amicus* brief). As discussed in Point I.B.1, Bell and Hobart directly informed Terran Orbital's Board, including Sclavos, of serious liquidity issues. *See In re Catalina Mktg. Corp. Sec. Litig.*, 390 F. Supp. 2d 1110, 1116 (M.D. Fla. 2005) (actual knowledge inferred from internal discussions by speakers); *Marrari v. Med. Staffing Network Holdings, Inc.*, 395 F. Supp. 2d 1169, 1189 (S.D. Fla. 2005) (actual knowledge inferred from fact defendants were "informed" of negative trends). Thus, Defendants misplace reliance on *Einhorn v. Axogen, Inc.*, where the

- 16 -

complaint *disclaimed* any allegations of intentional wrongdoing to more easily state a claim under the Securities Act of 1933 (which does not require scienter).  42 F.4th 1218, 1255 (11th Cir. 2022).

**Puffery**.  Defendants renew their argument that the statements in SAC ¶¶ 137-38, 143, 145-46, 149, 153, 157-58 are inactionable "puffery" (Mot. 27-28), *i.e.*, statements so "[e]xcessively" vague or optimistic they are deemed immaterial as a matter of law.  *Carvelli*, 934 F.3d at 1320.  Materiality turns on whether there is a "substantial likelihood" a reasonable investor would find the information "important."  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449-50 (1976).  Because this requires a "delicate assessment[] of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him," this is best left to "the trier of fact."  *Carvelli*, 934 F.3d at 1320.  As such, a claim should not be dismissed for failure to plead materiality unless the alleged misstatement is "so obviously unimportant . . . that reasonable minds could not differ."  *Id.*  Defendants defy this standard in two ways.

Information that is "objectively verifiable" cannot be dispensed as mere puffery at the pleading stage.  *Theodore v. Purecycle Techs., Inc.*, 2022 WL 20157415, at *9 (M.D. Fla. Aug. 4, 2022) (*Purecycle I*); *City of Warren Gen. Emps.' Ret. Sys. v. Teleperformance SE*, 746 F. Supp. 3d 1395, 1407 (S.D. Fla. 2024) (*Teleperformance II*) (same when statements use "concrete language").  Statements such as "cash flow we generate from our programs . . . should cover our needs going forward," "the last thing any of us want to do is raise additional cash," "[w]e are not running out of cash," or "Rivada is great, but we don't rely on Rivada" all fail that litmus test.  SAC ¶¶ 137-38, 143, 158.[5]  For that reason, the Court has already rejected this argument for all these statements, as misrepresentations of cash flow or the importance of the Rivada contract

---

[5] Regarding the only statement held to be puffery by the Court that remains pled here, Plaintiffs respectfully submit that the statement that Terran Orbital "ha[d] adequate capital to successfully manage current and future programs" does not differ from other statements about current liquidity and cash flow that the Court held could be actionable.  SAC ¶153.

"would have altered the total mix of information" available to "a reasonable investor."  Order 19-20 (finding puffery for only one currently pled statement (AC ¶ 157, SAC ¶ 153)).

Further, as a concept rooted in materiality, whether a statement is puffery depends heavily on "context."  *Carvelli*, 934 F.3d at 1320.  Here, the statements about Terran Orbital's liquidity and Rivada were paramount to investors, who were "concerned" about Terran Orbital's eroding cash balance and, thus, focused on the timing and impact of the Rivada Contract.  SAC ¶¶ 4, 54-56, 59.  That is precisely why a block of investors publicly protested Defendants' cash management.  *Id.* ¶ 73.  This context negates Defendants' half-hearted materiality challenge.  *Vestis*, 2025 WL 2797712, at *10 (statements not puffery when made at "pivotal" moment on topics "essential" to business); *ProAssurance*, 600 F. Supp. 3d at 1215 (statements not puffery when made to "allay investor concerns").  That several of these statements were made in direct response to investor and analyst inquiry (SAC ¶¶ 137-38, 149, 157) confirms their materiality.  *See Neb. Inv. Council v. Fidelity Nat'l Info. Servs., Inc.*, 2024 WL 4349125, at *4 (M.D. Fla. Sept. 30, 2024) (materiality evident when "made in response to specific questions from investors").

