# EXHIBIT 1

DEFM14A 1 d887705ddefm14a.htm DEFM14A

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## SCHEDULE 14A
**Proxy Statement Pursuant to Section 14(a) of the
Securities Exchange Act of 1934
(Amendment No.    )**

Filed by the Registrant ☒

Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐    Preliminary Proxy Statement

☐    **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☒    Definitive Proxy Statement

☐    Definitive Additional Materials

☐    Soliciting Material under § 240.14a-12

# Terran Orbital Corporation
**(Name of Registrant as Specified in its Charter)**

**(Name of Person(s) Filing Proxy Statement, if other than the Registrant)**

Payment of Filing Fee (Check all boxes that apply):

☐    No fee required.

☒    Fee paid previously with preliminary materials.

☐    Fee computed on table in exhibit required by Item 25(b) per Exchange Act Rules 14a-6(i)(1) and 0-11.

**Table of Contents**

October 4, 2024

Dear Stockholder:

We cordially invite you to attend a special meeting, which we refer to as the "special meeting," of the stockholders of Terran Orbital Corporation, a Delaware corporation, which we refer to as "we," "us," "our," "Terran" or the "Company," to be held on October 29, 2024 at 11:00 a.m., Eastern Time. The special meeting will be conducted exclusively online through a live audio webcast to facilitate stockholder attendance and to enable stockholders to participate fully and equally, regardless of size of holdings, resources or physical location. You will be able to attend the special meeting virtually by visiting www.virtualshareholdermeeting.com/LLAP2024SM, where you will be able to listen to the meeting live and vote online.

On August 15, 2024, the Company entered into an Agreement and Plan of Merger, which we refer to as the "merger agreement," with Lockheed Martin Corporation, a Maryland corporation, which we refer to as "Lockheed Martin," or "Parent" and Tholian Merger Sub, Inc., a Delaware corporation and wholly owned subsidiary of Lockheed Martin, which we refer to as "Merger Sub," providing for the merger of Merger Sub with and into the Company, with the Company surviving the merger as a wholly owned subsidiary of Lockheed Martin, which we refer to as the "merger."

If the merger is consummated, each share of Company common stock, par value $0.0001 per share, which we refer to as "Company common stock," issued and outstanding immediately prior to the effective time of the merger will, other than cancelled shares and dissenting shares (each as defined in the accompanying proxy statement), be converted into the right to receive $0.25 in cash, without interest.

At the special meeting, you will be asked to consider and vote on the following matters:

- a proposal to approve the adoption of the merger agreement and the merger (which we refer to as the "merger agreement proposal");

- a proposal to approve, on a nonbinding advisory basis, compensation that will or may become payable to our named executive officers in connection with the merger (which we refer to as the "nonbinding merger-related compensation proposal"); and

- a proposal to approve one or more adjournments of the special meeting, if necessary or appropriate, to solicit additional proxies if there are insufficient votes at the time of the special meeting to approve the merger agreement proposal (which we refer to as the "adjournment proposal").

The board of directors of the Company, which we refer to as the "Board," has unanimously approved, adopted and declared advisable the merger agreement and recommended that the Company's stockholders vote in favor of the merger agreement proposal. The Board made its determination after consultation with its legal and financial advisors and consideration of a number of factors. **The Board unanimously recommends that you vote (i) "FOR" approval of the merger agreement proposal; (ii) "FOR" approval of the nonbinding merger-related compensation proposal; and (iii) "FOR" approval of the adjournment proposal.**

***Your vote is very important, regardless of the number of shares that you own***. The merger cannot be completed unless the holders of a majority of the outstanding shares of Company common stock entitled to vote thereon vote in favor of the merger agreement proposal.

The accompanying proxy statement provides you with detailed information about the special meeting, the merger agreement and the merger. A copy of the merger agreement is attached as <u>Annex A</u> to the accompanying proxy statement. We encourage you to carefully read the entire proxy statement and its annexes, including the merger agreement, along with all documents incorporated by reference in this proxy statement. You also may obtain additional information about the Company from documents we have filed with the Securities and Exchange Commission, which we refer to as the "SEC," by following the instructions listed in the section of the accompanying proxy statement entitled "*Where You Can Find More Information*."

1

**Table of Contents**

If you have any questions or need assistance submitting a proxy to have your shares of Company common stock voted at the special meeting, please contact Sodali & Co, the Company's proxy solicitor, by calling toll free at (800) 662-5200, or for banks and brokers, collect at (203) 658-9400.

Thank you in advance for your cooperation and continued support.

Sincerely,

/s/ Marc Bell
Marc Bell
Co-Founder, Chairman and Chief Executive Officer

The accompanying proxy statement is dated October 4, 2024. The notice of meeting, the proxy statement and the form of proxy card are being mailed to our stockholders on or about October 4, 2024.

**NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED THE MERGER AGREEMENT OR THE MERGER, PASSED UPON THE MERITS OR FAIRNESS OF THE MERGER AGREEMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY, INCLUDING THE PROPOSED MERGER, OR PASSED UPON THE ADEQUACY OR ACCURACY OF THE INFORMATION CONTAINED IN THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

> **YOUR VOTE IS IMPORTANT. PLEASE SUBMIT YOUR PROXY ELECTRONICALLY VIA THE INTERNET OR TELEPHONICALLY OR BY COMPLETING, SIGNING, DATING AND PROMPTLY RETURNING THE ENCLOSED PROXY CARD IN THE ACCOMPANYING PREPAID REPLY ENVELOPE, WHETHER OR NOT YOU PLAN TO ATTEND THE SPECIAL MEETING VIRTUALLY. IF YOU ATTEND THE SPECIAL MEETING VIRTUALLY AND VOTE AT THE SPECIAL MEETING, YOUR VOTE AT THE MEETING WILL REVOKE ANY PROXY PREVIOUSLY SUBMITTED. IF YOU HOLD YOUR SHARES OF COMPANY COMMON STOCK THROUGH A BANK, BROKERAGE FIRM OR OTHER NOMINEE, YOU SHOULD FOLLOW THE PROCEDURES PROVIDED BY YOUR BANK, BROKERAGE FIRM OR OTHER NOMINEE IN ORDER TO VOTE. AS A BENEFICIAL OWNER OF SHARES OF COMPANY COMMON STOCK HELD IN "STREET NAME," YOU HAVE THE RIGHT TO DIRECT YOUR BANK, BROKERAGE FIRM OR OTHER NOMINEE ON HOW TO VOTE THE SHARES IN YOUR ACCOUNT.**

2

**Table of Contents**

**TERRAN ORBITAL CORPORATION**
**6800 Broken Sound Parkway NW, Suite 200**
**Boca Raton, FL 33487**

**NOTICE OF SPECIAL MEETING OF STOCKHOLDERS**

| | |
|---|---|
| **Time and Date:** | 11:00 a.m., Eastern Time, on October 29, 2024 |
| **Place:** | The special meeting will be conducted virtually via live audio webcast. You will be able to attend the special meeting virtually and vote online during the meeting by visiting www.virtualshareholdermeeting.com/LLAP2024SM. |
| **Items of Business:** | To consider and vote on: |

- a proposal to approve (a) the adoption of the Agreement and Plan of Merger, dated as of August 15, 2024, by and among Terran Orbital Corporation, a Delaware corporation, which we refer to as "we," "us," "our," "Terran" or the "Company," Lockheed Martin Corporation, a Maryland corporation, which we refer to as "Lockheed Martin" or "Parent," and Tholian Merger Sub, Inc., a Delaware corporation and wholly owned subsidiary of Lockheed Martin, which we refer to as "Merger Sub," as it may be amended from time to time, which we refer to as the "merger agreement," a copy of which is attached as <u>Annex A</u> to the accompanying proxy statement and is incorporated in its entirety into this notice and made a part hereof, and includes (i) as Exhibit A thereto the form of certificate of incorporation of the surviving corporation of the merger (as defined below), and (ii) as Exhibit B thereto the form of bylaws of the surviving corporation of the merger and (b) the merger (which we refer to, collectively, as the "merger agreement proposal");

- a proposal to approve, on a nonbinding advisory basis, compensation that will or may become payable to our named executive officers in connection with the merger (which we refer to as the "nonbinding merger-related compensation proposal"); and

- a proposal to approve one or more adjournments of the special meeting, if necessary or appropriate, to solicit additional proxies if there are insufficient votes at the time of the special meeting to approve the merger agreement proposal (which we refer to as the "adjournment proposal").