**Opinions**.  Defendants seek to immunize statements in SAC ¶¶ 138, 144, 145, 148, 152-53, 155, and 159, where they expressed comfort with Terran Orbital's liquidity or stated that it had sufficient cashflows to reach "breakeven" in 2024, as inactionable opinions. Mot. 29-30. Opinions convey a "sentiment" or a "view," as opposed to a "fact," which is "determinate [and] verifiable." *Omnicare,* 575 U.S. at 183-84.  Here, the Court has already held that confirming "[y]es, we do," in response to the question "do you have enough cash to make it through to cash flow positive" is a statement of verifiable fact (AC ¶ 159; SAC ¶ 157), and that remains so.  Order 23-24.

Further, all remaining statements are actionable.  As explained in *Omnicare*, an opinion is "untrue" if it is not honestly held by the speaker but, alternatively, is "misleading" if it lacks a

reasonable basis.  575 U.S. at 185-89.  This is so because investors expect opinions to "fairly align[] with the information in the issuer's possession," especially senior officers.  *Id.*

Here, the Court held that the remaining statements were not actionable because, as in *Carvelli*, 934 F.3d at 1323, there was no allegation that "defendants didn't truly believe what they [said]."  Order 18.  Plaintiffs respectfully submit that this cannot be squared with the allegation Bell and Hobart were the very ones who repeatedly raised ***concerns*** behind closed doors about Terran Orbital's current cash position.  *See Chabot Walgreens Boots All., Inc.*, 2023 WL 2908827, at \*15 (M.D.Pa. Mar. 31, 2023) (directing others to "confidentially develop a Plan B" supported finding that public opinions by same executive expressing confidence in merger were "insincere").

Furthermore, *Carvelli* focused solely on subjective falsity because that was the only argument raised by the appellant there.  934 F.3d at 1323.  But *Omnicare* is not so limited.  Even if opinions are truly held, "a defendant can be held liable" if those opinions "do not fairly align with [internal] information."  *SEC v. Mufareh*, 2024 WL 3952437, at \*10 (M.D. Fla. Aug. 27, 2024).  Here, Defendants repeated assertions that they had *no* concern with Terran Orbital's current liquidity and that it could sustain on *existing* cashflows were inconsistent—indeed, contrary—to the very information discussed in private Board meetings they attended.  *See Vestis*, 2025 WL 2797712, at \*9 (defendants "remain liable . . . because they knew facts inconsistent with [their] opinions"); *Shafer v. Global Payments, Inc.*, 2024 WL 2789447, at \*5 (N.D. Ga. Mar. 29, 2024) (opinions made when speaker is "on notice" of facts undermining them are actionable).

Contrary to their half-hearted argument (Mot. 30), no "hindsight" is required as Defendants were on notice of these issues *before* offering their views publicly.  *See In re Eagle Building Techs., Inc. Sec. Litig.*, 319 F. Supp. 2d 1318, 1329-30 (S.D. Fla. 2004) (allegations not grounded in "hindsight" when based on information available at time of statements); *In re Theragenics Corp.*

- 19 -

*Sec. Litig.*, 137 F. Supp. 2d 1339, 1349 (N.D. Ga. 2001) (same).  Defendants' remaining argument

that investors shouldn't have believed they had "no concerns" given the figures disclosed in Terran

Orbital's financial reports (Mot. 29-30) exposes the fallacy of those opinions.  Unlike Defendants,

investors lack perfect information about Terran Orbital and were entitled to rely on those

opinions.[6]

### B.        The SAC Raises a Strong Inference of Scienter

Scienter is a state of mind embracing "intent to defraud" as well as "severe recklessness."