| | |
|---|---|
| **Record Date:** | You may vote if you were a stockholder of record at the close of business on September 16, 2024. |
| **Proxy Voting:** | **Your vote is very important, regardless of the number of shares of Company common stock you own.** The merger of Merger Sub with and into the Company, with the Company surviving the merger, which we refer to as the "merger," and other transactions contemplated by the merger agreement cannot be consummated unless the merger agreement proposal is approved by the affirmative vote of the holders of a majority of the outstanding shares of Company common stock, par value $0.0001 per share, which we refer to as "Company common stock," entitled to vote thereon. Even if you plan to attend the special meeting virtually, we request that you complete, sign, date and return, as promptly as possible, the enclosed proxy card in the accompanying prepaid reply envelope or submit your proxy by telephone or the Internet prior to the special meeting to ensure that your shares of Company common stock will be represented and voted at the special meeting if you are unable to attend virtually. If you do not attend the special meeting virtually and fail to return your proxy card or fail to submit your proxy by telephone or the Internet, your shares of Company common stock will not be counted for purposes of determining whether a quorum is present at the special meeting and will have the same effect as a vote "**AGAINST**" the merger agreement proposal. |

1

**Table of Contents**

|  |  |
|---|---|
|  | If you are a stockholder of record, voting online at the special meeting will revoke any proxy previously submitted. If you hold your shares of Company common stock through a bank, brokerage firm or other nominee, you should follow the procedures provided by your bank, brokerage firm or other nominee in order to vote. As a beneficial owner of shares of Company common stock held in "street name," you have the right to direct your bank, brokerage firm or other nominee on how to vote the shares of Company common stock in your account. You are also invited to attend the special meeting virtually. However, because you are not the stockholder of record, you may not vote your shares of Company common stock online at the special meeting, unless you request and obtain a legal proxy from your bank, brokerage firm or other nominee. |
| **Recommendation:** | The board of directors of the Company, which we refer to as the "Board," has unanimously approved, adopted and declared advisable the merger agreement and recommended that the Company's stockholders approve the merger agreement proposal. The Board made its determination after consultation with its legal and financial advisors and consideration of a number of factors. **The Board unanimously recommends that you vote (i) "FOR" approval of the merger agreement proposal; (ii) "FOR" approval of the nonbinding merger-related compensation proposal; and (iii) "FOR" approval of the adjournment proposal.** |
| **Attendance:** | Only stockholders of record or their duly authorized proxies have the right to vote at and attend the special meeting virtually. Beneficial owners of shares are invited to attend the special meeting virtually. Beneficial owners who wish to vote online at the meeting should obtain a legal proxy from their bank, broker or other nominee. If you are the representative of a corporate or institutional stockholder, you must present proof that you are the representative of such stockholder. |
| **Appraisal Rights:** | Under the General Corporation Law of the State of Delaware, as amended, and all rules and regulations promulgated thereunder, which we refer to as the "DGCL," the Company's stockholders of record and beneficial owners of Company common stock who do not vote in favor of the adoption of the merger agreement, and who properly demand appraisal of such shares of Company common stock (and do not effectively withdraw or otherwise waive or lose their right to appraisal) have the right to seek appraisal of the "fair value" of their shares of Company common stock as determined by the Delaware Court of Chancery pursuant to Section 262 of the DGCL, but only if they fully comply with all of the applicable legal requirements of Section 262 of the DGCL, which are summarized in this proxy statement in the section entitled "*Appraisal Rights*" beginning on page 108 and set forth in their entirety in Section 262 of the DGCL, which may be accessed without subscription or cost at the following publicly available website: https://delcode.delaware.gov/title8/c001/sc09/index.html#262. This means that if you perfect your appraisal rights, do not subsequently withdraw your demand for appraisal, do not otherwise waive or lose your right to appraisal, and follow the procedures set forth in Section 262 of the DGCL, you may be entitled to have your shares of Company common stock appraised by the Delaware Court of Chancery and to receive payment in cash of the "fair value" of your shares of Company common stock, exclusive of any elements of value arising from the accomplishment or expectation of the merger, as determined by the Delaware Court of Chancery, in lieu of receiving the merger consideration if you follow exactly the procedures set forth in Section 262 of the DGCL. The amount you ultimately receive in an appraisal proceeding may be less than, equal to or more than the amount you would have received under the merger agreement. See "*Appraisal Rights*" beginning on page 108. |

2

**Table of Contents**

**WHETHER OR NOT YOU PLAN TO ATTEND THE SPECIAL MEETING VIRTUALLY, PLEASE COMPLETE, DATE, SIGN AND RETURN, AS PROMPTLY AS POSSIBLE, THE ENCLOSED PROXY CARD IN THE ACCOMPANYING PREPAID REPLY ENVELOPE, OR SUBMIT YOUR PROXY BY TELEPHONE OR THE INTERNET. IF YOU ATTEND THE SPECIAL MEETING VIRTUALLY AND VOTE ONLINE DURING THE SPECIAL MEETING, YOUR VOTE AT THE MEETING WILL REVOKE ANY PROXY PREVIOUSLY SUBMITTED. IF YOU HOLD YOUR SHARES OF COMPANY COMMON STOCK THROUGH A BANK, BROKERAGE FIRM OR OTHER NOMINEE, YOU SHOULD FOLLOW THE PROCEDURES PROVIDED BY YOUR BANK, BROKERAGE FIRM OR OTHER NOMINEE IN ORDER TO VOTE. AS A BENEFICIAL OWNER OF SHARES OF COMPANY COMMON STOCK HELD IN "STREET NAME," YOU HAVE THE RIGHT TO DIRECT YOUR BANK, BROKERAGE FIRM OR OTHER NOMINEE ON HOW TO VOTE THE SHARES IN YOUR ACCOUNT.**

By order of the Board of Directors,

/s/ James Black
James Black
General Counsel and Secretary

October 4, 2024
Boca Raton, FL

3

**TABLE OF CONTENTS**

| | |
|---|---:|
| SUMMARY | 1 |
| QUESTIONS AND ANSWERS ABOUT THE SPECIAL MEETING AND THE MERGER | 15 |
| CAUTIONARY STATEMENT CONCERNING FORWARD-LOOKING INFORMATION | 25 |
| THE SPECIAL MEETING | 26 |
| Time, Place and Purpose of the Special Meeting | 26 |
| Record Date and Quorum | 26 |
| Attendance | 26 |
| Vote Required | 26 |
| Shares Owned by Our Directors and Executive Officers | 28 |
| Proxies and Revocation | 29 |
| Adjournments and Recesses | 29 |
| Appraisal Rights | 29 |
| Solicitation of Proxies; Payment of Solicitation Expenses | 30 |
| Questions and Additional Information | 30 |
| PARTIES TO THE MERGER | 31 |
| THE MERGER | 32 |
| Overview of the Merger | 32 |
| Directors and Officers of the Surviving Corporation | 32 |
| Background of the Merger | 32 |
| Reasons for the Merger; Recommendation of the Board of Directors | 44 |
| Opinion of Lincoln International LLC | 50 |
| Certain Prospective Financial Information | 58 |
| Financing of the Merger | 60 |
| Bridge Note Purchase Agreement | 60 |
| Amendments to Existing Debt Agreements | 62 |
| Amendments to Existing Intercreditor Agreements | 62 |
| Repayment Upon Closing of the Merger Agreement | 63 |
| Closing and Effective Time of the Merger | 63 |
| Procedures for Payment of Merger Consideration | 63 |
| Interests of Company Directors and Executive Officers in the Merger | 63 |
| Section 16 of the Exchange Act | 71 |
| Certain Material U.S. Federal Income Tax Consequences of the Merger | 72 |
| THE MERGER AGREEMENT (PROPOSAL 1) | 76 |
| Explanatory Note Regarding the Merger Agreement | 76 |
| The Merger | 76 |
| Closing and Effective Time of the Merger | 76 |
| Conversion of Shares | 77 |
| Payment for Securities | 77 |
| Dissenting Shares | 78 |
| Treatment of Company Equity and Equity-Based Awards | 78 |
| Treatment of Company Warrants | 79 |
| Representations and Warranties | 80 |
| Definition of Material Adverse Effect | 81 |
| Covenants Relating to the Interim Operations of the Company's Business | 83 |
| Open Source Audit and Remediation | 86 |
| Invention Assignment Agreements | 86 |
| Go-Shop; Covenants Regarding Non-Solicitation | 86 |
| Restrictions on Changes of Recommendation to Company Stockholders | 89 |
| Additional Agreements of the Parties to the Merger Agreement | 91 |
| Conditions to the Merger | 95 |