*FindWhat*, 658 F.3d at 1299; *see also TSG Water Res., Inc. v. D'Alba & Donovan Certified Pub.*

*Accts., P.C.*, 260 F. App'x 191, 202 & n.2 (11th Dec. 2007) (failing to distinguish between "intent"

and "recklessness" is improper).  Severe recklessness arises when there is "a danger of misleading

buyers" that "is so obvious that the defendant must have been aware of it."  *FindWhat*, 658 F.3d

at 1300.  Statements made when the speaker "knew facts suggesting the statements were inaccurate

or misleadingly incomplete" is "classic evidence of scienter."  *Short Squeeze*, 620 F. Supp. 3d at

1253; *see also SEC v. Revolutionary Concepts, Inc.*, 2022 WL 386085, at *10 (11th Cir. Feb. 9,

2022) (failure to disclose contrary facts is "classic . . . evidence of scienter").  Whether defendants

"actually believed" their statements is "irrelevant" to whether they recklessly disregarded contrary

information.  *Spitzberg v. Hou. Am. Energy Corp.*, 758 F.3d 676, 686 (5th Cir. 2014).

Importantly, scienter can be inferred from "direct" or "circumstantial" evidence.  *Mizzaro*

*v. Home Depot, Inc.*, 544 F.3d 1230, 1249 (11th Cir. 2008); *see also Nathenson v. Zonagen Inc.*,

---

[6] Defendants stress that Hobart and Riffel only made a single misstatement, and Sclavos did not make any.  Mot. 22-23.  This ignores that, as alleged (SAC ¶¶ 135, 137-38, 140, 141, 148-49, 157, 149), they are liable for being present when others "uttered a false statement" and "failed to correct it."  *Wellcare Health Plans, Inc. v. Farha*, 2009 WL 3853592, at *6 (M.D. Fla. Mar. 30, 2009); *see also In re Bos. Sci. Corp. Sec. Litig.*, 646 F. Supp. 3d 249, 276 n.29 (D. Mass. 2022) (party who "impliedly adopted . . . misstatements" by others can properly be considered a "maker" under *Janus*).

267 F.3d 400, 410 (5th Cir. 2001) ("Congress plainly contemplated that scienter could be proven by inference, thus acknowledging the role of indirect and circumstantial evidence").  To qualify as "strong" under 15 U.S.C. § 78u-4(b)(2), the inference of scienter must be "cogent and at least as compelling as any opposing inference" drawn from the facts alleged.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).  The test is whether "*all* of the facts alleged, taken collectively, give rise to a strong inference . . . not whether any individual allegation, scrutinized in isolation" does so.  *Id.* at 323.  Notably, the inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible.'"  *Id.* at 324.  Rather, a tie among competing inferences favors the plaintiff.  *Id.*  Here, the SAC pleads a host of facts that, individually and in concert, raise an overwhelming inference of scienter for each Defendant.

### 1.    The SAC Pleads Direct Evidence of Scienter for Each Defendant Through Contemporaneous Knowledge

The Proxy, signed by Bell, details Defendants' direct knowledge of the relevant liquidity issues and the importance of Rivada throughout the Class Period.  SAC ¶¶ 189-208.  The Court did not previously reject these scienter allegations but, rather, required an amended complaint to clarify "how the statements in the Proxy correspond to and reveal fraudulent intent or severe recklessness in the actions or statements by each Defendant."  Order 26.  The SAC does just that by specifying the responsibility of each Defendant for the knowledge admitted in the Proxy and which statements were made shortly before or after.  *See FindWhat*, 658 F.3d at 1300 (finding scienter for statements made after an internal meeting where illegal source of revenue was discussed); *see also SEC v. GenAudio Inc.*, 32 F.4th 902, 930-31 (10th Cir. 2022) (similar where defendant participated in a series of behind closed doors preliminary meetings that undermined public statements about potential deal with Apple); *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1531 n.3 (8th Cir. 1996) (similar where misstatement came after board meeting where concealed

misappropriations were discussed).   These post-hoc admissions strongly evince Defendants' scienter at the time of the statements.  *See Vestis*, 2025 WL 2797712, at \*10 ("Plaintiffs' task is made easier, however, by [Defendants's] own admissions."); *see also Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009) (post-hoc admissions not "fraud by hindsight" when they "tend to prove [defendants'] state-of-mind at the time of their misleading statements and omissions").