**Table of Contents**

| | |
|---|---|
| Termination | 97 |
| Termination Fees | 98 |
| General Provisions | 99 |
| Related Agreements | 100 |
| Required Vote; Board Recommendation | 102 |
| NONBINDING MERGER-RELATED COMPENSATION PROPOSAL (PROPOSAL 2) | 103 |
| ADJOURNMENT OF THE SPECIAL MEETING (PROPOSAL 3) | 104 |
| MARKET PRICE OF COMPANY COMMON STOCK | 105 |
| SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT | 105 |
| APPRAISAL RIGHTS | 108 |
| DELISTING AND DEREGISTRATION OF COMPANY COMMON STOCK | 114 |
| CONDUCT OF OUR BUSINESS IF THE MERGER IS NOT COMPLETED | 114 |
| OTHER MATTERS | 114 |
| Other Matters for Action at the Special Meeting | 114 |
| Future Stockholder Proposals | 114 |
| Householding Information | 115 |
| WHERE YOU CAN FIND MORE INFORMATION | 116 |
| APPENDIX I: RECONCILIATIONS OF GAAP TO NON-GAAP MEASURES (UNAUDITED) | I-1 |
| ANNEX A: MERGER AGREEMENT | A-1 |
| ANNEX B: OPINION OF LINCOLN INTERNATIONAL LLC | B-1 |

ii

Table of Contents

## THE MERGER

This discussion of the merger is qualified in its entirety by reference to the merger agreement, which is attached to this proxy statement as <u>Annex A</u>. You should read the entire merger agreement carefully as it is the legal document that governs the merger.

The merger agreement provides that Merger Sub will merge with and into the Company. The Company will be the surviving corporation in the merger and will continue to do business following the merger. As a result of the merger, the Company will become a privately held company and will cease to be listed on any public market. You will not own any shares of the capital stock of the surviving corporation.

### Overview of the Merger

The Company, Lockheed Martin and Merger Sub entered into the merger agreement on August 15, 2024. Under the terms of the merger agreement, Merger Sub will be merged with and into the Company, with the Company surviving the merger as a wholly owned subsidiary of Lockheed Martin. In connection with the merger, each share of Company common stock issued and outstanding immediately prior to the effective time (other than the cancelled shares and dissenting shares) will be automatically converted into the right to receive the merger consideration, without interest.

Following and as a result of the merger:

- Company stockholders will no longer have any interest in, and will no longer be stockholders of, the Company, and will not participate in any of the Company's future earnings or growth;

- shares of Company common stock will no longer be listed on NYSE, and price quotations with respect to shares of Company common stock in the public market will no longer be available; and

- the registration of shares of Company common stock under the Exchange Act will be terminated.

### Directors and Officers of the Surviving Corporation

The directors of Merger Sub as of immediately prior to the effective time will be the initial directors of the surviving corporation, in each case until the earlier of their resignation or removal, or until their respective successors are duly elected and qualified, as the case may be. The officers of the Company immediately prior to the effective time will be the initial officers of the surviving corporation, in each case until the earlier of their resignation or removal, or until their respective successors are duly elected or appointed and qualified, as the case may be. Except as set forth under "*The Merger—Interests of Company Directors and Executive Officers in the Merger—Retention Bonus*," no definitive plans or agreements have been made by Lockheed Martin regarding the continued service of any of the Company's officers after the merger closing.

### Background of the Merger

The following is a summary of the principal events, meetings, negotiations and actions among the parties leading to the execution and public announcement of the merger agreement. This summary does not purport to describe every interaction among the Company, Lockheed Martin or other parties or their respective representatives.

On March 4, 2021, Tailwind Two Acquisition Corp., which we refer to as "Tailwind Two," a Cayman Islands exempted company that was formed as a special purpose acquisition company, which we refer to as the "SPAC," for the intended purpose of pursuing a business combination with an acquisition target, consummated its initial public offering and listed its securities on the NYSE under the symbol "TWNT."

Table of Contents

On October 28, 2021, Tailwind Two entered into an Agreement and Plan of Merger, which we refer to as the "Tailwind Merger Agreement," by and among Tailwind Two, Titan Merger Sub, Inc., which we refer to as "SPAC Merger Sub," a wholly owned subsidiary of Tailwind Two, and Terran Orbital Operating Corporation, formerly known as Terran Orbital Corporation, which we refer to as "Legacy Terran Orbital." On March 25, 2022, Legacy Terran Orbital consummated the business combination with Tailwind Two and SPAC Merger Sub, which we refer to as the "Business Combination." In connection with the Business Combination, SPAC Merger Sub merged with and into Legacy Terran Orbital, becoming a wholly owned subsidiary of Tailwind Two. Upon filing a notice of deregistration with the Cayman Islands Registrar of Companies and a certificate of incorporation and a certificate of corporate domestication with the Secretary of State of the State of Delaware, Tailwind Two became a Delaware corporation and changed its name to Terran Orbital Corporation. At the time of the signing of the Tailwind Merger Agreement, closing of the Business Combination and thereafter, the Company was an early-stage operating company with cash proceeds received by the Company at closing of the Business Combination, net of redemptions, of approximately $58.4 million. This meant the Company required a significant amount of additional capital in order to execute on its business plan.

As an early-stage company, the Company sought to invest in scaling its manufacturing to support its commercial operations. In September 2022, the Company had $35.8 million of cash and cash equivalents on hand, and in order to conserve its cash and due to the capital-intensive nature of the effort, the Company decided to focus its business on manufacturing satellites and satellite buses and abandon its PredaSAR business plan of developing a constellation of radar imaging satellites.

During the same time frame, the Company also began exploring additional sources of capital. As part of that process, the Company engaged in discussions with Lockheed Martin, which was an early investor in Legacy Terran Orbital, a major stockholder, and the Company's primary commercial customer. These conversations resulted in the parties entering into a convertible note and warrant purchase agreement on October 31, 2022, providing for the issuance and sale to Lockheed Martin of the Convertible Notes for an aggregate principal amount of $100 million.

As of December 31, 2022, the Company had approximately $93.6 million in cash and cash equivalents.

In February 2023, the Company signed a significant contract to manufacture several hundred satellites for Rivada Space Networks, which we refer to as "Rivada." Although the Company believed that Rivada was on the verge of obtaining financing for its constellation, Rivada ultimately did not obtain any material financing during 2023. Partly due to that fact, the Rivada program was delayed, and consequently, expected milestones and associated payments were postponed. The Company noted in its Annual Report on Form 10-K filed soon thereafter on March 23, 2023, which we refer to as the "2023 Form 10-K," that the Company may be reliant on a single contract with Rivada for a substantial portion of its revenue in 2023 and future fiscal periods—and moreover if Rivada were unable to fund and maintain its operations, the Company's financial condition would be materially adversely affected.

In the 2023 Form 10-K, the Company disclosed other risks and uncertainties associated with its business, industry, and ownership of securities, including that it derives a substantial portion of its revenue from Lockheed Martin and that it may be reliant on a single contract with Rivada for a substantial portion of its revenue in 2023 and future fiscal periods. It also noted that the economic viability of customers is not guaranteed over time and that it may not be able to convert orders in backlog, or sales opportunities presented in pipeline, into revenue.

In the spring of 2023, the Company began exploring additional financing options to cover its forecasted cash requirements. As a result, the Company completed an equity raise through a registered direct offering in May of 2023, which resulted in gross proceeds of $37.1 million.

During the summer of 2023, Company management began exploring a variety of options for the Company to obtain a cash infusion sufficient to fund its growth plans. These included informal discussions with various firms regarding a take-private transaction or a significant equity investment in the Company. Company management also explored various forms of alternative capital raise transactions. The Company disclosed that on June 30, 2023, it had approximately $48.6 million in cash and in cash equivalents.

On July 19, 2023, the Board held a special meeting. The purpose of the meeting was to update the Board on conversations that had occurred with interested parties regarding financing and strategic options that were being considered. Subsequently, over the next two months, the Board held a series of update meetings on the Company's financial condition and management's efforts to obtain additional capital. Marc Bell discussed certain expected upcoming program awards but noted that these awards would not solve the Company's near-term liquidity issues due to their anticipated timing.