As to Bell, the SAC pleads his direct knowledge of the omitted facts based on his presence and statements at Board meetings discussing Terran Orbital's liquidity crisis.  For example, on August 3, 2023, following up on a previous meeting where Bell had told the Board that program revenue "would not solve the Company's near-term liquidity issues," Bell updated the Board on discussions with private equity and other funding sources, and heard Hobart tell the Board that the Company could enter a "negative cash position in the coming months, which may necessitate pursuing a capital raise."  SAC ¶¶ 193-94.  Yet, ***mere days later***, Bell told investors that "the last thing any of us want to do is raise additional cash" and "right now, everything is lining up well for us."  *Id.* ¶ 195.  Similarly, on October 6, the Board—which included Bell—voted to authorize Jefferies to initiate a sales process as a direct result of cash constraints.  *Id.* ¶ 196.  Yet, ***ten days later***, Bell told the market that "this level of cash is expected to be sufficient to cover our capital investments and operating use."  *Id.* ¶ 197.  While Bell insisted publicly that "we don't need cash" and "[w]e have no need to raise additional capital," behind closed doors, he participated in a Board meeting discussing an "at-the-market" facility to raise capital.  *Id.* ¶¶ 198-200.[7]  Thus, Bell was

---

[7] Defendants attempt to insulate Bell's quotes given to newspapers from liability by relying on *In re Republic Servs., Inc. Sec. Litig.*, 134 F. Supp. 2d 1361 (S.D. Fla. 2001).  There, however, an article *interpreting* defendants' statements was presented to establish *scienter*. *Id.*  That case did not, and could not, bar consideration of statements provided to third-party publications by a defendant. *See, e.g., In re Scientific-Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351, 1356 (N.D. Ga. 2002) (actionable statements include *Atlanta Constitution* interview)*, aff'd*, 374 F.3d 1015

privately participating in the Company's search for strategic solutions for cash issues while bluntly denying that there were any cash problems publicly throughout the Class Period. *Edge v. Tupperware Brands Corp.*, 2023 WL 6310236, at *6 (M.D. Fla. Sept. 28, 2023) (scienter shown where defendant was "internally acting to address certain risks but concurrently the Company was continuing to mislead investors about the significant problems associated with those risks.").

In addition, Bell had direct contemporaneous knowledge of Rivada's payments through constant direct communication with Rivada's CEO. Bell said he performed "extreme due diligence" into the sources of funding for their contract, that the Rivada CEO "kept us engaged almost daily," and that the two exchanged multiple text messages on the timing of payments. SAC ¶¶ 210-12; *see, e.g.*, *Anastasio v. Internap Network Servs. Corp.*, 2011 WL 13124500, at *15 (N.D. Ga. Sept. 30, 2011) (scienter supported where defendant was "kept apprised on an almost daily basis"). Necessarily, all of these topics touch on the scale of those payments and evince Bell's understanding of their importance, especially considering Bell's knowledge of the liquidity issues.

The SAC pleads Hobart's direct knowledge as well. Hobart, like Bell, was present at the August 3 meeting where Bell outlined the "magnitude of the Company's cash needs" and recommended engaging Jefferies to sell the Company. SAC ¶ 194. Hobart specifically advised the Board that the Company could soon enter a "negative cash position in the coming months, which may necessitate pursuing a capital raise. *Id.* Yet, *mere days later*, on August 12 that Hobart told the market that "the cash flow we generate"—*i.e.*, not additional capital raises—"should cover our needs going forward." SAC ¶ 195. Hobart also said nothing when, in the same call, Bell denied that "any of us" want to raise additional cash. *Id.* Given Hobart's discussions with the

---

(11th Cir. 2004); *In re Teco Energy, Inc. Sec. Litig.*, 2006 WL 2884960, at *2, 7-8 (M.D. Fla. Oct. 10, 2006) (actionable statement is quote in *Wall Street Journal*); *City of St. Clair Shores Gen. Employees' Ret. Sys. v. Lender Processing Servs., Inc.*, 2012 WL 1080953, at *3 (M.D. Fla. Mar. 30, 2012) (defendants liable for being "quoted in . . . articles in their official capacities").