33

Table of Contents

The Board met again on August 3, 2023. At this meeting, Mr. Bell provided an update on management's communications with certain private equity firms. He also discussed potential financing transactions that were being explored. He noted that the magnitude of the Company's cash needs was due in part to a major Company program being put on hold by the customer (which customer was not Lockheed Martin or Rivada), delaying a large initial payment that was expected when the program began. Gary Hobart, Chief Financial Officer of the Company at that time, provided an overview of the Company's cash requirements, noting that delays in receiving collections on existing and new expected contract awards may result in the Company going into a negative cash position in the coming months, which may necessitate pursuing a capital raise. During this discussion, the Board discussed engaging Jefferies LLC, which we refer to as "Jefferies," for advisory services associated with strategic alternatives to a capital raise. Jefferies previously advised the Company on other matters, including the issuance of the Convertible Notes to Lockheed Martin in October 2022.

The Board held a regular meeting on August 10, 2023. Mr. Bell provided an update on the Company's pursuit of alternative financing opportunities. He then recommended that Jefferies be formally engaged to explore a sale of the Company or other strategic alternatives. The Board unanimously approved engaging Jefferies.

On August 11, 2023, the Company executed an engagement letter with Jefferies to provide transaction advisory services with respect to a strategic review process, which could include an investment, sale of the Company, "take private" transaction or an alternative strategic relationship.

On September 11, 2023, the Board established a special committee of the Board, which we refer to as the "Special Committee," comprised solely of independent directors James LaChance, Stratton Sclavos and Thomas Manion, to address issues and considerations related to, among other things, the Company's cash needs relative to projected liquidity position due to concerns raised with the Board by management of the Company (including uncertainty of timing of the award date for a program relating to the SDA's Tranche 2 Transport Layer (T2TL) Beta constellation, receipt of advanced payments relating to such award, and if such payments would occur by the end of September 30, 2023), the assessment of financing options and alternatives and a potential financial restructuring of the Company. The Special Committee engaged King & Spalding LLP, which we refer to as "King & Spalding," on September 12, 2023 to provide legal advice.

On September 14, 2023, the Special Committee approved the Company's entry into a securities purchase agreement with certain investors in connection with a proposed confidentially marketed public offering, which we refer to as the "CMPO," whereby the Company would sell and issue, in a registered public offering, equity securities. On September 18, 2023, the Special Committee approved the pricing terms of the CMPO. The Company closed the CMPO on September 25, 2023, resulting in $32.5 million of proceeds.

On September 21, 2023, the Board met with the Company's financial advisor, Jefferies. Jefferies presented on industry conditions and the performance of other De-SPACs in the aerospace industry. Jefferies noted that unlike these companies, the Company was well-positioned as it had a number of contracts with commercial and government customers. Jefferies discussed the Company's two options – to (i) attempt to remain independent and conduct future capital raises, increasing stockholder dilution, or (ii) seek a change in control transaction that would pull forward value for stockholders. Jefferies walked through a variety of potential structures for a strategic transaction and potential companies and firms that might provide a good fit as an acquiror of the Company.

The Board met again on October 6, 2023. Given the Company's continuing cash constraints, notwithstanding the Company's recently completed capital raise, the Board authorized management and Jefferies to initiate the strategic review process that had been briefed to the Board at a prior meeting. Following the Board's direction, management and Jefferies put together materials to support a strategic review process. On October 24, 2023, Jefferies began the process of contacting various parties, including Lockheed Martin, to gauge their interest in a strategic transaction with the Company. Interested parties were placed under non-disclosure agreements and provided limited financial and operational information regarding the Company.

34

Table of Contents

By October 26, 2023, Rivada had paid the Company $5 million. The Board met for a regular quarterly meeting on November 9, 2023. In that meeting, Mr. Bell described a letter received that day from its customer Rivada. As a result of that letter, management believed Rivada would provide a material payment in the near term, facilitating a restart of the Company's work for this customer, which had been delayed. However, soon thereafter, because the Company had not received expected further milestone payments from Rivada and did not have a definitive schedule on whether further payments would be received, the Company determined it would remove the expected revenue contribution related to Rivada and would adjust its expected 2023 revenue from $250 million to $130 million. In late December 2023, Rivada made a payment which, along with another customer payment, was sufficient for the Company's near-term capital requirements; however, such payments were not expected to address the Company's long-term liquidity needs.

Lockheed Martin and the Company entered into a non-disclosure agreement with respect to a potential transaction on November 15, 2023. On November 16, 2023, the Company provided Lockheed Martin and other parties who had signed non-disclosure agreements with a first-round process letter requesting initial indications of interest in a strategic transaction with the Company on December 14, 2023.

On December 11, 2023, the Wall Street Journal published an article that indicated the Company was seeking a buyer. The Company filed a Current Report on Form 8-K with the SEC on the same day in response, noting the Company was engaged in a strategic review process and that it had engaged Jefferies to provide transaction advisory services in connection with this process, which could include an investment, sale of the Company, "take private" transaction or an alternative strategic relationship.

On December 19, 2023, the Board held a special meeting concerning the strategic review process. Greg Valentine from Jefferies provided an update on behalf of Jefferies. He indicated that in the prior few weeks, Jefferies had contacted 81 different parties concerning an acquisition of the Company or an alternative strategic transaction. Mr. Valentine noted 33 parties had entered into non-disclosure agreements, which we refer to "NDAs," and received additional Company financial information as of that time. This process had resulted in six potential bidders who Jefferies expected to move to a second round. He described the remaining six potential bidders, which included Lockheed Martin and five other companies – Company A, B, C, D and E. Despite a deadline of December 14, 2023, to provide indications of interest, no formal indications of interest had been received. In order to maintain interest, Jefferies extended the time to provide indications of interest to the six interested companies, one of which had entered the process late and another that had yet to execute an NDA. Two of the interested parties had been delayed in completing their due diligence process to arrive at a formal indication of interest and so were provided extensions. Additionally, three of the other interested parties had completed very limited or no due diligence efforts up until that point and were subsequently provided extensions. Mr. Valentine also noted that the Company's recent public disclosure of its strategic review process in the Current Report on Form 8-K filed with the SEC on December 11, 2023 had not resulted in additional interest from any parties that Jefferies had not already contacted or resulted in any new parties contacting Jefferies.

On December 27, 2023, Company E was the last remaining party in the process to execute an NDA and was subsequently provided Company materials and financial information.

As of December 31, 2023, the Company had approximately $71.7 million in cash and in cash equivalents.

On January 10, 2024, Company E officially withdrew from the Company's strategic process.

On January 18, 2024, representatives of Lockheed Martin and Citibank, Lockheed Martin's financial advisor, which we refer to as "Citi," attended a management presentation by Jefferies and the Company at the Company's offices in Irvine, California and toured the Company's manufacturing facilities.

On January 19, 2024, representatives of Company A attended a management presentation by Jefferies and the Company at the Company's offices in Irvine, California and toured the Company's manufacturing facilities.

On January 19, 2024, the Board held a special meeting. Management provided an update to the Board regarding the status of the strategic review process.

**Table of Contents**

On January 30, 2024, Company A officially withdrew from the strategic process. Company B, C and D never fully engaged in the strategic process nor made an offer to acquire the Company.

On February 9, 2024, Mr. Valentine from Jeffries provided an update on the strategic review process to the Board. At that time, he noted that the most interested potential bidder left was Lockheed Martin. The Board discussed the reasons for the apparent lack of strong interest in an acquisition of the Company, including the Company's financial profile, lack of fit with current strategic objectives of various potential bidders, and the Company's financial projections, which ascribed higher probability of win and progress to certain programs and proposals than the prospective bidders. Mr. Valentine noted that he understood that Lockheed Martin had expended considerable resources on the Company to date and that he believed an acquisition of the Company was a high priority for Lockheed Martin. The Board also raised and discussed the possibility of an earnout structure or other contingent value right to bridge any gap between the value ascribed to the Company by management and Jefferies and any bidder who might emerge with an offer. Jefferies was authorized by the Board to provide bidding instructions and a deadline to any interested parties. On February 14, 2024, Jefferies provided a second-round bid letter to representatives of Citi, setting a deadline of February 28, 2024 for a final offer. Between February 14 and February 20, 2024, Lockheed Martin and the Company conducted a series of due diligence calls covering a variety of operational topics. No offer was received by February 28, 2024, but Lockheed Martin requested and was granted an extended deadline for its final offer.