Board about liquidity at that and other meetings, it is reasonable to infer that he was similarly monitoring and apprised of the Company's cash position throughout the Class Period. *Kohut v. KBR, Inc.*, 2015 WL 11995250, at *13, *26 (S.D. Tex. Sept. 3, 2015) (complaint "does not rest on 'must have known' allegations" where "personal involvement" in process is pled).

As to Riffel, the SAC pleads that he received information about Terran Orbital's fragile cash position immediately before making his misstatement. On May 13, 2024, Riffel spoke to Lender R about financing, and the next day received terms beyond what the Company could stomach. SAC ¶¶ 102, 201.[8] The Proxy discusses no other financing offers. *See* Ex. 1. The *same day* as receiving the terms, Riffel blanketly asserted that "[w]e do not have any concerns" meeting the Company's liquidity obligations. SAC ¶ 202. He did not disclose the contrary information he had freshly received or temper his remarks. As with Hobart, the fact of Riffel's involvement in the failed attempt to secure financing raises the inference that he was also involved in the other fundraising transactions through the Class Period. *KBR, Inc.*, 2015 WL 11995250, at *26

So too as to Sclavos. As a member of the Board, Sclavos was privy to the concerns raised by management at all meetings throughout the Class Period, including, for example, Bell's statements about "near-term liquidity issues," Hobart's description of the risk of a "negative cash position," and the Board's actions in response. SAC ¶¶ 193-94, 196,205, 207. Indeed, Sclavos was one of the members on the three-person Special Committee formed to focus on these very issues. SAC ¶ 196. Defendants object that the SAC "mentions [Sclavos] in just two paragraphs" (Mot. 20), ignoring any references to the Board or to the Special Committee. Defendants raise form over substance. *See, e.g.*, *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 661–

---

[8] Defendants disingenuously raise "confusion" about when Riffel spoke with the lender, highlighting that the AC pleads May 14, 2022 and the SAC pleads May 13, 2024. Defendants are mistaken. Mot. 20. The AC clearly pled that they spoke on May 14, 2024, consistent with the Proxy (Ex. 1), whereas the SAC inadvertently pleads May 13, 2024. AC ¶ 102; SAC ¶ 201.

62 (S.D.N.Y. 2017) (rejecting similar argument where statement is "expressly attributed" to Board and the Individual Defendants were alleged to be members of the Board).  Furthermore, the fact that Sclavos had *access* to the information discussed in these meetings—including all presented to the Special Committee—is sufficient.  *See Doller v. Hertz Glob. Holdings, Inc.*, 2025 WL 2896919, at *6 (M.D. Fla. Oct. 10, 2025) ("[A]ccess to such information alone suffices here.").

### 2. The SAC Alleges Compelling Individualized Motives

While lack of a motive to defraud is not "fatal," allegations of "personal financial gain may weigh heavily in favor of a scienter inference." *Tellabs*, 551 U.S. at 325; *accord Haddad v. RAV Bah., Ltd.*, 2008 WL 11399704, at *5 (S.D. Fla. Nov. 6, 2008).  The SAC incorporates allegations from the AC, which the Court previously held demonstrate "the fact that Bell and Hobart stood to profit from the Lockheed Martin acquisition" and stood to lose everything if the Company entered bankruptcy.  Order 28.  This motive combines with the SAC's well-pled allegations of contemporaneous contrary knowledge to support the strong inference of scienter.  *See, e.g., Scientific-Atlanta,*, 239 F. Supp. 2d at 1365–66 (scienter pled through knowledge and motive).