On March 1, 2024, Lockheed Martin, in response to the second-round bid letter, delivered a non-binding offer letter to the Company and filed a Schedule 13D/A with the SEC disclosing its offer. The non-binding offer letter provided for the acquisition of all equity in the Company for a price of $1.00 per share, which was less than the then trading price of the Company's shares. We refer to this proposal as the "Lockheed Martin March Offer." No other offers or written proposals were received at any time in connection with the Company's strategic review process. Lockheed Martin's counsel, Hogan Lovells, also provided a markup of the form merger agreement that the Company had prepared as part of the bid process.

The Board met on March 3, 2024 to discuss the Lockheed Martin March Offer. Representatives of Jefferies provided their opinion that given the perceived low value of the offer, the nature of conversations around the offer and the fact of the offer's public disclosure, that the Board should consider adopting a shareholder rights plan to provide for additional control over the Company's potential sale process and ensure the preservation of the Company's long-term value for its stockholders. Following legal advice from the Company's outside legal counsel, Akin Gump Strauss Hauer & Feld LLP, which we refer to as "Akin," and further discussion, the Board adopted a shareholder rights plan and filed the rights agreement as an exhibit to a Current Report on Form 8-K filed with the SEC on March 4, 2024. Jefferies then provided its views on the Lockheed Martin March Offer and opined that the Board could attempt to negotiate for an improved offer from Lockheed Martin or wait until further progress on the Company's business plan resulted in an increase in the Company's stock price, leading to an improved offer. During the March 3, 2024 meeting, the Board delegated to the Special Committee and its advisors the authority to assess the Lockheed Martin March Offer and develop a strategy to respond to Lockheed Martin, as well as to make recommendations on these topics to the full Board.

During the weeks of March 4 and March 11, 2024, the Special Committee held various internal discussions, working group sessions and informal meetings with the Company's management team to establish a process to gather the necessary information to properly evaluate the Lockheed Martin March Offer and formulate a strategy to respond to Lockheed Martin. Such necessary information included, among other things, the Company's financial budget and forecast, probabilities and assumptions relating to the conversion of pipeline into backlog, potential future contract awards and the Company's current and future operational capacity, each to the extent necessary to sufficiently understand the Company's liquidity position and valuation as part of the Special Committee's ongoing assessment of the Lockheed Martin March Offer. Additionally, in the week following the Lockheed Martin March Offer, Mr. LaChance, Chairman of the Special Committee and of the Company's Audit Committee, spoke to Casey French, the Director of Corporate Development of Lockheed Martin, to discuss Lockheed Martin's rationale for the Lockheed Martin March Offer and to establish a line of communication to Lockheed Martin as the Special Committee continued to evaluate the proposal. During March and April 2024, Mr. LaChance spoke with Mr. French on a regular basis to keep Lockheed Martin generally apprised of the fact that the Special Committee was continuing to consider the Lockheed Martin March Offer.

36

**Table of Contents**

As part of the ongoing review of the Lockheed Martin March Offer, on March 20, 2024, the Special Committee met with representatives of Jefferies and King & Spalding to review the strategic outreach process conducted by Jefferies over the foregoing months, including a detailed discussion of the prospective buyers involved, feedback received during the process and any communications with prospective buyers since receiving the Lockheed Martin March Offer. The Special Committee discussed with Jefferies and King & Spalding the advisability of contacting certain interested parties and, upon the advice of Jefferies and King & Spalding, determined that it was advisable for Jefferies to initiate such communications with four of the buyer prospects, including a private equity buyer and three large strategic buyers. Jefferies' contacts did not result in any further engagement with any of these parties.

On March 21, 2024, the Board held a regular quarterly meeting. At this meeting, Mr. Bell provided an update on the efforts of the Company's major customer Rivada to obtain financing for its satellite constellation. He noted his understanding that if Rivada obtained significant funding, it was prepared to provide a material milestone payment to the Company, which he believed would impact the Company's valuation and the Lockheed Martin March Offer. In its Annual Report on Form 10-K filed on April 1, 2024, which we refer to as "2024 Form 10-K," the Company disclosed its view that its contract with Rivada was subject to uncertainty and its backlog may not be converted into revenue.

At the Board meeting, Mr. Bell also discussed the possibility of the Company conducting an "at the market" facility to raise capital through open market equity sales.

The 2024 Form 10-K also disclosed that the Company may require additional capital support, that its substantial amounts of debt and payment obligations could affect Company operations and financial condition, and there were substantial doubts about the Company's ability to continue as a going concern.

Following the March 2024 Board meetings, the Special Committee, with the assistance of Jefferies and King & Spalding, continued to evaluate the Lockheed Martin March Offer in order to determine whether the Lockheed Martin March Offer was in the best interests of the Company's stockholders. Such evaluation included discussions with management to best understand real-time information relating to the Company's contract with Rivada and the likelihood and timing of payments from Rivada, the Company's projected cash flows and ability to maintain compliance with the financial covenants under the Company's existing debt documents, and the ability for the Company to pursue additional financing transactions. During this time, Mr. LaChance continued to speak with Mr. French on several occasions regarding the status of the Special Committee's review of the Lockheed Martin March Offer and desire to reach a decision as quickly as possible; however, the Company did not respond to Lockheed Martin's non-binding proposal during any of these discussions.

In April 2024, Mr. LaChance, on behalf of the Special Committee, and management of the Company invited Lockheed Martin to present Lockheed Martin's non-binding proposal to the Board. On April 16, 2024, Mr. French, Mr. Scott Weiner, Vice President, Corporate Development of Lockheed Martin, and Mr. Robert Lightfoot, President of Lockheed Martin Space, attended a meeting at the Company's offices in Irvine, California, at which Lockheed Martin discussed with the Company its assessment of the Company's business and plans. During this meeting, management of the Company also presented updated information regarding the Company's financial forecast, discussed program gross margins and presented its views on pipeline opportunities. During this meeting, Mr. LaChance suggested to Lockheed Martin management the concept of an earn-out or contingent valuation right, which we refer to as a "CVR," as a potential way to bridge the valuation gap between the Lockheed Martin March Offer and the general views on valuation held by the Board and the Company at that time. The Company did not respond to Lockheed Martin's proposal during this meeting. At this time, on March 31, 2024, the Company had approximately $43.7 million in cash and in cash equivalents.

On April 24, 2024, the Special Committee engaged Province LLC, which we refer to as "Province," a nationally recognized financial advisory firm, to perform an additional and independent valuation analysis on the Company to guide the Special Committee and the Board in its ongoing evaluation of the Lockheed Martin March Offer.

On April 25, 2024, the Special Committee met with Province and King & Spalding to provide Province with the necessary background regarding the Company's liquidity situation, 2024 revenue forecasts, pipeline and operational capacity, probability in winning new contracts and the details of the Lockheed Martin March Offer. The Special Committee also discussed the options available to the Company, including engaging with Lockheed Martin on the Lockheed Martin March Offer as well as alternatives to a sale of the company, including potential alternative sources for raising capital and potential consequences from a liquidity perspective if the timing of payments and winning contracts were to be unfavorable to the Company. The Special Committee also discussed potential implications of

37

Table of Contents

letting the Lockheed Martin March Offer remain outstanding without a response while the Company explored other strategic alternatives, or the implications that could result from rejecting the Lockheed Martin March Offer. Over the following six weeks, Province prepared a valuation model to use in the Board's strategic process and assisted the Special Committing in assessing a range of alternatives.

On April 30, 2024, Lockheed Martin informed the Company that it was withdrawing the Lockheed Martin March Offer and on May 2, 2024, Lockheed Martin filed a Schedule 13D/A with the SEC disclosing such information publicly. That same day, the Company publicly announced that its strategic review to maximize stockholder value was still ongoing.

On May 6, 2024, the Company's Chief Transformation Officer, Mr. Gary Hobart, received an unsolicited email from a non-traditional micro-cap business lender, which we refer to as "Lender R," offering potential liquidity solutions. On the same day, the Company had a conversation with Lender R and provided public information for review, and on May 13, 2024, a conference call was held between the Company and Lender R's underwriting team. The following day, Lender R's CEO provided verbal terms to Mr. Mathieu Riffel, the Company's Acting CFO, for a $5 million unsecured term loan with a 30-week tenor and 117% annualized coupon, but the Company declined to pursue this financing due to the high interest rate. On May 22, 2024, Lender R provided slightly improved terms for a $5 million unsecured term loan with a 36-week tenor and 99% annualized coupon, which the Company again declined to pursue due to the high interest rate and small potential proceeds relative to its total capital requirements.