Defendants offer up the same arguments previously rejected by the Court: (i) that the "change in control" allegations are "generic," and (ii) that a lack of insider sales defeats motive.  Mot. 11-12.  The argument about the "generic" nature of Bell and Hobart's bonuses ignores the unique and well-pled allegations about the "change-in-control" provisions, under which Bell and Hobart stood to profit handsomely by as much as up to *three times* their base salary.  SAC ¶¶ 213-19.  Far from a general desire for higher compensation, this is a bespoke payout specific to the very transaction at issue.  *See Theodore v. Purecycle Techs., Inc.*, 2023 WL 4035880, at *9 (M.D. Fla. June 15, 2023) (*Purecycle II*) ("personal financial incentive to consummate a merger" from merger bonus is a proper motive).  Indeed, unlike executives of other companies, these provisions gave Bell and Hobart interests in the merger that admittedly *differed* from stockholders.  SAC ¶

218. Defendants attack these allegations by again relying on a case that declined to credit a change-in-control clause motive when it was based on "speculation and conjecture." *Waterford Twp. Gen. Emps. Ret. Sys. v. Suntrust Banks, Inc.*, 2010 WL 3368922, at *4 (N.D. Ga. Aug. 19, 2010). As Plaintiffs previously showed, and left unanswered in Defendants' papers, the merger allegations in *Suntrust* were based on "speculation and conjecture" because there were no allegations of a pending merger. *See* ECF. No. 72-3 (complaint). That is simply not the case here.

Defendants' argument that a failure to show a lack of insider sales defeats scienter fails because other motives are pled. *See In re Thornburg Mortg., Inc. Sec. Litig.*, 695 F. Supp. 2d 1165, 1194 (D.N.M. 2010) (other motive allegations "fill[] the gap left by the lack of [such] activity."), *aff'd sub nom. Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190 (10th Cir. 2013); *see also Fla. St. Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 663 (8th Cir. 2001) (lack of stock sales not dispositive when there are "other motives, such as the hope of huge bonuses"). Here, although Defendants held shares, many were not yet vested—meaning they could ***not*** be sold—as confirmed by the Form 4 filings they submitted. Defs.' Exs. 9-16. Triggering the change-in-control provision would allow Defendants to monetize *all* those shares, rather than only a fraction. SAC ¶ 214. Thus, Defendants' speculation and conjecture about what Bell "could have earned if he had sold his stock during the Class Period" (Mot. 12) is entirely without merit.

Defendants also ignore a separate, additional motive pled: the "existential" threat to Terran Orbital's survival that required it to raise new capital or attract a strategic buyer, both of which would be hindered if its liquidity struggles became public. SAC ¶¶ 220-21. Defendants attempt to liken this to a "generic" motive held by all companies to increase profits and raise capital. Mot. 12. But these allegations—unique and specific to Terran Orbital's survival—set this motive apart from those held by *all* companies. *See Sood v. Catalyst Pharm. Partners Inc.*, 2014 WL 1245271,

at *7 (M.D. Fla. Mar. 26, 2014) (motive pled for issuer when "remaining listed on the public exchange was essential to its survival"). In fact, this very argument was recently rejected in *Short Squeeze*, which credited the allegation that the corporate defendant's "financial desperation" supplied a proper motive. 620 F. Supp. 3d at 1252-55. Although the Eleventh Circuit has not spoken on the topic, this is fully consistent with the law in other Circuits. *See Frank v. Dana Corp.*, 646 F.3d 954, 960 (6th Cir. 2011) (need for company to secure "loans imperative for its survival" provided proper motive); *Cabletron*, 311 F.3d at 39 (motive pled when complaint alleged that "very survival" of company was on the line).

### 3. The Core Operations Doctrine Supports an Inference of Scienter

The core operations doctrine reflects a commonsense inference that "officers of a company have knowledge of critical facts related to its core operations." *Teleperformance II*, 746 F. Supp. 3d at 1412. Defendants stress that it can "rarely" give rise to a strong inference of scienter on its own. Mot. 18. Even so, courts—including in the case they rely on—all agree that such allegations can "bolster" the inference of scienter, especially when coupled with other pertinent allegations. *Teleperformance II*, 746 F. Supp. 3d at 1412; *see also In re Flowers Foods, Inc. Sec. Litig.*, 2018 WL 1558558, at *14 (M.D. Ga. Mar. 23, 2018).