On May 7, 2024, the Special Committee met with King & Spalding and Province to discuss Lockheed Martin's withdrawn proposal. At this meeting, Province presented the model it prepared for the Special Committee to assist with preparing a new proposal to Lockheed Martin and discussed, among other things, the projections regarding future operating results, sources and uses of liquidity for 2024 and valuation implications based on comparable company market performance, relative to forward projections. Additionally, the Special Committee discussed potential options moving forward, including further engagement with Lockheed Martin and bridging any valuation gap with a CVR that could provide additional value tied to the success of certain programs and bids that had a subjective probability of winning.

On May 13, 2024, Mr. LaChance contacted Mr. French to request a discussion. Thereafter, during May 2024, Mr. French and Mr. LaChance spoke periodically about the liquidity position of the Company. Mr. LaChance indicated that the Special Committee was continuing to evaluate the Lockheed Martin March Offer notwithstanding that it had been withdrawn, and that given the complex capital structure and uncertainty regarding various potential contracts, the valuation of the Company was difficult. Mr. LaChance also informed Mr. French that the Special Committee was intending to request Province to perform additional work in connection with the ongoing evaluation of the previously withdrawn Lockheed Martin March Offer, including an additional retainer payment.

On May 21, 2024, the Special Committee met again with King & Spalding to discuss the strategy for seeking to encourage Lockheed Martin to re-engage in discussions with the Company, including the potential terms of a proposal that the Company might make to Lockheed Martin, including a per-share price and contingent consideration tied to converting pipeline opportunities. The Special Committee decided to re-engage Province for additional work relating a valuation analysis to assist the Special Committee in its strategy for re-approaching Lockheed Martin.

On May 23, 2024, the Board held a regular meeting. Mr. Bell provided an update on the Company's customer Rivada, noting Rivada was expecting an investment but that the Company was not relying on that expectation and would start reducing staff on the program in the next few weeks in the absence of positive developments. The Board discussed broader cost cutting measures that the Company should consider. Mr. Bell described certain initial steps that the Company was pursuing. Mr. Bell also provided an update on the Company's bid for the Tranche 2 Transport Layer (T2TL) Gamma program, which we refer to as "Gamma," with the U.S. Space Development Agency, which we refer to as the "SDA", noting the Company was optimistic that it would win one of the awards, but that the timing of such decision was uncertain and could be several months in the future. In the Company's Form 10-Q for the period ended June 30, 2024, the Company reduced its total backlog to $312.7 million, from $2.7 billion, as several uncertainties remained regarding Rivada's ability to continue funding contract performance. Although, through late 2023 and early 2024, the Company did not consider milestone payments from Rivada as critical to liquidity, because other projects were anticipated to become operational in 2024, delays and cancellations in those projects led to increased reliance on anticipated milestone payments from Rivada to help fund interim cash requirements. The uncertainty in Rivada's ability to pay also significantly deteriorated the Company's cash forecast.

38

Table of Contents

The Board discussed the Company's ongoing liquidity outlook over the next quarter. Mr. Hobart noted that the Company was attempting to negotiate interim milestone payments with Lockheed Martin to receive payments earlier than currently planned. The failure of the Company's original propulsion supplier to deliver in a timely fashion and the supplier's subsequent termination had caused the Company to pivot to a new supplier, resulting in delays to the program, which had pushed out expected payments, constraining the Company's liquidity profile. Mr. Hobart noted that the Company might need a permanent cash infusion of up to $120 million to cover the Company's expected cash burn for the year.

On June 4, 2024, the Special Committee met with King & Spalding and Province to discuss the ongoing second phase of Province's engagement, which involved Province conducting a more comprehensive due diligence review and providing certain preliminary opinions and preliminary analyses regarding the non-binding proposal Lockheed Martin had previously submitted (and subsequently withdrawn). Province discussed with the Special Committee the ongoing liquidity constraints of the Company, noted the difficulty in continuing to operate the business given its cash burn unless it found a solution to its liquidity constraints. During this meeting, the Special Committee also discussed approaching Lockheed Martin, including the timing for doing so and the potential terms of any counter-proposal. Further, the concept of including a CVR in the framework of a counter-proposal was discussed, specifically the high-level options for the scope of the CVR pool, which included (1) limiting the CVR pool to the Company's contract with Rivada; (2) limiting the CVR pool to the Company's three biggest program opportunities; or (3) proposing a broader construct that would include specified additional opportunities or a "fully-baked" scenario that would include Small-GEO and Direct-to-Device opportunities and capture all future contracts (other than with Lockheed Martin and the SDA). Province previewed possible pricing for the CVR within these different scenarios.

On June 12, 2024, the Special Committee met with King & Spalding and Province to set the framework for quantifying a potential CVR in an indicative proposal to Lockheed Martin. At this meeting, the Special Committee discussed a term sheet for an indicative proposal, including pricing, length of the exclusivity period and other items. The term sheet included $1.00 per share of contingent consideration in the form of the CVR, the scope of which would be tied to any pipeline opportunities not related to Lockheed Martin or the SDA. At this meeting, the Special Committee also discussed the numerous outstanding proposals and pipeline opportunities emerging as potential future awards, noted the potential for significant future growth, and talked about concerns given the ongoing liquidity and cash flow forecasts and challenging operating environment. The Special Committee also discussed the possibility of requesting advance payments from Lockheed Martin under the Tranche 1 "Monsoon" contract pursuant to which the Company had partially completed the satellite buses, which we refer to as the "Monsoon Advance Payment Request". The Company had not yet earned a milestone payment due to the delayed receipt and integration of propulsion from its supplier.

On June 18, 2024, Mr. LaChance, at the direction of the Board, spoke with Mr. French and verbally presented a notional proposal consisting of $1.50 per share, with a $1.00 CVR upside, which we refer to as the "June 18 Proposal," as well as the Monsoon Advance Payment Request previously discussed at the Special Committee meeting on June 12, 2024. Mr. French said he would convey the Monsoon Advance Payment Request and discuss the June 18 Proposal internally at Lockheed Martin, but indicated that he did not believe the June 18 Proposal would be workable.

On July 1, 2024, the Company met with investment bank H.C. Wainwright, which we refer to as "Wainwright," to discuss the possibility of conducting a capital raise transaction. Due to covenant restrictions in the Company's existing debt documents, Wainwright was tasked with finding a party to complete a transaction structured in a way that was either (i) allowable under the Company's existing debt documents or (ii) reasonable to the Company's existing lenders such that they would consent to the transaction. Following such discussion and to facilitate an expedient transaction, the Company entered into an engagement letter with Wainwright on July 1, 2024. Over the following two weeks and after consultation with Wainwright and Akin, the Company decided to pursue three potential transactions concurrently, with the final decision to be made at a later date: (1) a warrant inducement transaction, which we refer to as the "Proposed Warrant Inducement Transaction," whereby the Company would reduce the strike-price on existing warrants purchased by an investor in its securities offerings in May and September 2023 and issue new warrants; (2) a working capital facility providing access to $25,000,000 from a new lender, with such capital to be used for working capital purposes and subject to an interest rate on borrowed amounts, which we refer to as a "Proposed Working Capital Facility"; and (3) an at-the-market offering, which we refer to as the "ATM," providing for sales of common stock, from time to time, into the market at then-current market prices, subject to a maximum of 26,362,513 shares as allowable pursuant to the convertible note and warrant purchase agreement.

39

Table of Contents

Between July 5, 2024 and July 13, 2024, the Company negotiated a term sheet with a prospective lender, with such term sheet providing for up to $25,000,000 under the structure of a Proposed Working Capital Facility. Subject to certain restrictions, a working capital facility was allowable under the existing debt documents with the Company's existing lenders. However, after multiple rounds of negotiation with a prospective lender, the term sheet the Company received for a Proposed Working Capital Facility was not a true working capital facility as contemplated by the carve-outs from the covenants under the Company's existing debt agreements, but rather was structured as a term loan and therefore was not permitted under the Company's existing debt agreements.

On July 8, 2024, Mr. LaChance spoke with Mr. French about the June 18 Proposal. During that meeting, Mr. French reiterated Lockheed Martin's previously communicated position with respect to the June 18 Proposal.

On July 9, 2024, the Special Committee met with King & Spalding and Province to discuss Mr. LaChance's conversation with Mr. French the day earlier. The Special Committee noted for Province that if the time came for a meeting to discuss and negotiate a potential transaction with Lockheed Martin, then the Special Committee, Province and the Company's management team would need to work together to prepare accordingly and support the proposed valuation relative to Lockheed Martin's discounted cash flow (DCF) valuation. Mr. LaChance added that Mr. French was taking the June 18 Proposal to his investment committee.