Here, Terran Orbital's very "survival" hinged on finding a solution to its worsening liquidity profile, which was the subject of intense focus, discussed repeatedly at Board meetings with the input of numerous third-party advisors who worked with senior management. SAC ¶¶ 220-21. Incredibly, Defendants claim that the SAC does not allege facts that Defendants "ignored relevant information" about "items that could affect Terran's liquidity." Mot. 18-19. The SAC alleges in exacting detail that Bell, Hobart, Riffel, and Sclavos actively discussed at regular and emergency meetings "items that could affect Terran's liquidity," but hid this information in their public statements. *See* Section I.B.1. Similarly, the Rivada Contract represented a whopping 92%

- 27 -

of Terran Orbital's future "backlog" and was a critical, if not the single largest, component of its business forecast in 2023 and 2024.  SAC ¶¶ 106, 222.  In light of the ongoing liquidity issues and internal discussions as to whether customer payments would be sufficient, the commonsense inference is that Terran Orbital's reliance on the Rivada Contract was included in these discussions.  Courts have found the inference applicable on far weaker facts.  *See City of Warren Gen. Emps.' Ret. Sys. v. Teleperformance SE*, 2024 WL 2320209, at *19 (S.D. Fla. May 22, 2024) (*Teleperformance I*) (business that was a "significant driver of [future] growth" permitted core operation inference); *Pub. Emps. Ret. Sys. of Miss. v. Mohawk Indus., Inc.*, 564 F. Supp. 3d 1272, 1302 (N.D. Ga. 2021) (same for business that accounted for 40% of sales); *see also Plotkin*, 407 F.3d at 699-700 (core operation inference proper when "IPaxess was a struggling company" and new "agreements" would bring in much needed revenue).

### 4.    A Wealth of Other Facts Confirms the Inference of Scienter

A variety of other facts further substantiate the inference of scienter.  **<u>First</u>**, Bell frequently described Terran Orbital's liquidity and cash needs as well as the Rivada Contract in response to investor and analyst questions on the subject.  SAC ¶¶135-59.  Making misstatements on a subject "repeatedly" can "more strongly evince an inference that the defendant spoke with scienter." *Purecycle II*, 2023 WL 4035880, at *6 (collecting cases).  Indeed, doing so in response to analyst questions "demonstrate[s] that the individual Defendants' statements were not accidental." *Buqueras v. Sharecare, Inc.*, 2025 WL 3183000, at *10 (N.D. Ga. Sept. 25, 2025); *see also Teleperformance I*, 2024 WL 2320209, at *19.  **<u>Second</u>**, Bell held himself out as an expert on the Rivada Contract, frequently citing texts with Rivada's CEO about individual payments and touting "almost daily" engagement with him.  SAC ¶¶ 85, 211-12.  Defendants' objections about what information Rivada would have provided (Mot. 19) misses the point.  The importance of Rivada to Terran Orbital did not rely on information received from Rivada but, rather, how Defendants

- 28 -

chose to incorporate payments from Rivada in their business plans—a matter any competent executive would be aware of given the magnitude of the contract and how much attention Bell paid to it. *See Thorpe v. Walter Inv. Mgmt., Corp.*, 111 F. Supp. 3d 1336, 1373-74 (S.D. Fla. 2015) (scienter bolstered where defendant "held himself out to be knowledgeable").

### 5.    The Inference of Scienter is Overwhelming

The SAC pleads a narrative that raises the clear and compelling inference that Defendants sought to preserve their equity interests and outsized buyout payments by staving off bankruptcy, publicly denying any liquidity problems existed while secretly scrambling to find solutions. Defendants assert that their public statements were merely "mistaken confidence." Mot. 21 (citing *Kadel v. Flood*, 427 F. App'x 778, 780 (11th Cir. 2011). Unlike in *Flood,* however, here the confidence was only in public. Behind closed doors, there were frank admissions that the Company's cash position was tenuous and needed immediate solutions. *Vestis*, 2025 WL 2797712, at *11 (inference defendants were "uninformed but honest" is "not more likely than the alternative" that defendants knew but hid the truth until "forced . . . to come clean"). To the extent Defendants had any purported "optimism," as Defendants claim, that belief was undeniably formed with full knowledge of the severity and scope of Terran Orbital's growing liquidity crisis and the actions they took to avert insolvency or bankruptcy. That belies the innocent inference. *See In re Emergent BioSolutions Inc. Sec. Litig.*, 2023 WL 5671608, at *26 (D. Md. Sept. 1, 2023) (defendants "may well have been working in good faith to manufacture vaccine drug substance rapidly" but complaint raised a strong inference that "while doing so, they omitted the myriad known deficiencies at [the facility] that undercut the success of that endeavor and did so with reckless disregard for how those omissions could mislead investors"). Further, the inference of simple optimism is unpersuasive for statements that were not forward-looking or opinions but, rather, false representations of current fact. *Buqueras*, 2025 WL 3183000, at *10. Indeed, it is