On July 17, 2024, Mr. French spoke with Mr. LaChance and indicated that Lockheed Martin would be seeking a liquidity review of the Company, reiterated and confirmed that Lockheed Martin and was not willing to negotiate on the June 18 Proposal, and stated that Lockheed Martin was not interested in pursuing any new commercial agreements or a strategic transaction with the Company at that time, including because of Lockheed Martin's concerns about the Company's liquidity situation. Mr. French conveyed to Mr. LaChance that the Company should, however, contact Lockheed Martin if the Company ran into an immediate liquidity problem.

On July 17, 2024, the Special Committee met to discuss Mr. LaChance's conversation with Mr. French earlier that day. In particular, the Special Committee focused on the anticipated impacts resulting from the Company's short-term liquidity concerns and discussed available options.

On July 19, 2024, the Board held a special meeting. Mr. LaChance reported on Lockheed Martin's rejection of the June 18 Proposal. Adarsh Parekh, Chief Financial Officer of the Company, provided an update on the potential financing options available to the Company, including the Proposed Working Capital Facility, which would likely require existing lender consent or cooperation to complete, the Proposed Warrant Inducement Transaction, which would require existing lender consent under the current terms of such proposed transaction by virtue of their equity consent right under the convertible note and warrant purchase agreement, or use of the Company's ATM, which had been previously negotiated and was expected to be signed in the upcoming days. The Board endorsed management moving forward on multiple paths: exploring potential financing options that would not require a lender consent and engaging with Lockheed Martin on a potential sale of the Company.

On July 22, 2024, Jefferies met with Mr. Weiner from Lockheed Martin at the Farnborough air show and discussed the Company's willingness to explore a sale transaction that would provide a near-term liquidity solution.

40

**Table of Contents**

On July 23, 2024, the Company signed a sales agreement in connection with the ATM facility, which we refer to as the "Sales Agreement". However, sales under such Sales Agreement could not occur until the Company had released its quarterly financial results.

On July 24, 2024, Mr. Parekh contacted Mr. French to request Lockheed Martin's consent to enter into the Proposed Warrant Inducement Transaction. Mr. Parekh explained the urgency to obtain feedback from Lockheed Martin. Mr. Parekh also explained the terms of the Proposed Warrant Inducement Transaction, which Mr. Parekh believed would provide the Company with necessary near-term liquidity with a less significant dilutive impact, and on more favorable terms, than alternative transactions potentially available.

On July 25, 2024, Jefferies requested a follow-up call with Mr. French and Mr. Weiner to see if they intended to re-engage with the Company and what diligence they would require in order to transact. During this call, Jeffries communicated the dire cash position of the Company and said that the Company would be willing to transact at a below market price. Mr. French and Mr. Weiner informed Jefferies that Lockheed Martin would need additional detail on the Company's bid on the SDA Gamma program, a 13-week liquidity forecast and obligations under the Company's contract with Rivada before they could consider whether to reengage with the Company on a potential transaction to purchase the Company. Over the following days, the Company provided this information to Lockheed Martin by way of Jefferies.

On July 25, 2024, the Board held a special meeting to discuss the status of the Company's efforts to obtain financing. Representatives from King & Spalding and Province were present. Mr. Bell noted that the Company's options were to (i) obtain Lockheed Martin's consent to facilitate a financing to bridge the Company's liquidity constraints until an expected contract award and customer payment occurred or (ii) continue to explore a sale to Lockheed Martin. Management indicated that the Company had approximately three weeks before potentially exhausting its cash reserves. The Board discussed exploring a third parallel path, a Chapter 11 bankruptcy. The independent directors of the Board received legal advice from King & Spalding regarding the directors' fiduciary duties in the context of an insolvency.

The Board met again on August 1, 2024 to discuss the current status of management activities and the Company's ongoing liquidity concerns. Mr. Bell updated the Board on his efforts to have Lockheed Martin accelerate payments on active programs. Mr. Bell indicated his view that Lockheed Martin may have a continuing interest in acquiring the Company. He also provided an update on the Company's negotiations with the SDA to finalize an expected contract award in the next two weeks, which would result in an initial material payment to the Company in order to begin work. Dan Moses, a representative of the Special Committee's financial advisor, Province, gave his opinion that the Company should begin planning for a potential reorganization or liquidation given its very limited cash balance.

On August 1, 2024, Mr. Hobart and Mr. Bell contacted Mr. French to request Lockheed Martin's consent to the Proposed Warrant Inducement Transaction. On August 2, 2024, Mr. LaChance called Mr. French and Mr. French expressed that Lockheed Martin was not supportive of the Proposed Warrant Inducement Transaction because it would not provide sufficient liquidity to solve the Company's liquidity issues. Mr. French indicated in response to inquiries that in order for Lockheed Martin to consider exploring whether an acquisition of the Company would be possible, the price would have to be "in or around" $0.25 per share for the common stock. Mr. French indicated that in the case of any transaction there would need to be a bridge for the Company's liquidity until closing and that the bridge would require a consent of existing lenders.

On August 3, 2024, Mr. Valentine from Jefferies spoke with a representative of Company F, a party that had previously executed an NDA in the fall of 2023 but had withdrawn its intent to remain in the Company's strategic process, concerning a potential acquisition of the Company. Company F declined to conduct further diligence based on the Company's financial and liquidity profile, as well as an overall shift in Company F's strategy.

41

**Table of Contents**

On August 4, 2024, the Special Committee met with King & Spalding and Province to discuss Mr. LaChance's conversation with Mr. French on August 1, 2024 and August 2, 2024. A discussion then ensued about a potential transaction with Lockheed Martin and potential implications for the Company. In particular, the Special Committee discussed the value of engaging in discussions with Lockheed Martin in light of the Company's short-term liquidity and prospects. The Special Committee agreed that three paths should be pursued in parallel: (1) potential equity capital raising through the ATM (up to the maximum allowable without Lockheed Martin's consent); (2) exploration of a potential transaction with Lockheed Martin; and (3) engaging advisors to prepare the Company for a potential bankruptcy filing in case necessary. The Special Committee also determined that Mr. LaChance and Mr. Moses would request a call later that evening with Mr. French and a representative of Citi, in an effort to understand whether Lockheed Martin would be willing to consider a transaction with the Company. The Special Committee then discussed the strategy for ongoing engagement with Lockheed Martin if they were prepared to reengage. During that call, Lockheed Martin emphasized that they did not have a confirmed path to transact, that they were not presenting an offer to the Company, that if they were to explore a transaction, it would have to be for a price "in or around" $0.25 per share, and that the lending group would need to agree to put bridge financing in place.

On August 5, 2024, the Board held a special meeting. Mr. Bell discussed efforts to accelerate the SDA Gamma contract negotiations and award and the subsequent first milestone payment. He noted that Lockheed Martin was considering an offer of $0.25 per share for the common stock of the Company. He described Lockheed Martin's view that the existing lender group would need to provide an immediate infusion of capital to bridge the Company to a closing of an acquisition. He advised that the Company and Board should commence negotiations with Lockheed Martin while simultaneously attempting to explore financing options. He noted ongoing discussions with a number of parties but that the requirement to get consent from the Company's current debtholders made the ability to execute an alternative transaction uncertain. The Board expressed a preference for a financing resolution to the Company's liquidity challenges, but barring the availability of sufficient financing, that it preferred a transaction with Lockheed Martin to bankruptcy. Mr. Hobart described the Company's continuing cash needs. He noted even if the Company could raise capital now and bridge to an SDA Gamma award and payment, the Company would likely need to raise capital again later this year.

Also on August 5, 2024, in consideration of the Company's worsening liquidity situation, the Company re-engaged with Lender R. On August 6, 2024, the Company had a conference call to update Lender R's underwriting team, and the following day Lender R provided verbal terms for a $4 million unsecured term loan with a 26-week tenor, 145% annualized coupon, and $200,000 origination fee. Lender R noted that the economic terms of the proposal had changed because the Company's cash runway had decreased since its prior proposal. No further action was taken given the unfavorable terms and limited size of the term loan, the prospect of negotiations with Lockheed Martin for a potential transaction, and the requirement for the existing lenders to sign a subordination agreement pursuant to the Company's existing debt documents in order to access over $2,000,000 of this term loan.

During the week of August 5, 2024, Company management explored engaging bankruptcy counsel as part of the Board's direction to continue to explore various alternative paths.