- 29 -

difficult to conceive *any* nonculpable inference for why Defendants would conceal known adverse facts and repeatedly make public representations to the contrary. Defendants argue that they "assessed strategic alternatives," yet the pled misstatements show that they *repeatedly denied assessing strategic alternatives*. SAC ¶¶ 81, 138, 143, 145-46. At a bare minimum, there is "at least a fifty-fifty chance that the individual defendants knew about the alleged fraud (or were severely reckless in not knowing)." *Mizzaro*, 544 F. 3d at 1249.

## II. PLAINTIFFS STATE A CONTROL PERSON CLAIM

A claim under Section 20(a) of the Exchange Act requires a primary violation and requisite control by a defendant. *Carvelli*, 934 F.3d at 1330. Defendants move to dismiss for failure to plead (i) a "culpable participation," (ii) control only as to Sclavos, or (iii) a primary violation. Mot. 30. Twice now, Defendants have failed to address binding Eleventh Circuit law specifically rejecting a culpable participation requirement. *See Laperriere v. Vesta Ins. Grp., Inc.*, 526 F.3d 715, 723-25 (11th Cir. 2008). Control is the "power to control the corporate policy that resulted in corporate liability under 10(b)." *In re Villa*, 261 F.3d 1148, 1152 (11th Cir. 2001). The "overwhelming trend is . . . to use the Rule 8(a) standard for pleading control liability." *Miller v. Dyadic Int'l, Inc.*, 2009 WL 10697095, at *11 (S.D. Fla. Sept. 29, 2009). The SAC pleads Sclavos' control through the allegation that he conducted Terran Orbital's business affairs and had control over the Company's public statements (SAC ¶¶ 20, 262-63). *See Miller*, 2009 WL 10697095, at *11 (control pled through "power to control the general business affairs" and power over public reporting). Finally, the AC pleads a primary violation for all the reasons above.

### CONCLUSION

For the foregoing reasons, the Court should deny the Motion in its entirety. Alternatively, Plaintiffs respectfully request leave to replead, which should be granted freely. Fed. R. Civ. P. 15.

- 30 -

Dated:  January 9, 2026

Respectfully submitted,

MILLER SHAH LLP

POMERANTZ LLP

*/s/ Jayne A. Goldstein*
Jayne A. Goldstein (Fl. Bar #144088)
Nathan C. Zipperian (Fl. Bar #61525)
2103 N. Commerce Pkwy.
Fort Lauderdale, Florida 33326
Telephone: (954) 515-0123
Facsimile: (866) 300-7367
jagoldstein@millershah.com
nczipperian@millershah.com

*/s/ Justin D. D'Aloia*
Justin D. D'Aloia (admitted *pro hac vice*)
Guy Yedwab (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jdaloia@pomlaw.com
guyyedwab@pomlaw.com

*Counsel for Plaintiffs and Liaison Counsel
for the Class*

*Counsel for Plaintiffs and Lead Counsel
for the Class*

WOHL & FRUCHTER LLP
Joshua E. Fruchter
(*pro hac vice* application forthcoming)
25 Robert Pitt Drive, Suite 209G
Monsey, New York 10952
Telephone: (845) 290-6818
Facsimile: (718) 504-3773
jfruchter@wohlfruchter.com

*Additional Counsel for Lead Plaintiffs*