On August 6, 2024, the Board held a special meeting. The Board received an update on financing and discussed the process of bankruptcy planning. Mr. Bell indicated the Company's current preferred path was to begin using the Company's ATM that week in order to bridge to expected program milestone payments in the near future.

That same day, Mr. Valentine from Jefferies spoke to Company G, a party that was involved in the Company's strategic process but had stated that it would not submit a bid for the Company, to gauge interest in an acquisition of the Company.

On August 7, 2024, Hogan Lovells and Akin met to discuss the merger agreement markup that Lockheed Martin had provided to the Company in March as part of the Lockheed Martin March Offer and whether revisions would need to be made to the draft agreement in the event the parties agreed to consider a transaction.

From August 7, 2024 to August 14, 2024, Lockheed Martin and the Company and their respective counsel negotiated the terms of a possible merger agreement that would be required in the event that Lockheed Martin decided to propose an acquisition of the Company, including a "go shop" provision given the potential compressed time period and potential offer price for the transaction. During this time, the Company also negotiated the terms of the bridge financing note purchase agreement that would be required under those circumstances with the bridge facility lenders comprised of Lockheed Martin, Beach Point and FP, each of whom were also existing lenders to the Company.

42

**Table of Contents**

On August 8, 2024, Company G responded to Jefferies that it was unlikely that it would pursue a transaction with the Company.

On August 8, 2024, the Board held a special meeting. At that meeting, Mr. Bell outlined the Company's options to bridge its liquidity deficit, including raising money through its ATM facility. Mr. Bell informed the Board that it would be unable to execute on its plan to raise money through its ATM facility in time to be able to bridge the deficit with proceeds from the ATM. Coupled with the inability of the Company to obtain consents from the existing lenders that would be needed to conduct alternative capital raises, Mr. Bell indicated that the Company was left with no viable options. He noted the possibility that certain small financing commitments might come through in the near term but was not optimistic. He further stated that Mr. French indicated that he would seek internal authorization for an acquisition of the Company at $0.25 per share and a $30 million bridge loan. He noted that if Lockheed Martin elected not to make a formal offer that he believed it would give the consents necessary under the Company's debt agreements to permit the Company to engage in a separate capital raise. As a consequence of these developments, Mr. Bell recommended terminating efforts to use the ATM for now and focus on reaching agreement on a sale of the Company to Lockheed Martin. After discussing, the Board agreed that Mr. Bell should engage with Lockheed Martin and work on documenting a transaction, subject to the Board obtaining a fairness opinion from an independent financial advisor and a more fulsome consideration of the offer and potential alternatives. Subsequently, the Company engaged Lincoln to provide an opinion regarding the fairness, from a financial point of view, of the consideration to be received by stockholders in the proposed transaction with Lockheed Martin, pursuant to an engagement letter that provided that no portion of Lincoln's fees were contingent on the conclusions set forth in the Opinion or the consummation of the transaction.

The Board also discussed suspending the Special Committee. The Board and its independent directors discussed the benefits of the independent directors and the full Board having direct oversight of continued discussions in the interest of time and efficiency, and the Board's desire to be fully aware of all matters going forward rather than using a special committee. The independent directors of the Board agreed to suspend the Special Committee for the time being rather than continuing to delegate responsibilities to a Special Committee.

On the same day, Peter Krauss, Chief Operating Officer of the Company, was authorized to contact senior management at Rivada to see if an immediate cash payment could be made as an advance against a large milestone payment that the Company expected to bill Rivada for in the coming weeks. This request was viewed as a last option to pursuing a sale to Lockheed Martin or a bankruptcy filing. Rivada did not advance any payments to the Company.

During the period of August 9 through August 12, 2024, representatives from the Company, Jefferies, Lincoln, Lockheed Martin and Citi conducted multiple due diligence sessions covering the aspects of the Company's financial and operational performance and expectations.

On August 12, 2024, the Company filed its Quarterly Report on Form 10-Q for the period ended June 30, 2024 with the SEC, reporting its second quarter earnings and disclosing $14.6 million of cash and cash equivalents as of July 31, 2024. The Company noted that if it were unable to raise capital it may be required to cease its operations, initiate insolvency proceedings or otherwise conduct a capital restructuring, divest its assets at unattractive prices or accept an offer to purchase the Company at a discount to its current market price of its outstanding shares.

On August 12, 2024, the Board held a special meeting. The purpose of the meeting was to consider a sale of the Company to Lockheed Martin. Representatives from Akin provided an overview of the directors' fiduciary duties. Representatives from Jefferies gave an overview of the strategic review process from inception to date, the Company's current liquidity, and the potential options available to the Company. The Board was generally in favor of pursuing a proposal from Lockheed Martin given the absence of viable alternatives.

On August 13, 2024, representatives from the Company, Jefferies and Akin met to discuss the final negotiation of terms of the bridge note purchase agreement and the merger agreement, including the operating covenants.

43

[Table of Contents](#)

On August 14, 2024, the Board held a special meeting to consider the potential transaction with Lockheed Martin. Also on August 14, 2024, Lockheed Martin management approved a plan to acquire the Company at a price of $0.25 per share and Mr. French communicated that approval to the Company.

At the special meeting, representatives of Lincoln presented Lincoln's financial analyses and rendered an oral opinion, confirmed by delivery of its written Opinion dated August 14, 2024 to the Board to the effect that, as of such date and based on and subject to various assumptions made, procedures followed, matters considered, and limitations and qualifications on the review undertaken in such opinion, the merger consideration to be received by the holders of common stock (other than holders of excluded shares) pursuant to the merger agreement was fair, from a financial point of view, to such holders. For a detailed discussion of the Opinion, see "—*Opinion of Lincoln International LLC*" below.

Representatives of Akin reviewed the terms of the proposed merger agreement and related bridge note purchase agreement, with a particular focus on the "go-shop" and "fiduciary out" provisions, efforts to secure regulatory approvals, financing, closing conditions, termination fees and termination rights, and remaining open points. The Board discussed the terms of the proposed merger agreement.

On the morning of August 15, 2024, the Board reconvened to discuss the final transaction agreements. Representatives of Akin provided their views on the resolution of the remaining open issues. Following consideration of the matters discussed during the course of the Board meeting, the Board unanimously (i) determined that the merger, on the terms and subject to the conditions set forth in the merger agreement, was fair to, and in the best interests of the Company and its stockholders, (ii) approved adopted and declared advisable the merger agreement and the execution, delivery and performance of the merger agreement and the transactions contemplated thereunder, including the merger, (iii) directed that the approval and adoption of the merger agreement (including the merger) be submitted to a vote at a meeting of the stockholders of the Company and (iv) recommended that the Company's stockholders approve the adoption of the merger agreement and approve the merger on the terms and subject to the conditions set forth in the merger agreement. The Board also approved the terms and conditions of the bridge note purchase agreement and related agreements, including the voting and support agreements and amendments to the Company's existing debt agreements.

On August 15, 2024, following approval of the Board, the Company and Lockheed Martin executed the merger agreement and the Company and the lenders executed the bridge note purchase agreement. That morning, prior to the commencement of trading on the NYSE, the Company and Lockheed Martin issued a joint press release announcing the transaction.

Following the execution of the merger agreement, Jefferies initiated the process of contacting 80 different potential bidders as part of the Company's exercise of its rights under the go-shop clause of the merger agreement. The Company did not receive any acquisition proposals prior to the commencement of the no-shop period start date.

After considering the proposed terms of the transaction, and taking into consideration the matters discussed during that meeting and prior meetings of the Board, including the factors described above and under the section entitled "— *Reasons for the Merger; Recommendation of the Board of Directors*," the Board unanimously (a) determined that the merger, on the terms and subject to the conditions set forth in the merger agreement, is fair to, and in the best interests of the Company and its stockholders; (b) approved, adopted and declared advisable the merger agreement and the execution, delivery and performance of the merger agreement and the transactions contemplated thereunder, including the merger; (c) directed that the approval and adoption of the merger agreement (including the merger) be submitted to a vote at a meeting of the stockholders of the Company; and (d) recommended that the Company's stockholders approve the adoption of the merger agreement and approve the merger on the terms and subject to the conditions set forth in the merger agreement.

**Reasons for the Merger; Recommendation of the Board of Directors**

At a meeting held on August 15, 2024, after careful consideration of the various factors discussed below, the Board, by a unanimous vote of all directors, (a) determined that the merger, on the terms and subject to the conditions set forth in the merger agreement, is fair to, and in the best interests of, the Company and its stockholders; (b) approved, adopted and declared advisable the merger agreement and the execution, delivery and performance of the merger

44